1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2               RICHMOND DIVISION

3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                    :
4   DONNA K. SOUTTER, et al.        :
                                    :
5               Plaintiffs          :
    v.                              :   Civil Action
6                                   :   No. 3:10CV00107
    EQUIFAX INFORMATION SERVICES, LLC :
7                                   :   July 15, 2010
                Defendant.          :
8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ :

9

10

11      COMPLETE TRANSCRIPT OF MOTION TO CHANGE VENUE
            BEFORE THE HONORABLE ROBERT E. PAYNE
12             UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   Leonard A. Bennett, Esq.
     Matthew J. Erausquin, Esq.
16   Consumer Litigation Associates
     12515 Warwick Blvd.
17   Suite 100
     Newport News, VA   23606
18
             Counsel for the plaintiff.
19
     Barry Goheen, Esq.
20   King & Spalding
     1180 Peachtree Street, NE
21   Atlanta, GA   30309-3521

22           Counsel for the defendant.

23

24           DIANE J. DAFFRON, RPR
           OFFICIAL COURT REPORTER
25         UNITED STATES DISTRICT COURT

 1           (The proceedings in this matter commenced at

 2     3:00 p.m.)

 3

 4           THE CLERK:  Civil Action No. 3:10CV00107,

 5     Donna K. Soutter, for herself and on behalf of all

 6     others similarly situated, et al. v. Equifax

 7     Information Services, LLC.

 8               Mr. Leonard A. Bennett and Mr. Matthew J.

 9     Erausquin represent the plaintiffs.  Mr. Barry Goheen

10     represents the defendant.

11               Are counsel ready to proceed?

12               MR. BENNETT:  The plaintiffs are, Your Honor.

13               MR. GOHEEN:  Yes, Your Honor.

14               THE COURT:  All right.  It's a motion to

15     transfer.

16               Mr. Goheen, you're up.  Just to clear the

17     decks, the motion relates to plaintiffs Soutter and

18     Webb.  Webb's claims, according to the reply brief,

19     have been settled, and you-all want to sever this

20     case, I guess that's Counts Two and Three of the

21     amended complaint, and transfer it to Pennsylvania.

22     Is that right?

23               MR. GOHEEN:  That's correct, Your Honor.  I

24     think Mr. Bennett and I explained this a couple months

25     ago.  That was one of three statewide class actions

1   that were filed.

2          The lead action, the original action, was

3   pending in the Eastern District of Pennsylvania before

4   Judge Brody in Philadelphia.  That case settled and

5   motions have been filed, including the one that

6   Mr. Bennett filed yesterday, as well as the one in the

7   other jurisdiction to transfer and get all three

8   before Judge Brody so she can entertain the parties'

9   petition for settlement on a classwide basis.

10          THE COURT:  And you're in agreement with that

11  motion?

12          MR. GOHEEN:  I am, Your Honor.  Equifax is.

13          THE COURT:  Is there an order tendered?

14          MR. BENNETT:  There is not, Judge, but I will

15  get an order immediately when I return to the office.

16          THE COURT:  Well, I think I will just recite

17  that with the agreement of counsel made in open court

18  today to the motion that it is hereby ordered that the

19  order is granted and the complaint by Webb -- is that

20  Counts Two and Three?

21          MR. BENNETT:  Yes, Your Honor.

22          THE COURT:  -- of the first amended class

23  complaint shall be severed and transferred to the

24  Eastern District of Pennsylvania.  Do you have the

25  style of the case in the motion?

 1          MR. BENNETT:  I do, Judge.

 2          THE COURT:  To that case.  And the clerk will

 3   take care of it.

 4          Do you have an order?

 5          MR. GOHEEN:  I've just got the motion.  It

 6   was filed yesterday if the Court needs the style of

 7   the case.

 8          THE COURT:  No.  We'll have it.  If it's been

 9   filed, it's in the records and we can get to it.

10          MR. BENNETT:  Yes, Your Honor.

11          MR. GOHEEN:  Yes, Your Honor.

12          THE COURT:  Now we're dealing with the motion

13   to transfer Ms. Soutter's case.

14          MR. BENNETT:  Your Honor, may I interrupt?

15          Should I file an order or did Your Honor just

16   explain the clerk will file an order?

17          THE COURT:  We'll prepare an order.

18          MR. BENNETT:  Thank you, Judge.

19          MR. GOHEEN:  Thank you, Your Honor.

20          May it please the Court, Barry Goheen

21   representing Equifax Information Services.  And just

22   for the record, co-counsel, Mr. Montgomery, was

23   excused from today's proceedings, as the Court might

24   recall, but I did want to make that clear for the

25   record.

1          THE COURT:  Yes.

2          MR. GOHEEN:  I trust the Court has read our

3    papers, so I don't want to regurgitate what we have

4    put into our papers, but I do want to make a couple

5    points for Your Honor's benefit that we believe merit

6    particular emphasis.

7          First, I know this is not necessarily a

8    fact-finding type of exercise, but we do believe it's

9    significant that it's now undisputed that neither

10   party resides in this district or division.  The

11   affidavit of Ms. Soutter says that she resides in

12   Culpepper, which is in the Western District.  As the

13   Court is aware, Equifax is headquartered in Georgia.

14         We respectfully suggest that the policies

15   underlying Section 1404(a) are not fair and we would

16   suggest are impaired if we simply allow plaintiffs to

17   file wherever they want to file, and then fall back on

18   the old saw that, Well, the plaintiffs' choice of

19   forum is paramount and should not be disturbed.  We

20   don't believe that to be the law.  Where, as here, the

21   plaintiff chooses a forum that is not her home forum.

22         THE COURT:  That is pretty well settled, I

23   think.  The deference of the plaintiff's choice of

24   forum is not due the deference.  Let me start again.

25   The plaintiff's choice of forum is not due the

1  deference it ordinarily is due when the choice of

2  forum is not the plaintiff's home forum.

3          MR. GOHEEN:  Yes, Your Honor.  We believe

4  that to be --

5          THE COURT:  I think that's settled.  At least

6  here it is.

7          On the other hand, it's not that there is no

8  connection here at all, is there?  The judgment issues

9  have revolved around judgments obtained in and issued

10  by the Circuit Court of the City of Richmond, don't

11  they?

12          MR. GOHEEN:  Yes, Your Honor.  The judgment

13  was obtained, according to Ms. Soutter's affidavit, it

14  looks like based on Equifax's investigation to date

15  that appears to be correct as well.  She had a

16  judgment against her in the General District Court

17  here in Richmond.  It looks like when we look at --

18          THE COURT:  How did they get jurisdiction

19  over her here in that case?  Did she live here?

20          MR. GOHEEN:  I'm not familiar with that, Your

21  Honor.  Perhaps Mr. Bennett does.  I'm not familiar

22  with how that jurisdiction and how that judgment came

23  to be entered against Ms. Soutter.  I'm sure we'll

24  find that out in due course in discovery in the case,

25  though.

1              Actually, procedurally, it sort of tracks

2    another case Mr. Bennett filed earlier this year in

3    this court.   It was a statewide class action in

4    Quigley.   In that case, the named plaintiff lived in

5    Alexandria.   We moved to transfer that, and there

6    actually was a consent order issued to Your Honor, who

7    then assigned it, and that case went over.   So we're a

8    little bit surprised that there's even pushback on

9    this motion.

10             But I will say something -- Mr. Bennett said

11   something when we had our status conference in May.

12   He said something -- I'm paraphrasing now.   It was

13   something like, To its credit, Equifax did not move to

14   transfer to the Northern District of Georgia.   And

15   that's true.   We didn't make that.   Quite candidly, we

16   believe we could have, and it would have been a well

17   taken motion under the theory that when the plaintiff

18   decides to sue a division in a district where neither

19   the plaintiff nor Equifax resides, then the plaintiff

20   essentially has chosen a forum that is inconvenient

21   for both parties.

22             We think the law is clear that the case

23   should be venued in a forum that's at least convenient

24   for one of the parties, but we didn't try to get it

25   moved to Georgia even though we had a case last year

1    in Philadelphia where a nonresident plaintiff sued

2    Equifax.  We did make a motion to transfer that to the

3    Northern District of Georgia.  It was granted.  So we

4    think that would have been a well-grounded motion.

5    Especially, with regard to one of the key third party

6    witnesses.  I think we talked about this in May as

7    well, which was ChoicePoint, which is now LexisNexis,

8    and one of their key witnesses is in Atlanta as well.

9         We're not seeking that.  We're only seeking

10   to have the case transferred to the plaintiff's home

11   venue.  In fact, there was an interesting case.  This

12   was subsequent to the briefing that came out of the

13   Eastern District of Pennsylvania.  It was a class

14   action under the FCRA.  It didn't involve Equifax or

15   as far as I know any of the parties or counsel in this

16   case, but the defendant company was headquartered in

17   Oklahoma and sought transfer to Oklahoma.  Even though

18   in that case the plaintiff lived in the district, in

19   Philadelphia, the Court granted the motion and

20   transferred the case to Oklahoma anyway and held that

21   in cases brought under the FCRA, the primary situs of

22   activity, such as relevant documents and witnesses,

23   etc., typically is the forum where the defendant is

24   headquartered.

25         So we believe that those principles would not

1   only support the transfer to Equifax, we think it

2   certainly supports transfer to at least the

3   plaintiff's home district.  We believe that Equifax

4   and the plaintiff, and jurors, we don't believe the

5   Gulf Oil v. Gilbert case that we cited in our papers

6   where the Supreme Court said jurors should not be

7   burdened with jury duty to adjudicate a case without

8   significant connection to the forum we believe

9   supports the notion that this case should at least be

10   venued where at least one of the named parties

11   resides.

12       We believe, in fairness, not seeking to

13   transfer to the Northern District of Georgia, that

14   that place should be the Western District of Virginia

15   where this named plaintiff resides.  Therefore, we ask

16   that the Court grant our motion and transfer the case

17   to the United States District Court for the Western

18   District of Virginia.  Thank you, Your Honor.

19       THE COURT:  Mr. Bennett.

20       MR. BENNETT:  May it please the Court.  In

21   answer to your question that you posed as to how to

22   obtain jurisdiction.  The judgment was vacated because

23   the Virginia Credit Union located here in Richmond

24   sued my client didn't have jurisdiction over my

25   client.  As I understand, it was then vacated.

1  Although that was, of course, never -- termination of

2  judgment continued within her credit report.

3          The issue that we are facing, originally the

4  brief was transferred to Roanoke.  Upon the settlement

5  of the Webb case, and I was as much a bystander as a

6  participant in the settlement in which Mr. Goheen was

7  lead for Equifax, Roanoke became an odd choice given

8  that there was no connection at all to Roanoke with

9  Webb gone, and thus the reply brief, which is contrary

10  to the motion.  I mean, technically, there wasn't even

11  a motion pending to transfer to Culpepper, but the

12  reply brief says --

13          THE COURT:  You mean Charlottesville.

14          MR. BENNETT:  Charlottesville.  I'm sorry.

15          THE COURT:  How many divisions are there in

16  the Western District?

17          MR. BENNETT:  Five, I believe, Your Honor.

18          THE COURT:  One is Harrisonburg, right?

19          MR. BENNETT:  Harrisonburg.

20          THE COURT:  Isn't Culpepper in the

21  Harrisonburg Division?

22          MR. BENNETT:  I believe it's in

23  Charlottesville when I did the tracking.

24          THE COURT:  It is?

25          MR. BENNETT:  It is, Your Honor, but I

1    wouldn't swear by it.   But I understand that.   And you

2    have Roanoke, Danville.   Actually, I think there's

3    six.   There's Abingdon.   But, frankly, for my client,

4    Richmond is more convenient for her a number of

5    reasons.   She's familiar with it and she's so

6    testified.

7           But what the defendant has failed to offer in

8    its brief and is even more certain -- well, clearly it

9    has failed to offer now is any reason why the

10   defendant would benefit from a move to

11   Charlottesville.

12          In this instance, it's apparent that their

13   move is not to anywhere.   It's away from the Eastern

14   District of Virginia.   It is away from the Richmond

15   Division.   There is not even a suggestion that any of

16   the witnesses Equifax might need, third party

17   witnesses or otherwise, are in the Western District or

18   outside of this division within our state.

19          The only witnesses that Equifax identified we

20   attached in our supplemental filing are from out of

21   state.   This court dealt with facts that were less

22   favorable to the party I was representing, the

23   plaintiff, in Mullins than this case.   In Mullins,

24   Your Honor considered and properly adopted what is a

25   uniform rule.   That the witness convenience standard

1  or threshold does not look to the convenience of the

2  parties as much as it looks to the convenience of the

3  third party witnesses.  And all of the third party

4  witnesses, Judge, as well as rationally we would

5  expect most of the putative class would have a

6  connection to the Richmond Division.

7         The class is defined, and we're not there

8  yet, but the putative class definition is individuals

9  that have a City of Richmond General District Court

10 judgment.  It's my understanding, and we're only early

11 in discovery, that the defendant will proffer

12 something unique.  A unique defect in the City of

13 Richmond General District Court information-gathering

14 process.  But regardless, the data gathering would

15 have come from a nexus of information and witnesses

16 surrounding the courthouse, blocks away from this

17 courthouse.

18        THE COURT:  What do you know about the

19 residents of class who were sued and against whom

20 judgments were obtained in the City of Richmond in the

21 General District Court?

22        MR. BENNETT:  We have not yet completed

23 our -- we have served discovery, and we have it

24 outstanding, both third party and individual -- I

25 mean, in defense discovery.

1          THE COURT:  How many judgments are there?

2          MR. BENNETT:  There are, I would say,

3    comfortably 100,000 plus.

4          THE COURT:  100,000?

5          MR. BENNETT:  Yes, sir.  Now, if the question

6    is how many class members?  We don't know that.  The

7    defendant has offered to stipulate generally to the --

8    well, we are hopeful that we will be able to obtain a

9    stipulation as to a number.  We don't -- we have not

10   been proffered a number even privately or publicly

11   yet.

12         THE COURT:  When someone is sued in the

13   General District Court in the City of Richmond, does

14   it have to be a venue provision that requires the City

15   of Richmond to be the proper venue?

16         MR. BENNETT:  For any attorney to initiate a

17   collection action, it would have to be in the home

18   venue of the individual.

19         THE COURT:  Under the Virginia law?

20         MR. BENNETT:  Under federal law under the

21   Fair Debt Collection Practices Act.

22         THE COURT:  So, presumptively, then all of

23   the members of the class, however numerous they would

24   be, or at least most of them would be residents of

25   Richmond, Virginia?

1            MR. BENNETT:  Yes, sir.

2            THE COURT:  All right.  What did you say

3    about a defect in the General District Court's

4    procedures?  Is that what you're saying?  Is that a

5    defense in the case?

6            MR. BENNETT:  No.  I think the question is,

7    is this a problem that exists in the County of

8    Chesterfield General District Court?  And it may.  But

9    our discovery and our information to date is limited

10   and has only been with respect to the City of

11   Richmond.

12           THE COURT:  You just confused me by reference

13   to the County of Chesterfield.  You made some

14   statement that the defendants were taking the position

15   that they had as a defense that there was a defect in

16   the systems of the General District Court of the City

17   of Richmond.  At least that's what I thought you were

18   saying.  Am I wrong about that?

19           MR. BENNETT:  It is what I was saying, and if

20   I could apologize to the defendant.  These were

21   private conversations that the defendant has not taken

22   in a formal discovery pleading.  And so I do not have

23   any on-the-record information as to --

24           THE COURT:  Well, then I won't consider that.

25           MR. BENNETT:  Yes, Your Honor.

1        THE COURT:  Unless Mr. Goheen wants to agree

2   to it or raise it himself.  And I'll let him worry

3   about that in his time, and I'm not going to try to

4   force him to do it.  I just won't consider that.

5        MR. BENNETT:  Thank you, Judge.

6        I would also, Judge, suggest that the third

7   parties at issue in this case are not -- I mean, most

8   important third party, the individual identified in

9   our pleadings, is the Virginia Supreme Court's point

10  person on -- and I'm trying to get his name because

11  it's a hard one for me.  Ken Mittendorf,

12  M-i-t-t-e-n-d-o-r-f, the assistant director of the

13  Department of Judicial Information Technology for the

14  Executive Secretary of the Virginia Supreme Court.

15  This is the individual who is, and I've spoken with

16  and we've provided this information in my declaration,

17  who is almost solely responsible for the electronic

18  presentation of data in the Virginia case information

19  system.  He's the individual that the vendors would

20  interact with.  He's the individual that designs the

21  access systems and in terms of providing information

22  as to what electronic avenues were used.

23        THE COURT:  He is in the Eastern District of

24  Virginia?

25        MR. BENNETT:  He is.  In fact, his office is

1   in the office of the Virginia Supreme Court Executive

2   Secretary, which is three blocks or less from here, a

3   block and a half.  So you also have, to the extent it

4   was an individual case, the facts about the judgment

5   itself would come from the lawyer who represented the

6   Virginia Credit Union and the Virginia Credit Union.

7   I did not represent Ms. Soutter at the General

8   District Court level, but those witnesses or the

9   entity Virginia Credit Union is here in Richmond.  Its

10  attorney is here in Richmond.

11          THE COURT:  Are you saying that there are

12  100,000 of these erroneously issued judgments?

13          MR. BENNETT:  No, sir.  No.  I'm sorry.

14          THE COURT:  You're saying there are 100,000

15  judgments have been issued in the period of time at

16  issue?

17          MR. BENNETT:  I am, Judge.

18          THE COURT:  How many of them do you believe

19  are erroneously issued judgments?

20          MR. BENNETT:  I believe that the majority of

21  those that have been terminated by satisfaction,

22  appeal or vacated are going to be erroneous.

23          THE COURT:  How many of that, roughly?

24          MR. BENNETT:  I don't know yet, Judge.

25          THE COURT:  You don't even know an order of

1   magnitude?

2           MR. BENNETT:  I mean, I believe it's

3   certainly going to be thousands, Judge.

4           THE COURT:  Don't guess.  If you don't know,

5   that's okay.

6           MR. BENNETT:  Well, this is what I do know.

7   I do know that the courthouse provides a sheet each

8   month, provided when Equifax's vendor would use it, a

9   sheet each month with judgments that have been

10  terminated.  And those sheets would be 8 1/2 by 11

11  with the City of Richmond's -- or something like 30 or

12  40 pages a month of judgments.  But the reason why

13  it's complicated is that there are two elements

14  required.  That, that is they have to have this

15  judgment that has been terminated, and there has to be

16  a consumer report issued in the time frame that

17  Equifax failed to pick that up.

18          The underlying or core difficulty is that

19  Equifax and its vendor devised a system to by

20  automated means pick up all the judgments, all the bad

21  stuff.

22          THE COURT:  But they didn't pick up the

23  termination?

24          MR. BENNETT:  Was no automated means to do

25  that.

1            THE COURT:  Oh, goodness gracious.  Okay.

2            MR. BENNETT:  So needless to say, as

3     pleasant, I'm sure, as Charlottesville is, there's no

4     connection to it.  There's no -- unless there's an odd

5     consumer who was sued in Richmond either improperly or

6     moved, we would not expect there to be any nexus with

7     Charlottesville.  And to the extent that the defendant

8     would be concerned about our client's convenience, our

9     client has elected Richmond.  Our client has stated in

10    her pleadings her preference for Richmond.

11           The defendant doesn't get to argue for the

12    convenience of the plaintiff.  This court has

13    considered this, as numerous courts, but this court

14    most recently to my knowledge in the Mullins decision,

15    the question is the third parties.

16           In this instance, you have a nexus of class

17    members that we expect to be in this district and

18    division.  You have all of the Virginia evidence with

19    the exception of my client, who would provide modest

20    testimony.  There was a decision that recently was

21    rendered in the Fourth Circuit, and the name escapes

22    me, July 1, under the Fair Credit Reporting Act

23    considering -- I do know that it was out of the

24    District of Maryland.

25           MR. GOHEEN:  Stillmock.

1           MR. BENNETT:  Can we spell that?

2           MR. GOHEEN:  S-t-i-l-l-m-o-c-k.

3           MR. BENNETT:  Thank you.  And Stillmock --

4      THE COURT:  If you had gotten that off Lexis,

5 you would have gotten charged for it.  You're going to

6 have to pay his billable hours on it to get that

7 citation from your opponent.

8           MR. GOHEEN:  Count on it, Your Honor.

9           MR. BENNETT:  That's why I couldn't get a job

10 with a quality firm.  I couldn't remember the case

11 names.  Only the general descriptions.  International

12 Shoe is the only one I can remember and I don't hardly

13 remember what that says.

14      THE COURT:  You probably think that's a case

15 involving the --

16           MR. BENNETT:  Product liability, I assume.

17      THE COURT:  The scale fell off of the shelf

18 in the New York subway.  Is that what you think it is?

19           MR. BENNETT:  I think or something similar.

20      THE COURT:  Or maybe it's a shoe that fell

21 off a shelf.

22           MR. BENNETT:  I was thinking a defective shoe

23 from my consumer mentality.  But in the decision, the

24 question, and actually was considering whether you

25 could certify a class action under a -- there's a

1   provision of the Fair Credit Reporting Act that we

2   never brought, but -- and we think hopefully it will

3   be gone because it gives the FCRA a bad name, but

4   there was a change in the last amendment to the Fair

5   Credit Reporting Act, the second to last, that

6   requires the redacting of credit card receipts of the

7   account number and the expiration date.

8           So the cases Your Honor considered in the

9   certification battle in the <u>Williams v. LexisNexis</u>

10  matter, the annihilating damages cases and whether you

11  would knock someone out, were all cases -- the ones

12  favorable to us were all cases that were coming out of

13  courts that were faced with maybe a Chinese restaurant

14  that was being sued for a thousand bucks for every

15  credit card receipt that came out in two years for

16  failing to update its machine.  And some courts were

17  considering whether to terminate those cases by

18  different means under Rule 23.

19          The Seventh Circuit ruled no.  This court

20  refused in the majority opinion to accept that as

21  well.  But the important thing is, Well, the question

22  in there was what type of evidence would you use to

23  consider statutory damages and whether a class was

24  ruled 23(f) reversal or -- reversal or denial of

25  certification.

1    And the Court has significant language that

2    the evidence that's used to determine the culpability

3    of the defendant is not plaintiff specific.  That is

4    that it's not focused on -- for us to prove that there

5    was a willful violation of the statute, the evidence

6    of Donna Soutter is not the critical evidence.

7    The evidence of the defendant's conduct would

8    be obtained from other than simply the plaintiff.  And

9    so under the applicability of this case, Judge, to the

10    extent that Donna Soutter pursues her willfulness

11    claim, which she is, even that evidence would not come

12    from her at all.  I don't know that -- not only does

13    Donna Soutter have the right to say, I elect Virginia.

14    I've made the determination and don't need Equifax's

15    paternalistic protection, that Richmond is my choice

16    of venue.  It is more convenient to me.

17    Equifax has not disclosed any witnesses

18    outside of the Richmond area that are in Virginia.  It

19    does not seek, and we would oppose by other arguments,

20    to transfer it outside of the state.  And I think that

21    the Court has ruled in previous matters the way that

22    we ask you to rule today, in the Mullins case

23    particularly.  The convenience of these witnesses, the

24    nexus of the facts, and the law and discovery that

25    will occur in this courthouse and in this city, I

1   think, overwhelm any argument defendant would have if

2   any were made.

3            THE COURT:  Mr. Goheen.

4            MR. GOHEEN:  Thank you, Your Honor.  Just two

5   very quick points.  First, Mr. Bennett said something.

6   We're not trying to flee the court.  Equifax has cases

7   in this court.  Ten or twelve a year.  We filed two

8   motions to transfer since our firm has been

9   representing Equifax, which is 3 1/2 years now.  Since

10  the beginning of '07.  One I just mentioned, Quigley,

11  which was by consent transferred to Alexandria.  This

12  is the second one.  Two out of however many cases that

13  we've had.  So I'd respectfully --

14           THE COURT:  You're not in headlong flight.

15           MR. GOHEEN:  I'm not in headlong flight.  No,

16  absolutely not.  Here, just as in Quigley, we don't

17  have a plaintiff or a defendant that is a resident of

18  this district or division.  That's the basis for the

19  motion.  The other cases that have been filed, to our

20  knowledge they live in the district.  There's not a

21  big basis for a transfer motion.

22           I respectfully reject that particular

23  connotation as to why we filed this.  That's just not

24  right.  And the final thing I would say is -- what Mr.

25  Bennett said in response to Your Honor's question

1  about was there jurisdiction over Ms. Soutter.  If

2  that's correct and that was the reason for the

3  erroneous entry of the judgment, if I understood that

4  correctly, well, that seems to be the height of irony.

5  There was no jurisdiction over her in Richmond, so she

6  got the judgment.  So now let's go file suit in

7  Richmond embracing the jurisdiction.

8          THE COURT:  They are two different courts,

9  though.

10          MR. GOHEEN:  I understand, Your Honor.

11  You're right.  They are different courts, but I do

12  believe that there's an irony there that suddenly

13  Richmond is a wonderful venue when two or three years

14  ago, whatever this occurred, the General District

15  Court did not have jurisdiction over her.  So now

16  she's embracing Richmond.  I do believe there's an

17  irony there.

18          Finally, all the things that Mr. Bennett just

19  said, as I said, that would counsel in favor of going

20  to Atlanta.  We're not making that motion, but we

21  certainly think a middle ground, let's go where the

22  plaintiff is, there is an actual damages claim in the

23  case.  Presumably, friends and family witnesses will

24  be relevant witnesses.  We haven't gotten into

25  discovery yet to confirm that.  But Your Honor does

1   enough FCRA cases to know there's going to be

2   witnesses there in addition to Ms. Soutter.  So that

3   is where this case should be.  Thank you, Your Honor.

4           THE COURT:  All right.  The matter is before

5   the Court on a motion of Equifax Information Services,

6   LLC to transfer the venue to the Western District of

7   Virginia.

8           Originally, the motion sought transfer to

9   Roanoke, Virginia, because there was another plaintiff

10  by the name of Webb who was in Roanoke.  The Webb

11  matter has been settled and he will be out of the case

12  when the order is entered later in the day or

13  tomorrow.  And his case is being transferred to the

14  Eastern District of Pennsylvania.

15          Ms. Soutter filed a class action complaint on

16  behalf of herself and others similarly situated.  The

17  allegation is that Equifax violated the Fair Credit

18  Reporting Act which provides, *inter alia*, that

19  whenever a consumer reporting agency prepares a

20  consumer report, it shall follow reasonable procedures

21  to assure maximum possible accuracy of the information

22  concerning the individual about whom the report

23  relates.

24          She is bringing a class on behalf of herself

25  purportedly and all people who have suffered a

1  negative credit impact due to erroneously reported

2  judgments in the General District Court for the City

3  of Richmond.

4      The motion to transfer is based on the fact

5  that Soutter does not live or work in the Eastern

6  District, but instead lives in Culpepper, which is in

7  the Western District. And that Equifax is in Atlanta,

8  Georgia, and, therefore, neither party is in the

9  Eastern District of Virginia.

10     The motion is brought under 28 U.S.C. Section

11  1404(a) under which for the convenience of parties and

12  witnesses in the interest of justice the district

13  court may transfer a civil action to any other

14  district or division where it might have been brought.

15     The Court is obligated to inquire into

16  whether the claims might have been brought in the

17  transferee form and whether the interest of justice

18  and convenience of the parties and witnesses warrant

19  transfer to that forum.

20     The plaintiff's choice of forum is generally

21  entitled to substantial deference. However, that

22  deference or the amount of deference that is due to

23  the plaintiff's choice is considerably less as

24  numerous decisions of this court have indicated when

25  the choice is of a forum which is not the plaintiff's

1   home forum, and most particularly is deference at its

2   low point when the cause of action or claim has

3   nothing really to do with the forum of selection.

4           It's clear that this case could have been

5   brought in the Western District of Virginia in either

6   Roanoke or Charlottesville.  I believe what happened

7   is that Soutter filed the case.  Webb joined it in an

8   amendment.  Webb is out of it, so I doubt that Roanoke

9   would have been a forum where the case could have been

10  brought originally.  Charlottesville is a forum where

11  the case could have been brought originally.

12          Once you have that inquiry satisfied, you

13  look at several factors:

14          (1) Ease of access to sources of proof;

15          (2) the convenience of the parties and the

16  witnesses;

17          (3) the cost of obtaining the attendance of

18  witnesses;

19          (4) the availability of compulsory process;

20          (5) the interest in having local

21  controversies decided at home;

22          (6) in diversity cases, the Court's

23  familiarity with the applicable law; and

24          (7) the interest of justice.

25          Factor 6 is not implicated in the comparison

1   because this action arises under federal law.

2          Principal among the precepts to consider are

3   the plaintiff's choice of forum, witness convenience,

4   access to sources of proof, party convenience, and the

5   interest of justice.

6          The first three of the first enumerated

7   factors concern convenience.  The latter four concern

8   the administration of justice.

9          Courts often give less weight to the

10  plaintiff's choice of forum in class action cases,

11  particularly when geographically dispersed plaintiffs

12  are joined together in a class action.  No one

13  contests the obvious fact that this could have been

14  filed in the Western District of Virginia, in

15  particular Charlottesville.

16         The weight of the convenience factors seems

17  clearly to fall on the side of allowing the action to

18  proceed in the Eastern District of Virginia.  The

19  proof, the parties, and the witnesses are in four

20  locations:  Culpepper, which is where the plaintiff

21  keeps her records, Richmond, where the judgment in

22  question was entered and where some of the other

23  witnesses who will be instrumental in ascertaining the

24  substance of the case are situate, Virginia Beach,

25  where several witnesses reside, and Atlanta where

1   Equifax is situate.

2          Each of those four locations favors Richmond

3   over Charlottesville in the transfer analysis that the

4   Court made in Byerson, which is the case that forms

5   the basis for the six articulated factors.

6          Administration of justice is the fourth

7   factor or is an important factor.  The fourth Byerson

8   factor, availability of compulsory process, weighs

9   against transfer.  The plaintiff identifies a number

10  of witnesses in the Eastern District both in Richmond

11  and Virginia Beach on whom she intends to rely.

12  Equifax dismisses the expected testimony of those

13  witnesses as cumulative or not likely to be disputed

14  or not likely to be significant, but Equifax has

15  identified no witnesses other than the plaintiff who

16  hailed from the Western District.  Thus, in any event,

17  the availability of compulsory process counsels in

18  favor of the Eastern District.

19         The fifth and seventh Byerson factors allow

20  Equifax to present some colorable arguments in favor

21  of Charlottesville, but transferring to

22  Charlottesville would cut the distance between the

23  plaintiff's home and the court by a relatively small

24  measure.  These factors are, at best, slightly

25  favorable to Equifax.

1    In total, the <u>Byerson</u> factors weigh even more

2  decisively against transfer in context of the case

3  that is brought in this case and this complaint and

4  the proposed class, which likely will consist mostly

5  of people who live in Richmond or in the venue area

6  for the General District Court for the City of

7  Richmond where the judgments at issue were entered.

8    That's going to be particularly significant

9  in the class action when it comes to securing class

10  participation and other information.  The witnesses

11  identified by the plaintiff respecting the City of

12  Richmond's system and the administration of the system

13  and the Virginia court system for electronic

14  information are located in Richmond.

15    On the whole, it seems to me that this case

16  is properly venued here, and it is appropriate to keep

17  it here because all of the factors under the statute

18  counsel in favor of keeping it here and none of them

19  really push the calculus in any other direction.

20    It will be much better for the parties and

21  the witnesses to be here.  The ease of access to

22  certain sources of proof, particularly those relating

23  to the entry of judgments, will be here.  The cost of

24  obtaining the attendance of witnesses likely will be

25  less.  The availability of compulsory process counsels

1    in favor of this forum, and the interest of justice

2    generally counsels in favor of this forum.

3          So the motion to transfer the Soutter case to

4    the Western District of Virginia will be denied, and

5    that's particularly appropriate where Charlottesville

6    has no nexus with the case except that it is somewhat

7    proximate.  Culpepper is in that division and that

8    district and the plaintiff lives in Culpepper, but

9    there's not a great deal of difference between the

10   distance from Culpepper to Charlottesville and

11   Culpepper to Richmond as the record shows.

12         Is there anything else that needs to be done?

13         MR. BENNETT:  Your Honor, may I approach?

14         Nothing else with respect to this motion.

15   There is one administrative issue I at least want to

16   raise related to discovery.  We have -- there is a

17   motion that the defendant has filed to enlarge its

18   response time to discovery after meeting and

19   conferring with us, and we consented to that, and I

20   anticipate there being an exchange of orders for

21   signature shortly, and Your Honor will receive that.

22   But that, of course, would not impact the Court.

23         The defendant has also represented to us it

24   is diligently attempting to obtain discovery

25   information and provide dates for its witnesses.  And

1   our position with respect to requests to accommodate

2   those difficulties that the defendant may be having

3   has been, given that our discovery cutoff is in the

4   middle of October, if the defendant will move the

5   Court on defendant's motion to which we would consent.

6           THE COURT:  I am lost.  What are you talking

7   about?

8           MR. BENNETT:  The parties, I think, or the

9   defendant has leave, but both parties in spirit would

10  be asking the Court to move the discovery deadline,

11  which is currently set mid-October.

12          THE COURT:  Until when?

13          MR. BENNETT:  Sixty days.

14          MR. GOHEEN:  What we have, Your Honor, is, as

15  Mr. Bennett just said, we are diligently gathering,

16  attempting to gather, information.  We are also trying

17  to navigate availability.

18          THE COURT:  Availability of whom?

19          MR. GOHEEN:  Witnesses for deposition.

20          THE COURT:  From where?  Whose witnesses?

21          MR. GOHEEN:  Equifax's witnesses.

22          THE COURT:  They are going to be available

23  real quickly.  July to August is one month.  August to

24  September is another month.  September to October is

25  three months.  In that 90-day period, they are going

1   to be available.

2          MR. GOHEEN:  I'm not saying they're not, Your

3   Honor.

4          THE COURT:  So let's get them on the front

5   end, not the back end.

6          MR. GOHEEN:  That's what we're attempting to

7   do, Your Honor.

8          THE COURT:  Why do we need to move the

9   discovery cutoff?

10          MR. GOHEEN:  Well, as I said, I think we've

11   got availability, but we've got scheduling issues and

12   other sorts of things with the documents that I

13   anticipate we're going to be producing, it's going to

14   be difficult.  They have a cutoff, I don't know

15   exactly the date, but I think it's something like

16   August 16 maybe for their expert disclosure and so

17   forth and so on.

18          So we're trying to get all these depositions

19   taken in the next four weeks.  And that's a tall task

20   with all due respect.  And we're trying to do it and I

21   think we can.

22          THE COURT:  How many depositions are you

23   talking about?

24          MR. BENNETT:  There's four right now.

25          THE COURT:  Four depositions in four weeks

1   and you think that's a tall task?  I can guarantee you

2   one thing.  Unless the method of taking depositions

3   has changed a lot since I did it, you can do four in

4   four weeks.

5           MR. BENNETT:  Yes, sir.  The challenge that I

6   expect is that the initial witnesses that the

7   defendant -- well, let me instead of targeting

8   Equifax.  In these Fair Credit Reporting Act cases, it

9   is not uncommon that the witnesses that the defendant

10  identifies, the employees the defendant proffers, are

11  not the nuts and bolts witnesses.  They are the party

12  line witnesses.  One of the witnesses that is

13  identified, Alicia Fluellen, is the witness that

14  testifies --

15          THE COURT:  Even I know what she testifies

16  to.  She's testified at every case we've had.

17          MR. BENNETT:  That's right.  And we have not

18  even noticed her deposition, for example.  But the

19  point being, the other witnesses, of the five that

20  have been identified, we have noticed four of those

21  witnesses.  They are now -- we have agreed dates.  As

22  of this early afternoon we came to an agreement of

23  August 11 and 12, that our expert witness disclosure

24  date is the 16th.  The defendant and the plaintiff

25  can work through that.

1      THE COURT:  What is the expert about?

2      MR. BENNETT:  Apparently, currently the only

3  issue, not the only, but the defendant's defense will

4  be how difficult it is to ascertain the judgment or

5  termination of judgment information.  So we will have

6  a witness that says it isn't difficult.  But that's --

7      THE COURT:  The statute has made that

8  decision.  You do it.  If you're going to be in this

9  business, do you it.  And you figure out how to do it.

10  And don't give me any sob story about how hard it is

11  to do it.  That's the bottom line.  Congress made that

12  decision, didn't it?

13      MR. BENNETT:  Yes, sir.

14      THE COURT:  We're not free to revisit that.

15  They have got to do it.  It's that simple.

16      How many billions of dollars does Equifax

17  make in doing this, Mr. Goheen?  They make a lot of

18  money, don't they?

19      MR. GOHEEN:  I don't know if it's in the

20  billions, but it's a significant sum.

21      THE COURT:  Well, it's at least in the

22  hundreds of millions if I remember from previous

23  cases.

24      MR. GOHEEN:  That's likely fair, Your Honor.

25      THE COURT:  Don't run that one up the flag

1   pole too far because I believe that by the dawn's

2   early light it may have a lot of holes in the flag

3   after a little bit of shooting.  Come on.  That's not

4   much of a defense.  Is that all this is about?

5          I don't understand the problem here.  You

6   have four witnesses.  I don't know why you need to

7   move -- if you need to move anything, move the expert

8   disclosures.

9          MR. BENNETT:  Yes, sir.  I think that's what

10  we'll likely do.  We will continue to -- but I think

11  this conversation is me letting the Court know so that

12  we don't appear in front of you in September for the

13  first time when the defendant says we've had a bunch

14  of people gathering the records and the documents and

15  we now have to get this other task performed.  I want

16  to give --

17         THE COURT:  What you're saying is they don't

18  designate the right witnesses to testify.  And that's

19  not acceptable.  You designate the right people.

20         MR. GOHEEN:  We are designating the right

21  people.

22         THE COURT:  They can work in the evenings.

23  They can work on the weekends.  They can get these

24  things done in due course.  And then you'll know who

25  it is that's collected the documents and who has the

1    knowledge.  You pony up the right people, then we

2    won't have any problem.

3         The idea that you have to have two rounds of

4    depositions.  One of people who are designated who

5    don't really know anything and then they identify who

6    does know, and then you've got to go do that is not

7    the way that this ought to be done.  And I've dealt

8    with this before, and we're not going to have that

9    kind of problem, I don't think, in this case.

10        You just tell Equifax, Mr. Goheen, they have

11   to identify all the people who know what they are

12   doing and who have the knowledge of the case and they

13   have to do it promptly.

14        This case was filed when?  How long ago was

15   this case filed?

16        THE CLERK:  April 30, Your Honor.

17        THE COURT:  April.  This isn't a complicated

18   case.  It's not a case of great difficulty.  The real

19   problem is going to be trying to figure out what

20   happened to the judgments up here and who the class

21   is.

22        MR. BENNETT:  Yes, sir.

23        THE COURT:  And if you're going to have --

24   who is your expert?  An industry usage person or what?

25        MR. BENNETT:  A retired General District

1  Court, Civil Division, clerk from a different

2  jurisdiction.

3           THE CLERK:  Your Honor, I misspoke.  I looked

4  at the wrong docket sheet.  It was filed February 17.

5           THE COURT:  You've had even more time.  So

6  they have known about it, Mr. Goheen.  You get them

7  saddled up and ride them hard.

8           MR. GOHEEN:  We're doing that, Your Honor.

9  We are working diligently gathering people with

10  relevant knowledge and with relevant documents.  We

11  are doing that, Your Honor.

12           THE COURT:  This is July 15.  Why can't you

13  get all that done by July 30?

14           MR. GOHEEN:  The company is preparing to

15  undertake a two-week trial beginning next week with

16  some of these same witnesses.  And we have, as I said,

17  witness vacations and other international travel,

18  on-the-job, job-related, of some of the witnesses that

19  Mr. Bennett said --

20           THE COURT:  That can get rescheduled.

21           MR. GOHEEN:  We have reached an agreement on

22  the dates for these four witnesses, though, Your

23  Honor.

24           THE COURT:  But I'm not interested in the

25  four witnesses.  I want all of the witnesses, every

1    one of them you're going to use, identified.

2         MR. GOHEEN:  They have been, Your Honor.

3         THE COURT:  And you're going to take their

4    depositions.  Set a schedule.  This international

5    travel for business is not going to cut it.  They have

6    known this case was in the works since February.  They

7    could have worked their schedule around the deposition

8    plans and the deposition schedule.  Equifax must learn

9    that it needs to put these cases in high priority.

10        Where is your two-week case pending?

11        MR. GOHEEN:  San Francisco, Your Honor,

12   Federal Court.

13        THE COURT:  Okay.  So they are not going to

14   be out there for the whole two weeks, are they?

15        MR. GOHEEN:  I doubt it, Your Honor.

16        THE COURT:  Yeah.  So tell them to come back

17   and they will be Johnny-on-the-spot with information

18   of all kinds, and let them get to work.  I'm not going

19   to extend the discovery cutoff.  You-all have to get

20   moving on it.  So don't tender the order.

21        If you want to change your expert disclosure

22   dates within the discovery cutoff, then you can do

23   that.  But there's no sense in -- it sounds to me like

24   we're going at a snail's pace here and we need to pick

25   it up.  Both sides.  Okay?

1          MR. BENNETT:  Yes, sir.

2          MR. GOHEEN:  Yes, Your Honor.

3          THE COURT:  Thank you very much.  We'll be in

4     adjournment.

5

6          (The proceedings were adjourned at 3:54 p.m.)

7

8          I, Diane J. Daffron, certify that the

9     foregoing is a true and accurate transcription of my

10    stenographic notes.

11

12                    /s/
          _____    _____
13                    DIANE J. DAFFRON, RPR, CCR       DATE

14

15

16

17

18

19

20

21

22

23

24

25