**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

DONNA K. SOUTTER
*For herself and on behalf of all similarly situated individuals.*

   Plaintiff,

v.            CIVIL ACTION NO. 3:10-cv-00107

EQUIFAX INFORMATION SERVICES, LLC,

   Defendant.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

  Comes now the Plaintiff, DONNA K. SOUTTER, for herself and on behalf of all other

similarly situated individuals, by counsel, and for her Memorandum in Support of her Motion for

Class Certification, she states as follows:

**INTRODUCTION**

  This case is brought as a class action under the federal Fair Credit Reporting Act

(FCRA), 15 U.S.C. § 1681, *et seq.* Plaintiff alleges on a class basis that Equifax Information

Services, LLC ("Equifax") violated 15 U.S.C. § 1681e(b) in its failure to maintain procedures

reasonably adequate to assure the maximum possible accuracy of its Virginia civil judgment

reportings. More specifically, Plaintiff alleges that Equifax systematically ignored hundreds of

thousands of public records showing that Virginia civil judgments had been satisfied, vacated, or

appealed, hereafter "judgment terminations"). In fact, Equifax has revealed in discovery that it did

not obtain any judgment terminations for at least a year and a half (ending just this year). Prior to

that time and continuing through the present, Equifax so inadequately incentivized its agents to

collect such termination records that they were often simply ignored. Moreover, Equifax concedes

that it has never in its known history reviewed, audited, or otherwise sought to determine if its third

party agents were adequately collecting such records.

Such a claim is ideally suited for class certification, providing injured consumers the means to obtain clean credit reports and money damages, and enhance judicial economy by providing this Court with the means to avoid inefficient and resource intensive individual litigation.

## STATEMENT OF FACTS AND PROPOSED CLASS CLAIMS

### A.   The Amended Complaint alleges that Equifax violated 15 U.S.C. § 1681e(b).

Upon a Plaintiff's motion for class certification, the facts of the Complaint are taken as true and an inquiry into the merits is usually forbidden.  Eisen v. Carlisle Jacquelin, 417 U.S. 156, 177-78. (1974).   Nevertheless, Plaintiff supplements her allegations in the Second Amended Complaint as appropriate *infra*.   The facts and merits argument material to the present motion are as follows:

The conduct of consumer reporting agencies (CRAs) is governed by the FCRA, the principal purposes of which are "to preserve the integrity of the consumer banking system and to protect the right of consumers to fairness and accuracy in the reporting of information about their financial affairs."  Acosta v. Trans Union, LLC, 240 F.R.D. 564, 566 (C.D. Cal. 2007).   To serve these purposes, the FCRA obligates CRAs to follow "reasonable procedures to assure maximum possible accuracy" in their credit reporting.   15 U.S.C. § 1681e(b).   "[A] consumer reporting agency violates § 1681e(b) if (1) the consumer report contains inaccurate information and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy."  Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 415 (4th Cir. 2001).   This requirement is independent of a consumer's right to dispute and obtain correction of inaccurate information.

Whether or not a CRA has followed "reasonable procedures" will almost always remain a jury question.   As the Fourth Circuit has explained:

> The issue of whether the agency failed to follow "reasonable procedures" will be a "jury question[ ] in the overwhelming majority of cases." *Guimond*, 45 F.3d at 1333. *See also* Andrews v. TRW Inc., 225 F.3d 1063, 1068 (9th Cir.2000) ("It would normally not be easy for a court as a matter of law to determine whether a given procedure was reasonable in reaching the very high standard set by the statute ....");

*cf. also* <u>Stewart,</u> 734 F.2d at 51 (stating that a plaintiff need only "minimally present some evidence" of unreasonableness).

<u>Dalton.</u>, 257 F.3d at 416.  As the objective of § 1681e(b) is to ensure "maximum possible accuracy," the statute accordingly imposes a high standard for CRAs. <u>Andrews v. TRW, Inc.</u>, 225 F.3d 1063 (9th Cir. 2000) ("very high standard set by statute"), *rev'd on other grounds*, 534 U.S. 19 (2001). They must adopt procedures not just to catch many of the errors, but to ensure "maximum possible accuracy." "[W]hen a consumer reporting agency learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise) it must review its procedures for assuring accuracy." 16 C.F.R. Part 600 FTC Commentary Appendix 607 (3)(A).  In short, CRAs should be doing everything possible, within the limits of economic reality, to ensure maximum accuracy.   A CRA is required under § 1681e(b) to ensure that paid debts are so reported and the current status of a public record is accurately included.  <u>Id</u>. at 3(f) and (G).   Equifax does not escape its FCRA liability by relying on its public records vendor. <u>Thompson v. Equifax Credit Info. Services, Inc.</u>, CIV.A. 00-D-1468-S, 2001 WL 34142847 (M.D. Ala. Dec. 14, 2001); <u>Dennis v. BEH-1 LLC,</u> 520 F.3d 1066 (9th Cir. 2008).

Donna Souter is currently a self-employed court reporter and previously was a Senior Dispatcher for the Virginia State Police. (Exhibit "A", Souter Dep. at 8:1-6; 11:5-9).  She has not been involved in other litigation besides that involving her credit report.  She has no criminal history. (Exhibit "B", Plaintiff's Responses to Interrogatories, No. 13).  She is committed to the class because she understands this issue has affected the lives of other Virginias.  (Exhibit "A", Souter Dep. at 40:5-10; 41:16-21).

In June 2007, Ms. Soutter became sick and unable to work and thereafter fell behind on a credit card with Virginia Company Bank.  (<u>Id</u>., 20:3-7).  Prior to that date she had otherwise exemplary credit.  The Bank sued her in Richmond General District Court.  (Exhibit "C", Richmond GDC Court

File).  Almost immediately, she made direct payment arrangements with the Bank (and has continued to meet this obligation to this day). (Exhibit "A", Soutter Dep. at 23:6-10; 27:9-18).  However, there was thereafter a miscommunication between the Bank and its attorney.  Without Ms. Soutter's knowledge, the Bank's attorney obtained an uncontested civil judgment on January 29, 2008 in the amount of $14,403.79. (Id. at 23:10-19).  The Plaintiff then learned about the mistake when she received a mailed copy of the judgment.  (Id.).  She immediately contacted the Bank to get the matter corrected.  Internally, Bank employees documented this contact.

On February 25, 2008, the Bank's attorney filed a motion to vacate the mistaken judgment, which motion was granted on March 20 2008.  Upon vacating the judgment, the Richmond General District Court then dismissed the case. (Exhibit "C", Richmond GDC Court File).

After obtaining the vacated judgment, Plaintiff almost immediately contacted Equifax to ensure that it did not report the judgment as unpaid. (Exhibit "B", Plaintiff's Responses to Defendant's Interrogatories, No. 1).  In response to her April 11, 2008 letter, on May 23, 2008 Equifax informed Ms. Soutter that it was not reporting the Virginia Credit Union judgment.  (Id.).  Whether or not this was true at that time, by July 2008, Equifax was reporting the judgment and was reporting it as unpaid and not as vacated.  (Exhibit "D", Equifax Responses to Plaintiff's First Set of Interrogatories, No.3).   The Plaintiff made a second dispute on December 26, 2008 after she was denied credit. (Exhibit "B", Plaintiff's Responses to Defendant's Interrogatories, No. 1).  The Plaintiff's Equifax file was corrected on December 30, 2008.  (Id.).  In that delayed period, Equifax had furnished at least three (3) hard inquiry credit reports with the inaccuracy. (Exhibit "D", Equifax Responses to Plaintiff's First Set of Interrogatories, No.3).   It also furnished three account review credit reports to Plaintiff's existing creditors.  (Id.).

The problem faced by Donna Soutter is a common one.  Over the last two years alone, at least 5,000 people have had to make similar disputes to Equifax regarding its failure to update City of

Richmond General District Court judgments as terminated.[1] Equifax's own monthly audits evidenced its tolerance of a "Dispute Ratio" of between 4% and 5%, translating to approximately one (1) dispute for every twenty (20) to twenty-five (25) public records in its system.

Unlike credit accounts, Equifax affirmatively seeks out and purchases public records data, including Virginia civil judgments, to report to the world about Virginians when it sells their credit file. It proactively gathers and disseminates this derogatory information even though there is nothing in the FCRA that requires it to do so. Equifax has used a series of different vendors over the years. Originally, these vendors relied on in-person manual reviews of civil courthouse records. Typically, clerk's offices would make available copies of termination records – satisfactions, vacates and appeals. (Exhibit "E". Declaration of Denise Hain. at ¶ 10). Weekly update reports were made available. (Id.) Docket books were examined. (Id.) However, sometime after 2006, Equifax and its vendors stopped this more careful process and began collection of judgment information solely from automated resources. (Id. at ¶ 11). Initially, Equifax's vendor obtained the information in bulk from the Supreme Court of Virginia. That ended in or about April 2009, when the bulk feed was terminated. (The Supreme Court was concerned with how its data was being used by Equifax's agent and other vendors.) However, even before this change, Equifax and its vendor had not once sought to purchase vacates or appeals. (Exhibit "F", Deposition of Ken Mittendorf, Dep. at 69:22-70:5).

Under the terms of its contract with Equifax, LexisNexis was obligated to collect and provide all affirmative judgments. However, in contrast, it was only obligated to collect judgment terminations if it determined it was "commercially reasonable" to do so.

Equifax has been fully aware of the procedures used by LexisNexis to gather Virginia judgment records. Its contract with the vendor states:

LexisNexis will provide Equifax with its' procedures for collecting dispositions.

---

[1] Equifax has produced a database of the names and addresses of each such consumer. The database of consumers statewide is of course even larger.

> Changes to these procedures must be provided to Equifax 10 business days prior to implementation by LexisNexis.  If the proposed change adversely affects any Equifax businesses, or puts Equifax in a position of non-compliance with any local, state or federal legislation, Equifax reserves the right to reject the procedure change with stated reasons.  Equifax will not unreasonably withhold its' approval from LexisNexis.

*Equifax/LexisNexis Agreement*, Exhibit "A" to Agreement, ¶C.3.d.   Equifax understood the LexisNexis process.  For example, when LexisNexis lost its ability to buy judgment termination records in bulk, it informed Equifax's responsible management employee, Shawn DeGrace.  In relevant part, LexisNexis stated:

> Good Morning Equifax Team:
>
> In our ongoing effort to keep you informed of public record issues, I am writing to let you know we have reached an impasse with the Virginia Court Administration as our source of statewide District court judgments.
>
> […]
>
> As always, court access status updates stemming from this collection issue and others are available on your extranet site under **Tools→Court Status**.  The VA District courts have been updated to a "Limited Access" status, as we will be collecting satisfaction records.   Client Services will keep you apprised of any new developments.
>
> Please let me know if you have any questions,

Then, to that email Equifax responded: "Thanks so much for keeping us posted."  Standing alone, these emails establish:  (a.) Equifax was kept up to speed and was actively aware that it was not receiving judgment terminations and was "apprised of any new developments." (b.) It also knew that "Virginia District Courts have been updated to a 'Limited Access' status."

Equifax was aware that LexisNexis was having difficulty processing judgment termination records in a timely fashion, and thereafter, was unable to obtain them at all.  The result was that for over a year and a half, Equifax did not receive or add to its files any judgment termination records.  When LexisNexis finally obtained a large batch of the judgment termination records, Equifax refused

to purchase them because they would exceed its budget:

> I discussed this with James today. He asked if the 2008 records were included in the forecast that you gave us earlier this year – meaning were you anticipating receiving these records when you gave us the forecast?

> Regardless, due to the end of the year budget stuff, I still have to obtain approval before we can start receiving the records for 2008. However, if they were part of your original forecast, then this will probably help me get approval. Once I hear back, I will ask for a rush approval. Hopefully, I will get it.

Plaintiff alleges that these procedures followed by Equifax to seek out, purchase and integrate the derogatory judgment records - about which it had no means to ensure were accurately and completely reported thereafter – were unreasonable, and willfully so.

**B.    The Proposed Class.**

The Plaintiff's initial proposed class definition was limited to consumers who faced Equifax's inaccurate reporting of civil judgments from the City of Richmond General District Court. After completion of discovery, the Plaintiff has learned and Equifax has conceded that the Equifax procedures challenged as to the City of Richmond are consistent statewide. The parties have agreed that Plaintiff will seek certification of a class that is geographically limited to all state courts in Virginia, rather than just the General District Court of the City of Richmond.

However, regardless of what is alleged as a proffered class definition in a complaint or in this motion, the Court is free to define the class as it finds more appropriate. "Holding plaintiffs to the plain language of their definition would ignore the ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition." Bratcher v. Nat'l Standard Life Ins. Co. (In re Monumental Life Ins. Co.), 365 F.3d 408, 414 (5th Cir. 2004) *cert. denied*, 125 S.Ct. 277 (2004); Meyer v. Citizens & S. Nat'l Bank, 106 F.R.D. 356, 360 (M.D. Ga. 1985) ("The Court has discretion in ruling on a motion to certify a class. This discretion extends to defining the scope of the class."); Bafus v. Aspen Realty, Inc., 236 F.R.D. 652, 655 (D. Idaho 2006)

("At the hearing in this matter, Plaintiffs offered this revised definition. The Court finds that the revised definition better reflects Plaintiffs' claims in these actions. Therefore, the Court will consider the revised definition in making its class certification determination.")  Accordingly, and particularly with the previously stated consent of Equifax, Plaintiff intends to move for certification upon a class definition that includes all Virginia state courts.

These modifications should cause no harm to class certification because even upon the modified Classes; all purported Class members were harmed in the same manner and by the same conduct of the Defendant.   See also Woods v. Stewart Title Guaranty Company, 2007 WL 2872219 (D. Md. Sept. 17, 2007) (certifying a class of individuals as proposed by plaintiffs during class certification briefing that was broader than the class plaintiffs' alleged in the class action complaint after discovery uncovered a broader group of individuals harmed by the same practice alleged in the complaint).

Accordingly, the enlarged 15 U.S.C. § 1681e(b) class definition that Plaintiff's counsel has communicated to Equifax will include:

> (1) all natural persons (2) for whom Equifax's records note that a "hard inquiry" credit report was furnished to a third party (3) other than for an employment purpose (4) at a time when any Virginia General District Court or Circuit Court judgment that had been satisfied, appealed, or vacated more than 30 days earlier[2] was reported in Equifax's file as remaining unpaid.

Further, the Plaintiff's suggested definition would exclude from the Class "those individuals who have suffered actual damages [greater than $1,000] due to Defendant's [FCRA] violations."

Stillmock v. Weis Markets, Inc., 09-1632, 2010 WL 2621041, *3 (4th Cir. July 1, 2010) (Reversing on Rule 23(f) appeal a denial of certification in a FCRA class defined to exclude consumers who

---

[2] Because 15 U.S.C. § 1681e(b) assigns liability only if an agency fails to act reasonably to assure maximum possible accuracy (as opposed to imposing strict liability), Plaintiff has suggested a window of 30 days within which Equifax would have obtained the updated Court record.  Nearly all of its abstracting of unpaid Virginia court judgments is performed in a shorter window.

asserted actual damage).

Beyond the proposal suggested by the Plaintiff herein, the Court retains its discretion to adapt or modify the class definition to resolve typicality, predominance or other defense concerns it concludes have merit. Fed. R. Civ. P. 23(c)(1)(C) gives District Courts broad discretion to modify the class definition until there is a decision on the merits.  *See* 2 H. NEWBERG AND A. CONTE, NEWBERG ON CLASS ACTIONS § 6.14 (4th ed. 2006) ("broad discretion [under Rule 23] to modify the definition of the class even after certification.").  In fact, in the last two contested consumer classes certified in this District, the Court did just that. *Williams v. Lexis Nexis Risk Management,* 3:06cv241-REP; *Cappetta v. G.C. Services LP,* 3:08cv288-JRS.  Accordingly, when addressing Equifax's semantic arguments either preemptively or in reply, Plaintiff will suggest corrections to the class definition that would resolve such contrived obstacles.[3]

## ARGUMENT

## I.    PLAINTIFF'S CLAIM SATISFIES EACH OF THE FOUR THRESHOLD REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(a).

Certification of a Rule 23(b)(3) class requires that the following four criteria be met:

> . . . .(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and, (4) the representative parties will fairly and adequately protect the interest of the class.

Fed. R. Civ. P. 23(a).  In addition, the court must find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a

---

[3] The Court may amend or modify the definition of the class it ultimately makes its decision on certification in the interests of judicial economy and fairness.  "As long as the complainants can be identified in a manner that advances the purpose of Rule 23, procedural fairness permits flexibility." 3 Newberg on Class Actions § 8:12 (4th ed.)  The re-definition of the class would satisfy the interests of judicial economy and fairness, in that the claims of consumers with judgments in other Virginia courts will not need to be litigated in subsequent actions.  Enlargement of a class has been permitted by the courts as a "housekeeping" modification to alleviate the need for the filing of separate actions.  Id.

class action is superior to other available methods for the fair and efficient adjudication of the

controversy.  Eisen v. Carlisle Jacquelin, 417 U.S. 156 (1974).  "Notably, ' '[c]ertification is only

concerned with the commonality (not the apparent merit) of the claims and the existence of a

sufficiently numerous group of persons who may assert those claims.' ' Brown v. Nucor Corp., 576

F.3d 149, 152 (4th Cir.2009) (quoting Lilly v. Harris-Teeter Supermarket, 720 F.2d 326, 332-33 (4th

Cir.1983)), cert. denied, Nucor Corp. v. Brown, --- U.S. ----, 130 S.Ct. 1720, 176 L.Ed.2d 185

(2010).  Stillmock v. Weis Markets, Inc., 09-1632, 2010 WL 2621041 (4th Cir. July 1, 2010).  As

this Court has explained:

> The policy in the Fourth Circuit is "to give Rule 23 a liberal rather than a restrictive
> construction, adopting a standard of flexibility in application [that] will in the
> particular case best serve the ends of justice for affected parties and promote judicial
> efficiency."  In re A.H. Robins Company, Incorporated, 880 F.2d 709, 740 (4th Cir.
> 1989), cert denied sub nom. Anderson v. Aetna Casualty and Surety Company, 493
> U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989) (internal quotations marks omitted).
> See also Jeffreys v. Communications Workers, 212 F.R.D. 320, 322 (E.D. Va.2003).

Morris v. Wachovia Securities, Inc. v. Wachovia Securities, Inc. 223 F.R.D. 284, 291 (E.D.Va.

2004). See also Karnette v. Wolpoff & Abramson, Civil Action No.: 3:06cv44 (E.D. Va. 2007)(R.

Payne).  Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968), cert. denied, 394 U.S. 928 (1968).

The Court should resolve any doubt regarding the propriety of certification in favor of

allowing certification.  Eisenberg v. Gagnon, 766 F.2d 770, 785 (3rd Cir. 1985), cert. denied, 474

U.S. 946 (1985).  The Fourth Circuit has agreed, cautioning:

> If a lawsuit meets these requirements, certification as a class action serves important
> public purposes. In addition to promoting judicial economy and efficiency, class
> actions also "afford aggrieved persons a remedy if it is not economically feasible to
> obtain relief through the traditional framework of multiple individual damage
> actions." 5 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 23.02 (3d
> ed.1999). Thus, federal courts should "give Rule 23 a liberal rather than a restrictive
> construction, adopting a standard of flexibility in application which will in the
> particular case 'best serve the ends of justice for the affected parties and ⋯ promote
> judicial efficiency.' " In re A.H. Robins, 880 F.2d 709, 740 (4th Cir.1989).

*Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 424 (4th Cir. 2003).  *Accord*, *In re Data Corp.*

*Securities Litigation*, 116 F.R.D. 216 (D. Minn. 1986); *In re Folding Cartons Antitrust Litigation*, 75

F.R.D. 727 (N.D. Ill. 1977).  *See also*, Lozada v. Dale Baker Oldsmobile, Inc., 197 F.R.D. 321, 327

(W.D. Mich. 2000).

This policy of resolving doubt in favor of class certification furthers the salutary purpose of

compensating victims of widespread wrong.  *See generally*, Esplin v. Hirschi, *supra*.  Further, "[t]he

procedural device of a Rule 23(b)(3) class action was designed not solely as a means for assuring

legal assistance in the vindication of small claims but, rather, to achieve the economies of time,

effort, and expense."  Sterling v Velsicol Chemical Corporation, 855 F.2d 1188, 1196 (6th Cir.

1988).

Federal courts have long regarded "consumer claims" as "particularly appropriate for class

resolution."  *see* Amchem Prods. v. Windsor, 521 U.S. 591, 625 (1997); In re Mexican Money

Transfer Litig., 267 F.3d 743, 747 (7th Cir. 2001); Cavin v. Home Loan Ctr., Inc., 236 F.R.D. 387,

395-96 (N.D. Ill. 2006) ("[c]onsumer claims are among the most commonly certified for class

treatment").  As set forth below, there is no basis for regarding this case any differently.

**A.      The Classes Are So Numerous As To Make Joinder Impracticable.**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is

impracticable."  Talbott v. GC Servs., Ltd. Pshp., 191 F.R.D. 99, 102 (W.D.Va. 2000).  *See* Shelton

v. Pargo, Inc., 582 F.2d 1298, 1312 (4th Cir. 1978).  "When the class is large, numbers alone are

dispositive..."  Riordan v. Smith Barney, 113 F.R.D. 60, 62 (N.D. Ill. 1986).   There is no set

minimum number of potential class members that fulfills the numerosity requirement. See Holsey v.

Armour & Co., 743 F.2d 199, 217 (4th Cir.1984) (citing Kelley v. Norfolk & Western Ry. Co., 584

F.2d 34 (4th Cir.1978)).  However, where the class numbers 25 or more, joinder is usually

impracticable.  Cypress v. Newport News General & Nonsectarian Hosp. Assn, 375 F.2d 648, 653

(4th Cir. 1967).

In this case, the proposed class is more than sufficiently numerous to make joinder impossible.  Equifax has stipulated that the class size is at least 300. (Exhibit "D", Equifax Responses to Plaintiff's First Set of Interrogatories, No.6).  While calculation of exact class size is not possible until Phase II discovery, Equifax has produced two databases that provide insight into the breadth of this problem.

Equifax has produced the names and addresses of consumers who during the previous two years disputed Virginia civil judgments upon the basis that the judgment had been satisfied, vacated or appealed.  ("Disputes Database").  There are over 17,000 such persons.   While Plaintiff is not pursuing a class claim under 15 U.S.C. § 1681i(a) for Equifax's failed dispute investigations, most of the consumers who later made a dispute would have first suffered a violation of  § 1681e(b).  If just 30% of these disputes were meritorious, the class size would still exceed 5,000 Virginia consumers.

The second Equifax database was an ordered production of credit history data for each consumer presently listed by Equifax in three sample zip codes - 23232, (Richmond), 23803 (Petersburg) and 23608  (Newport News) – who had in their Equifax file a Virginia judgment.  Each of these zip codes includes approximately 40,000 persons.

http://www.census.gov/geo/www/gazetteer/places2k_layout.html#zcta last viewed October 28, 2010.  Because this data was only recently produced, Plaintiff's analysis of the file is ongoing and will be detailed subsequent to this filing.  However, with this data the determination of numerosity will be a simple one, as explained below.

Plaintiff's counsel has also requested, paid for, and received a database from the Virginia Supreme Court that contains each judgment satisfaction record and many of the vacated and appealed judgments in the State's judicial computer system.  ("Supreme Court Database").  It is a simple exercise to compare judgment records in Equifax's files against the Supreme Court Database to determine which Equifax records continued to omit the accurate current status.  It is also a

mathematical exercise to measure the length of delay between the date that the judgment was terminated in the Court records and the month that it was later updated by Equifax.

**B.      An Ascertainable Class Exists.**

"Though not specified in the Rule, establishment of a class action implicitly requires both that there be an identifiable class and that the plaintiff or plaintiffs be a member of such class. 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure:* Civil 2d § 1760, pp. 115 *et seq.* (2d ed. 1986)." In re A.H. Robins Co., Inc., 880 F.2d 709, 728 (4th Cir. 1989) *abrogated on other grounds by* Amchem Products, Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).  This necessity is sometimes referred to as ascertainability – the requirement that the class description be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  FPP § 1760, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed.).   In Phase I litigation, the parties have considered and argued off docket whether this element was satisfied or controversial in the case.   Plaintiff has sought a stipulation as such, and Equifax has refused.  Out of an abundance of caution, Plaintiff peremptorily addresses the issues Defendant has so far suggested.

The ascertainability requirement is at this early stage only a theoretical burden.  "[T]he class does not have to be so ascertainable that every potential member can be identified at the commencement of the action. … If the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." FPP § 1760, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed.).  In fact, "Where the plaintiff has demonstrated that the class of persons he or she wishes to represent exists, that they are not specifically identifiable supports rather than bars the bringing of a class action, because joinder is impracticable."  *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 645 (4th Cir. 1975) (citing cases under both Rule 23(b)(2) and 23(b)(3)).  A class like this one is ascertainable because it is "defined by the activities of the defendant[.]"  Alliance to End Repression v. Rochford, 565 F.2d 975, 978 (7th Cir. 1977); see also

Lewis v. Tully, 96 F.R.D. 370, 376 (N.D. Ill. 1982) *on reconsideration,* 99 F.R.D. 632 (N.D. Ill. 1983) ("a class that is defined by the contested practices of the defendant is sufficiently ascertainable.").  Membership is determined by whether or not Equifax furnished a credit report regarding that person and the manner in which it did so.

Defendant's position to date has evidenced its confusion of "ascertainability" with class member "identifiability."  Equifax has not suggested in discovery any logical impediment to the proposed class definition – persons about whom Equifax furnished a credit report that inaccurately omitted an updated judgment status.  Instead, it has resisted an ascertainability stipulation on the grounds that it believes Plaintiff could not identify all such persons.

The first of its expected arguments is the conceptual possibility of a "disappearing" judgment. Equifax takes a static snapshot of a consumer's file at one discrete minute in time each month. Therefore, if for example, that snapshot for the month of August 2008 was taken at 1:04 a.m. on August 31, 2008, Equifax asserts that it can never know whether a credit report sold at 1:03 a.m. or at 1:05 a.m. on that same date (or any other time in the that month) actually looked the same as the snapshot archive or contained the inaccurate judgment.   Or put another way, if a frozen scan snapshot was taken on July 31 and again on August 31, and the inaccurate judgment appeared in both snapshots, Equifax asserts as a barrier to ascertainability and numerosity the theoretical possibility, however improbable, that at some time during the period between these two dates, the inaccurate judgment could have been removed from the file and then added back in before the later frozen scan date.  And theoretically, the "hard inquiry" credit report could have been furnished while the judgment at issue was temporarily removed from the file, such that it would not have been contained in the credit report.

This theoretical possibility is a red herring manufactured for this litigation.  When the issue was considered at the deposition of Margaret Leslie, Equifax's responsible employee, she testified that the possibility that any unarchived changes were made to a public record judgment and then

reversed during a frozen scan period is so negligible as to be meaningless in practice.

Equifax has also floated an argument as to why a frozen scan archive file would be imperfect for determining class membership.  That argument is similarly based on Equifax's apparent lack of confidence in the accuracy and completeness of its frozen scan credit files.  As explained above, Equifax's files are archived at the end of each month.  Equifax claims that it does not record the exact day of the month that an initial judgment or a later termination of a judgment is added to a consumer's credit file.  For example, if Equifax received a civil judgment and placed it in a consumer's credit file on March 15, 2008, it claims that such event would be dated in the archive only by the month and year, March 2008.  If that judgment was then updated to the Equifax credit file as satisfied a full year later, perhaps on July 17, 2009 (despite satisfaction in the courthouse on an earlier date), Equifax's archive frozen scan would have recorded the date that satisfaction occurred only as a month and year and not as an exact day – July 2009 in the above example.  The Equifax argument then concludes that even upon a review of the Equifax records, Plaintiff could not determine whether a credit report that occurred in the month of July 2009, when the Equifax file was finally updated, occurred before or after the satisfaction was recorded to the file that same month. For example, the satisfaction was added to the file on July 17, 2009, if the credit report was furnished on July 10, 2009, the inaccurate judgment would have remained in the credit report.  On the other hand, if the inquiry occurred on July 23, 2009, the inaccuracy would have been previously corrected. Defendant asserts that without knowing the critical date of the satisfaction update in Plaintiff's file (July 17, 2009 in this example), Plaintiff and the Court would be unable to determine if a specific credit report was inaccurate. Equifax's opposition then would ask the Court to deny class certification because of the academic possibility that a handful of consumers may be either incorrectly left out or included (depending upon the method later ordered for class notice)

This argument fails factually.  It is true that the frozen scan files Equifax has produced do not record the day of the month that a judgment record is added or updated.  But if the case is certified,

the precise date of the month on which a judgment record or update was delivered to Equifax by its vendor LexisNexis is available from it, and LexisNexis has confirmed the same in its sworn testimony.

Further, nearly all consumers have experienced multiple hard inquiry credit reports over the period starting two years before this case and only one inaccurate report is necessary for class membership.   The degree of precision Equifax has to date suggested is unnecessary.   "Every potential member of the class is not required to be identifiable, but merely circumscribed by some objective set of criteria." FPP § 1760, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed.) citing Hendrix v. Faulkner, 525 F.Supp. 435 (D.C.Ind.1981) *affirmed and vacated in part on other grounds sub nom*. Wellman v. Faulkner, 715 F.2d 269 (7th Cir. 1983).  Even if there was more than a handful of such persons with uncertain class membership status, they could be easily carved out of the Court's certified class definition.

## C.    There Are Questions Of Law and Fact Common To The Class.

Rule 23(a)(2) requires that there be a common question of law or fact.   Commonality requires that there be at least one question of law or fact common to the members of the class. Jeffreys v. Communications Workers, 212 F.R.D. 320, 322 (E.D.Va. 2003); Central Wesleyan College v. W.R. Grace & Co., 143 F.R.D. 628, 636 (D.S.C. 1992), *aff'd* 6 F.3d 177 (4th Cir. 1993) (stating that commonality "does not require that all, or even most, issues be common, nor that common issues predominate, but only that common issues exist.")

Commonality is a liberal standard, and the fact that there are some factual variations in individual grievances among class members does not defeat commonality. Jeffreys, 212 F.R.D. at 322.  Not all factual or legal questions raised in the litigation need be common so long as at least one issue is common to all class members. McGlothlin v. Connors, 142 F.R.D. 626 (W.D. Va. 1992). The commonality requirement requires that the classes present dispositive questions which will propel the case through the system.  See Stott v. Haworth, 916 F.2d 134, 145 (4th Cir.1990); Lienhart

v. Dryvit Systems, Inc., 255 F.3d 138, 146 (4th Cir. 2001).   The commonality requirement of Rule

23(a)(2) is satisfied if "common questions [are] dispositive and overshadow other issues." Id.

"'Minor differences in the underlying facts of individual class members cases do not defeat a

showing of commonality where there are common questions of law.'" DiFelice v. U.S. Airways,

Inc., 235 F.R.D. 70, 78 (E.D. Va. 2006).

There are a large number of common issues – most are so. *Were Equifax's procedures for*

*reporting Virginia civil judgments unreasonable?  Did these procedures violation § 1681e(b)?  Were*

*credit reports that omitted the current status of a terminated judgment inaccurate?  Where Equifax's*

*FCRA violations willful?  If so, what is the proper damage measure per violation?*  In fact, even

Defendant's proffered "core" issues suggested in its Motion to Consolidate are all common issues.

In contrast, as discussed below, there are very few individual issues.

## D.    The Claims Of The Named Plaintiff Are Typical Of Those Of All Other Class Members.

Rule 23(a)(3) requires that the claims of the named Plaintiff be typical of the claims of the

class.  The Fourth Circuit has noted that "the premise of the typicality requirement is simply stated:

as goes the claim of the named Plaintiff, so go the claims of the class." Broussard v. Meineke

Discount Muffler Shops, 155 F.3d 331, 340 (4th Cir. 1998) (quoting Sprague v. General Motors

Corporation, 133 F.3d 388, 399 (6th Cir.1998)).  The typicality requirement, so explained, tends to

merge with the commonality requirement. General Telephone Company of the Southwest v. Falcon,

457 U.S. 147, 158 n.13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). "[T]he typicality prerequisite

focuses on the general similarity of the named representatives' legal and remedial theories to those of

the proposed class." Karnette v. Wolpoff & Abramson, Civil Action No.: 3:06cv44 (E.D. Va.

2007)(citing Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 472 (5th Cir. 1986)); see also Williams

v. LexisNexis Risk Mgmt. Inc., CIV A 306CV241, 2007 WL 2439463 (E.D. Va. Aug. 23, 2007).

The typicality requirement is met when class representatives show that: (1) "their interests are

squarely aligned with the interests of the class members;" and (2) "their claims arise from the same

events or course of conduct and are premised on the same legal theories as the claims of the class

members." Fisher v. Virginia Electric and Power Company, 217 F.R.D. 201, 217 (E.D.Va. 2003)

(*citing* Jeffreys v. Communications Workers, 212 F.R.D. 320, 322 (E.D.Va. 2003); Morris v.

Wachovia Securities, Inc., 223 F.R.D. 284, 295 (E.D.Va. 2004).

    Donna Soutter's claim is typical of those of other class members.  She, as every class

member, alleges a violation of the same FCRA provision, 15 U.S.C. §1681e(b).  This claim

challenges the credit reporting procedures of Equifax and does not depend on any individualized

facts.   Equifax obtains all of its Virginia judgment records under the same contract from the same

vendor.  During the period at issue in this case, those records were gathered from a single source –

the Virginia Supreme Court's website.  Equifax's notice and knowledge of the challenged reporting

problem is the same for Plaintiff as for the Class.  Plaintiff's proof of each of these elements in her

own case will advance the class claims in proportionate degree.

    The Plaintiff's interests are squarely aligned with those of the putative class members.  Her

FCRA claims arise out of Equifax's same policies and procedures as those of the proposed class

members.   Equifax has conceded in its Rule 30(b)(6) depositions, and through the terms of its

vendor contracts, that it followed the same course of conduct, process, and procedures for all class

members.  It has thus testified that the events and process for the named Plaintiff were "typical" of

those for the entire proposed class.  The Plaintiff's claims are typical of the proposed class members

and meet the requirements of Rule 23(a).

**E.    Donna Soutter Adequately Represents the Class.**

    The final component of Rule 23(a) requires that the "representative parties will fairly and

adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4). This prerequisite is met when:

"(1) the named plaintiff[s] [have] interests common with, and not antagonistic to, the Class' interests;

and (2) the plaintiff[s'] attorney is qualified, experienced and generally able to conduct the

litigation." In re Southeast Hotel Properties Ltd. Pushup Investor Legit., 151 F.R.D. 597, 607

(W.D.N.C.1993); Wiseman v. First Citizens Bank & Trust Co., 212 F.R.D. 482, 489 (W.D.N.C. 2003).

The underlying premise of a class action is that litigation by representative parties adjudicates the rights of all class members, and therefore basic due process requires that the named Plaintiff possess undivided loyalties to absent class members. Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 338 (4th Cir. 1998)(citing e.g., In re General Motors Corp. Pick_Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785, 796 (3rd Cir.1995). Representation will be considered "adequate" if the class representatives are not disqualified by reason of interests antagonistic to the rest of the class. Ostrof v. State Farm Mutual Auto. Insurance Co., 200 F.R.D. 521, 530 (D.Md. 2001).

"The burden is on the defendant[] to demonstrate that the representation will be inadequate." Johns v. Rozet, 141 F.R.D. 211, 217 (D.D.C. 1992); *see also* In re Southeast Hotel Properties Ltd. P'ship Investor Litig., *supra* at 607; Lewis v. Curtis, 671 F.2d 779, 788 (3rd Cir. 1982); Trautz v. Weisman, 846 F. Supp. 1160, 1167 (S.D.N.Y. 1994). To defeat the adequacy requirement of Rule 23, a conflict "must be more than merely speculative or hypothetical." Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 430 (4th Cir. 2003)(citing 5 Moore's Federal Practice § 23.25[4][b][ii] (2002)).

Equifax cannot possibly satisfy that burden since both components of the "adequacy'" test are plainly met here. Plaintiff's counsel is experienced in class action work as well as consumer protection issues under the Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq*, and have been approved as Class counsel in multiple cases before this Court.

Plaintiff does not have any interests antagonistic to those of the proposed class and is prepared to pursue this litigation vigorously to redress the wrongs alleged. Both the named Plaintiff and the proposed class share an identical interest in establishing Defendant's liability. To establish liability, all members of the proposed class seek the same findings on the common questions of law

and fact.  No apparent or even imagined antagonism exists between the named Plaintiff and the members of the putative class.

Defendant has in Phase I telegraphed its intent to assert a challenge to Ms. Soutter's adequacy based upon her position as regards her non-pursuit of actual damages.  For herself, the Plaintiff seeks solely statutory and punitive damages.   Similarly, she has proposed a class definition that excludes from its membership consumers who assert that they have sustained actual damages in excess of $1,000 (the statutory damages maximum under § 1681n).  In response, Equifax apparently would raise an argument now rejected in this Court as well as by the Fourth Circuit: the assertion that a consumer who does not pursue actual damages is in conflict with those in the class who may.  See Gardner v. Equifax Info. Servs., LLC, 2007 WL 2261688, at *5 (D. Minn. 2007).

For a conflict of interest to defeat the adequacy requirement, "that conflict must be fundamental." Gunnells, 348 F.3d at 430 (citation and internal quotations omitted).  "A conflict is not fundamental when, as here, all class members 'share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants].' Moreover, a conflict will not defeat the adequacy requirement if it is "merely speculative or hypothetical[.]" (citation and internal quotations omitted).  Ward v. Dixie Nat. Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010).   This is the greatest difficulty facing Equifax in its argument.  Despite the completion of Phase I discovery it offers no proof or identification of putative class members who would seek to litigate substantial actual damage claims.  Conjecture is an inadequate basis for opposing class certification.

Equifax's expected argument is that by pursuing a FCRA claim in this case without including those consumers who would allege inordinately large actual damages, the Plaintiff would harm such consumers if permitted to represent the class.  For several reasons, this possibility does not render Plaintiff inadequate.  First, the number of such persons – consumers who by the § 1681e(b) violation challenged in this case would have suffered and be able to prove significant actual damages - will be

limited.  The claim herein is for the inaccuracy in the initial Equifax credit report.  In contrast, the

Plaintiff does not seek class treatment of a claim for violating § 1681i(a), the provision most often

litigated with significant damage proofs. The damages sustained in these cases will nearly always be

limited to the loss suffered until the consumer could make and accomplish their § 1681i(a) dispute.

If the inaccuracy were not thereafter corrected, then the FCRA violation from which damages would

arise would be the separate violation of § 1681i(a).[4]  *See e.g.* <u>Gardner v. Equifax Info. Services, LLC</u>,

2007 WL 2261688 (D. Minn. Aug. 6, 2007) (Likely that many members of a § 1681i(a) class would

assert actual damage claims).

Second, for the largest share of the class, the event terminating the judgment was its

satisfaction.  Satisfied judgments remain in a consumer's credit report, but thereafter are noted as

"Paid."  The improvement in a consumer's credit score after such an update is important, but

incremental.  And of course, the Plaintiff has proposed in her class definition the same exclusion of

consumers with hard damage claims that was permitted in the Fourth Circuit's recent FCRA

decision, <u>Stillmock v. Weis Markets, Inc.</u>, 09-1632, 2010 WL 2621041, *3 (4th Cir. July 1, 2010).

Nevertheless, it is possible that the Court not define the Class with such exclusion.  And it is

conceivable that a small number of consumers may otherwise chose to prosecute a claim for actual

damages greater than available statutory damages.  In such event, Rule 23(c)(2) contemplates the

protection of a class member's opt out right.  The Fourth Circuit has found the protection not just

relevant, but sufficient.   <u>Gunnells</u>, 348 F.3d at 430-2 (" Rule 23(c)(2) permits members of a class

maintained under section (b)(3) to opt out of the class, providing an option for those Plaintiffs who

wish to pursue claims against TPCM requiring more individualized inquiry. Thus, rhetoric aside,

---

[4]  The lone exception to this reality is in an employment context where the consumer is seeking a benefit (a job) that is unique and would become unavailable after an inaccurate consumer report causes the employer to hire a different applicant.  Plaintiff has excluded such reports – already a very small part of Equifax's business – from those triggering class membership.  Equifax separately codes its hard inquiries as employment purposed as it must necessarily comply with the notice requirements of 15 U.S.C. § 1681k(a)(1).

Plaintiffs with only direct claims are not being "[j]amm[ed]," "sacrificed" or "caught" in any class action against their will. (citation omitted)."). Likely that many members of a § 1681i(a) class would assert actual damage claims). This is as well the conclusion of the Seventh Circuit. <u>Murray</u>, 434 F.3d at 952-953 ("When a few class members' injuries prove to be substantial, they may opt out and litigate independently. See <u>Jefferson v. Ingersoll International, Inc.</u>, 195 F.3d 894 (7th Cir.1999).") As <u>Murray</u> explained, "Only when all or almost all of the claims are likely to be large enough to justify individual litigation is it wise to reject class treatment altogether.") <u>Id</u>. In contrast, in a § 1681i(a) class claim, opt-out protections may not be sufficient. <u>Gardner v. Equifax Info. Services, LLC</u>, 2007 WL 2261688 (D. Minn. Aug. 6, 2007) (distinguishing <u>Murray</u> because class alleged under 15 U.S.C. § 1681i(a)).

Defendant cannot dispute by its argument the very real likelihood that absent class relief, the modest, but important FCRA claims at issue in this case would go unresolved. Defendant's contemplated defense of the interests of putative class members – concern that they not lose their theoretical actual damages claims – is disingenuous. It raises the same irony considered by the Seventh Circuit in <u>Eggleston v. Chicago Journeyman Plumbers Local Union No</u>. *130*:

> [I]t is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified. When it comes, for instance, to determining whether "the representative parties will fairly and adequately protect the interests of the class," […] it is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.

657 F.2d 890, 895 (7th Cir. 1981). In truth, there can be no conflict as the real decision is between pursuing class litigation for statutory and punitive damages or instead not pursuing any claim at all. <u>Gunnells v. Healthplan Servs., Inc.</u>, 348 F.3d 417, 426 (4th Cir. 2003)("First, it appears likely that in the absence of class certification, very few claims would be brought against TPCM, making "<u>the adjudication of [the] matter through a class action ... superior to no adjudication of the matter at all</u>." See 5 *Moore's Federal Practice* § 23.48[1] (1997).")(emphasis added). There is no likely interest by

class members to *individually* litigate.   All the Court need consider is the disproportionate gap between the number of Virginia consumers who have had to and did make a dispute (17,000) and those who have been able to file a lawsuit (1). *See* <u>Gunnells v. Healthplan Servs., Inc.,</u> 348 F.3d 417, 424 (4th Cir. 2003).

There is no just alternative to class certification.  Without class treatment, thousands of Virginia consumers will remain with inaccurate credit reports and no viable means to pursue their FCRA claims.  If Equifax somehow could articulate a developed basis to oppose certification because of damages issues, either as to adequacy or predominance of class issues, the last best alternative would not be a result that left the class claims unlitigated.  Rather, it would be a trial plan and class certification order that reserved for class treatment all liability issues, with damage questions untouched and otherwise reserved for individual litigation.  The Court would certify the class on select issues for class determination. "Not infrequently, actions filed as class actions present predominating common issues of liability, while proof of damages may remain as individual issues for the several class members. Under Rule 23(c)(4), an action may be maintained as a class action with respect to particular issues. Courts have frequently upheld class actions limited to common issues, while deferring or severing individual issues of the named parties or of the class for later disposition."  3 Newberg on Class Actions § 9:47 (4th ed.).  *See, e.g.,* <u>Valentino v. Carter-Wallace, Inc.</u>, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues."); <u>Fabricant v. Sears Roebuck</u>, 202 F.R.D. 310, 317 (S.D. Fla. 2001) ("Numerous courts have certified TILA actual damages class actions on the issue of liability to resolve common questions.").  If liability is established, this Court could then "either appoint a master to resolve actual damages or merely allow class members to bring individual actions with the benefit of a *res judicata* finding of liability." <u>Fabricant,</u> 202 F.R.D. at 317.  As this

Court explained:

> The Advisory Committee's Note accompanying the 1966 amendments of Rule 23, 39
> F.R.D. 98, 106, recommends severing issues in order to allow each class to establish,
> if they can, defendant's liability to the class as a whole, while reserving the proof of
> individual issues for a later proceeding. The procedure has been utilized by federal
> courts in class actions where the advantages and economies to be achieved by a single
> adjudication of common issues recommends class action treatment of those issues.
> See Samuel v. University of Pittsburgh, 538 F.2d 991 (3d Cir.1976); Bing v.
> Roadway Express, Inc., 485 F.2d 441 (5th Cir.1973); Green v. Wolf Corp., 406 F.2d
> 291 (2d Cir.1968), cert. denied 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969);
> See generally 7A Wright & Miller, Federal Practice & Procedure: Civil § 1790 at
> 187-88 (1972). Further, A.H. Robins and Rule 23(c)(4) make plain that district courts
> may separate and certify certain issues for class treatment. A.H. Robins, 880 F.2d at
> 728.

Chisolm v. TranSouth Fin. Corp., 184 F.R.D. 556, 566 (E.D. Va. 1999).

## II.    PLAINTIFF'S CLAIMS SATISFY THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(b)(3)

Under Fed. R. Civ. P. 23(b)(3), an action that satisfies the threshold prerequisites for

certification may be maintained as a class action if the court finds that: (1) "the questions of law or

fact common to the members of the class predominate over any questions affecting only individual

members"; and (2) "a class action is superior to other available methods for the fair and efficient

adjudication of the controversy."  Plaintiff's claim satisfies those requirements.

### A.    Common Questions Of Law Or Fact Predominate Over Individual Ones.

Rule 23(b)(3)'s predominance inquiry does not require Plaintiff to "show that the legal and

factual issues raised by the claims of each class member are identical."  In re Napster, 2005 U.S.

Dist. LEXIS 11498, at *28.  Rather, the focus of that inquiry is on whether the proposed classes are

"sufficiently cohesive to warrant adjudication by representation."  Amchem, 521 U.S. at 623.  Thus,

"[w]hen common questions present a significant aspect of the case and they can be resolved for all

members of the class in a single adjudication, there is clear justification for handling the dispute on a

representative rather than on an individual basis."  Hanlon, 150 F.3d at 1022.  "This standard is

met . . . where there exists generalized evidence that proves or disproves an element of the class member's claim on a simultaneous, class-wide basis." White, 2002 U.S. Dist. LEXIS 26610, at *58.

Rule 23(b)(3) requires that the questions of law or fact common to all members of the class predominate over questions pertaining to individual members. Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 142 (4th Cir.2001); *Simmons v. Poe*, 47 F.3d 1370, 1380 (4th Cir. 1995). The predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. Gariety v. Grant Thornton, LLP, 368 F.3d 356, 362(4th Cir. 2004)(citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623_24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)); Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 142 (4th Cir.2001). This criterion is normally satisfied when there is an essential common factual link between all class members and the defendants for which the law provides a remedy. Talbott v. GC Servs., Ltd. Pshp., supra, 191 F.R.D. at 105 citing Halverson v. Convenient FoodMart, Inc., 69 F.R.D. 331 (N.D. Ill. 1974).

Resolution of the common issues of fact and law in this case in a single proceeding will not only promote the efficient adjudication of these matters; it will dispose of them almost entirely.   As suggested above, the most significant issues in the case all pertain to uniform conduct by Equifax – its uniform credit reporting procedures, its knowledge and notice of the defects in its systems; the willfulness of its conduct.  In contrast, the individual inquiries are modest at best: *Did Equifax furnish a credit report about that consumer in response to a "hard inquiry" by one of its customers? Did the credit report contain a Virginia civil judgment as unpaid more than 30 days after it was in fact terminated? How many times did Equifax commit this violation for that consumer?*

Inasmuch as the issues of liability are unquestionably common to the class, Equifax can defeat certification under Rule 23(b)(3) only by showing that individual issues relating to each class member's entitlement to damages predominate over that issue.  But it cannot make that showing. Class members would not be required to prove causation or actual damages in order to obtain statutory damages. Accordingly, far from raising any individual questions, the statutory damages

determination is itself an issue that is largely common to the classes as a whole, and the availability

of such damages would "weigh[] in favor rather than against class certification*." In re Napster,* 2005

U.S. Dist. LEXIS 11498, at *36. As the Fourth Circuit just this summer explained in reversing denial

of certification in a FCRA case:

> Where, as here, the qualitatively overarching issue by far is the liability issue of the
> defendant's willfulness, and the purported class members were exposed to the same
> risk of harm every time the defendant violated the statute in the identical manner, the
> individual statutory damages issues are insufficient to defeat class certification under
> Rule 23(b)(3).

*Stillmock v.* Weis Markets, Inc*.*, 09-1632, 2010 WL 2621041 (4th Cir. July 1, 2010).

The lone individual issue for each class member is the amount of statutory damages and

punitive damages appropriate for each class member.  The amount of statutory damages between

$100 and $1,000 and the amount of awarded punitive damages will depend on the number of

violations suffered by each respective consumer.  Id. at *6.  This is a simple determination – each

consumer report that the Defendant furnished during the period in which its credit reporting was

inaccurate is a violation of §1681e(b).   Accordingly, Plaintiff's statutory damage claims raise no

individual questions in relation to the amount of damages.  *See, e.g.*, *Acosta*, 260 F.R.D. at 571

(noting that any distinction among claims of class members relating to the §1681e(b) damages they

suffered "is immaterial here where the FCRA awards statutory damages"); *Bonner*, 2006 U.S. Dist.

LEXIS 54418, at *18-19; *White*, 2002 U.S. Dist. LEXIS 26610, at *56-57.[5]

**B.     The Class Action Device Is Superior To Other Available Methods For Adjudicating
These Controversies.**

Finally, the Court must determine whether a class action be superior to other methods for the

fair and efficient adjudication of the controversy under Fed. R. Civ. P. 23(b)(3).   Lienhart v. Dryvit

---

[5]  Inasmuch as Plaintiff is not seeking class treatment with regard to actual damage
determinations, these cases raise no individual questions with regard to such determinations.
See, *e.g*., Murray, 434 F.3d at 953 ("a representative plaintiff must be allowed to forego claims
for compensatory damages in order to achieve class certification").

Systems, Inc., 255 F.3d 138, 142 (4th Cir.2001); In re A.H. Robins Co., Inc., 880 F.2d 709, 713 (4th

Cir. 1989).  The factors to be considered in determining the superiority for the class mechanism are:

1) the interest in controlling individual prosecutions; 2) the existence of other related litigation; 3) the

desirability of concentrating the litigation in the forum; and 4) manageability.  Hewlett v. Premier

Salons Int'l, Inc., 185 F.R.D. 211, 220 (D.Md.1997); Newsome v. Up_To_Date Laundry, Inc.,    219

F.R.D. 356, 365 (D.Md. 2004).

Efficiency is the primary focus in determining whether the class action is the superior method

for resolving the controversy presented.  Talbott, 191 F.R.D. at 106 citing Eovaldi v. First Nat'l

Bank, 57 F.R.D. 545 (N.D. Ill. 1972).    In examining these factors, it is proper for a court to consider

the "...inability of the poor or uninformed to enforce their rights, and the improbability that large

numbers of class members would possess the initiative to litigate individually." Citifinancial v.

Logan Furniture Mart, Inc., 503 F.2d 1161, 1164 (7th Cir. 1974).   "In determining superiority, courts

also consider the anticipated amount of recovery for each plaintiff.  Class actions are particularly

appropriate where multiple lawsuits would not be justified because of the small amount of money

sought by the individual plaintiffs." *See Advisory Committee Note* to 1996 Amendment to Rule 23.

Thus, the class mechanism permits a large group of claimants to have their claims adjudicated in a

single lawsuit.  In so doing, certification enables the court to manage a large number of small and

medium sized claims where the awesome costs of discovery and trial could easily prevent any

adjudication of those claims and preclude any relief to the class.  See Lozada v Dale Baker

Oldsmobile Inc., 197 F.R.D. 321, 332-333 (W.D. Mich. 2000).

Class litigation is not only the most efficient means of adjudicating these disputes; it is the

only means.  Separately litigating the common issues that bind the two classes, whether in hundreds

or hundreds of thousands of individual lawsuits would be a practical impossibility—even assuming it

were economically feasible for consumers to pursue these claims on their own.  Furthermore, even if

just a small fraction of the classes were to bring individual suits, the adjudication of common issues

in a single proceeding would be infinitely more efficient than would be the separate adjudication of thousands of individual claims.[6]

The reality, however, is that the alternative to class treatment in these cases is not hundreds of thousands, or even hundreds, of individual actions.  "As courts have repeatedly recognized, the statutory damages available under the FCRA are 'too slight to support individual suits.'" _E-Loan_, 2006 U.S. Dist. LEXIS 62654, at *28; _see also_ In re Farmers, 2006 U.S. Dist. LEXIS 27290, at *44; White, 2002 U.S. Dist. LEXIS 26610, at *52; Braxton, 209 F.R.D. at 662.  Moreover, even if that were not the case, the large majority of class members would never think to bring individual claims because they are unaware their rights have been violated—having little lay knowledge of the complex blanket of FCRA protections.  See, e.g., Bonner, 2006 U.S. Dist. LEXIS 54418, at *22 ("[M]any of the persons in these classes may be unaware that the form letter sent by Defendants may violate the FCRA, and a class action suit may help to safeguard their rights."); White, 2002 U.S. Dist. LEXIS 26610, at *58 ("Because . . . individual putative class members may not be aware of the violation of their [FCRA] rights, it appears improbable that the putative class members would possess the initiative to litigate their claims individually.").

"[T]here is a strong presumption in favor of a finding of superiority" where, as here, "the alternative to a class action is likely to be no action at all for the majority of class members." Cavin, 236 F.R.D. at 396.[7]  This presumption is rooted in the policy that lies "at the very core of the class

---

[6] See, _e.g._, White v. E-Loan, 2006 U.S. Dist. LEXIS 62654, at *28 (N.D. Cal. Aug. 18, 2006) ("given that thousands of consumers may have suffered identical injury, a class action is certainly the most efficient way to adjudicate disputes over those consumers' rights"); Cavin, 236 F.R.D. at 396; Bonner, 2006 U.S. Dist. LEXIS 54418, at *21; White, 2002 U.S. Dist. LEXIS 26610, at *53 ("the piecemeal approach is rife with shortcomings, not the least of which is the possibility of inconsistent adjudications with regard to an identical course of conduct").

[7] The minute fraction of consumers who theoretically might bring individual claims were this action not certified for class treatment can hardly assert any substantial interest in controlling the prosecution of their claims.  Such individual control "matters mainly when absent class members have personal injury claims."  White, 2002 U.S. Dist. LEXIS 26610, at *50.  "Where as here, the

action mechanism"—namely, "overcom[ing] the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 625.  Thus, as Judge Easterbrook noted in <u>Murray v. GMAC Mortgage</u>, "Rule 23(b)(3) was designed for situations such as [those involving FCRA statutory damage claims for impermissible use], in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate."  434 F.3d at 953; see also <u>Bonner</u>, 2006 U.S. Dist. LEXIS 54418, at *21-22.

Given the commonality that characterizes all of the issues in these cases, such treatment will not raise any significant manageability hurdles, despite the large size of the proposed classes.  Even if it did, however, "[a] class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the . . . wrongdoing that will go unpunished if class treatment is denied—to no litigation at all."  <u>Carnegie v. Household Int'l, Inc.</u>, 376 F.3d 656, 661 (7th Cir. 2004). In short, absent class action treatment, "there is unlikely to be any meaningful enforcement of the FCRA by consumers whose rights have been violated[.]"  <u>E-Loan, 2006</u> U.S. Dist. LEXIS 62654, at *28.

Finally, judicial resources are best economized and focused by handling this case as a class action.  <u>Mitchell-Tracey</u>, 237 F.R.D. at 560; <u>Arrington</u>, 2001 WL 34117734 at *8.  Indeed, unless Class members obtain relief through this class action, most will likely obtain no relief at all.  There simply is no other practical means for this Class to challenge a practice which stands in clear violation of federal law.  "The desirability of providing recourse for the injured consumer who would otherwise be financially incapable of bringing suit and the deterrent value of class litigation clearly render the class action a viable and important mechanism in challenging fraud on the public."  6 H.

---

focus of the proceeding will be the alleged course of conduct of the defendants in conscious disregard of the consumers' rights, the purpose of which is to determine whether statutory and punitive damages are due, the interest in personally controlling the litigation is small."  *Id*.  To the extent any individual does wish to retain such control, he or she can always opt out of the Class.

NEWBERG AND A. CONTE, NEWBERG ON CLASS ACTIONS § 21:30 (4th ed. 2003).

Alternatively, in the unlikely event that Class members become aware of their rights and are able to locate counsel, this would result in a multiplicity of scattered suits resulting in the inefficient administration of litigation.   The remarks of one district court faced with common issues of similar import are no less applicable here: "[t]here can be no serious dispute that . . . that considerations of judicial economy heavily favor litigating these common issues once, as part of a single class action, rather than rehashing the same questions of law and fact in each of what could likely amount to [hundreds of] thousands of individual lawsuits."  In re Napster, 2005 U.S. Dist. LEXIS 11498, at *29.

## CONCLUSION

The proposed class meets the requirements of Rule 23(a) as well as Rule 23(b)(3).  On this basis, the Plaintiff respectfully moves that the Court grant her Motion for Class Certification.

Respectfully submitted,
DONNA K. SOUTTER


_____/s/_____
Leonard A. Bennett, VSB # 37523
Counsel for the Plaintiff
Consumer Litigation Associates, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, VA 23606
Tel:     757- 930-3660
Fax:     757-930-3662
lenbennett@clalegal.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of October, 2010, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification to the following:

John Anthony Love
King & Spalding
1180 Peachtree St NE
Atlanta, GA 30309-3521
TLove@KSLAW.com

John Willard Montgomery, Jr.
Montgomery & Simpson, LLLP
2116 Dabney Rd., Suite A-1
Richmond, VA 23230
jmontgomery@jwm-law.com

Barry Goheen
King & Spalding
1180 Peachtree St NE
Atlanta, GA 30309-3521
bgoheen@kslaw.com

K. Ann Broussard
King & Spalding
1180 Peachtree St NE
Atlanta, GA 30309-3521
abroussard@kslaw.com

_____/s/_____
Leonard A. Bennett, VSB # 37523
Counsel for the Plaintiff
Consumer Litigation Associates, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, VA 23606
Tel:    757- 930-3660
Fax:    757-930-3662
lenbennett@clalegal.com