**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| DONNA K. SOUTTER, *for herself and on behalf of all similarly situated individuals*, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | |
| | : | 3:10-CV-00107-REP |
| EQUIFAX INFORMATION SERVICES LLC, | : | |
| | : | |
| | : | |
| Defendant. | : | |

**EQUIFAX INFORMATION SERVICES LLC'S**

**RESPONSE IN OPPOSITION TO**

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

John W. Montgomery, Jr.
Virginia State Bar No. 37149
Counsel for Equifax Information Services, LLC
Montgomery & Simpson, LLLP
2116 Dabney Road, Suite A-1
Richmond, VA 23230
Telephone (804) 355-8744
Facsimile (804) 355-8748
Email: jmontgomery@jwm-law.com

Barry Goheen (Admitted *Pro Hac Vice*)
J. Anthony Love (Admitted *Pro Hac Vice*)
King & Spalding LLP
1180 Peachtree Street N.E.
Atlanta, Georgia 30309-3521
Telephone (404) 572-4600
Facsimile (404) 572-5100
Email: bgoheen@kslaw.com
            tlove@kslaw.com
Counsel for Equifax Information Services LLC

## INTRODUCTION

Equifax Information Services LLC ("Equifax") submits this response in opposition to Plaintiff's motion for class certification (Doc. 73). Plaintiff's motion, which seeks certification of an ill-defined statewide class asserting a single one claim for violation of § 1681e(b) of the Fair Credit Reporting Act ("FCRA"), should be denied for any of several reasons. First, Plaintiff's class definition contained in her motion -- the fourth one she proposed in only eight months -- does not allow the putative class to be objectively ascertained. Second, Plaintiff is neither a typical nor an adequate representative of the proposed class. Third, Plaintiff does not satisfy the predominance requirement -- among other things, her sole claim for violations of § 1681e(b) requires proof of an inaccurate credit report, which is a uniquely individualized issue -- nor does she satisfy the superiority requirement, given the fact that she sued another consumer reporting agency for the same allegations and settled on an individual basis, eschewing any attempt at class certification. Accordingly, as detailed below, Plaintiff's motion for class certification should be denied.

## RELEVANT FACTUAL BACKGROUND

### I. THE REPORTING AND DISPOSITION OF JUDGMENTS IN VIRGINIA'S CIRCUIT AND GENERAL DISTRICT COURTS

Virginia is divided into 31 judicial circuits, with a total of 120 circuit courts of general jurisdiction and 140 general district courts. (*See Virginia Courts in Brief*, http://www.courts.state.va.us/courts/cib.pdf (last visited Nov. 11, 2010).) Each court maintains a clerk's office, which receives, processes, and maintains records of all cases brought before it. (*Id*.) The Office of the Executive Secretary of the Virginia Supreme Court ("OES") provides administrative assistance to all courts in Virginia and maintains a Department of Information Systems ("DIS"). (*See* Deposition of Ken Mittendorf (attached as Exhibit 1), 4:17-19.) A Case

1

Management System ("CMS") developed by DIS is used by all general district courts and most circuit courts to record information concerning judgments and their dispositions. (*Id*., 5:11-6:17, 8:7-15, 9:16, 11:21-12:5.)  DIS makes limited information about cases in the district and circuit courts available to the public through the Virginia Supreme Court's website. (*Id*., 10:2-17.)  The information is extracted from CMS and stored in a separate database, the current iteration of which is known as "DB2." (*Id.*, 14:15-22.)

### A.      The Flow Of Case Information Through CMS And DB2

Case information in the district and circuit courts flows from the courtroom or clerk's office to CMS, and then to DB2. (*Id*., 14:15-22.)  Initially, the court clerk enters information about a new case – such as the parties and attorneys – into CMS. (*Id.*, 14:23-15:10.)  Court clerks have access to CMS terminals, where information about events in a case can be recorded either while court is in session, or in the clerk's office the next day. (*Id.*, 15:11-21.)  No one from the Virginia Supreme Court reviews the physical records and documents that are in the clerk's offices of Virginia's district and circuit courts before case information is made available on the Supreme Court website; thus, if an error is made at the trial court level, that error will also appear in DB2. (*Id.*, 17:1-15.)

When subsequent events, such as judgments or other actions, occur in cases, information is entered into CMS by court personnel. (*Id.*, 22:22-23:11.)  Special codes are used as a shortcut for entry of some information. (*Id.*, 25:3-9.)  The letter "I," for example, means that a case was dismissed, while "A" means that a judgment was vacated. (*Id.*, 27:12-22.)  The final step is transfer of information from CMS to the Supreme Court's DB2 database, where it is made available to the public through the Virginia Supreme Court website. (*Id.*, 35:4-24.)

### B.     The Reporting Of Judgments And Judgment Dispositions

When a court enters a judgment, the clerk's office makes a notation of that fact in CMS. (*See* Mittendorf Dep., 20:19-21:14.)  If the judgment is subsequently satisfied, appealed, vacated, or set aside, the clerk's office will update CMS to reflect the disposition.  (*Id.*, 22:22-23:5.)  As discussed below, the manner in which each disposition type is handled varies considerably.

### 1.     Satisfactions

While special CMS codes exist for certain types of dispositions such as dismissals ("I") and vacated judgments ("A"), no code exists for satisfactions.  (*Id.*, 42:4-43:10; *see also* Exhibit 2, Gen. Dist. Ct. Case Management User's Guide, Section IV, Civil Hearing Disposition ("User Guide").)  Instead, CMS contains a special field labeled "JGMT SAT."  (*Id.*, 42:18-43:1.)  When the court receives notification that a judgment has been satisfied, the clerk is required to enter a checkmark or an "x" and the date that the court received notice of the satisfaction, not the date the satisfaction occurred.  (*Id.*, 42:21-43:10, 44:11-17.)  No code exists for entering a satisfaction because the date is not controlled by the court and will not be known by court employees until notice is received from one of the parties.  (*Id.*, 43:2-21.)[1]  Absent such notice, the court has no way to determine whether or when payments are made by the debtor.  (*Id.*, 43:1-44:10.)  For this reason, a judgment may be satisfied well before notice is sent to the court and, consequently, well before the satisfaction is recorded by the court clerk.  (*Id.*, 44:11-17.).

The clerks of the court enter the date that the court *received* the satisfaction as the date *satisfied* in CMS.  (*Id.*, 72:1-73:21.)  For 2008 and 2009, approximately 15-16% of general district court judgments were satisfied.  (*Id.*, 70:20-71:16.)  In the Richmond City General

---

[1] The court provides a form that parties may use to notify the court that a judgment has been satisfied.  A copy of the form, called a DC-458 form, is attached as Exhibit 4.  The circuit courts use a different form, a copy of which is attached as Exhibit 5.

District Court ("GDC"), where Plaintiff's judgment was filed, the clerk updates the CMS system to reflect a satisfied judgment when the clerk receives a Notice of Satisfaction and the notice complies with Va. Code § 16.1-94.01.  (Decl. of Sandra Blount (attached as Exhibit 3), ¶ 5.).

### 2.      Appeals And "Vacates" And "Set Asides"

As with satisfactions, no code exists in CMS for an appeal.  (*Id.*, 44:18-21; *see also* User Guide (Ex. 2).)  Instead, CMS has a section to note when an appeal has been requested and when it has been "perfected."  (*Id.*, 44:18-45:2.)  The clerk enters the date the appeal is requested and then, if the appeal is perfected, that date is entered in the date-perfected field.  (*Id.*, 45:1-46:2.)  Less than one-half of 1% of general district court cases are appealed.  (*Id.*, 70:19-71:4.)

CMS contains a code ("A") for vacated judgments, which the clerk must enter.  (*Id.*, 27:7-28:11, 46:3-5.)  CMS does not contain a code for "Set Aside."  (*See* User Guide (Ex. 2).)  In the Richmond City GDC, copies of vacated judgments are placed in a specific area of the Clerk's Office labeled "Credit Bureau Strikes" and are available to the public.  (Blount Decl. ¶ 9.)  A stamp is placed on the copy of the original judgment that states "Strike From Your Records" advising that the judgment should no longer be on the judgment debtor's credit history.  (*Id.*)  The "strikes" are made available to the public upon request.  (*Id.*)

## II.   EQUIFAX'S ROLE IN THE COLLECTION OF JUDGMENTS AND DISPOSITIONS IN VIRGINIA GENERAL DISTRICT AND CIRCUIT COURTS

### A.      Equifax's Relationship With Its Public Records Vendors

Equifax is a consumer reporting agency.  (Decl. of Shawn DeGrace (attached as Exhibit 6), ¶ 3.)  With respect to public records such as judgments and the dispositions of judgments in Virginia, Equifax contracts with a public records vendor ("PRV"), which specializes in gathering information relating to court filings. (*Id.* ¶ 4.)  Equifax has maintained relationships with PRVs

4

to gather public record information since at least the late 1980s.  (*Id.*)  The use of a PRV is standard practice in the credit reporting industry.  (*Id.*)

In Virginia, Equifax has used LexisNexis as its PRV since February 2007 (*id.* ¶ 5), and their contract requires LexisNexis to meet certain quality and performance standards and to comply with all applicable laws and regulations.  (*Id.* ¶ 6.)  Equifax also performs certain data quality checks of the information provided by the PRV.  (Decl. of Margaret Leslie (attached as Exhibit 7), ¶ 4.)  Consumers who believe that a judgment is being inaccurately reported in their credit files can dispute the entry with Equifax.  (Decl. of Alicia Fluellen (attached as Exhibit 8), ¶ 5.)  When Equifax receives such a dispute, it contacts the PRV, which then contacts the original source of the information (generally the court), reviews the information, and reports the results to Equifax.  (*Id.*)  Equifax requires the PRV to verify all information from the "primary source," defined as the courthouse from which the record was obtained.  (*Id.* ¶ 6.)

### B.  LexisNexis's Role In The Collection Of Public Records

#### 1.  LexisNexis's Collection Of Public Records Generally

LexisNexis collects information regarding civil judgments of the general district courts in Virginia.  (Decl. of Mark Johnson (attached as Exhibit 9), ¶ 2.)  It also collects information regarding a small number of judgments from the Virginia circuit courts.  (*Id.*)  LexisNexis or one of its predecessor companies has been collecting judgment information, including information about satisfactions and vacated judgments, in Virginia for over ten years.  (*Id.* ¶ 3.)

LexisNexis uses a variety of methods for collecting information regarding civil judgments and case dispositions from Virginia district courts.  (*Id.* ¶ 5.)  At one time, the Virginia Supreme Court provided information regarding judgments and case dispositions in bulk via electronic media.  (*Id.*)  In some instances, LexisNexis's independent contractors perform an

5

in-person review of source documents at courthouses using a variety of methods.   (*Id.*) LexisNexis has also retrieved selected information about case dispositions from the Virginia Supreme Court's website.   (*Id.*)   Finally, LexisNexis collects information about public records from the circuit courts via an in-person review of source documents.   (*Id.*)[2]

## 2.      Collection Of Records Through The Bulk Feed

Until May 2009, the Virginia Supreme Court made available information regarding civil judgments and case dispositions in the Virginia district courts via regularly scheduled bulk feeds. (Johnson Decl., ¶ 6.)  Specifically, LexisNexis received, among other things, the (A) court name, (B) case number, (C) name and address of the defendant (judgment debtor), (D) name of the plaintiff (judgment creditor), (E) date filed, (F) judgment amount, and (G) disposition date, if applicable.   (*Id.*)   LexisNexis was advised by personnel at the Virginia Supreme Court that the disposition date shown in some records was the date a satisfaction was recorded (not the date paid), or the date a judgment was vacated by order of the court or after an appeal.   (*Id.*)

LexisNexis was advised by DIS personnel that the bulk feed would provide data necessary to track the current status of Virginia district court civil judgments, including timely updates to reflect satisfactions and, in some cases, vacated judgments.   (*Id.* ¶ 7.)    LexisNexis

---

[2] Plaintiff's brief contains many misstatements of fact in reliance on a declaration provided by a retired court clerk for the Newport News GDC.  (Doc. 73-5.)  While she might be competent to testify regarding procedures in Newport News before she retired, she has no knowledge regarding the over 250 other district and circuit courts in Virginia.   Plaintiff's attempts to extrapolate her testimony across Virginia should be rejected.  LexisNexis has provided a proper foundation to testify concerning operations in all Virginia courts, unlike Ms. Hain, who worked in one court and is not even a current employee.   Indeed, Ms. Hain's declaration contains significant opinion testimony, much of which should be stricken because she was not disclosed as a purported expert in accordance with the operative scheduling order. Furthermore, Equifax has supplied the declaration of Ms. Blount, which contains information from the current clerk in the court in which Plaintiff's judgment was entered.  Ms. Blount's declaration is appropriately limited to her knowledge of procedures in her court.  (Supplemental Decl. of Sandra Cox Blount (attached as Exhibit 3B), ¶ 1.)

6

also conducted standard quality assurance reviews of the bulk feeds and monitored the volumes of case dispositions relative to civil judgments and other statistics for consistency with its historical experience. (*Id.*) To supplement known gaps in the bulk feed relating to vacated judgments, LexisNexis employed independent contractors to conduct in-person reviews of source documents in the district courts as described below. (*Id.*)

### 3. Collection Of Records Through The Supreme Court's Website

The OES also maintains a public access website through which limited information about civil judgments in Virginia general district courts may be obtained. (*Id.* ¶ 8.) LexisNexis developed a "webscrape" to cull information from that website through automated searches. (*Id.*) The webscrape was designed to identify case dispositions relating to cases for which the Supreme Court's bulk feed had previously reported information about a civil judgment. (*Id.*) LexisNexis used the case numbers associated with previously reported judgments to search for dispositions in those cases. (*Id.*) The webscrape was used until December 2009, at which time the Virginia Supreme Court altered the access procedures for its website, thereby preventing use of automated searches. (*Id.* ¶ 9.)[3]

### 4. Collection Of Records Through In-Person Visits To Courts

#### (a) General Practices

LexisNexis uses independent contractors, or collectors, to obtain information about civil judgments and case dispositions from Virginia's district courts. (Johnson Decl. ¶ 10.) They visit

---

[3] Seriously testing the limits of Rule 11, Plaintiff asserts that the bulk feed was terminated because, in part, the "Supreme Court was concerned with how its data was being used by Equifax's agent." (Doc. 73 at 5.) That statement is utterly false, demonstrated by Plaintiff's failure to provide any record cite that would support such a statement. That falsehood is illustrative of several unsupported, false statements that permeate Plaintiff's brief and call her credibility (and adequacy) into serious question.

each district court to obtain information on judgments and dispositions recently entered.  (*Id.*)
They review publicly available information and record what they find using a program
developed by LexisNexis.  (*Id.*)  During each visit, the collector retrieves information about civil
judgments and case dispositions first made publicly available since the last visit, including the
(A) judgment debtor's name and address, as it appears in the court file, (B) date the judgment
was filed, (C) case number and amount of judgment, (D) plaintiff's name (i.e., the creditor), and
(E) judgment status (filed, satisfied, or vacated).  (*Id.* ¶ 11.)

### (b)     Variable Access To Records Among The Courts

The methods used by each collector vary depending on the access available at each court,
the relationship the collector has with court personnel, and unique, unexpected events that may
arise during a court visit or over time.  (*Id.*)

As to case dispositions, the collectors are required to review specific fields in the source
documents to determine whether to code the judgment as satisfied or vacated.  (*Id.* ¶ 12.)
Information needed to make this determination may be displayed in different places and in
different forms depending on the type of source document made available to the collector and the
practices of the specific district court.  (*Id.*)  Some district courts (and judges) use varied
terminology and  different forms of orders to report the same kind of case disposition.  (*Id.*)  For
example, the Richmond City District Court used the term "strike" in some cases where the
judgment has been vacated.  (*Id.*)  In addition, many district courts, including the Richmond City
District Court, describe a vacated judgment as a "dismissal," despite the fact that this term is
more commonly used to refer to the termination of a proceeding. (Suits are dismissed, judgments
are vacated.)  (*Id.*)  District courts also may reference a vacatur as a "reversal."  (*Id.*)

The collector's access to the records varies according to the means of access provided by each district court. (*Id.* ¶ 13.) For example, a collector who visits four courts may access the records in four different ways: (A) via a computer terminal available to the public in the courthouse that allows access to records for that court only, (B) via a computer terminal available to court workers only, but offered to the collector by court personnel, (C) by reviewing the original records, or (D) by reviewing print-outs or other summaries of records prepared or provided by court staff. (*Id.*)

Using case dispositions as an example, some clerks in the Virginia district courts prepare weekly spreadsheets of the dispositions entered and keep the spreadsheets for the collectors. (*Id.* ¶ 14.) Other clerks create a pile, sometimes placed in a box, of the disposition records entered between visits by the collectors. (*Id.*) In other courts, the collectors must search the case numbers in the public access terminals to determine in which cases dispositions have been filed, or review the original records if in a district court with a smaller docket. (*Id.*)

Collectors develop relationships with court personnel that may improve the level of access and cooperation. (*Id.* ¶ 15.) Some collectors are more successful than others in developing these relationships, and these relationships change over time. (*Id.*) For example, court personnel might allow one collector to use a computer terminal designed for use by court personnel, while another may deny access. (*Id.*) Likewise, some court personnel might be more willing to create and make available lists of disposition summaries, while others are less cooperative. (*Id.*) The specific collector used at a particular district court has changed over time, affecting these relationships and possibly modifying the process used at that court. (*Id.*)[4]

---

[4] The Johnson declaration contains two tables that reflect the different collection procedures and how they vary by court and disposition type. (Johnson Decl. ¶ 17.)

## III.   THE UNIQUE FACTS OF THE NAMED PLAINTIFF

### A.   Plaintiff's Admitted Failure To Pay A Debt To Virginia Credit Union And The Resulting Lawsuit And Disposition

Plaintiff admits that she had a Visa Platinum account with Virginia Credit Union ("VCU") on which she owed VCU approximately $15,000. (Deposition of Donna Soutter (excerpts attached as Exhibit 10), 19:17-20:10.) VCU sued her in the Richmond City GDC by filing a Warrant in Debt on June 21, 2007. (*See* Exhibit 11.) Plaintiff subsequently entered into a payment plan with VCU. (Soutter Dep., 23:6-16.) Nevertheless, a judgment was entered against her and in favor of VCU in the amount of $14,403.79 on January 29, 2008. (*See* Exhibit 12.) Counsel for VCU then filed a motion to have the judgment set aside, and the court entered an order on March 20, 2008, which ruled that the judgment was "set aside and dismissed without prejudice." (*See* Exhibit 13.) Plaintiff still owes over $7,000 to VCU. (Soutter Dep., 27:7-15.) She concedes that her judgment was not satisfied or appealed. (*Id.*, 57:6-11.)

The clerk of the Richmond City GDC entered information concerning Plaintiff's case into CMS. (*See* Mittendorf Dep., 22:17-21.)[5] After the last hearing in the case, a court employee entered a notation that the case had been dismissed by entering an "I" code for dismissal. (*Id.*, 23:21-24:9.) The court employee had the option of entering a code "A" for vacated, but did not do so. (*Id.*, 28:4-11.) As of September 2010, the case reported as "dismissed." (*Id.*, 33:21-25.)

### B.   Plaintiff's Two Disputes With Equifax

Plaintiff contacted Equifax on two occasions concerning the judgment. (Fluellen Decl. ¶ 7.) First, Equifax received a letter from Plaintiff on May 20, 2008, wherein Plaintiff stated that the VCU judgment had been entered against her in error, and she enclosed a copy of the order

---

[5] Attached as Exhibit 14 is a screen shot reflecting information in CMS for Plaintiff's case. (Mittendorf Dep., 21:21-22:6.)

dismissing the case.   (*Id*. ¶ 8 and Ex. A.)  At that time, the judgment was not on Plaintiff's credit file, and Equifax sent Plaintiff a letter so advising her.  (*Id*. ¶ 9.)

Second, Equifax received a letter from Plaintiff on December 28, 2008, disputing the judgment and enclosing a copy of the order dismissing the case.  (*Id.* ¶ 10 and Ex. B.)  In response, Equifax promptly removed the judgment from her credit file and sent her a letter so advising her.  (*Id*. ¶ 10.)  Equifax received no further communications from Plaintiff concerning the judgment.  (*Id*.)   Plaintiff has no evidence that the judgment has ever reappeared on her credit file, and she is not aware of any credit denials based on an Equifax report at any time since the judgment was removed from her credit file.  (Souter Dep., 37:10-17.)

## C.   Plaintiff's Claimed Actual Damages

### 1.   Alleged Credit Score Damage

Plaintiff alleges that "Plaintiff and other class members suffered credit score damage." (Doc. 2 ¶ 26.)  Consistent with that allegation, Plaintiff testified at her deposition that she and other putative class members have "sustained damage to their credit score as a result of what Equifax allegedly did in this case."  (Souter Dep*.*, 71:22-72:1.)  Plaintiff testified that her credit score was very high before the VCU judgment appeared on her file and that it was much lower thereafter.  (*Id.*, 73:24-74:4.)  Plaintiff also asserts that "every member of the class had some sort of credit score damage."  (*Id.*, 77:3-5.)[6]

### 2.   Seven Categories Of Actual Damages Listed In Initial Disclosures

---

[6] A consumer credit score is a numerical calculation based on information in a consumer's credit file.  (Leslie Decl. ¶ 6.)   One purpose of a credit score is to estimate the likelihood that a consumer will meet his or her debt obligations.  (*Id*.)  Credit scores may depend on many variables in a consumer's particular credit file, such as number of open accounts, balances, delinquencies, and public record information.  (*Id*.)  Therefore, Equifax's procedures for reporting public record data in Virginia will potentially impact different consumers in different ways.  (*Id*.)

11

In her Rule 26(a)(1) Disclosures, Plaintiff listed seven types of actual damages, including emotional distress, anguish, frustration, damage to reputation, embarrassment, and economic damage.  (*See* Exhibit 15 at 5.)  Although Plaintiff's counsel attempted to coach his client at her deposition by stating that Plaintiff is "not seeking individual damages" (Soutter Dep., 66:3-4), Plaintiff nevertheless testified that she did, in fact, have "actual, cognizable damages with respect to Equifax."  (*Id.*, 69:8-13.)  She then testified that she had some level of actual damages *for each of the seven subcategories* listed in her Disclosures.  (*Id.*, 70:22-71:3.)

### 3.      Credit Denial

Further, in her responses to Equifax's interrogatories, Plaintiff stated that she "has been denied credit based on the inaccurate information reporting within her credit file," incorporated "her Rule 26(a)(1) disclosures as her claim for damages," and expressly alleged a credit denial by Discover Financial Services on December 16, 2008.  (*See* Pl.'s Resp. to Def.'s Interrog. Nos. 10 and 11 (copy attached as Exhibit 16).)  Plaintiff was able to obtain credit with other merchants in 2008 even with the judgment on her file.  (Soutter Dep., 36:22.)

### D.      Plaintiff's Class Action Lawsuits Against Consumer Reporting Agencies

Plaintiff has filed separate class actions in this Court against two other consumer reporting agencies concerning the same judgment at issue in this case.  On November 4, 2009, Plaintiff filed Civil Action No. 3:09-cv-695 against Experian Information Solutions, Inc.  (*See* Exhibit 17.)  On July 26, 2010, Plaintiff filed Civil Action No. 3:10-cv-514 against Trans Union, LLC.  (*See* Exhibit 18.)  Plaintiff testified that her claims against Experian parallel those against Equifax and arise from the same basic set of events.  (Soutter Dep., 43:3-20.)  Plaintiff settled with Experian – on an individual basis – for an undisclosed sum of money; she then dismissed that case and did not seek class certification.  (*Id.*, 46:1-48:1.)  Plaintiff testified that her

12

settlement with Experian was sufficiently satisfactory that she no longer needed to pursue a class action against it.  (*Id.*, 52:1-14.)  To date, Plaintiff has not served Trans Union.

## IV.   PLAINTIFF'S CLASS CERTIFICATION MOTION

Plaintiff filed her original complaint on February 17, 2010, and a first amended complaint (the operative complaint) on February 26, 2010 (Docs. 1, 3).   On July 20, 2010, the Court severed the misjoined claims of a second plaintiff and transferred them to the United States District Court for the Eastern District of Pennsylvania.  (Doc. 50.)

### A.   Plaintiff's Four Class Definitions

In the eight months spanning the original complaint and the filing of her class certification motion, Plaintiff offered no less than *four* different class definitions – a clear sign that the proposed class cannot be identified or ascertained with any precision.

### 1.   The Proposed Classes In The Original And Amended Complaints

Plaintiff initially proposed a class of "[a]ll consumers for whom Equifax furnished a consumer report which reported a judgment that was either set aside, vacated or dismissed with prejudice."  (Doc. 1 ¶ 14.)  The amended complaint proposed a much different class definition:

> All consumers (a.) who Equifax credit files show had a primary address in Virginia as of February 17, 2010, (b.) about whom Equifax furnished a consumer report to a third party that showed a civil judgment in the General District Court for the City of Richmond at any time on or after February 17, 2008; and (c.) where, on such date the report was furnished, the records of the General District Court for the City of Richmond showed that the judgment had been satisfied, appealed, vacated or otherwise set aside.

(Doc. 3 ¶ 24.)

### 2.   The Expansion Of The Proposed Class In Discovery

Plaintiff's interrogatory responses, served on September 28, 2010, substantially broadened the proposed class, both geographically and with regard to the courts at issue.

Specifically, in her third attempted formulation of a class, Plaintiff defined the putative class as:

> (a) All natural persons who (b) in February 2008 or in a month thereafter maintained a primary address located in the Commonwealth of Virginia in their Equifax credit file and (c) during any such month had within their Equifax credit file a civil judgment in a Virginia General District Court or Virginia Circuit Court with an unpaid status, (d) and after the date such judgment was added to the Equifax credit file, but before any update was made to the file to show that judgment as paid, satisfied, vacated, set aside or appealed, were the subject of a hard inquiry request for an Equifax consumer report, (e) more than 30 days after the respective Virginia General District Court or Virginia Circuit Court records showed the judgment as paid, satisfied, vacated, set aside or appealed.

(Pl.'s Resp. to Def.'s Interrog. No. 15) (Ex. 16.)  Even here, Plaintiff continued to hedge her bets, stating that the "Amended Complaint states only one possible formulation of the class definition," and that "Plaintiff will proffer a second definition in her intended Second Amended Complaint," which was never filed.  (*Id.*)

### 3.   Plaintiff's Fourth Proposed Class Definition In Her Motion

In her class certification motion, Plaintiff has further altered her proposed class definition, which, in its fourth formulation in eight months, now attempts to sweep into the class:

> (1) All natural persons (2) for whom Equifax's records note that a "hard inquiry" credit report was furnished to a third party (3) other than for an employment purpose (4) at a time when any Virginia General District Court or Circuit Court judgment that had been satisfied, appealed, or vacated more than 30 days earlier was reported in Equifax's file as remaining unpaid.

(Doc. 73 at 8.)  Significantly, Plaintiff's current definition drops the earlier reference to "the records of the General District Court for the City of Richmond."  In fact, Plaintiff's current proposed definition does not have any link to the records of the courts of any general or circuit court, which is not surprising given the fact that Plaintiff's name does not appear on the data provided by Equifax or the data provided by the Virginia Supreme Court, which Plaintiff had intended to use to identify the putative class members.  Plaintiff's efforts to ascertain the class

14

through the use of these records clearly was abandoned when she realized, following the depositions of DIS personnel, that it would be futile to do so.

Plaintiff's motion contains further parameters for class membership not found in the definition.  First, she drops a footnote after the phrase "30 days earlier," stating:  "Because 15 U.S.C. § 1681e(b) assigns liability only if an agency fails to act reasonably to assure maximum possible accuracy (as opposed to imposing strict liability), Plaintiff has suggested a window of 30 days within which Equifax would have obtained the updated Court record.  Nearly all of its abstracting of unpaid Virginia court judgments is performed in a shorter window." (*Id.* at 8 n.2.)

Second, immediately following the definition, Plaintiff states that her "suggested definition would exclude from the Class 'those individuals who have suffered actual damages [greater than $1,000] due to Defendant's [FCRA] violations.'" (*Id.* at 8, quoting *Stillmock v. Weis Markets, Inc.*, 2010 WL 2621041, *3 (4th Cir. July 1, 2010) (brackets added by Plaintiff).) Finally, Plaintiff notes that her proposed class definition requires proof of "inaccurate reporting of civil judgments." (*Id.* at 7.)  In other words, because the sole claim in the case is asserted under § 1681e(b) of the FCRA, each class member must prove that his or her credit report was inaccurate as a prerequisite to recovery, as Plaintiff concedes at the outset of her motion. (*See id.* at 2, quoting *Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409, 415 (4th Cir. 2001), for the proposition that a claim under § 1681e(b) requires proof, among other things, that "the consumer report contains inaccurate information.")

## B.      Plaintiff's Inability To Ascertain The Putative Class

Plaintiff's four proposed class definitions in eight months demonstrate, among other things, her inability to propose and define an ascertainable class.  Indeed, despite her undertaking extensive efforts to obtain information from the Virginia Supreme Court and from Equifax,

15

Plaintiff's class certification motion is silent on the specifics of any proposed methodology for ascertaining the class -- no doubt because the data obtained by Plaintiff from the Virginia Supreme Court is wholly unreliable for ascertaining a class, evidenced by the fact that Plaintiff's name does not appear on the Supreme Court list. [7]

### 1. The Data Produced By Equifax During Discovery

In discovery, Equifax produced three sets of data to Plaintiff.  (Leslie Decl. ¶ 7.)  The first set listed consumers who had disputed a Virginia judgment on their credit file under four different dispute codes pertaining to the disposition of judgments.  (*Id.*; Fluellen Decl. ¶ 11.) Plaintiff's name does not appear on this set of data because Equifax removed the VCU judgment in December 2008.  (Leslie Decl. ¶ 7.)  Because Plaintiff's dispute was resolved based on the documents she provided to Equifax, no dispute code was entered in her file, consistent with Equifax's procedures.  (*Id.*)

The second set of data included a subset of the consumers listed in the first set of data who still had judgments in their credit files as of the date the data was produced.  (*Id.* ¶ 8.) Plaintiff's name does not appear in this data because her judgment was deleted from her credit file in December 2008, before the data was produced.  (*Id.*)  The third set of data included a list of consumers from three zip codes in Virginia who had current Virginia judgments in their credit files.  (*Id.* ¶ 9.)  Plaintiff's name does not appear in this data because her judgment was deleted from her credit file in December 2008, before the data was produced.  (*Id.*)

---

[7] It is significant that the Plaintiff's class definition in the operative complaint contains a requirement that "the records of the General District Court showed that the judgment had been satisfied, appealed, vacated or otherwise set aside" (Doc. 3 ¶ 24), yet Plaintiff's class definition in her motion does not contain any similar provision requiring a search of the court records in the Richmond City GDC or any other Virginia court.

## 2.      The Data Produced By The Virginia Supreme Court

Plaintiff's counsel requested certain data from the Virginia Supreme Court as part of this lawsuit.  (Mittendorf Dep., 47:9-12.)   Specifically, counsel requested information regarding certain types of cases with judgments or judgment dispositions.  (*Id.*, 47:9-22.)  Plaintiff's name did not appear on the list provided by the Supreme Court because her counsel did not request information on dismissed judgments.  (*Id.*, 48:8-20.)  In addition, the list provided by the court contains not only judgments involving individual consumers, but also businesses against whom a judgment was entered.  (Deposition of Mamiko Barnard (excerpts attached as Exhibit 19), 30:4-14.)  The data does not include any information at all from the circuit courts.  (*Id.*, 8:9-13.) Moreover, the list contains addresses for consumers, but does not indicate whether the addresses are current or years old.  (*Id.*, 32:23-33:19.)  Ms. Barnard also testified that the satisfaction dates entered may not reflect the date the judgment actually was satisfied (*id.*, 17:7-12), thus calling the reliability of that data into further question.

## <u>ARGUMENT</u>

Plaintiff's sole claim against Equifax is that it allegedly failed to follow reasonable procedures to assure maximum possible accuracy of its consumer reports, in violation of 15 U.S.C. § 1681e(b).  She alleges that "Equifax adopted procedures that collected and reported updates to public record civil judgments that were less systematic and effective than those it used to collect and report the underlying judgments."  Doc. 3 ¶ 30.[8]  That claim is not certifiable.

---

[8] Equifax, of course, denies that it violated § 1681e(b).  Indeed, Equifax's procedures are reasonable, particularly given the substantial differences that exist from court to court and disposition type to disposition type in Virginia, as discussed below.

I.      **THE DECISION ON WHETHER A CLASS SHOULD BE CERTIFIED REQUIRES RIGOROUS ANALYSIS.**

Plaintiff bears the burden of proving all requirements of Rule 23.  *See Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001).  "[I]n case after case," the Fourth Circuit has stressed that "it is *not the defendant* who bears the burden of showing that the proposed class *does not comply* with Rule 23, but that it *is the plaintiff* who bears the burden of showing that the class *does comply* with Rule 23."  *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006) (emphasis original) (citing cases).  Struggling to discharge that burden, Plaintiff makes several misstatements of the law, suggesting her inability to demonstrate the propriety of class certification when assessed under the proper standards.

A.      **The Court Does Not Accept The Allegations In Plaintiff's Complaint As True When Assessing Class Certification.**

First, Plaintiff seriously misstates the law by asserting that, at the class certification stage, "the facts of the Complaint are taken as true." Doc. 73 at 8.  Indeed, the district court did exactly that in *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 364-65 (4th Cir. 2004), when it "simply relied on [plaintiffs'] allegations in the complaint," and violated Rule 23 by doing so:  "We conclude that, by accepting the plaintiffs' allegations for purposes of certifying a class in this case, the district court failed to comply adequately with the procedural requirements of Rule 23."

As the Fourth Circuit held in *Gariety*, "[i]f it is appropriate for a court simply to accept the allegations of a complaint at face value in making class action findings, every complaint asserting the requirements of Rule 23(a) and (b) would automatically lead to a certification order, frustrating the district court's responsibilities for taking a 'close look' at relevant matters, for conducting a 'rigorous analysis' of such matters, and for making 'findings' that the requirements of Rule 23 have been satisfied." *Id.* at 365 (citations omitted).  "Moreover, if courts could only

consider the pleadings, then parties would have wide latitude to inject frivolous issues to bolster or undermine a finding of predominance." *Id.* (internal quotations omitted). "[W]hen a district court considers whether to certify a class action, it performs the public function of determining whether the representative parties should be allowed to prosecute the claims of absent class members." *Id.* at 366-67. Given that reality, "[w]ere the court to defer to the representative parties on this responsibility by merely accepting their assertions, the court would be defaulting on the important responsibility conferred on the courts by Rule 23 of carefully determining the class action issues and supervising the conduct of any class action certified." *Id.* at 367.

In short, the allegations in Plaintiff's operative complaint are just that – unsworn assertions. They cannot be accepted as true for purposes of her class certification motion.

**B.      The Court Can, And Should, Evaluate The Merits Of The Case To The Extent Appropriate In Resolving The Class Certification Issue.**

Plaintiff's second misstatement asserts that, at the class certification stage, "an inquiry into the merits is usually forbidden." Doc. 73 at 8 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974)). Yet again, Plaintiff ignores the Fourth Circuit's opinion in *Gariety*, 368 F.3d at 366, which completely refutes that assertion:

> *Eisen*'s prohibition against assessing plaintiffs' likelihood of success on the merits as part of a Rule 23 certification does not mean that consideration of facts necessary to a Rule 23 determination is foreclosed merely because they are required to be proved as part of the merits. The analysis under Rule 23 must focus on the requirements of the rule, and if findings made in connection with those requirements overlap findings that will have to be made on the merits, such overlap is only coincidental.

In short, the law is that a class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. v. Falcon*, 457 U.S. 147, 161 (1982). In other words, "to protect both the rights of the absent plaintiffs to present claims that are different from those common to the class and the

19

right of the defendant to present facts or raise defenses that are particular to individual class members, district courts must conduct a 'rigorous analysis' to insure compliance with Rule 23." *Thorn*, 445 F.3d at 318 (quoting *Falcon*, 457 U.S. at 161).[9]  As set forth below, Plaintiff does not satisfy these "rigorous" standards for class certification.

## II.   PLAINTIFF DOES NOT SATISFY THE REQUIREMENTS OF RULE 23.

"To be certified, a proposed class must satisfy Rule 23(a) and one of the three subparts of Rule 23(b)."  *Thorn*, 445 F.3d at 318.  Moreover, "[a]lthough not specifically mentioned in the rule, the definition of the class is an essential prerequisite to maintaining a class action."  *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976).  Here, Plaintiff fails to satisfy any of these three essential requirements for class certification, let alone all three as required.

### A.   The Proposed Class Is Not Objectively Ascertainable.

It is "elementary" that, "in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."  *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970); *see also Bakalar v. Vavra*, 237 F.R.D. 59, 64 (S.D.N.Y. 2006) ("Whether a proposed class is ascertainable is fundamental to certification.").  As courts in this Circuit have held, a class should not be certified "unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  *Solo v. Bausch & Lomb Inc.*, 2009 WL 4287706, *4 (D.S.C. Sept. 25, 2009); *Cuming v. S.C. Lottery Comm'n*, 2008 WL 906705, *1 (D.S.C. Mar. 31, 2008); *Kirkman*

---

[9] Plaintiff's third error is citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2003), for the proposition that Rule 23 should be given "a liberal rather than a restrictive construction."  Doc. 73 at 10 (quoting *Gunnells*).  The Fourth Circuit's subsequent opinion in *Thorn* retreated from that position:  "To the extent the vision of liberality and flexibility set forth by the court in *Gunnells* conflicts with the Supreme Court's admonitions that we should pay 'careful attention' to Rule 23 by giving it a 'rigorous analysis,' we are, of course, bound to follow the Supreme Court."  *Thorn*, 445 F.3d at 318 n.8.

*v. N. Carolina R.R. Co.*, 220 F.R.D. 49, 53 (M.D.N.C. 2004) (all denying certification due to lack of adequate class definition) (quotations omitted). Moreover, where "certification is sought pursuant to Rule 23(b)(3), as is the case here, "precise definition of the class is required because Rule 23(b)(3) provides for monetary relief and requires notice to allow class members to opt out of the litigation." *Cerdant, Inc. v. DHL Express (USA), Inc.*, 2010 WL 3397501, *5 (S.D. Ohio Aug. 25, 2010) (denying class certification due to lack of ascertainability).

> **1.     The Data Supplied By Equifax And By The Virginia Supreme Court Do Not Identify Members Of The Proposed Class.**

Plaintiff asserts that it is a "simple exercise to compare judgment records and Equifax's files against the [Virginia] Supreme Court Database to determine which Equifax records continued to omit the accurate current status" and a "mathematical exercise to measure the length of delay between the date the judgment was terminated in the Court records and the month that it was later updated by Equifax." Doc. 73 at 12-13. It may be a "simple" exercise to compare the two sets of data as Plaintiff suggests, but it does not allow the class to be ascertained: indeed, *Plaintiff's name does not appear in either the Equifax data or the Virginia Supreme Court data*.

Furthermore, as DIS personnel testified, if data entry errors occur at the clerk of court level, then the data that is available through DB2 and the Virginia Supreme Court website also will be inaccurate. *See* Mittendorf Dep., 17:1-15; Deposition of David Savage (excerpts attached as Exhibit 20), 10:1-18. Plaintiff's own case demonstrates the coding ambiguities that plague the court database. There, the judge entered an order requiring that the judgment against her be "set aside and dismissed with prejudice." *See* Ex. 13. The judge likely intended that order to have the effect of vacating the *judgment* and dismissing the *case* without prejudice, but that is not what the order states. In any event, the appropriate code to be used by the court clerk is unclear. The clerk apparently made the reasonable choice to code the order as a "dismissal," but could

just as reasonably have chosen to code it as a "vacated" judgment.  Regardless, as Plaintiff's circumstances demonstrate, the language used by courts is not always precise or consistent.  Consequently, different courts and different clerks may develop their own unique methods for interpreting orders and assigning codes.

Inaccuracies in the court database are especially problematic with respect to satisfactions, which, according to Plaintiff, form by far the largest segment of the purported class.  Doc. 73 at 21.  Unlike with court orders, the clerk must depend on third parties (the judgment creditors) to provide necessary information for updating the files.  Consequently, examination of the database, or even the court file, will not necessarily reveal whether a judgment has been satisfied.  Given these ambiguities and lapses in available information, the Virginia database cannot, as Plaintiff proposes, be relied upon to identify class members.  Member identification, even if possible, would require examination of a massive number of individual court records and other evidence, which defeats the efficiencies a class action is designed to achieve.  *See Kirkman*, 220 F.R.D. at 53 (denying class certification:  "While the Court would eventually be able to ascertain potential class members through detailed title searches, this task is simply not administratively feasible given the number of potential members across more than 300 miles of land."); *see also Mann v. TD Bank, N.A.*, 2010 WL 4226526, *1 (D.N.J. Oct. 20, 2010) (class certification denied where "there is no feasible way to determine class membership").

The lists extracted from Equifax's database are equally, if not more problematic for purposes of ascertaining the proposed class.  Plaintiff asserts that, "[o]ver the last two years alone, at least 5,000 people have had to make similar disputes to Equifax regarding its failure to update City of Richmond General District Court judgments as terminated."  Doc. 73 at 4-5.  That assertion is incorrect for two reasons.  First, the Equifax data from which Plaintiff derives this

number covers disputes involving not just judgments, but liens as well.  *See* Leslie Decl., ¶ 11. Second, and more importantly, the disputes cover a wide range of circumstances, of which only an unknown fraction are similar to Plaintiff's.  Without a painstaking review of the individual dispute records maintained by Equifax and the individual court files for each putative class member, Plaintiff has no way of determining (1) whether a particular dispute was meritorious; or (2) whether the alleged error resulted from (a) a judgment creditor's failure to report a satisfaction, (b) the court clerk's failure to correctly code a disposition, (c) imprecise wording in a court order, or (d) an alleged deficiency in Equifax's procedures.  The class is unascertainable as a result.  *See, e.g.*, *Tidenberg v. Bidz.com*, 2010 WL 135580, *2 (C.D. Cal. Jan. 7, 2010) (class certification denied where plaintiff provided "no precise and reliable method for objectively ascertaining the identities of class members, or even for establishing that plaintiff herself is a member of the proposed class").

### 2. Plaintiff's Proposed Class Definition Impermissibly Allows – If Not Requires – Putative Class Members to Self-Identify.

Another serious problem is Plaintiff's exclusion from the class of any consumer with more than $1,000 in actual damages. Doc. 73 at 8.  In other words, any consumer believing that he or she has more than $1,000 in actual damages is not a class member.  That membership requirement is not administratively feasible, nor is it objective.  Indeed, the only way for a person to ascertain whether he or she is in the class is to self-identify.

The reason this is problematic is that self-identification allows class members to await the resolution of the case before deciding whether to include themselves in the class.  For example, if a class is certified and a substantial judgment is awarded at trial, a person could, at that time, take the position that (s)he does not have $1,000 in actual damages and, therefore, should be entitled to the benefits of the judgment as a "class member."  Conversely, if a class is certified and

23

Equifax either prevails on a motion for summary judgment or prevails at trial, that same person could take the position that (s)he *does* have $1,000 in actual damages and, therefore, was never in the class and, consequently, could not be bound by the judgment for Equifax, which otherwise would extinguish all of his or her claims, whether for statutory or actual damages.

In essence, the $1,000 cut-off allows any potential class member to assess the outcome of the merits of the case before deciding whether to participate.  Such a scenario manifestly prejudices Equifax and is not permitted.  As another court in this Circuit ruled, individuals "are not allowed to sit idly by, watch what happens, and then make a tactical decision to secure the benefits of … the class action."  *Byerson v. Equifax Info. Services LLC*, 2009 WL 82497, *2 (D.S.C. Jan. 9, 2009) (describing the problem of "one-way intervention").

In any event, a proposed class definition that grants sole discretion to consumers to decide, based on their own subjective beliefs and self-assessment, whether they fall within the class definition is not compliant with Rule 23.  Such subjective criteria fail an essential requirement of class certification.  *See, e.g., Cuming*, 2008 WL 906705, *1 ("The proposed class definition must not depend on subjective criteria or the merits of the case or require an extensive factual inquiry to determine who is a class member."); *In re GM Corp. "Piston Slap" Prod. Liability Lit.*, 2006 WL 1049259, *6 (W.D. Okl. Apr. 19, 2006) (denying certification where "individualized, somewhat subjective determinations" were required "to decide membership") (quoting *Luedke v. Delta Airlines, Inc.*, 155 B.R. 327, 332 (S.D.N.Y. 1993)); *Dumas v. Albers Medical, Inc*, 2005 WL 2172030, *6 (W.D. Mo. Sept. 7, 2005) (certification denied where it was "likely that a substantial number of proposed class members would not know, and indeed would have no way of knowing, whether they were members of the class"); *Mike v. Safeco Ins. Co.*, 223 F.R.D. 50, 54 (D. Conn. 2004) ("Where a threshold inquiry is necessary to determine class

membership, the benefits to proceeding as a class action are eviscerated.") (denying certification); *In re Copper Antitrust Lit.*, 196 F.R.D. 348, 353 (W.D. Wis. 2000) (class definition "must not depend on subjective criteria"; denying certification on this basis).

### 3. The Class Definition Wrongly Assumes Homogeneity In Court Processes, Disposition Volumes, And Pick-Up Frequencies.

Another problem is that class membership requires that the judgment "that had been satisfied, appealed, or vacated more than 30 days earlier was reported in Equifax's file as remaining unpaid." Doc. 73 at 8. That component of the class definition erroneously assumes that the disposition is (1) immediately entered by the court upon disposition and (2) immediately made available for pick-up by the PRV. Plaintiff, however, has presented no evidence regarding the efficiencies of the 260 courts she seeks to include in this lawsuit. Furthermore, Virginia courts have no control over judgment creditors, who are responsible under the law for reporting judgment satisfactions in a timely manner. *See* Va. Code § 16.1-94.01.

Furthermore, Plaintiff improperly imposes a 30-day requirement on pickup, wrongly assuming that every court, district or circuit, in every city and county in Virginia has, or should have, the same pick-up frequency. In fact, courts have widely different volumes of dispositions, which result in widely different pick-up schedules of those dispositions by the PRV. *See* DeGrace Decl. ¶ 8. In other words, there cannot be a "one size fits all" class definition that imposes a 30-day requirement on Equifax to obtain case dispositions given the substantial variations in court procedures, processes, and case and disposition volumes as well as the PRV's pick-up frequency. The FCRA mandates *reasonable* procedures -- it does not impose a 30-day time limit to retrieve case dispositions. No law suggests that a presumption of 30 days, regardless of circumstances, is a reasonable amount of time for transmission of dispositions. *Cf. Fraga v. Smith*, 607 F. Supp. 517, 522 (D. Or. 1985) (decertifying class where plaintiffs alleged

25

unreasonable delay with respect to processing of applications; "whether delays were reasonable or not depends on more than the amount of time INS needed to process an … application").

    **4.**       **The Court Should Decline Plaintiff's Invitation To Define The Proposed Class.**

Virtually conceding the lack of ascertainability, Plaintiff purports to shift that responsibility to the Court, hoping that the Court might "amend or modify the definition of the class … in the interests of judicial economy and fairness."  Doc. 73 at 9.  Such a "wait-and-see approach" is inappropriate:

> At oral argument, Plaintiff's counsel acknowledged that the class definitions were too broad but invited the Court to pare them down with appropriate limitations fashioned in light of evidence to be presented at the merits stage of the action. This wait-and-see approach is untenable because, until a class of persons alleged to be entitled to relief is defined, the Court cannot conduct the numerosity, commonality, typicality and adequacy analyses that must precede certification.

*In re Fosamax Products Liability Lit.*, 248 F.R.D. 389, 397 (S.D.N.Y. 2008).

The Court should be particularly reluctant to assume the responsibility for defining the proposed class in light of Plaintiff's strategic decision to broaden the class to include all of Virginia, and broaden it further to include circuit courts as well as general district courts. Indeed, the definition proposed in the class certification motion is (1) different than the definition proposed less than six weeks previous in her interrogatory responses, which in turn was (2) substantially different than the definition proposed in the operative complaint.  The Court should not define the class given Plaintiff's failure to propose an ascertainable class.  *See Tidenberg*, 2010 WL 135580, *3 ("The Court is particularly reluctant to intrude upon what appears to be a strategic choice by Plaintiff to modify the class definition alleged in the Complaint. Accordingly, the Court denies Plaintiff's Motion on the grounds that Plaintiff has failed to

establish that an identifiable class exists and that the representative plaintiff is a member of the proposed class.") (citing *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 728 (4th Cir. 1989)).

**B.  Plaintiff Does Not Satisfy The Requirements Of Rule 23(a).**

Plaintiff also fails to establish the Rule 23(a) requirements of typicality and adequacy of representation.  Even a properly ascertainable class would not cure these problems.

**1.  Plaintiff Does Not Satisfy The Typicality Requirement.**

"The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'"  *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)).  For this reason, "a comparison of the plaintiffs' claims or defenses with those of the absent class members" is required.  *Deiter*, 436 F.3d at 467.  The typicality analysis "begin[s] with a review of the elements of [the] plaintiff['s] *prima facie* case and the facts on which the plaintiff would necessarily rely to prove it.  We then determine the extent to which those facts would also prove the claims of the absent class members."  *Id.*

To establish a violation of § 1681e(b), which is the sole claim asserted in this case, Plaintiff must prove that (1) her consumer report contained inaccurate information and (2) Equifax failed to follow reasonable procedures to assure maximum possible accuracy.  *See Dalton*, 257 F.3d at 415.  Plaintiff cannot prove inaccuracy through a simple comparison of data extracted from the Virginia Supreme Court and Equifax databases.  Extensive examination of individual court records and credit files would be required.  For this reason alone, Plaintiff is not a typical class member, if indeed any such person exists, because the facts needed to prove the inaccuracy of Plaintiff's credit report will not advance the claims of absent class members.

27

Typicality is further undermined by the absence of uniform procedures in Virginia's various courts.  Plaintiff has not demonstrated that satisfactions, appeals, and vacated judgments are treated in a similar manner by the courts or by LexisNexis.  Furthermore, according to Plaintiff the vast majority of purported class members -- unlike Plaintiff -- have *satisfied* judgments.  Doc. 73 at 21.  This fact, plus the unusual circumstances surrounding the judgment entered against Plaintiff (which involved an error made by her creditor), render her atypical.

2.      Plaintiff Does Not Satisfy The Adequacy Requirement.

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (citations, quotations, and brackets omitted).  As a threshold matter, neither of the sets of data upon which Plaintiff bases her claim that the class is ascertainable identifies Plaintiff; in other words, to the extent that Plaintiff seeks to use either the Equifax data or the Virginia Supreme Court data to identify class members, she cannot represent the putative class because her name is not in either data set.  *See Weinberger v. Retain Credit Co.*, 498 F.2d 552, 556 (4th Cir. 1974) (where named plaintiff was "not a member of the class he seeks to represent," plaintiff did "not fulfill the first prerequisite of Fed. R. Civ. P. 23(a)"); *see also Mann*, 2010 WL 4226526, *13 (certification denied where "even after months of fact discovery, … there is still minimal evidence that [plaintiff] himself qualifies as a class member").

In any event, "basic due process requires that named plaintiffs possess undivided loyalties to absent class members." *Broussard*, 155 F.3d at 338.  It is difficult to perceive how Plaintiff could satisfy that standard here given the undisputed facts that she (1) filed the same lawsuit against Experian, then settled it individually for her own reasons, dismissing her class

allegations in the process and thus leaving those putative class members to fend for themselves, and (2) has unilaterally capped any putative class member's recovery at $1,000.

Certainly, Plaintiff can choose, in her own individual case, what remedies and types of damages she will seek for herself. But as a proposed class representative, she must act in the best interests of the proposed class. *See*, *e.g.*, *Wagner v. Lehman Bros., Inc.*, 646 F. Supp. 643, 661 (N.D. Ill. 1986) ("duty of finest loyalty"). As *Broussard* explicitly holds, a "conflict in remedial interests" renders representation inadequate under Rule 23(a)(4). 155 F.3d at 335. If Plaintiff is similarly situated to the (unascertainable) putative class members as she alleges, then the other putative class members have eight different types of actual damages, all of which are being waived by this Plaintiff. But if Plaintiff's eight types of asserted actual damages are unique to her, such that the other putative class members do not have those damages, then her claims are not typical of those of the putative class members. Either way, Plaintiff does not satisfy Rule 23(a).

Nothing in *Broussard* suggests that this conflict can be ameliorated simply, as Plaintiff contends, through "protection of a class member's opt-out right." Doc. 73 at 21. If that were the law, there would be no need for Rule 23(a)(4); under Plaintiff's unsupported view, so long as an opt-out right is available, any class representative is adequate. That, obviously, is not the law, and nothing in *Broussard* suggests that it should be.

For this reason, Plaintiff's reliance on *Stillmock* and *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006), is misplaced. It was clear that actual damages were virtually non-existent in those cases, which makes sense given the core allegations in those cases (*Murray*: a letter that did or did not constitute a "firm offer of credit"; *Stillmock*: a receipt that did not comply with FACTA, thus leaving willfulness as the only question for resolution). Here, in

contrast, Plaintiff not only alleges actual damages to all putative class members in the form of "credit score damage," she has testified that she personally sustained seven additional types of actual damages in the form of emotional distress, harm to reputation, economic damage, and so on.  In other words, in *Stillmock* and *Murray*, there were, in essence, no actual damages to waive for any putative class members, and the named plaintiffs were not inadequate as a result; in this case, however, Plaintiff not only is waiving her own actual damages in eight different categories, but is requesting permission to do so for untold (and unascertainable) numbers of other individuals.  She should not be permitted to do so.  *See Broussard*, 155 F.3d at 337-39.

### C.      Plaintiff Does Not Satisfy The Requirements of Rule 23(b)(3).

"Rule 23(b)(3) has two components:  predominance and superiority."  *Thorn*, 445 F.3d at 319.  Plaintiff satisfies neither requirement here.

### 1.      Individual Issues Predominate Over Any Common Issues.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623; *Gariety*, 368 F.3d at 362.  Plaintiff does not satisfy the predominance requirement here.

### (a)      Inaccuracy Is A Predominant Individual Issue.

The most obvious individualized issue is inaccuracy.  As Plaintiff concedes in her brief (Doc. 78 at 2), for a claim to succeed under FCRA § 1681e(b) -- which is the only claim Plaintiff asserts here -- the consumer must demonstrate an inaccuracy in her credit file, meaning that an "inaccurate [credit] report is necessary for class membership."  *Id.* at 16.  The inaccuracy determination cannot be made on a classwide basis.

The best source for that proposition is Plaintiff's own counsel, who made exactly this argument before this Court three years ago in an effort to obtain class certification in another

case.  In *Williams v. LexisNexis Risk Mgt.*, 2007 WL 2439463 (E.D. Va. Aug. 23, 2007), counsel

was challenged by the defendant as to why certification was not sought for the 1681e(b) claim,

which was asserted only on behalf of the named plaintiff in that case.  Counsel explained that a

1681e(b) claim is not certifiable, as the Court recited in its opinion:

> Plaintiffs agree that they assert the § 1681e(b) claim only as individuals, but they
> argue that they do so because § 1681e(b) claims require a showing of inaccuracy
> as a threshold matter.  Asserting a § 1681e(b) claim for the entire class would
> render the class action device useless, note Plaintiffs, because it would require an
> assessment of whether or not each class member's report was, in fact, inaccurate.

2007 WL 2439463, *4.

The same 1681e(b) claim that was not certifiable in *Williams* is not certifiable here.  That

claim requires each consumer to demonstrate an inaccuracy in his or her credit file.  Plaintiff

makes no effort to explain how inaccuracy possibly could be adjudicated on a classwide basis,

and in fact it cannot be, a proposition demonstrated by Plaintiff's brief:  her argument on

inaccuracy (Doc. 73 at 3-5) purports to prove inaccuracy via citations to her deposition, the court

documents filed in the VCU case, and Equifax's discovery responses specific to Plaintiff.  In

short, each consumer's credit file and history (as well as each individual court file concerning

each individual consumer) necessarily must be analyzed before Equifax can be found to have

violated § 1681e(b) as to that consumer.[10]

Other courts agree.  For example, in *Owner-Operator Independent Drivers Ass'n, Inc. v.

USIS Commercial Svcs., Inc.*, 537 F.3d 1184 (10th Cir. 2008), the Tenth Circuit affirmed the

denial of class certification in a case asserting a claim under § 1681e(b).  Reciting that an

---

[10] Reviewing each court file for each consumer would be burdensome and disruptive to
the clerks of Virginia courts.  As one clerk testified, "[w]hen a party wishes to see a particular
file(s), our deputy clerks will pull the case(s) and stay with the individual while the case is being
reviewed to insure safe keeping of the court record."  Blount Decl. ¶ 12.

element of an e(b) claim is that "the report in question was, in fact, inaccurate," the court affirmed the district court's ruling that "the accuracy of each individual's [report], an essential element of a § 1681e(b) claim, required a particularized inquiry."  537 F.3d at 1194; *see also Harper v. TransUnion, LLC*, 2006 WL 3762035, *9 (E.D. Pa. Dec. 20, 2006) (denying certification in 1681e(b) case where defendants would be "challenging plaintiff's assertion that defendants issued inaccurate credit reports to the individual class members, so a plaintiff's inquiry would have to extend to the financial history of each putative class member").

As in this case, the claims in *Owner-Operator* and *Harper* each asserted willful FCRA violations.  *See Owner-Operator*, 537 F.3d at 1188 (plaintiffs' claims included "willfully … failing to assure maximum accuracy" of reports); *Harper*, 2006 WL 3762035, *9 ("Plaintiff's proposed trial plan provides for a single trial on liability and a single finding as to statutory and punitive damages.  I find that such a plan is untenable under the liability analysis required by § 1681e(b).").  Class certification was deemed inappropriate in those cases, and not even sought by the same Plaintiff's counsel before this Court in *Williams*.

In short, Equifax is unaware of any reported case in which a federal court has certified a § 1681e(b) claim for class treatment.  This Court should not become the first.  Indeed, "the record must affirmatively reveal that resolution of the [claim] on the merits may be accomplished on a class-wide basis."  *Thorn*, 445 F.3d at 321; *see also Stott v. Haworth*, 916 F.2d 134, 145 (4th Cir. 1990) ("Class certification is only proper when a determinative critical issue overshadows all other issues.").  Plaintiff does not satisfy that standard here.[11]

---

[11] Again, Plaintiff's reliance on *Stillmock* is misplaced.  In that case, the court held that certification is proper where "the qualitatively overarching issue by far is the liability issue of the defendant's willfulness."  2010 WL 2621041, *5.  *Stillmock* was not a 1681e(b) case, and thus the class members in that case were not required to demonstrate inaccuracy.  Here, for any

32

> **(b)** **The Issue Of "Reasonable Procedures" Cannot Be Determined On A Classwide Basis.**

Likewise, the other primary issue in a § 1681e(b) claim -- the reasonableness of the consumer reporting agency's procedures -- cannot be resolved on a classwide basis, and it is reasonable as a matter of law for a consumer reporting agency to rely on court records. *See Henson v. CSC Credit Services*, 29 F.3d 280, 285-86 (7th Cir. 1994). Indeed, the evidence in this case demonstrates that the circumstances under which LexisNexis and Equifax gather information from Virginia courts vary widely from court to court and from time to time. No single, uniform procedure is followed, nor should it be. Having expanded the case to include all of Virginia, and expanding it further to include circuit courts in addition to district courts, Plaintiff has now swept into this lawsuit courts that are significantly different with respect to procedures, number of cases, accessibility, degree of automation, and the amount of cooperation and assistance provided to LexisNexis's representatives.

In other words, what might be "reasonable" as to one consumer in a specific court in a specific locality cannot apply to the circumstances of another consumer in a different court in a different locality. Consequently, evidence required for advancement of Plaintiff's individual claim would be significantly different from the evidence required for other class members. *See McDonald v. Prudential Ins. Co.*, 1999 WL 102796, *4 (N.D. Ill. Feb. 19, 1999) (certification denied where court was required "to make an individual assessment" on proper rates "in reference to the appropriate geographical area").

---

putative class member to maintain a claim against Equifax, that consumer must demonstrate an inaccuracy, which is the "qualitatively overarching issue" for the sole claim in this case, § 1681e(b).

Plaintiff completely ignores the idiosyncrasies that exist among the courts spread across Virginia by describing her claim at "an unacceptably general level." *Deiter*, 436 F.3d at 467 (affirming denial of certification). Plaintiff merely alleges that "Equifax adopted procedures that collected and reported updates to public record civil judgments that were less systematic and effective than those used to collect and report the underlying judgments." Doc. 3 ¶ 30. As in *Dieter*, such a vague allegation is "unacceptably general" to sustain class certification.

The predominance of individual issues is further demonstrated by the absence of uniform procedures in Virginia's various courts. Plaintiff presents no evidence that satisfactions, appeals, and vacated judgments are treated in a similar manner either by the courts or by LexisNexis. Plaintiff, for example, claims that Equifax "did not obtain any judgment terminations for at least a year and a half (ending just this year)." Doc. 73 at 1. This alleged lapse, however, did not occur until *after* the disputed judgment had been removed from Plaintiff's credit file in December 2008. Fluellen Decl., ¶ 10. Certainly, Plaintiff would have no standing to assert a claim based on alleged facts that occurred after the time her credit file was corrected, nor would such evidence be admissible on her claim. Regardless, because the circumstances for collection of data changed during the alleged "lapse period," a different assessment of reasonableness would be required than for the time period pertinent to Plaintiff's claim.

As the Fourth Circuit held in *Broussard*, "only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class." 155 F.3d at 340. Moreover, as *Broussard* makes clear, "the class action device" does not permit plaintiffs "to strike [defendant] with selective allegations, which may or may not have been available to individual named plaintiffs." *Id*. at 345. The substantial difference in court procedures,

automation, and numerous other issues preclude any ability to adjudicate reasonableness in a uniform, classwide manner.  Predominance is, therefore, lacking for this additional reason.

            (c)        **As Plaintiff Concedes, The Amount Of Statutory Damages Will Vary By Consumer.**

As noted above, Plaintiff should not be allowed to jettison actual damages for the entire proposed class given her testimony that she has sustained at least eight different types of actual damages.  But even if the Court could allow Plaintiff to gerrymander her claims in this way, individualized issues remain even with regard to statutory damages, as Plaintiff concedes:  "The amount of statutory damages between $100 and $1000 in the amount of awarded damages will depend on a number of violations suffered by each respective consumer."  Doc. 73 at 26.

Plaintiff's assertion that "[t]his is a simple determination" (*id.*) is incorrect -- as detailed above, inaccuracy is a uniquely individualized issue; certainly no data produced by Equifax or by the Virginia Supreme Court suggests any inaccuracy in Plaintiff's credit reports.  Because inaccuracy is an individualized issue, which Plaintiff ties to the award of statutory damages, the amount of statutory damages also is an individualized issue.

Other courts have agreed that statutory damages depend, at least in some part, on the individual circumstances of each class member.  *See*, *e.g.*, *Campos v. ChoicePoint, Inc.*, 237 F.R.D. 478, 486 n.20 (N.D. Ga. 2006) (individual issues precluding class certification included "the determination of the proper amount of statutory damages to impose for each violation"); *Glatt v. PMI Group, Inc.*, 2004 U.S. Dist. LEXIS 28927, *16 (M.D. Fla. Sept. 7, 2004) ("the amount of damages is likely greater for some putative class members than for others or for the named plaintiffs -- whether actual or statutory," thus "the Court's determination of the amount of statutory damages would be determined based on each class member's individual situation -- not

on the least common denominator of the putative class").[12] Statutory damages, under Plaintiff's own formulation, are a predominant individual issue.

### 2. A Class Action Is Not The Superior Method Of Adjudication.

"The superiority requirement ensures that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" *Thorn*, 445 F.3d at 319 (quoting Fed. R. Civ. P. 23(b)(3)). Plaintiff does not satisfy the superiority component here.

### (a) The Presence Of The FCRA's Fee-Shifting Provision Counsels Against A Finding Of Superiority.

The law is settled that the superiority requirement is not satisfied when the plaintiff's claims implicate statutes allowing the successful plaintiff to recover her attorneys' fees. In other words, the availability of attorneys' fees for the successful plaintiff means that the case can never be a "negative value" case, which in turn justifies the case proceeding individually. Courts have applied this principle in the FCRA context. *See*, *e.g.*, *Harper*, 2006 WL 3762035, *10 ("I am … persuaded by Defendants' argument that the FCRA, by providing for the award of attorneys' fees, already provides an incentive for the putative class members to bring individual claims."); *see also Anderson v. Capital One Bank*, 224 F.R.D. 444, 451 (W.D. Wis. 2004) (holding that a "class action is not necessary to give injured parties an opportunity for relief that would be too expensive to obtain if they were limited to individual suits" because "their suits are essentially costless because they are entitled to an award of attorney fees and costs they incur in bringing suit"); *Campos*, 237 F.R.D. at 490 (class certification unnecessary, as "the statutory provision

---

[12] Judge Wilkinson's concurrence in *Stillmock* made exactly this point: "To protect 'the right of the defendant to present facts or raise defenses that are particular to individual class members,' … businesses deserve at least the opportunity to argue that certain individuals should receive statutory damages at the low end of the range." 2010 WL 2621041, *9 (Wilkinson, J., concurring) (quoting *Thorn*, 445 F.3d at 318).

entitling a plaintiff to recover costs and attorney's fees, should provide sufficient motivation for individual adversely affected plaintiffs to bring suit").[13]

The Fourth Circuit agreed in *Thorn*, which was brought under civil rights statutes that contain, like the FCRA, a fee-shifting provision.   Affirming the district court's denial of certification in that case, the Fourth Circuit approved the lower court's finding that "the class-action device was not necessarily superior to individual trials":

> Significantly, the district court noted that the small amount of each class member's claim would not dissuade an attorney from taking class member's individual cases because 42 U.S.C.A. § 1988 (West 2003) allows prevailing plaintiffs in § 1981 and 1982 actions to recover attorney's fees.

*Thorn*, 445 F.3d at 328.  Superiority is, therefore, lacking on this basis.

###### (b)       As Plaintiff Has Demonstrated, Individual Actions Are An Appropriate Way To Adjudicate These Issues.

Furthermore, Plaintiff's assertion that "[c]lass litigation is not only the most efficient means of adjudicating these disputes; it is the only means" (Doc. 73 at 27) is preposterous. Indeed, the most compelling refutation of that argument is Plaintiff herself -- she sued Experian under exactly the same facts (i.e., the VCU judgment supposedly languishing too long on her credit file, resulting in a denial of credit and other actual damages), and she settled with Experian on an individual basis for substantial money.  It borders on the frivolous for Plaintiff to assert that "these disputes" can only be adjudicated in a class action when she settled on an individual basis against another consumer reporting agency asserting the same allegations.

---

[13] Significantly, Judge Wilkinson cited both *Anderson* and *Campos* in his *Stillmock* concurrence, opining that "[t]here is no shortage of incentives for consumers to bring individual suits" in these circumstances because such suits are "essentially costless to winning plaintiffs." 2010 WL 2621041, *14 (Wilkinson, J., concurring) (quoting *Anderson*).

Furthermore, Equifax is aware of at least one other individual case filed in Virginia that makes these allegations. In *Janice and Kevin Holloway v. Sterling Church St. Furniture P'ship*, Case No. CL09-5897 (Cir. Ct. for City of Norfolk, filed Sept. 15 2009) (complaint attached as Exhibit 21), Ms. Holloway alleges that a default judgment was entered against her by the Virginia Beach General District Court on October 4, 2006, which was then vacated on October 13, 2006. *Id*. ¶¶ 7-8. The vacated judgment, however, did not appear on the CMS until March 2009 -- two-and-a-half years later. *Id*. ¶ 9. According to the complaint, Ms. Holloway "made several attempts, by contacting the General District Court, to have the correction made, but all to no avail." *Id*. ¶ 10. Among the defendants she sued is Equifax, which allegedly erroneously reported the judgment on her credit file. Her complaint seeks "[c]ompensatory damages from Equifax in the amount of $80,000" and "[p]unitive damages against Equifax in the amount of $90,000." *Id*. at 10.

In short, Equifax is aware of four lawsuits asserting claims arising from judgments allegedly not picked up by PRVs -- the three lawsuits Plaintiff has filed against Experian, Equifax, and Trans Union, one of which (Experian) she settled for substantial dollars, the second of which (Equifax) she claims to have sustained eight different categories of actual damages, and the third of which (Trans Union) she has declined to serve, while the fourth case (Holloway) seeks $170,000 in damages. In other words, the only evidence before this Court is that these cases can be, and have been, litigated individually just like the hundreds of other individual cases that are filed and litigated against consumer reporting agencies every year in district courts all over the country. There is no need to cram thousands of Virginians, each of whom must prove an inaccurate credit report among other individual requirements, into an unwieldy class action when, as this Plaintiff in her Experian case and the plaintiffs in Holloway demonstrate, such

38

cases are perfectly capable of being litigated and resolved on an individual basis.  *See Harper*, 2006 WL 3762035, *9 ("Due to the individualized proofs required to establish liability under § 1681e(b), I find that individual actions would have greater practical advantages than a class adjudication on these claims.").

### (c)     Plaintiff's "Trial Plan" Is Inefficient And Unconstitutional.

Finally, Plaintiff proposes "a trial plan and class certification order that reserve[s] for class treatment all liability issues, with damage questions untouched and otherwise reserved for individual litigation."  Doc. 73 at 23.  Under that unwieldy scenario, "[i]f liability is established, this Court could then either appoint a master to resolve actual damages or merely allow class members to bring individual actions with the benefit of a res judicata finding of liability."  *Id*. (quotations omitted).

The problems with that "trial plan" are numerous.  First, the fact that Plaintiff would reserve "damage questions" for "individual litigation" demonstrates that any trial of this case as a class action is not feasible and thus is inferior to the traditional form of FCRA litigation. Second, nothing in the law will allow the Court to "appoint a master to resolve actual damages issues or … allow class members to bring individual actions."  The mere proposal of a "plan" that would envision class members bringing their own individual actions conclusively demonstrates that Plaintiff is not proposing a class action but, instead, is seeking to jam thousands of "individual actions" into a proceeding for a special master.  That is not a class action; it is a lawsuit that will "degenerate in practice into multiple lawsuits separately tried." *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.19 (5th Cir. 1996).  "In such cases, class certification is inappropriate."  *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 745 (5th Cir. 2003).

39

Moreover, the Court cannot simply certify and take counsel's word that the case can be managed and tried efficiently (and constitutionally).   Indeed, it has long been the law in this Circuit that a court "should not certify the class merely on the assurance of counsel that some solution will be found."   *Windham v. American Brands*, 565 F.2d 59, 70 (4th Cir. 1977).  For this alternative reason, Plaintiff has not carried her burden of establishing superiority.

## **CONCLUSION**

Plaintiff's Motion for Class Certification should be denied.

/s/
John W. Montgomery, Jr.
Virginia State Bar No. 37149
Counsel for Equifax Information Services, LLC
Montgomery & Simpson, LLLP
2116 Dabney Road, Suite A-1
Richmond, VA 23230
Telephone (804) 355-8744
Facsimile (804) 355-8748
Email: jmontgomery@jwm-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of November, 2010, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to the following:

> Leonard A. Bennett
> Consumer Litigation Associates
> 12515 Warwick Boulevard
> Suite 100
> Newport News, Virginia  23606
> ***Counsel for Plaintiff***

/s/_____
John W. Montgomery, Jr.
Virginia State Bar No. 37149
Counsel for Equifax Information Services, LLC
Montgomery & Simpson, LLLP
2116 Dabney Road, Suite A-1
Richmond, VA 23230
Telephone (804) 355-8744
Facsimile (804) 355-8748
Email: jmontgomery@jwm-law.com

41

## EXHIBIT INDEX

1. Deposition of Ken Mittendorf

2. General District Court Case Management User's Guide, Section IV, Civil Hearing Disposition

3. Declaration of Sandra Cox Blount

      A.  Supplemental Declaration of Sandra Cox Blount

4. General District Court Satisfaction Form

5. Circuit Court Satisfaction Form

6. Declaration of Shawn DeGrace

7. Declaration of Margaret Leslie

8. Declaration of Alicia Fluellen

      A.      May 20, 2008 Correspondence from Plaintiff to Equifax
      B.      December 28, 2008 Correspondence from Plaintiff to Equifax

9. Declaration of Mark Johnson

10. Excerpts of Deposition of Donna Soutter

11. Warrant in Debt

12. Judgment Against Donna K. Soutter

13. Order Dismissing Soutter Judgment

14. CMS Screen Shot of Soutter Case

15. Plaintiff's Rule 26(a)(1) Disclosures

16. Plaintiff's Responses to Equifax's Interrogatories

17. Complaint, Donna K. Soutter v. Experian Information Services

18. Complaint, Donna K. Soutter v. Trans Union

19. Excerpts of Deposition of Mamiko Barnard

20. Excerpts of Deposition of David Savage

21. Complaint, Holloway v. Equifax Information Services LLC