Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF VIRGINIA
 3                  RICHMOND DIVISION
 4   ***********************************************
     DONNA K. SOUTTER, For Herself and On Behalf of All
 5   Similarly Situated Individuals,
 6              Plaintiffs,
           v.                    Civil Action Number
 7                               3:10cv107
     EQUIFAX INFORMATION SERVICES, LLC,
 8
                Defendant.
 9   ***********************************************
10
11
12
13                   DEPOSITION OF
14                  DONNA K. SOUTTER
15                 September 28, 2010
16             1:00 p.m.  -  3:25 p.m.
17                 Richmond, Virginia
18
19
20
21
22
23
24   JOB NO: 33566
25   REPORTED BY:  GWENDA E. APPLEGATE, RPR, CRR
```

Page 22

1   working and started paying, so...
2       Q   I understand you don't recall which of the
3   ones you attended. Do you recall if you attended more
4   than one?
5       A   Only one, but I don't know which one.
6       Q   Okay. And I take it it was not January 29 of
7   2008; right? That was the date that the judgment was
8   entered.
9       A   That was -- I was not present for that.
10      Q   So on the date, whatever hearing date you
11  attended, that's when you met Mr. Oakes?
12      A   Yes.
13      Q   I've seen that name somewhere in the
14  documents, but refresh my recollection. Who is he?
15      A   He was an employee at Virginia Credit Union.
16  You know, I think I went in September. That's when I
17  believe.
18      Q   Okay.
19      A   I think. That's what I want to say.
20      Q   All right. Do you recall if you received
21  notice of a lawsuit at the time it was filed; in other
22  words, you were served with it?
23      A   You're talking about this warrant?
24      Q   I am.
25      A   Yes.

Page 23

1       Q   Were you represented by counsel at any point
2   during that proceeding?
3       A   No, I was not.
4       Q   Now, Mr. Oakes, he's not an attorney, or is he
5   with --
6       A   No. He's an employee of Virginia Credit
7   Union. I don't know if he still works there or not. He
8   is sort of in charge of their collections. And I spoke
9   with him and told him that I was making arrangements,
10  and then he was fine with that. And then once I went
11  into credit counseling and they started making payments
12  in October of '07, and I just assumed it was all
13  handled. I didn't even know anything about the
14  January 29th, '08 hearing until I received in the mail
15  where a judgment had been obtained against me, when I
16  thought that everything was just fine.
17      Q   How did you become aware that the judgment had
18  been obtained against you?
19      A   In the mail.
20      Q   Through a court mailing, or was it from the
21  counsel for the credit union, do you recall?
22      A   I don't remember.
23      Q   Did you receive that notice of the default
24  judgment soon after January 29 of 2008, to the best of
25  your recollection? You don't need to look at --

Page 24

1       A   It was sometime in February.
2       Q   Okay.
3       A   It's this letter from Sandra C. Blount,
4   February 25th. That's the first notification I had.
5           MR. BENNETT: For the record, the witness is
6       referring to the letter that's within Exhibit 4. I
7       think it's the third or fourth, fifth page from the
8       end, the fifth page from the end.
9   BY MR. GOHEEN:
10      Q   Okay. I was actually going to pull another
11  document to talk about that, but we can talk about it
12  now. So that was the, that was the first time you
13  recall being informed of the default judgment?
14      A   That's correct.
15      Q   So you had not spoken with this, I guess
16  attorney, Archie Berkley, who sent this letter to Sandra
17  Blunt? Is that her name?
18      A   Blount, B-L-O-U-N-T.
19      Q   Blount. Okay.
20      A   No, I hadn't. But I did speak to him after I
21  received this letter.
22      Q   After you received the letter. What did you
23  do?
24      A   Well, first I called the credit union to find
25  out why this happened. And then Mr. Berkley, it's my

Page 25

1   understanding, works for the credit union, and he
2   contacted me and told me that they had filed paperwork
3   with the City of Richmond court after this judgment had
4   been obtained in error, I believe is what he said, and
5   that this motion and this order would take care of that
6   for me, so...
7       Q   Okay. And behind that letter --
8       A   Is the motion and the order.
9       Q   Right. The notice of motion, there's two
10  pages, a two-page motion there, I guess. It says that
11  counsel for the plaintiff will appear on March 20, 2008
12  to set aside this judgment; correct?
13      A   Uh-huh.
14      Q   Yes?
15      A   Yes. Oh, I'm sorry.
16      Q   That's okay.
17          So did you ever meet Mr. Berkley?
18      A   I did not.
19      Q   Did you attend the hearing on March 20?
20      A   No. But they sent me information in the mail
21  after that to verify that it had been taken care of. He
22  told me that -- or either he or Mr. Oakes, I can't
23  remember who, told me that there was no need for me to
24  be present, so...
25      Q   Now, you said a few minutes ago you had

Page 26

1  reached this agreement, if that's the right word, maybe
2  it's not, with the debt counseling?
3      A   (Indicating in the affirmative).
4      Q   How did that come about?
5      A   To be honest, I don't remember. I went on
6  line because I think I saw on Oprah Winfrey, believe it
7  or not, there was some guy on there talking about debt.
8  And there are people that actually owe more than I do,
9  believe it or not. They owe -- and he was telling them
10 to get into a debt management program, which I did.
11         I enrolled in something called Take Charge.
12 And they negotiated with the credit union and lowered
13 the interest rate, and the payment comes directly out of
14 my checking account every month. And that's what I did.
15     Q   So this was not something that was offered
16 directly by the credit union?
17     A   No.
18     Q   All right. It's something you affirmatively
19 sought out and --
20     A   Yes.
21     Q   -- enrolled in; is that correct?
22     A   That's correct.
23     Q   But they worked with the credit union to set
24 up the deductions from your paycheck and that sort of
25 thing?

Page 27

1      A   Uh-huh. Take Charge pulled the money out of
2  my checking account, and then they would send the money
3  to the credit union.
4      Q   Okay. You said that began in October of '07,
5  to the best of your recollection?
6      A   Yes.
7      Q   And you may have said this, but I forgot. Are
8  you still paying on it or was it paid off?
9      A   I dropped out of Take Charge because they
10 charge $30 a month to send a check that I could send
11 myself. But I've paid on it. I have a ledger if you
12 need to see it, where I've been paying on it ever since.
13 And it's paid down considerably, so...
14     Q   How much do you have left to --
15     A   I think it's like $7,500.
16     Q   So you've basically knocked out about half of
17 it; is that right?
18     A   Yes.
19     Q   Okay. Equifax had nothing to do with the
20 original lawsuit having been filed against you by the
21 credit union; right?
22     A   No.
23     Q   And Equifax had nothing to do with any failure
24 on your part to pay the debt to the credit union that
25 led to the lawsuit; right?

Page 28

1      A   No.
2      Q   Equifax had no involvement in the facts set
3  forth in paragraph three of this motion; in other words,
4  that the judgment was taken in error by someone
5  associated with the credit union, correct?
6          That wasn't very good. Let me try that one
7  more time. Equifax had no involvement in the fact that
8  the judgment was taken against you --
9          MR. BENNETT: This motion (indicating).
10         MR. GOHEEN: -- right?
11         THE WITNESS: This? Talking about the
12 warrant?
13         MR. BENNETT: The motion to set aside or to
14 vacate.
15         THE WITNESS: No, they didn't.
16 BY MR. GOHEEN:
17     Q   Okay. Since the resolution of this lawsuit,
18 and I'm referring to the credit union suit, have you
19 ever been sued by any entity for any reason?
20     A   No.
21     Q   Let's return back to your interrogatory
22 responses. All right. The first one, on the first
23 page, the interrogatory asks for all communications you
24 have had with Equifax in the last five years and
25 additional information; correct?

Page 29

1      A   Yes.
2      Q   Now, had you ever made a dispute with Equifax
3  for any reason whatsoever prior to 2008?
4      A   No.
5      Q   How did you come to communicate with Equifax
6  in the April, May 2008 timeframe?
7      A   Mr. Berkley told me that I needed to send
8  you-all a letter along with a copy of the motion and the
9  order and try to get you to remove this from my credit
10 report.
11     Q   Okay. So it was the -- I think you said
12 earlier you think he's --
13     A   That's --
14     Q   -- employed by the credit union?
15     A   Mr. Berkley is the attorney for the credit
16 union. And he realized that this was not supposed to
17 happen and he was trying to help me and keep me from
18 having to hire an attorney because I couldn't afford an
19 attorney.
20     Q   Okay.
21         MR. BENNETT: She didn't know we worked for
22 free.
23         MR. GOHEEN: I know the feeling.
24 BY MR. GOHEEN:
25     Q   All right. To your knowledge, then, was the

Page 34

1  Q  The question asked for each and every occasion
2  from February 26, 2008 to the present that you had been
3  denied credit, employment or insurance based on
4  allegedly inaccurate information contained in your
5  Equifax consumer report.  And then we asked for
6  information kind of fleshing that out.  But the response
7  was "Discover Financial Services," right?
8  A  Uh-huh.
9  Q  Correct?
10  A  Yes.
11  Q  So you put a date of December 16, 2008;
12  correct?
13  A  Yes.
14  Q  And you state "denied because of
15  collections/charge off/or judgment"; correct?
16  A  Yes.
17  Q  So I take it you were applying for a Discover
18  credit card?
19  A  Yes.
20  Q  For what purpose?
21  A  I wanted to purchase my writer so I could go
22  to work as a court reporter.
23  Q  I'll go back to this document we were just
24  looking at which was the Equifax response.  On
25  December 30th, 2008, right, that one?

Page 35

1  A  Uh-huh.
2  Q  Now, that beginning on page 3 of 12 --
3  A  Yes.
4  Q  -- is your credit, starts your credit file;
5  correct?
6  A  Yes.
7  Q  Now, for the next few pages, there are items
8  concerning credit cards and like information; correct?
9  A  Yes.
10  Q  Now, can you recall as you look through those
11  pages beginning at the bottom of page tree of 12, which
12  of those credit cards were active in December of 2008?
13  A  You want me to go through each of these
14  individually?
15  Q  Well, just the ones that were active that you
16  were using to the best of your recollection in December
17  of 2008.  It probably won't be all of them.
18  A  The Chase BP, that was my gas card.  I was
19  using that.  I still have it.  And it's paid in full,
20  balance zero.  The FIA had a balance of I think zero.
21  Belk I closed I think on my own.  When I left my job, I
22  think I closed it.
23       Penney's?  Gosh.  J Crew, Talbots, the balance
24  is zero.  That's it.
25  Q  If you go to page 7 of 12, in addition to --

Page 36

1  you see inquiries there at the bottom?
2  A  Oh, yeah.
3  Q  There's Discover which we've talked about, but
4  also Nordstrum and a company called Stellar One;
5  correct?
6  A  That's my bank, yes.
7  Q  Stellar One is your bank?
8  A  Uh-huh.  Yes.
9  Q  For Nordstrum the inquiry was October 19,
10  2008, for Stellar One it was August 16, 2008 --
11  A  Yes.
12  Q  -- right?  Now, did you obtain credit from
13  both of those entities in 2008?
14  A  Yes.
15  Q  So you were able to obtain credit from those
16  two entities, even though you contend the judgment was
17  still reporting on your credit file; is that right?
18  A  Stellar One originally denied me.  But once I
19  took them a copy of the motion and the order, then they
20  approved me.
21  Q  Okay.
22  A  Nordstrum approved me.
23  Q  As I said, we'll go through the dispute in
24  more detail next time around.  But with -- did you --
25  when you got the denial letter from Discover, is that

Page 37

1  when you sent your second dispute to Equifax?
2  A  Yes.  I think that's why I did it.
3  Q  After you received the judgment -- I'm sorry,
4  received this from Equifax that deleted the judgment
5  from your credit file, did you reapply to Discover?
6  A  No.
7  Q  Why not?
8  A  I just figured they were going to deny me
9  anyhow.
10  Q  But other than Discover, you've not been
11  denied credit based on an Equifax credit report since
12  2008, to the best of your knowledge?
13  A  I don't know.
14  Q  Sitting here, you don't know of any other
15  occasion where you were denied based on an Equifax
16  credit report; is that right?
17  A  That's right.
18       MR. GOHEEN:  Let's mark this.
19
20       (Soutter Deposition Exhibit Number 6
21       was marked for identification)
22
23  BY MR. GOHEEN:
24  Q  This has been marked as Exhibit 6.  This is a
25  document that was produced by your counsel to us in this

Page 42

1  Q  Why did you make -- well, strike that.
2     Did you personally make the decision to file
3  this case as a class action?
4     MR. BENNETT: Answer the question however you
5  want. Independent of any advice that I gave you,
6  did you make a decision?
7  BY MR. GOHEEN:
8     Q  Right.
9     A  Yes.
10    Q  For the reasons you've just stated?
11    A  To keep it from happening to someone else.
12    Q  Other than your legal counsel, did you speak
13 with any other person about the decision to pursue this
14 case as a class action?
15    A  No.
16    Q  As we talked about a few minutes ago, this is
17 one of three different cases you filed against the
18 consumer reporting agencies; right?
19    A  Yes.
20    Q  The first of those cases actually was filed
21 against Experian; correct?
22    A  Yes.
23    MR. GOHEEN: Let me mark this.
24
25

Page 43

1     (Soutter Deposition Exhibit Number 7
2      was marked for identification)
3
4  BY MR. GOHEEN:
5     Q  We marked this as Exhibit 7. Do you recognize
6  this document to be the complaint filed on your behalf
7  against Experian Information Solutions dated November 4,
8  2009, in the United States District Court for the
9  Eastern District of Virginia?
10    A  Yes.
11    Q  I take it based on what you said a few moments
12 ago, your thought process with regard to pursuing the
13 case against Equifax as a class action was the same with
14 regard to Experian as a class action and TransUnion as a
15 class action; is that fair?
16    A  Yes.
17    Q  And you understand that your complaint against
18 Experian essentially alleged the same issues that you're
19 alleging against Equifax; right?
20    A  Yes.
21    Q  Meaning that it arose from the erroneously
22 filed judgment by the Virginia Credit Union and then the
23 alleged failure by the consumer reporting agency to take
24 it off of your credit file?
25    A  Yes.

Page 44

1     MR. BENNETT: Object, I would say objection,
2  it mischaracterized the allegations. It's
3  Experian.
4     MR. GOHEEN: Did I say Equifax?
5     MR. BENNETT: No. You said that they arose
6  from the same fact pattern.
7     MR. GOHEEN: Oh, I see. Okay.
8  BY MR. GOHEEN:
9     Q  And you understood at the time the case was
10 filed that you were making class allegations against
11 Experian?
12    A  Yes.
13    Q  Now let's look at paragraph 17 of the
14 complaint against Experian. It's at the top of page
15 four under the heading that says "Class Action
16 Allegations." Do you see that?
17    A  Yes.
18    Q  That class is defined as follows, and I quote,
19 "All consumers for whom Experian furnished a consumer
20 report which reported a judgment in the Richmond General
21 District Court as unpaid that was either set aside,
22 vacated or appealed or dismissed with prejudice prior to
23 the date of this reporting."
24    Now, that's similar to the class definition
25 you have in your amended complaint against Equifax;

Page 45

1  right?
2     A  Yes.
3     Q  It's not the same but, again, it arises from
4  the same basic set of events; right?
5     A  Yes.
6     MR. GOHEEN: Let's mark this as the next one.
7
8     (Soutter Deposition Exhibit Number 8
9      was marked for identification)
10
11 BY MR. GOHEEN:
12    Q  I'm going to hand you Exhibit 8. Ms. Soutter,
13 have you ever seen Exhibit 8 before?
14    THE WITNESS: Did you mail this?
15    MR. BENNETT: I don't know if we did or not.
16 If you don't recall it, just say "I don't recall
17 it."
18    THE WITNESS: Okay. I don't recall it.
19 BY MR. GOHEEN:
20    Q  You understand the document to be --
21    A  I do.
22    Q  I beg your pardon?
23    A  I do understand the document.
24    Q  I wasn't finished. That wasn't my question.
25    A  Oh.

12 (Pages 42 to 45)

TSG Reporting 877-702-9580

Page 46

1  Q  Do you understand this document to be the
2  dismissal of your lawsuit against Experian?
3  A  I do.
4  Q  Why did you dismiss the lawsuit against
5  Experian?
6       MR. BENNETT:  Objection, attorney/client
7  privileged and work product.  You can give him any
8  answers you want to give him as long as they aren't
9  derived from information that you obtained from
10 discussions with us.  If the information you have
11 as to why you would have dismissed Experian in this
12 fashion are derived from us, then you should say
13 that information was derived from conversations
14 with my attorney.
15      THE WITNESS:  Okay.  That information was
16 derived from conversations with my attorney.
17 BY MR. GOHEEN:
18 Q  Did you make the decision to dismiss Experian?
19 A  Yes.
20 Q  Did Experian pay you money as part of the
21 settlement?
22      MR. BENNETT:  Objection.  There is a
23 settlement agreement, and that settlement agreement
24 is confidential and protected.  It's also -- the
25 basis for the objection is beyond the scope of

Page 47

1  permissible discovery.
2       MR. GOHEEN:  I don't think -- that's not going
3  to work.
4       MR. BENNETT:  It is.  In fact, it's worked in
5  a case in which --
6       MR. GOHEEN:  You don't need to recite --
7       MR. BENNETT:  No, City of Alexandria -- I mean
8  the Alexandria division just recently ruled that
9  you're not entitled to discover settlement amounts
10 from other defendants.
11      MR. GOHEEN:  Is that a class action?
12      MR. BENNETT:  It's not a class action.
13      MR. GOHEEN:  Well, then, that's why it doesn't
14 apply here.
15      MR. BENNETT:  Well --
16 BY MR. GOHEEN:
17 Q  Were you satisfied with the terms of the
18 settlement, Ms. Soutter?
19 A  Yes.
20 Q  Now, the class claim that you are asserting
21 against Experian according to Exhibit 8 was dismissed
22 without prejudice; right?
23 A  Yes.
24 Q  So you understand that to mean that the
25 settlement was not on behalf of the entire class but

Page 48

1  only between yourself personally and Experian; correct?
2  A  Yes.
3  Q  So, in other words, you never filed a motion
4  for class certification against Experian; right?  You're
5  not aware of one having ever been filed; right?
6       MR. BENNETT:  Are you aware?
7       THE WITNESS:  I am not aware.
8  BY MR. GOHEEN:
9  Q  And to your knowledge, no class was ever
10 certified against Experian, right, to your knowledge?
11 A  I am not aware.
12 Q  And that's the case -- and that was the case
13 even though you were asserting essentially the same
14 allegations against Experian that you are asserting
15 against Equifax; correct?
16 A  Correct.
17 Q  Does it --
18      MR. BENNETT:  Well, you mean class
19 allegations.
20      MR. GOHEEN:  Class allegations.
21      MR. BENNETT:  You've already indicated that
22 Experian never took it off after a dispute.
23      MR. GOHEEN:  Right.
24 BY MR. GOHEEN:
25 Q  So in that sense, the Experian allegations are

Page 49

1  actually more severe than against Equifax; right?
2       MR. BENNETT:  Or --
3  BY MR. GOHEEN:
4  Q  Equifax took the judgment off before Experian
5  did, right, as far as you know?
6       MR. BENNETT:  As far as you know.  This is not
7  a quiz.  He's not --
8  BY MR. GOHEEN:
9  Q  You don't have to look at counsel.
10 A  I don't know the answer to the question.  I
11 mean --
12      MR. BENNETT:  That's all you need to say if
13 you don't know the answer.
14      THE WITNESS:  I don't know the answer.
15 BY MR. GOHEEN:
16 Q  Is it fair then to say, Ms. Soutter, that you
17 received a sufficiently satisfactory settlement, that
18 you felt like you did not need to pursue a class action
19 against Experian?
20      MR. BENNETT:  Objection.  There is a
21 confidential settlement agreement between Experian
22 and my client.  In addition, you're arguing with my
23 client.  She's already expressed her view.
24 BY MR. GOHEEN:
25 Q  You can answer the question.

```
                                                    Page 50
 1      A   Repeat the question, please.
 2      Q   Is it fair to say -- and I'm not trying to
 3   argue with you. But is it fair to say that you received
 4   a sufficiently satisfactory settlement that you did not
 5   feel that you personally needed to pursue a class action
 6   against Experian?
 7          MR. BENNETT: Objection. You're asking about
 8   the terms of this confidential settlement.
 9          MR. GOHEEN: No, I'm not. I'm not either.
10          MR. BENNETT: Well, will you agree that
11   Experian settlements which you insist on to be
12   confidential, that you'll quit insisting on that?
13          MR. GOHEEN: No. I'm not asking her about any
14   term of the settlement.
15          MR. BENNETT: You are.
16          MR. GOHEEN: I'm asking her if she was
17   personally satisfied that she didn't need to file a
18   class action motion.
19          MR. BENNETT: You're also arguing with the
20   witness.
21          MR. GOHEEN: No, I'm not.
22          MR. BENNETT: You are. You're arguing with
23   her that somehow she could drop the class because
24   she received cash. That's the implication you're
25   making.
```

```
                                                    Page 51
 1          MR. GOHEEN: You said it, I didn't. I'm just
 2   asking the question.
 3          MR. BENNETT: Okay. Ask her if she was bought
 4   out. Ask her.
 5          MR. GOHEEN: Why? You'll object to it.
 6          MR. BENNETT: Because you're asking.
 7          MR. GOHEEN: I'm not asking that.
 8          MR. BENNETT: You are. You're just phrasing
 9   it in a sharper way but it's the same question.
10   You are arguing with the witness. Ask her --
11          MR. GOHEEN: Arguing or not, argumentative is
12   not a reason not to answer the question, as you
13   know, so --
14          MR. BENNETT: No, but it is the reason -- I
15   would not stop the deposition to seek a protective
16   order based on that. But I am expressing my
17   caution because -- and I suspect you don't have a
18   lot of questions in which you'll be accusing my
19   client, but --
20          MR. GOHEEN: I'm not accusing her of anything.
21   I'm trying to establish class action issues, as you
22   pointed out a few moments ago.
23          MR. BENNETT: I will step back. Ask her as
24   you choose to ask her.
25   BY MR. GOHEEN:
```

```
                                                    Page 52
 1      Q   Earlier I believe you answered yes to the
 2   question, I'll make sure that I restate it properly,
 3   were you satisfied with the terms of the settlement with
 4   Experian. And you said yes.
 5      A   Yes.
 6      Q   So based on your testimony that you believed
 7   it to be a settlement with which you were satisfied, was
 8   it sufficiently satisfactory that you did not feel like
 9   you needed to file or pursue a class action against
10   Experian any longer?
11          MR. BENNETT: If the assumptions he's making
12   are correct, then you would tell him correct. If
13   they're not correct, then correct his assumptions.
14          THE WITNESS: Correct.
15   BY MR. GOHEEN:
16      Q   Would you similarly be open to the idea of
17   obtaining a satisfactory individual settlement with
18   Equifax in lieu of pursuing a class action against
19   Equifax?
20          MR. BENNETT: Objection, work product and --
21          MR. GOHEEN: I'm asking her. I'm not asking
22   you.
23          MR. BENNETT: You're not -- if you're trying
24   to make a buyout offer to my client, it's not going
25   to be in the deposition.
```

```
                                                    Page 53
 1          MR. GOHEEN: I'm not trying to do anything.
 2   I'm asking a question. And it doesn't have
 3   anything to do with any work product or privilege.
 4   I'm asking her personally, is she open or isn't
 5   she. Either she is or she's not.
 6          MR. BENNETT: Whether she would sell the class
 7   out for personal gain, is that what you're asking
 8   her? Why don't you ask her, would you sell the
 9   class out for personal gain?
10          MR. GOHEEN: No, I'm not asking her that.
11   Repeat the question.
12
13       (Whereupon the following question was read by
14   the court reporter: "Would you similarly be open to
15   the idea of obtaining a satisfactory individual
16   settlement with Equifax in lieu of pursuing a class
17   action against Equifax?")
18
19          THE WITNESS: No.
20   BY MR. GOHEEN:
21      Q   Okay. Why not?
22      A   Because I do sincerely believe that there are
23   other folks out there that have been through probably
24   more severe problems in their lives than I have because
25   of negative reporting that wasn't removed from their
```

Page 54

1  credit histories.
2  Q  Okay. So you're not open to that idea even
3  though you made the same allegations roughly against
4  Equifax and Experian?
5  A  Yes.
6  Q  That's right?
7  A  That's correct.
8  Q  And you understand you filed a similar
9  complaint against TransUnion; right?
10  A  Yes.
11  Q  And you understand that asserts class
12  allegations as well; correct?
13  A  Yes.
14  Q  And as with the other two being Equifax and
15  Experian, they arise out of the same basic allegations;
16  correct?
17  A  Yes.
18  Q  The same basic facts, I mean; right?
19  A  Yes.
20  Q  Are you able to distinguish between and among
21  your experiences with the three consumer reporting
22  agencies with regard to removing the judgment from your
23  credit file?
24  A  No.
25  Q  Why not?

Page 55

1  A  I am not.
2  Q  Why not?
3  A  I don't have an answer for that question. I
4  don't know. I guess I should be able to if I could --
5      MR. BENNETT: If you had your documents in
6  front of you?
7      THE WITNESS: Maybe.
8  BY MR. GOHEEN:
9  Q  Let me ask this. Were there occasions where
10  you were denied credit by a company or organization
11  based strictly on information that appeared in a
12  TransUnion credit file?
13  A  Yes.
14  Q  Just as we talked about that occurred strictly
15  with Experian and, on one occasion, strictly with
16  Equifax; right?
17  A  Yes.
18  Q  But you don't distinguish those events,
19  just --
20  A  Yes.
21  Q  -- in terms of culpability?
22  A  Not really.
23  Q  Let's go back to the amended complaint for a
24  moment. By the way, back on the Experian thing again,
25  do you have any, sitting here today, do you have any

Page 56

1  facts that would lead you to believe that what Equifax
2  did with regard to the judgment is any better or worse
3  than what Experian did with regard to removing the
4  judgment?
5  A  No.
6  Q  What about with TransUnion versus Equifax,
7  same answer?
8  A  No.
9  Q  So the same answer, which is no; is that
10  right?
11  A  Yes, same answer.
12  Q  Now let's look at page six of the amended
13  complaint, paragraph 24. Now, do you agree with me that
14  paragraph 24 sets forth the class definition that you
15  were proposing at the time the amended complaint was
16  filed?
17  A  Yes.
18  Q  I want to read that definition. "All
19  consumers, A, who Equifax credit files show had a
20  primary address in Virginia as of February 17, 2010, B,
21  about whom Equifax furnished a consumer report to a
22  third party that show a civil judgment in the General
23  District Court for the City of Richmond at any time on
24  or after February 17, 2008, and C, where on such date
25  the report was furnished the records of the General

Page 57

1  District Court for the City of Richmond showed that the
2  judgment had been satisfied, appealed, vacated or
3  otherwise set aside."
4      Did I read that correctly?
5  A  Yes.
6  Q  Now, you did not have a judgment that was
7  satisfied; correct?
8  A  Correct.
9  Q  And you did not have a judgment that was
10  appealed; right?
11  A  Correct.
12  Q  Now, looking at subsection B, where you state
13  as part of the class definition about whom Equifax
14  furnished a consumer report to a third party that showed
15  a civil judgment in the General District Court for the
16  City of Richmond at any time on or after February 17,
17  2008, do you know sitting here today how many parties to
18  whom Equifax furnished your consumer report that showed
19  the judgment at any time on or after February 17, 2008?
20  A  I do not know.
21  Q  Go back to the interrogatory responses for
22  just a moment.
23  A  Okay.
24  Q  Look at number 15, if you could, interrogatory
25  number 15. Do you see that?

Page 66

1   correct that. She's not seeking individual damages
2   based on the class -- she doesn't have any
3   individual claims. She's not seeking individual
4   damages.
5       MR. GOHEEN: Okay. So when we come back for
6   phase two and I ask the same question, it will be
7   the same answer?
8       MR. BENNETT: Yes.
9       MR. GOHEEN: She's not seeking any actual
10  damages or individual damages at all?
11      MR. BENNETT: She's seeking statutory damages
12  and punitive damages.
13      MR. GOHEEN: Okay. All right. And that's the
14  same for her individual claim?
15      MR. BENNETT: She doesn't have an individual
16  claim.
17      MR. GOHEEN: Okay. Well, she has an
18  individual claim but as a class rep. But you're
19  saying there's not a separate individual claim.
20      MR. BENNETT: Right. If you look at the class
21  complaint, we've, we, under the count, we note it
22  as class claim versus individual. So if you look
23  at the first amended complaint, count one says
24  class action complaint. Count two for Tony Webb
25  says class action complaint. And then count three

Page 67

1   says individual claim for Tony Webb.
2       MR. GOHEEN: Okay.
3       MR. BENNETT: That was different than with
4   Experian. With Experian there is an individual
5   claim.
6       MR. GOHEEN: Right.
7       MR. BENNETT: There was not an individual
8   claim with you-all because you took it out in the
9   reinvestigation.
10      MR. GOHEEN: Are you going to update your
11  disclosures now that Webb has been severed off
12  those to make this clear for the record?
13      MR. BENNETT: Sure.
14      MR. GOHEEN: I think that -- I would suggest
15  that might be desirable.
16      MR. BENNETT: Sure.
17  BY MR. GOHEEN:
18   Q  All right. Well, that's helpful. So in other
19  words -- you understand kind of that back and forth,
20  Ms. Soutter?
21   A  I do.
22   Q  All right. You're not, as I understand what
23  Mr. Bennett has said, you're not seeking any actual
24  damages individually --
25   A  Yes.

Page 68

1    Q  -- for anything that you believe Equifax may
2   have done, it's only what you understand to be the
3   statutory damage?
4    A  That's correct.
5    Q  Which is similar, as I'm sure you understand
6   by now, between a hundred and a thousand dollars per
7   violation?
8    A  Uh-huh.
9    Q  Right? Correct?
10   A  Yes.
11   Q  And which is also being sought on behalf of
12  each member of the proposed class; right?
13   A  Yes.
14      MR. BENNETT: And punitive damages, we're also
15  seeking punitive damages.
16      MR. GOHEEN: Right.
17  BY MR. GOHEEN:
18   Q  And so then I take it that you did not sustain
19  any actual damages from Equifax; correct?
20      MR. BENNETT: Objection. If you know the
21  terms of actual damages or what it means
22  independent of my advice --
23  BY MR. GOHEEN:
24   Q  Well, let's go down these disclosures then.
25   A  I'm reading them. I understand them, mental

Page 69

1   anguish, emotional anguish, general economic damages.
2   It prevented me from moving forward with my purchase of
3   my writer so I could move forward with a more profitable
4   career rather than working at the hospital as needed. I
5   was also embarrassed by this. It's embarrassing to have
6   these things show up on your credit history. So -- and
7   I eventually --
8       MR. BENNETT: The question he's asking is
9   whether you believe you have actual --
10      THE WITNESS: I do.
11      MR. BENNETT: -- cognizable damages with
12  respect to Equifax.
13      THE WITNESS: Yes.
14  BY MR. GOHEEN:
15   Q  You understand you're not asserting them?
16      MR. BENNETT: You understand you're not
17  asserting actual damage claims against Equifax?
18      THE WITNESS: Yes.
19  BY MR. GOHEEN:
20   Q  And once this case is adjudicated, however
21  it's adjudicated, you're never going to be able to
22  assert them?
23   A  That's correct. I'm --
24      MR. BENNETT: Well, objection, you're giving
25  her legal advice that is contrary to what the

Page 70

```
 1    fourth circuit has recently ruled in the Weis
 2    Markets case.
 3         MR. GOHEEN:  That's -- well, that's fine.  I
 4    hear what you're saying.  But I get the objections.
 5    BY MR. GOHEEN:
 6    Q    Put it this way.  You understand that you are
 7    not seeking them in this case?
 8    A    That's right.
 9    Q    And the position would be from Equifax is that
10    you could not ever seek them against once this case is
11    adjudicated.
12    A    Yes, I understand that.
13    Q    Okay.  And you understand that that will be
14    the case, the position taken with regard to every other
15    member of the class that you're proposing to represent;
16    correct?
17    A    Yes.
18
19         (Discussion off the record)
20
21    BY MR. GOHEEN:
22    Q    Back to the disclosures, you said you were
23    looking through each of these.  I'm not going to go
24    through them based on what your counsel just said, but
25    I'm going to ask you generally.  Do you think you, for
```

Page 71

```
 1    all seven of those subcategories, you believe you have
 2    some level of actual damage?
 3    A    Yes.
 4    Q    All right.  Now I want to go to the complaint,
 5    back to the complaint for a minute, the amended
 6    complaint.  Look at paragraph 26.
 7         MR. GOHEEN:  This is off the record.
 8
 9         (Discussion off the record)
10
11    BY MR. GOHEEN:
12    Q    All right.  Back on the record, paragraph 26
13    states "As a result of the conduct, actions and
14    inactions of the defendant as alleged in this count, the
15    plaintiff and other class members suffered credit score
16    damage."  Do you know what the term credit score damage
17    means?
18    A    I'm assuming that means their credit score is
19    low.
20    Q    Or lower?
21    A    Lower, yes.
22    Q    All right.  So this allegation as I understand
23    it is asserting that you and the other members of the
24    proposed class sustained damage to their credit score as
25    a result of what Equifax allegedly did in this case?
```

Page 72

```
 1    A    Yes.
 2    Q    I take it, then, that you believe you have
 3    sustained damage to your credit score as a result of
 4    what Equifax allegedly did in this case?
 5    A    Yes.
 6    Q    All right.  Do you know that you have
 7    sustained damage to your credit score as a result of
 8    what you contend Equifax did in this case?
 9    A    Yes.
10    Q    All right.  How do you know?
11    A    I know because when I have applied for credit,
12    I've been denied based on the low FICA score or
13    whatever.
14    Q    Well, have you ever obtained your credit score
15    from Equifax at any point in time?
16    A    No.
17    Q    Prior to the erroneous judgment that was put
18    in the court file by the credit union, do you know what
19    your credit score was?
20    A    It was very high.  It was at least 750.  It
21    was high.
22    Q    And when did you obtain that score?
23    A    I don't know.  I don't know the answer.  But
24    it was very high.
25    Q    Well, do you recall, was it within the year
```

Page 73

```
 1    before the lawsuit, or had it been five years before?
 2    Do you roughly know the timeframe as to when you
 3    obtained that credit score?
 4    A    I had it up until this judgment appeared.  So
 5    other than that, no.
 6    Q    How often had you obtained your credit score
 7    from any source prior to the credit union case?
 8    A    Only when I went to apply for credit.
 9    Q    So you would obtain your credit score when you
10    would apply for credit?
11    A    I don't know that I would obtain my credit
12    score when I applied for credit.  I knew that my credit
13    was good.  So no, not credit score but --
14    Q    Right.  I'm focusing on that term credit score
15    damage.  That's why I'm asking the questions
16    specifically to credit score.
17    A    Then I don't know the answer.  I don't know
18    how often I obtained my credit score.  But I knew it was
19    high.  Even when I went to apply for credit, the
20    creditors would tell me that I had very good credit, my
21    score was high.  And that was it.
22    Q    This is prior to the judgment?
23    A    Correct.
24    Q    How often, if at all, have you obtained your
25    credit score since the judgment?
```

Page 74

1  A  Probably three or four times.
2  Q  And what have those scores been?
3  A  Like 620. I think once it was up to 650, I
4  think, which is low.
5  Q  And under what circumstances had you obtained
6  or have you been obtaining these credit scores, just as
7  trying to obtain credit or for some other purpose?
8  A  To purchase my writer so I could get my court
9  reporting career started.
10 Q  Did you ultimately obtain that equipment?
11 A  I did.
12 Q  When?
13 A  About eight months ago maybe. Not long.
14 Q  And you obtained it on credit --
15 A  No.
16 Q  -- or installment payment? How did you obtain
17 it?
18 A  My firm owner purchased it for me and I am
19 reimbursing her.
20 Q  So eight months ago --
21 A  I don't know if it's been that long. It's
22 close to that, though.
23 Q  So it's not -- well, sometime in 2010, do you
24 believe?
25 A  Yes.

Page 75

1  Q  As of 2010 the judgment was off your credit
2  file for all three consumer reporting agencies, to the
3  best of your knowledge?
4  A  I don't know the answer. I don't know.
5  Q  Did you make multiple efforts to obtain that
6  equipment?
7  A  Yes.
8  Q  You mentioned the one time. How many times
9  did you try?
10 A  Three.
11 Q  But none of those -- scratch that.
12    To the best of your knowledge, did any of
13 those denials or rejections result from Equifax?
14 A  Yes.
15 Q  Which one?
16 A  Discover.
17 Q  Okay. Other than that -- you're right. You
18 said that already. Other than that one?
19 A  I don't think so. I don't know.
20 Q  You had made the decision, then, to enter in
21 the court reporting business at least in the fall of
22 2008?
23 A  I was finished school then and I was -- I
24 needed to upgrade my equipment so that I had
25 professional grade equipment rather than student grade

Page 76

1  equipment.
2  Q  Do you know what is considered a good credit
3  score?
4  A  I would say 700.
5  Q  Do you know what's considered a fair credit
6  score?
7  A  I'm just going to guess and say 650.
8  Q  Now, do you know -- you said earlier that the
9  last couple times you've gotten your credit score, it
10 was somewhere from 628 to 650, I believe?
11 A  Yes.
12 Q  That's been without the judgment reporting,
13 right, as far as you know?
14 A  The last time that I received it, the judgment
15 was still showing. And that was with Experian and she
16 said it was 650, so...
17 Q  When was that?
18 A  I don't know the date.
19 Q  Going back to the term credit score damage, is
20 any reduction in the credit score considered in your
21 mind damage to a credit score if it results from the
22 judgment having been on someone's credit file? It goes
23 from 650 to 649.
24    If it were, if it were 650 without the
25 judgment, 649 with the judgment, you believe that's

Page 77

1  credit score damage?
2  A  Yes.
3  Q  So your assertion is that every member of the
4  class had some sort of credit score damage; right?
5  A  Yes.
6  Q  On the other hand, if it were 650 with the
7  judgment on it and 650 without it, that would not be
8  credit score damage, you believe?
9  A  From a judge -- if it's -- if the judgment
10 didn't appear and it was 650 -- well, if you're
11 referring to me, my credit score was above 700 before
12 the judgment appeared. So no, I -- no.
13 Q  I'm not referring to you.
14    MR. GOHEEN: Could you ask the question again,
15 please.
16
17    (Whereupon, the following question was read by
18 the court reporter: "On the other hand, if it were
19 650 with the judgment on it and 650 without it,
20 that would not be credit score damage, you
21 believe?")
22
23    THE WITNESS: That just doesn't make sense to
24 me, but anyway...
25    MR. BENNETT: Just tell him that.