**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**DONNA K. SOUTTER** , *for herself and on*
*behalf of others similarly situated individuals,*

       **Plaintiffs,**

  **v.**

**EQUIFAX INFORMATION SERVCES, LLC,**

      **Defendants.**

**Civil Action No. 3:10cv107-REP**

## PLAINTIFF'S REPY MEMORANDUM IN SUPPORT OF PLAINTIFF"S MOTION FOR CLASS CERTIFICATION

COMES NOW the Plaintiff, by counsel, and for her Reply in Support of Plaintiff's Motion for Class Certification, she states as follows:

## OVERVIEW

The data provided by Equifax late in Phase I supports the conclusion that approximately 304,000 Virginians currently remain subject to the agency's inaccurate credit reporting of civil judgments. (Ex. A, Erausquin Decl. ¶ 19). An additional number have previously suffered such inaccuracies, but today have corrected files. Equifax's opposition poorly responds to this core question – not one to be taken merely in isolation: Is class litigation superior to the alternatives? It is and the advantages presented overwhelm the modest administrative burdens or fringe obstacles concocted for Equifax's defense. Beyond Donna Soutter, only one consumer has found a lawyer and brought individual suit to attempt correction of such a massive problem. (Def.'s Opp'n at 38.) Only one other consumer has been able to manage legal action to obtain a corrected credit report. Individual litigation will never solve this problem.

While Plaintiff's reply tracks her initial structure, addressing Defendant's opposition points where made, several initial "overview" points are appropriate in replying to Equifax's memorandum.   First, Plaintiff would have earlier thought it obvious that her discovery and use of Phase I evidence be understood as partial and incomplete.   However, throughout its brief, Equifax comments on the limitations of the data it has so far provided or of the file requested and obtained earlier from the Executive Secretary of the Supreme Court of Virginia (Hereafter the "SCV").   Yet, the actual purpose of Plaintiff's discovery of Equifax's files or the SCV's creation of a responsive data file was to demonstrate that the data for identifying class members exists. (Ex. A, Erausquin Decl.).   Plaintiff has not yet sought to obtain all of the relevant Equifax files. She has not yet obtained the full set of relevant judgment records from the SCV.   If the case is certified, such discovery will be necessary and Equifax's resistance to producing such files will be mooted.   In such light, Defendant's opposition position of "You cannot identity all class members because we withheld data from you"[1] seems odd at best.

Second, in its Fair Credit Reporting Act (FCRA) litigation, Equifax consistently relies on in its own, internal justifications for its business processes instead of relying on the requirements of the statute that governs its reporting. 15 U.S.C. § 1681 *et seq*. In this case, the Plaintiff complains about inaccurate credit reporting by Equifax.   Plaintiff and all putative class members suffered one or more Equifax credit reports sold to a lender or other third party that inaccurately described a civil judgment as unpaid and owing.   To these allegations, Equifax responds with an opposition premised on an entitlement to report civil judgments about which it concedes it has only limited information.   In fact, it

does not merely assume that entitlement, but argues as if it is somehow obligated to report civil judgment about consumers.  It is not.  Equifax is a private business selling a commercial product for profit. Equifax is neither compelled by policy interests nor government mandate to report adverse credit information.  If Defendant is unable to timely obtain complete and accurate status information about Virginia civil judgments, then it should not include them in its credit reports.  Equifax falsely presumes otherwise. Similarly, Equifax's own procedures have separated the underlying judgment from later changes to its status.  It describes in its motion the original judgment and the later change in status to that judgment as two independent records.  This of course is not true for the actual courthouse public record.  It is not true as a legal reality.  Still, the result of this Equifax business process is a willingness to accept judgments about which it has no consistent ability to timely determine if the judgment status is actually paid, vacated or appealed at the time Defendant includes the judgment in a credit report.  By its own account, as many as one in four judgments have an actual courthouse status that is other than unpaid and owing. (Def's  Opp'n at 3-4).  Plaintiff alleges that a likely majority of these terminated judgments are actually reported by Equifax as unpaid and owing.  This is an intolerable margin of error.  It certainly would be better to report none of Virginia's judgments than report one in ten or one in fifteen so incorrectly.

## EQUIFAX'S STATEMENT OF FACTS

Equifax inappropriately contests merit facts and allegations offered by Plaintiff. In fact, it does not open its Argument section until nearly halfway through its 40-page brief.  Contrary to Equifax's assertions, this merits-based challenge is not appropriate at this posture.  This is not summary judgment and, in fact, with limited page space and a

different set of burdens to meet under Rule 23, there is no practical way that Plaintiff could respond fully by point-counterpoint to Equifax's often incorrect factual offering. Defendant is correct in arguing that a Rule 23 analysis is to be "rigorous" and that a moving plaintiff must meet each of the elements required under the rule. This Court has previously explained however that it applies a liberal construction to Rule 23 in conducting this rigorous analysis as to whether certification is appropriate. *Fisher v. Virginia Elec. & Power Co.*, 217 F.R.D. 201, 210 (E.D. Va. 2003) (citing *In re A.H. Robins,* 880 F.2d at 728, for the Fourth Circuit view that Rule 23 receive a liberal construction and that, in applying the rule, it is the district court's responsibility to perform a rigorous analysis of the particular facts of the case). However, Equifax is incorrect in now contesting factual allegations related only to the case merits. *Id*. The cases cited by Defendant do not disagree with this conclusion. The Court should "inquire no further into the merits than is necessary to determine the likely contours of this action should it proceed on a representative basis." *Id*. at 211.

This distinction is important in this case. Much of Equifax's brief is devoted to Defendant's theoretical challenges or complaints about the integrity or uniformity of the judgment data maintained by either the SCV or in individual Virginia courthouses. (Def's Opp'n at 1-9, 16-17, 21-23, 25, 27, 33-35). The other bulk of the opposition is a defensive justification for its present method of collecting civil judgment data. Many asserted facts are contested; many are not. However, to the extent that these "facts" do not assist the Court in "determin[ing] the likely contours" of a class action, they are presently irrelevant. *Id*. Whether the Richmond General District Court uses the term "judgment strikes" to describe terminations or "set aside" to describe vacates is not at all

relevant generally and certainly not at this point in the case.  Equifax's insistence that it does "data quality checks" or whether its vendor sometimes performs live record checks is not germane to this motion.

Equifax also recites its own view of the facts that pertain directly to Donna Soutter.  (Def's Opp'n at 10-13).  Plaintiff addresses those allegations in her reply argument only where relevant.

## ARGUMENT

Despite its length, Equifax's brief actually only challenges class certification on a small set of arguments.  These are addressed in sequence.

### A.    PLAINTIFF HAS DEFINED AN ASCERTAINABLE CLASS

### 1.    Equifax confuses Ascertainability with Identifiability.

Equifax's first argument opposing class certification is its assertion that "The proposed Class is not objectively ascertainable."  (Def.'s Opp'n at 20).  It poses this challenge by a number of fringe obstacles addressed below.  Defendant's primary mistake is its failure to articulate or even understand the difference between and standards for "ascertainability" and "identifiability."

Ascertainability is a simple concept, rarely used as a basis for denying class certification.  There is almost no Fourth Circuit authority on the point, largely because setting an ascertainable class definition is not complicated.  *McGlothlin v. Connors*, 142 F.R.D. 626, 632 (W.D.Va. 1992)(holding that a class "satisfies the minimum standard of definiteness . . . easily delineated and ascertained.  Therefore, creation of the class is not a complicated matter, and the court will not make it so.")  As explained in Plaintiff's opening brief, "[T]he class does not have to be so ascertainable that every potential

member can be identified at the commencement of the action. … If the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed. ); *See also Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976) ("In order to determine whether a class action is proper, the district court must determine whether a class exists and if so what it includes.").

While the Fourth Circuit has recognized an implicit requirement that the class be defined in advance of conducting the required Rule 23 analysis, it has left the analysis within the sound discretion of the district court to determine whether the threshold requirements spelled out in the Rule have been met. *In re A.H. Robins Co., Inc.*, 880 F.2d at 728; *Roman*, 550 F.2d at 1348.

The circumstances in which a court will most often find that a class is not ascertainable are those in which there is no objective means to determine class membership.  The best examples of these are the exceptional cases unearthed and cited in Defendant's brief.  (Def.'s Opp'n at 15, 20-24)  For instance, in *DeBremaecker v. Short*, the court held it was impossible to adequately ascertain exactly who was included in a class that defined membership as individuals who were "active in the Peace Movement" during the Vietnam War.  433 F.2d 733, 734 (5th Cir. 1970).  In *Bakalar v. Vavra*, the court refused to certify six sub-classes of defendants who may or may not have been in possession of known and/or unidentified art stolen by Nazis during World War II.  237 F.R.D. 59, 64 (S.D.N.Y. 2006). In *In re GM Corp Piston Slap Prod. Liability Lit.*, the court found that although it was possible to identify consumers who owned vehicles with the type of engine that was known to have a defect, there was no generally-accepted test

to determine which of those engines had the defect, and thus too difficult to ascertain which consumers had defective engines because there was no objective test.  2006 WL 104259, at *6 (W.D. Okl. Apr. 19, 2006).

These are examples of the types of cases that courts have not certified based on class definition.  The circumstances in these cases are a far cry from the present case in which the key definitional elements are (a.) Equifax furnished a consumer report (b.) that reported a judgment as unpaid or owing (c.) at least 30 days after the formal records in the courthouse showed otherwise.   Equifax can attempt its argument that identifying these persons would be time-consuming or expensive, but it cannot credibly argue that these elements are not objective.

Despite its repetitive characterization of its challenge as that of ascertainability, what Equifax is really challenging is the administrative feasibility of "identifying" class members - managability.  Ascertainability concerns the conceptual, while identifiability concerns the practical.   The former addresses the question of whether a class definition can be formulated while the latter regards how difficult or expensive it would be to discover the names and addresses of the persons who satisfy the conceptual definition. Relying heavily on the reasoning in *MTBE*, 209 F.R.D. at 336, 337, the National Consumer Law Center treatise on Class Actions explains:

> The most-often-stated criterion for class definition is that the class be ascertainable, meaning that its members can be ascertained by reference to objective criteria. This does not mean that, at the time of certification, each class member can be identified but that, at some time (including after notice), the class as a whole can be ascertained by the court. Although sometimes defendants will confuse identifiably with ascertainability and argue, even at time of certification, that it is necessary to determine who properly is in the class and that such a task would be burdensome, this position confuses either ascertainability (whether a class is determinable

by objective criteria) with identifiability or, more likely, manageability (whether, ultimately, the class can be managed). (footnotes omitted).

National Consumer Law Center, *Consumer Class Actions* § 3.2 (6th ed. 2006) & Supp.

Even assuming that the Rule requires a heightened prerequisite of defining a class that meets an ascertainability requirement, it is reasonable to apply the requirement in such a way to ensure the class definition describes members with precision using objective means, but not by engaging in an unnecessary, complicated exercise. *In re MTBE*, 209 F.R.D. at 336-337; *McGlothlin*, 142 F.R.D. at 632. In this case, the plaintiff's definition refers to objective criteria that precisely identifies class members using objective criteria: either an individual has had a Virginia judgment or not; either an individual has had that judgment modified, satisfied, vacated, dismissed or otherwise extinguished, or not; either the Defendant reported the judgment or it didn't; either the Defendant reported the update to judgment or it didn't. *See id*. Neither fact intensive nor subjective inquiries are required to make this determination. *See id*. While administrative feasibility is a consideration, it is not a bar to certification in this case because the Plaintiff will bear the entire burden of administering the class.

Equifax offers four discrete arguments as to ascertainability, each addressed below.

**2.      The Equifax and SCV Files demonstrate that a class can be identified.**

The roadblock that Equifax attempts to manufacture with regard to what it refers to as ascertainability – really one of identifiability – is premised upon the fact that the several Equifax files produced in discovery and the one SCV file created and obtained at Plaintiff's request are incomplete. This is true. They are incomplete. But this is also irrelevant. The files were obtained in order to show that certain categories of data exist

electronically, the breadth of the problem, and that the class is numerous.  These files do not represent the end of the road.

The full set of all judgment data, without the data code limitations that resulted in the exclusion of the Plaintiff's name from the list, is available from the Virginia Supreme Court upon request and payment.  Further, as a national consumer reporting agency, trafficking in the sale of large quantities of data on a wholesale basis, Equifax is certainly capable of producing the same frozen scan or "Sampling" data as it produced for the three zip codes as a result of the Stipulated Discovery Order.

At that point, identification of the class members becomes purely an administrative task that Plaintiff's counsel is fully capable of performing.  Giving Equifax the full benefit of the doubt - that its monthly snapshots were captured on the *first* day of each month - it is simply a matter of comparing a handful data fields to determine whether the judgment termination event (satisfaction, vacation or perfection of appeal) occurred more than 30 days prior to the snapshot date.  It is clear from the data already analyzed that the number of judgments contained in Equifax's systems that were *never* updated, even for just the three zip codes produced, is sufficient for this Court to reach a conclusion that the class statewide satisfies the Fourth Circuit's requirements for numerosity, and that consumers can be directly identified.  (Ex. A, Erausquin Decl. ¶10-19).  Notice can be sent to the class members using the "credit header" data stored in Equifax's systems, updated on a daily basis by various third parties, including current and potential creditors, therefore likely the most highly reliable source of address information.   The data analysis revealed that just within the data provided by Equifax for three zip codes, approximately 4,867 judgments that were previously satisfied,

appealed or vacated are still inaccurate in Equifax's system, months after this litigation was filed. *Id* at 16. Using the most current population data available, Equifax's sample records suggest that a reasonable estimate of the number of judgment records statewide that are still inaccurate could be 304,187 records, with some dating back as far as 2001. *Id*. at 19. These individuals are clearly within the class definition. Working back from there, it is simply a data matching exercise to identify the remainder of the consumers for whom their judgment records were corrected as of late 2010, but only after at least 30 days had passed between the relevant post-judgment action (satisfaction, vacation or appeal) and the *earliest* date that Equifax could have updated their files, and regarding whom a consumer report had been published in the interim period.

Defendant's complaints as to the SCV data are: (a.) the Plaintiff's name does not appear in the file requested from the SCV (b.) the SCV data could contain undefined errors because of input errors made by court clerks; (c.) the Plaintiff's record was ultimately coded as "dismissed" and not merely "vacated"; and (d.) satisfactions are not known until the creditor files the satisfaction in the courthouse. (Def.'s Opp'n at 21).

The first and third of these are the same complaint. The data file requested and purchased by Plaintiff's counsel from the SCV does not contain the Plaintiff's judgment information. This is a red herring. The explanation was long ago known to Equifax – its statements about this side issue in its brief disingenuously withhold that explanation from the Court. Plaintiff's counsel submitted a specific and exact set of data field requests to the SCV, which then constructed a customized search protocol that eventually was outputted in the file now discussed by the parties. Plaintiff's counsel requested identifying details regarding each civil judgment that had been satisfied, vacated or

appealed.  When the programmers at the SCV received the request, they interpreted it to have requested a search for records in the Virginia court case system that had a value in the "Satisfied" field or that contained the specific code in the judgment field assigned for "Vacated" or "Appealed".  The problem is that the code searched in this field is the final status reported by the court to the SCV.  Accordingly, if a judgment were vacated and then thereafter dismissed or tried to a defense verdict, the value in that field would be for "Dismissed" rather than for "Vacated."  This is exactly what occurred for Donna Soutter's judgment record.  After her judgment was vacated and set aside, it was then dismissed.  This later status is the value contained in the court management system.

This limitation, learned only after the SCV delivered the file towards the end of the Phase I discovery period, is irrelevant for class identifiability (or ascertainability).  If and when the Court certifies a class, regardless this issue, Plaintiff's counsel will have to design a more complete and final data request to submit to the SCV.  The information technology personnel there have already represented their ability to obtain the data set enlarged to included dismissal codes.  (Ex. B, Deposition of Ken Mittendorf,)("But the problem is, no one ever asked us to produce a list of all the dismissals.  We got, we got the dispositions that were in the abstract for judgment file and that's what we provided. If somebody said can you run all the dismissals, of course.  We can give you whichever way you want to cut it.  The problem is, sometimes you have to think about the problem that you're trying to solve.").

Either way – if the judgment is actually recorded as dismissed instead of just vacated, Equifax cannot accurately report the judgment as unpaid and owing.  The same data comparison would be made between the SCV data and the Equifax database.

The second of these file criticisms is that the SCV database may contain errors is originating court clerks made a data entry mistake.  Plaintiff expects this may be true, just as such errors could affect the accuracy of electronic data at any institution, be it a court or a bank, a medical office or a credit bureau.  Equifax does not attempt to quantify this potential set of input error files and in fact does not even suggest a hypothetical form of such mistakes.  Regardless, it is telling that Defendant is without alternate arguments or challenges to which to direct the Court's attention.  This position also reveals Defendant's misimpression of the standard for identifiability.  It appears from Equifax's opposition brief that it assumes a requirement of total perfection in identifying class members.  As Plaintiff has already summarized in her opening brief, the degree of precision Equifax has to date suggested is unnecessary.  "Every potential member of the class is not required to be identifiable, but merely circumscribed by some objective set of criteria." FPP § 1760, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed.) citing Hendrix v. Faulkner, 525 F.Supp. 435 (D.C.Ind.1981) *affirmed and vacated in part on other grounds sub nom.  Wellman v. Faulkner*, 715 F.2d 269 (7th Cir. 1983); *see also Roman*, 550 F.2d at 1348-48 (the district court did not abuse its discretion in defining the class); *McGlothlin*, 142 F.R.D. at 632 (it is unnecessary to know the precise size of a class, only that joinder is impractical); *In re MTBE*, 209 F.R.D. at 337 (holding that class members need not be ascertained prior to certification, only that they can be ascertained at some point in the case.)

Defendant's final complaint regarding the SCV data is that it would be limited to satisfactions that were actually filed in the respective court clerk offices.  This argument is particularly odd and reveals a lack of understanding of the way Virginia satisfactions

(or even those in other states) work. A judgment is not formally satisfied absent

docketing of notice of satisfaction with the court clerk.  Va. Code §§ 8.01-452, 455.

Regardless, this case is about Equifax's failure to accurately report what is reflected in

the public record. *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285-86 (7th Cir. 1994)

(CRA properly relied upon public record and is not required to look beyond actual court

docket).  If the Court determines this fringe argument of sufficient concern, it should

clarify the class definition to state:

> (1) all natural persons (2) for whom Equifax's records note that a "hard
> inquiry" credit report was furnished to a third party (3) other than for an
> employment purpose (4) at a time when any Virginia General District
> Court or Circuit Court judgment that had been satisfied, appealed, or
> vacated *in the court file* more than 30 days earlier was reported in
> Equifax's file as remaining unpaid.

Equifax next criticizes the Equifax "disputes" data file it was ordered to produce

by this Court's Order entered on September 20, 2010. (Dock't No. 61).  It correctly

suggests that the dispute file is not useful for identifying class members.  The particular

file it challenges is a list of individuals who made certain types of disputes.  This is not

necessarily useful in generating a full class list as many consumers have never disputed

the Equifax inaccuracies.  The violation alleged in this case is not under 15 U.S.C. §

1681i(a), the reinvestigation section of the FCRA, but instead under 15 U.S.C. §

1681e(b).  Plaintiff's counsel has not worked to compare the data in the Equifax disputes

file with the SCV data.  That function was served by the other files produced by Equifax.

The Disputes file was useful for discovering other consumers who were aware of the

subject problem and attempting to gauge whether or not actual damages are at issue.

**3.      An exclusion of actual damage consumers would not prevent
ascertainability.**

Given the likely class size – over 300,000 - it is possible that some small number of consumers would prefer to pursue a claim for actual damages.  As discussed fully in Plaintiff's opening memorandum, the best option class structure is one that relies on such consumers to opt out of the class, a safeguard that has been supported by most courts to consider such an issue including this Court and the Fourth Circuit. (Plaintiff's Mem. at 21-22.).  *Gunnells v. Healthplan Servs., Inc*., 348 F.3d 417, 430-2 (4th Cir. 2003); *Williams v. LexisNexis Risk Mgmt. Inc*.,  2007 WL 2439463 (E.D. Va. Aug. 23, 2007). When the minority of class members possess provable actual damages, this opt out safeguard provides adequate protection for class members. *Murray*, 434 F.3d at 952-953. ("Only when all or almost all of the claims are likely to be large enough to justify individual litigation is it wise to reject class treatment altogether.").  Equifax does not itself concede that any consumer has suffered actual damages in an amount greater than $1,000.  Confirmation could be sought at oral argument by asking Equifax what percentage of class members in this case does Equifax believe suffered significant actual damages as a result of the credit reporting inaccuracy. It is likely that few consumers could assert significant actual damages because their primary injury will be delay caused by the need to contact Equifax to force a reinvestigation.  The dearth of lawsuits filed by the 300,000 plus injured consumers – one besides Soutter – is further evidence of a consumer's difficulty in filing an individual action.   Accordingly, the Court could quite properly omit the express exclusion of consumers who incurred actual damages greater than $ 1,000 from its class definition.

Alternatively, and despite Equifax's skepticism, the Court could retain such limitation in the class definition and force the determination before summary judgment or

trial to avoid the one-way intervention problem Equifax correctly points out.  Plaintiff

would be ordered to serve a single Interrogatory to each class member asking for an

affirmative response if that Class Member has incurred actual damages greater than

$1,000.[2]  Those consumers who affirmatively respond would be definitionally excluded

from the class.  This could occur within 30 days after a full notice list is generated after

certification.

Equifax's opposition otherwise fails to address the Fourth Circuit's inclusion of

such limitation in its recent FCRA case reversing a District Court's denial of class

certification. *Stillmock v. Weis Markets, In*c., 09-1632, 2010 WL 2621041, *3 (4th Cir.

July 1, 2010).  Plaintiff's counsel cannot conceive of any alternative to the process stated

in the previous paragraph that would more rationally accommodate the definitional

exclusion of "consumers who had suffered identity theft" from what was a much larger

class than the one alleged in this case.

   **4.**  **The "30-day pickup" component in the class definition is proper.**

---

[2] Although not binding authority, the most complete and accurate summary of the case law in all such regards is provided by the Manual for Complex Litigation, which summarized the issue as follows:

> Some courts have held that class members are not parties for the purpose of discovery by interrogatories, but may be required to respond to a questionnaire approved by the court. Others have permitted limited numbers of interrogatories upon a showing of need, limited the number of class members to whom interrogatories may be directed, limited the scope of the discovery to a brief, nonmandatory questionnaire relating to common issues, or have imposed on defendants the added cost of mailing otherwise permissible interrogatories to absent members of a plaintiff class. Deposing absent class members requires greater justification than written discovery.

*Federal Judicial Center, Manual for Complex Litigation §21.41* (4th ed.) (footnote citations omitted).

Equifax begins its merits defense of the case by challenging under the guise of ascertainability the definitional element excluding consumers whose only qualifying inaccurate credit report was less than 30 days from the date that the court house record was updated. Its argument is that a 30-day window for its pick-up of judgment updates is sometimes unreasonable and sometimes not reasonable. Sometimes it would violate the FCRA, while in other instances it would not. This is not an ascertainability argument. Equifax does not dispute that the determination of this definition element is subjective or would be difficult or expensive to implement in identifying class members.

However, as its merits defense, Equifax again demonstrates its institutional arrogance in assuming an entitlement to report accurately only to the extent such accurate reporting is convenient and inexpensive. It also continues to ignore that the present case is about credit reporting and not public records collection. (Def.'s Opp'n at 1-9, 16-17, 21-23, 25, 27, 33-35).

Equifax argues that the Court should not presume that it would be equally unlawful for it to inaccurately report a judgment status for a consumer residing on the Eastern Shore or in rural Southwest Virginia as it would for consumer residing in Alexandria or Norfolk. (Def.'s Opp'n at 33). Historically and before the near complete shift to bulk or Internet data gathering methods, the former had less frequent scheduled visits from Equifax's public record vendors than the later. This was because there were fewer judgments obtained in the more remote jurisdictions. But from a credit reporting perspective – Equifax's procedures for those jurisdictions were irrelevant to the question of whether or not its credit reporting procedures were sufficiently reasonable to "ensure maximum possible accuracy." *See* 15 U.S.C. § 1681e(b). Equifax's position that it is

entitled to update those jurisdictions less frequently ignores the alternative that it could simply stop reporting judgments in those jurisdictions if it's business model did not accommodate the accurate reporting of those judgments.  There is also no evidence offered or suggested by Equifax to support its assertions.  This is because it pays its vendor by the record – the same amount for each courthouse gathered.  Equifax pays no more for a remote jurisdiction than it does for an urban one.

###### 5.      The Court is obligated to define an appropriate class.

Preempting what she correctly predicted as Equifax's tactic, Plaintiff cautioned the Court in her opening memorandum to avoid a game of 'gotcha' in which Defendant throws a random set of fringe arguments at the class definition to challenge non-core language or difficulties with same.   Plaintiff pointed out then as she does now that the class definition process is fluid and dynamic.   Rule 23 does not suggest that Plaintiff formulate a single chance to guess how many beans are in a jar.  Instead, while a plaintiff argues for a class definition, the Court makes the actual determination, modifying the definition to accommodate defects or criticisms it determines are well founded.  *Roman*, 550 F.2d at 1348-49.

In its brief, Equifax implies criticism of Plaintiff's previous efforts to formulate a class definition that accommodates the evidence and party positions revealed in Phase I litigation.  This is disingenuous.  Equifax has not only known about the Plaintiff's suggested class definition for months, but its counsel discussed same at length on multiple occasions as an updated definition was formulated.  Further, Equifax expressly consented to the expansion of the definition to encompass all Virginia courts and not simply Richmond.

Defendant cites a series of cases that it suggests rebut the law already tendered on this question in Plaintiff's opening brief.  None of those cases actually address the issue at hand.  The Equifax cases address circumstances in which changes were made after class certification or through a merits process.

As pointed out in Plaintiff's opening brief, "As long as the complainants can be identified in a manner that advances the purpose of Rule 23, procedural fairness permits flexibility." 3 Newberg on Class Actions § 8:12 (4th ed.) "Holding plaintiffs to the plain language of their definition would ignore the ongoing refinement and give-and-take inherent in class action litigation, particularly in the formation of a workable class definition." *Bratcher v. Nat'l Standard Life Ins. Co*. (In re Monumental Life Ins. Co.), 365 F.3d 408, 414 (5th Cir. 2004) *cert. denied*, 125 S.Ct. 277 (2004).  If the Court determines that one or more of Equifax's non-core challenges make sense, it's proper disposition would be to define the class in a manner to avoid such defect.

## B.     PLAINTIFF'S CLAIMS ARE TYPICAL OF THE CLASS

Equifax also makes a token challenge to Rule 23(a) typicality.  It asserts that Plaintiff cannot prove the element of inaccuracy for her case; that the methods of picking up records may vary between some Virginia courts and that most of the class will include persons who have satisfied their judgment as opposed to having it vacated or appealed. While Plaintiff's counsel is not entirely certain what Equifax means by at least two of these positions, this reply attempts a response.

The Plaintiff's credit reports were objectively inaccurate.  They reported the Virginia Credit Union judgment as unpaid and owing months after it had been vacated and dismissed.  Plaintiff is unclear what more Equifax is arguing.  It may be that

Defendant is again raising the fact that the current file requested and received from the SCV or the files produced in Phase I by Equifax do not include the Plaintiff's judgment. Plaintiff has addressed this above.  But it offers no explanation as to what this has to do with typicality.  The Plaintiff's § 1681e(b) claim is the same one to be prosecuted for the class.  Her credit report was objectively inaccurate; as was that of each class member. Her credit report was furnished using the same internal procedures at Equifax as were used for every putative class member.

Equifax also asserts without explanation that that, "Typicality is further undermined by the absence of uniform procedures in Virginia's various courts."  (Def.'s Opp'n at 28).  Of course there will be such variations.  The layout and personnel at each clerk's office are different.  However, Equifax fails to demonstrate what these have to do with its otherwise uniform <u>credit reporting</u> procedures. Equifax's chosen procedures to gather and purchase civil judgment records is detached from its FCRA credit reporting obligations.  If, as Equifax apparently asserts, Virginia civil judgment data cannot be uniformly and accurately obtained, then Equifax should not be reporting Virginia civil judgments in its credit reports.

Defendant's third challenge to typicality is limited to the sentence, "Furthermore, according to Plaintiff the vast majority of purported class members – unlike Plaintiff – have satisfied judgments."  (Def.'s Opp'n at 28).  It is possible Equifax is implying that its FCRA obligations to accurately report satisfaction terminations are materially different than its FCRA obligations to accurately report vacate and appeal terminations? If so, Equifax is wrong.  There is no material difference between the FCRA obligations for one versus the other..

Equifax's position is also unexpected for another reason because it agreed that the Plaintiff should pursue a statewide class.  It is aware from Plaintiff's counsel's representations that they currently represent other consumers – putative class members - with judgments that have been satisfied, appealed and vacated in other Virginia courts beyond Richmond.  They also represent consumers who have been subject to Equifax's failure to update satisfactions, in addition to vacates and appeals.  It would seem that Equifax's very worst outcome would be a narrowing of the Soutter class to just Richmond, with follow-on cases on behalf of additional representative Plaintiffs for classes limited to other specific Virginia jurisdictions.  Regardless, beyond its conjecture and unexplained queries, Equifax largely concedes typicality.

## C. PLAINTIFF IS ADEQUATE AS A CLASS REPRESENTATIVE

Equifax argues that Donna Soutter cannot adequately represent the putative class because (a.) she has filed and settled individually a previous case against Experian, and (b.) she suggests a class that would not seek actual damages.  Both positions fail to meet Equifax's burden to prove the inadequacy. "The burden is on the defendant[] to demonstrate that the representation will be inadequate."  *Johns v. Rozet*, 141 F.R.D. 211, 217 (D.D.C. 1992); *see also Lewis v. Curtis*, 671 F.2d 779, 788 (3rd Cir. 1982); *Trautz v. Weisman*, 846 F. Supp. 1160, 1167 (S.D.N.Y. 1994).

Defendant's account of Ms. Soutter's previous case against Experian is incomplete and off target.  Initially though, Equifax fails to explain what duty to the class Ms. Soutter would have violated by electing in that case not to seek class certification.  Before seeking class certification, a Plaintiff does not owe a duty to a putative class.

Shelton v. Pargo, Inc., 582 F.2d 1298, 1303 (4th Cir. 1978).  Further, even the implication of impropriety is void of fact.[3]

Equifax also withholds from the Court the following information long ago known to it.  Unlike the present case, the Experian case alleged an individual dispute reinvestigation claim under 15 U.S.C. § 1681i(a).  The case also was earlier in time and at that point Plaintiff's counsel had no idea how he was going to obtain bulk records from the Virginia court system.  Plaintiff's counsel had far more limited knowledge regarding Experian's source of public records – now known to also be LexisNexis after discovery in this case.   Given the short time available to discover and move for class certification, there is no way that the Plaintiff could have competently presented a Rule 23 motion in the case.

Accordingly, to ensure that there was no later allegation of impropriety – a failed effort it turns out given Equifax's defiant position – Plaintiff first dismissed with prejudice her own claim under § 1681e(b) and the class claim without prejudice.  This effort was begun before a settlement was reached.  The disposition orders in that case reflect these events.    The fact that the named Plaintiffs have claims in addition to those asserted on behalf of the class does not render representation inadequate.  *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith*, 903 F.2d 176 (2d Cir 1990) , *cert. denied*, 498 U.S. 1025 (1991).  "[T]he fact that individual plaintiffs may have interests which go beyond the interest of the class, but are at least co-extensive with

---

[3] There is no evidence that the Plaintiff or her counsel sought to leverage the class allegations in the Experian case for a larger individual settlement.  In fact, Plaintiff's counsel negotiated that settlement and represents pursuant to Fed. R. Civ. P. 11 that no such effort was made on the Plaintiff's behalf.  No conversation was had in such regard.  Not a word.

the class interest, will not defeat the class." *First Am. Corp. v. Foster*, 51 F.R.D. 248, 250 (N.D. Ga. 1970); *accord*, *Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417, 430-31 (4th Cir. 2003).

Equifax also asserts that Plaintiff cannot with integrity represent the class because she is foregoing actual damages.  Equifax of course does not admit that Ms. Soutter or any putative class member could actually prove significant actual damages from the alleged § 1681e(b) claim.  Accordingly, it resorts to attempted use of Plaintiff's Rule 26(a)(1) disclosures.  Again though, it does so incompletely and without candor to the Court.  Plaintiff's Rule 26(a)(1) disclosures were served early in this case when the action also included an individual claim for a second Plaintiff, Toni Webb.   The Rule 26(a)(1) disclosures expressly separated their damage disclosures for the Webb "Individual claim" and the statutory damages "Class claim"  (Dock't  No. 59).

Equifax also suggests only a possibility that some class members would be able to prove solely on a § 1681e(b) claim significant actual damages.  It does not represent its honest belief that this would actually occur.  As detailed in Plaintiff's opening brief, a conflict will not defeat the adequacy requirement if it is "merely speculative or hypothetical[.]"  (citation and internal quotations omitted).  *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010).   Despite the completion of Phase I discovery Equifax offers no proof or identification of putative class members who would seek to litigate substantial actual damage claims.  Conjecture is an inadequate basis for opposing class certification.

No apparent or even imagined antagonism exists between Plaintiff and members of the proposed class.  Nevertheless, "any conflicts that may be presently discovered will

likely pale in comparison to the issues unifying the class." *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 645 (N.D. Cal. 1987).

### D. CLASS ISSUES PREDOMINATE OVER INDIVIDUAL ISSUES

As with most of the Rule 23 elements it now challenges, Equifax ignores and fails to address any of the legal argument begun in Plaintiff's opening memorandum. Instead it continues its hodgepodge approach of miscellaneous challenges. Defendant offers three merits queries that it believes would constitute individualized issues in the case: (a.) inaccuracy; (b.) whether Equifax's credit reporting procedures were reasonable; and (c.) the calculation of statutory damages between the $100 and $1,000 statutory range.

The first of these arguments is the most confusing. This is because Equifax states its position solely as "these cases held accuracy is an individualized issue and therefore you should as well." Defendant does not suggest its own analysis or explanation as to how the two cases it cites have any relevance to the facts and claim in this case.

Equifax claims that proof of inaccuracy would be a difficult and resource consuming individualized issue. It claims this is so in largest part because that is what present Plaintiff's counsel represented to the Court in *Williams v. LexisNexis Risk Mgt.*, 2007 WL 2439463 (E.D. Va. Aug. 23, 2007). But *Williams* was a different case entirely. In *Williams*, the types of inaccuracies involved were varied and often complex. Many were "Mixed file" cases in which one consumer was confused with another of similar name. Others involved claims that certain criminal records were misinterpreted. Further, *Williams* was a national class. And examination of courthouse records could not be systematic or accomplished through a common database (such as that of the SCV). Many

of the criminal charges at issue were not publically accessible.  There were numerous reasons present Plaintiff's counsel did not move to certify a § 1681e(b) class in *Williams*.

This case is much different than *Williams* and the other cases cited by Equifax.  It presents an accuracy fact pattern that is objectively determinable.  The alleged inaccuracies are nearly identical among class members.  Contrary to Defendant's assertion that an accuracy determination required a review of Credit Union documents, personal testimony and courthouse papers, the determination of inaccuracy is actually far simpler and always objective.  The only questions are: 1. Did Equifax report a judgment as unpaid and owing, 2. on a date that the judgment record at the court house (directly or through the SCV system) was marked as satisfied, vacated (including dismissals) or appealed?  Plaintiff's counsel has already established that this set of determinations can be easily made. (Ex. A, Erausquin Decl. ¶ 11)

Remarkably, but in form, Equifax states: "In short, Equifax is unaware of any reported case in which a federal court has certified a § 1681e(b) claim for class treatment.  This Court should not become the first."  (Def.'s Opp'n at 32).  This is a deliberately misleading statement – Equifax uses the term "reported case" to avoid disclosing to the Court what it certainly knows: There have been at least three such cases, two certified over contest and sustained on interlocutory appeal  (Ex. B, Clark v. Experian Info. Solutions, Inc., et als., C/A Co. 8:00-1217-24; 8:00-1218-24; 8:00-1219-24; Ex. C, *Harris v. Experian Info. Solutions, Inc., et al.*, Case No. 6:06-CV—01808, 01810, 01811-GRA) and one a massive § 1681e(b) settlement that has so far survived Rule 23(b)(3) scrutiny past preliminary approval.  (Ex. D, *White v. Experian Info. Solutions, Inc.*, Case No. SACV05-1070 DOC (C.D.Ca. May 7, 2009).   Equifax was a party in all three cases.

Defendant's second challenge to predominance is a repeat of its argument that its "reasonable procedures" can vary by courthouse.   This has already been addressed in part.   The FCRA, 15 U.S.C. § 1681e(b) requires a CRA to use "reasonable procedures" to "ensure maximum possible accuracy" when it furnishes a credit report to a third party. Equifax has somehow twisted this to state "A CRA must use reasonable procedures in the collection of courthouse public records."     Equifax's position, reformulated to fit the FCRA is that for some consumers the FCRA would tolerate a different degree of inaccuracy than for others.   By its view, Equifax's margin of error in the accuracy of its credit reports for a Virginia consumer in a rural jurisdiction (residing where the judgment was obtained) would be different than for one in an urban jurisdiction with judgment records more often updated.   This certainly is not and cannot be the case.   Equifax may be correct that the data gathering process for some courthouses will differ fro other courthouses, but the purpose of the variances would be to maintain uniformly accurate data, not to reduce costs or meet a convenient timetable.   And as argued previously, if Equifax is unable to regularly update all of its Virginia civil judgments, it should not report those judgments.   These issues are entirely uniform and common between class members.

Equifax also fails to offer any estimate, description or even hypothesis as to how material and how diverse the Virginia record gathering processes can be.   By the descriptions offered in its declarations and brief, it appears that there are only a handful or less of differing courthouse procedures.   It remains unclear how such theoretical differences would be material to the case, let alone overwhelm the nearly uniform common questions of fact and law.

Equifax's final predominance argument is that determinations as to an appropriate amount of statutory damages per consumer will require individual inquiries.  The FCRA provides a remedy between $100 and $1,000 in statutory damages per consumer. Defendant claims that a determination of the appropriate amount for each class member will raise predominant individual issues.   However, again to form, Equifax ignores governing law in this Circuit that is directly on point. In *Stillmock*, the Fourth Circuit reversed the District Court's denial of certification based in large part on the individualized queries needed to determine statutory damage amounts.  The Court of Appeals held that the amount of statutory damages is determined by the number of separate violations incurred by each class member. *Stillmock v. Weis Markets, Inc.*, 385 F. App'x. 267, 273 (4th Cir. 2010).  In *Stillmock*, this was the number of credit card receipts issued for each consumer in violation of the FCRA.  In the present case, statutory damages would be determined by the number of credit report furnished in violation of § 1681e(b).  As the Fourth Circuit explained, "[T]his difference does not complicate matters very much at all given that the class can be broken down into subcategories based upon the number of violating receipts received per putative class member. In sum, we hold that common questions of law and fact predominate over the individual issues presented by Plaintiffs' purported class action, thus satisfying Rule 23(b)(3)'s commonality-predominance test." *Id.*

## E. CLASS ACTION IS THE SUPERIOR METHOD OF ADJUDICATION

Equifax opposes a finding of superiority, but does so without any attention to the established standard for such a finding or any of the arguments and law offered in

Plaintiff's opening brief.  Plaintiff does not now repeat those positions, but as with all matters, she incorporates her arguments made therein.

"[T]here is a strong presumption in favor of a finding of superiority" in a statutory damages FCRA case where, as here, "the alternative to a class action is likely to be no action at all for the majority of class members." *Cavin v. Home Loan Center, Inc.*, 236 F.R.D. 387, 396 (N.D. Ill. 2006).  This presumption is rooted in the policy that lies "at the very core of the class action mechanism"—namely, "overcom[ing] the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Thus, as Judge Easterbrook noted in *Murray v. GMAC Mortgage*, "Rule 23(b)(3) was designed for situations such as [those involving low damage FCRA claims], in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate."  *Murray v. GMAC Mortgage,* 434 F.3d at 953.

In its challenge to superiority, Equifax asserts – apparently with a straight face – that, "The law is settled that the superiority requirement is not satisfied when the plaintiff's claims implicate statutes allowing the successful plaintiff to recover her attorneys' fees."  (Def.'s Opp'n at 36).  The law is in fact settled in this Circuit and District, but not with the conclusion Equifax would prefer.[4]  In fact, both the Fourth Circuit and this Court have expressly rejected this patently flawed superiority challenge.

---

[4] Its claim to the contrary and failure to consider or present to the Court governing case law on the issue is consistent with Defendant's lack of candor throughout its brief.  As in this instance, its representations should be considered skeptically.  *See also* Virginia Rules of Professional Conduct, RULE 3.3 Candor Toward The Tribunal, "(a) A lawyer shall not knowingly: ...  (3) fail to disclose to the tribunal controlling legal authority in the subject jurisdiction known to the lawyer to be adverse to the position of the client and not disclosed by opposing counsel[.]"

Equifax fails to cite either case, both of which are governing law directly on point.  This

year, in a case known to Equifax's counsel, the Fourth Circuit considered Defendant's

exact argument and expressly rejected it:

> Apparently sensing the shallowness of the district court's analysis, Weis
> Markets argues that the availability of attorney's fees and punitive
> damages under FCRA makes individual lawsuits feasible.  Weis Markets'
> argument is without merit. First, the low amount of statutory damages
> available means no big punitive damages award on the horizon, thus
> making an individual action unattractive from a plaintiff's perspective.
> Second, there is no reasoned basis to conclude that the fact that an
> individual plaintiff can recover attorney's fees in addition to statutory
> damages of up to $1,000 will result in enforcement of FCRA by individual
> actions of a scale comparable to the potential enforcement by way of class
> action. (citations omitted).

*Stillmock v. Weis Markets, Inc.*, 385 F. App'x.  at 274-75; *Williams v. LexisNexis Risk*

*Management Inc.*, 2007 WL 2439463, at *9.

Defendant also makes the counter-intuitive argument that its position that

individual actions are an effective means to address the FCRA violations alleged in this

case is supported by the fact that one other consumer besides Donna Soutter has filed

such a case.  (Def.'s Opp'n at 37-38).  The number of consumers subjected to Equifax

unlawful conduct alleged in this case exceeds 200,000.  It has remained a problem for

years, if not a decade.  And yet only one consumer – Donna Soutter - has filed a federal

case that even touches on the issue.   Even the state court case proffered by Equifax as a

second case filing does not allege a violation of 15 U.S.C. § 1681e(b).  It is solely a

reinvestigation case brought under § 1681i(a).[5]

---

[5] This case filing also addresses Equifax's argument as to alleged actual damages and in
fact supports Plaintiff's position that the significant damages in non-employment purpose
cases under § 1681e(b) are limited and most often more appropriately prosecuted for the
violation of § 1681i(a).

The cause of such dearth is in part the perceived expense and lack of attorney access for consumers with FCRA.  For better or worse, present Plaintiff's counsel is one of less than a handful of attorneys nationally who practice fully in this field.  There is no possibility that counsel could accept and prosecute 200,000 individual FCRA cases, even if the Court's docket and staff could somehow manage them.  But a second important cause of the lack of individual cases is that he large majority of class members would never think to bring individual claims because they are unaware their rights have been violated—having little lay knowledge of the complex blanket of FCRA protections.  *See, e.g., Bonner*, 2006 U.S. Dist. LEXIS 54418, at \*22 ("[M]any of the persons in these classes may be unaware that the form letter sent by Defendants may violate the FCRA, and a class action suit may help to safeguard their rights."); *White*, 2002 U.S. Dist. LEXIS 26610, at \*58 ("Because . . . individual putative class members may not be aware of the violation of their [FCRA] rights, it appears improbable that the putative class members would possess the initiative to litigate their claims individually.").

Given the choice between no individual cases (or one) and a class case, the later is unquestionably the superior path.

**<u>CONCLUSION</u>**

Accordingly, for the reasons stated in Plaintiff's opening memorandum and in reply to Defendant's opposition, the Court should grant Plaintiff's Rule 23 Motion.

**DONNA K. SOUTTER,** *for herself and on behalf of others similarly situated individuals,*

_____/s/_____
Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION
ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, Virginia 23606
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of December, 2010, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

| John W. Montgomery, Jr., Esq.<br>Montgomery & Simpson, LLLP<br>2116 Dabney Road<br>Suite A-1<br>Richmond, VA  23230<br>jmontgomery@jwm-law.com | Barry Goheen, Esq.<br>King & Spalding<br>1180 Peachtree Street, NE<br>Atlanta, GA  30309-3521 |
|---|---|
| John Anthony Love<br>King & Spalding<br>1180 Peachtree Street, NE<br>Atlanta, GA  30309-3521<br>tlove@kslaw.com | Keasha Ann Broussard, Esq.<br>King & Spalding<br>1180 Peachtree Street, NE<br>Atlanta, GA  30309-3521<br>abroussard@kslaw.com |

_____/s/_____

Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION
ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, Virginia 23606
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net