```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF VIRGINIA

 3                      RICHMOND DIVISION

 4
      ---------------------------------------
 5                                          :
      DONNA K. SOUTTER, for herself and     :
 6    on behalf of all similarly            :   Civil Action No.
      situated individuals                  :   3:10-CV-107
 7                                          :
      vs.                                    :
 8                                          :   February 22, 2011
      EQUIFAX INFORMATION SERVICES, LLC     :
 9                                          :
      ---------------------------------------

10

11        COMPLETE TRANSCRIPT OF THE MOTIONS HEARING

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13              UNITED STATES DISTRICT JUDGE

14

15    APPEARANCES:

16    Leonard A. Bennett, Esquire
      Matthew J. Erausquin, Esquire
17    Consumer Litigation Association, PC
      12515 Warwick Boulevard
18    Suite 100
      Newport News, Virginia  23606
19    Counsel for the plaintiffs

20    John W. Montgomery, Jr., Esquire
      Montgomery & Simpson, LLP
21    2116 Dabney Road
      Suite A-1
22    Richmond, Virginia  23230

23

24                  Peppy Peterson, RPR
                    Official Court Reporter
25              United States District Court
```

```
1    APPEARANCES:  (cont'g)

2    Barry Goheen, Esquire
     King & Spalding
3    1180 Peachtree Street NE
     Atlanta, Georgia  30309
4    Counsel for the defendant

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2

3            THE CLERK:  Civil action number 3:10CV00107, Donna K.

4    Soutter, for herself and on behalf of all other similarly

5    situated individuals, et al, versus Equifax Information

6    Services, LLC.  Mr. Leonard A. Bennett and Mr. Matthew J.

7    Erausquin represent the plaintiffs.

8            Mr. John W. Montgomery, Jr., and Mr. Barry Goheen

9    represent the defendant.  Are counsel ready to proceed?

10           MR. BENNETT:  Ready for Soutter.

11           MR. GOHEEN:  Equifax is, Your Honor.

12           THE COURT:  All right.  Plaintiff has the burden on

13   this motion.  So Mr. Bennett.

14           MR. BENNETT:  Yes, Your Honor.

15           THE COURT:  Mr. Bennett, I think the first task is I

16   really need to -- I understand my responsibility in defining

17   the class, but I need to know what you think the class is and

18   what it should do.

19           There's been a lot of briefing on the topic, but this

20   giving me a dartboard to throw at doesn't help me much.  I want

21   to know what the class is now that you think ought to be

22   certified.

23           MR. BENNETT:  Judge, at page 13 of our reply brief,

24   which is docket number 79, we proffer it as, of course, all

25   natural persons to whom Equifax's records note that a hard
```

```
1    inquiry credit report was furnished to a third party.
2              There is some dispute in the law as to -- well, to
3    have a violation or to establish a violation --
4              THE COURT:  You are getting off on the tangents.
5              MR. BENNETT:  A hard inquiry, Judge, is a publication
6    of a credit report by Equifax to a third party.  It maintains
7    that history of hard inquiries of credit reports it has
8    furnished in its database.
9              THE COURT:  That's not a class definition I'm going
10   to adopt because that was so sufficiently confused that I had a
11   little trouble following.  I think the class might have trouble
12   following it, too, so why don't you tell me what the class is,
13   please.
14             MR. BENNETT:  It is drafted on -- again, the proposed
15   definition --
16             THE COURT:  That's the one you want, is on page 13 of
17   your reply brief.
18             MR. BENNETT:  Yes, Judge.  The language that the
19   Court has just described as more cumbersome than ideal --
20             THE COURT:  I didn't describe that language.  I
21   described what you said, because it had a lot of tangents in
22   it, as more cumbersome.
23             MR. BENNETT:  Yes, sir.
24             THE COURT:  All natural persons.
25             MR. BENNETT:  For whom --
```

1          THE COURT:  Everybody agrees with that, don't they?

2     Is there any conflict over that?

3          MR. BENNETT:  Not from us.

4          THE COURT:  From anybody.  I mean, you read the

5     briefs.

6          MR. BENNETT:  There isn't, Judge.

7          THE COURT:  For whom Equifax's records note that a

8     "hard inquiry" credit report was furnished to a third party.

9     Is there any dispute over that?

10          MR. BENNETT:  There's none in the briefing.

11          THE COURT:  Other than for employment purpose, any

12     dispute over that?

13          MR. BENNETT:  Not in the briefing.

14          THE COURT:  At a time when any Virginia General

15     District Court or Circuit Court judgment that had been

16     satisfied, appealed, or vacated in the court file more than

17     30 days earlier was reported in Equifax's file as remaining

18     unpaid.  There's where the dispute lies; right?

19          MR. BENNETT:  Yes, sir.

20          THE COURT:  Now, where is the dispute?  In all that

21     paragraph, that fourth criteria, where is the dispute?

22          MR. BENNETT:  Well, in fact, this part of the brief

23     is addressing one of those disputes.  That is, Equifax argues

24     that the definition we proposed would not be ascertainable.

25     More correctly, we think not identifiable, this argument,

1  because --

2          THE COURT:  My first question was, where is the

3  disagreement in paragraph four?  Over what text of the fourth

4  component of the class?  What's the disagreement over it as you

5  understand it?  It's not at a time when any Virginia General

6  District Court or Circuit Court judgment, is it?

7          MR. BENNETT:  No, sir.

8          THE COURT:  Is it within the text "that had been

9  satisfied, appealed, or vacated"?

10          MR. BENNETT:  I'm not aware of a dispute about any of

11  the language in four in terms of whether or not it is

12  identifiable.

13          THE COURT:  So they talk about whether it's

14  ascertainable.

15          MR. BENNETT:  Yes, sir.

16          THE COURT:  I think I understand the

17  ascertainability.  What is the next issue?

18          MR. BENNETT:  This class definition, Judge, the other

19  issue is what to do with outlier circumstances in which the --

20  which a consumer has a 1681e(b) credit actual damage claim,

21  and --

22          THE COURT:  That has to do with adequacy of her

23  representation; is that right?  Because she's not pursuing

24  actual damages for the class.

25          MR. BENNETT:  That is one argument that they are

1    making.   The other argument, Judge, is the argument that if we

2    were to definitionally -- if the Court were to definitionally

3    follow the lead of the *Stillmock v. Weis Markets* decision that

4    the Fourth Circuit rendered in which they reversed denial of a

5    class -- Fair Credit Reporting Act class action out of the

6    District of Maryland.

7           The Fourth Circuit noted a definitional exclusion

8    that wasn't in the actual text of the definition but was in the

9    text of the decision that followed it that excluded as class

10   members any individuals that had suffered identity theft

11   damages as a result.

12          We have proposed as one of the really two

13   alternatives for the Court's consideration a circumstance in

14   which the Court could exclude any individual that has --

15   asserts damages in excess of a thousand dollars.

16          THE COURT:   That's not in this definition.

17          MR. BENNETT:   That is not in the definition on this

18   page.

19          THE COURT:   Well, the one I asked you about is what

20   is it that you want me to adopt as a definition.   What is it?

21          MR. BENNETT:   Judge, we don't believe that the Court

22   needs do anything other than what is in this to properly --

23          THE COURT:   "This" meaning paragraph --

24          MR. BENNETT:   That's correct.

25          THE COURT:   -- 13.

1          MR. BENNETT:  That's correct.  We have argued in the

2     alternative that if the Court is somehow persuaded that there

3     would be a flood of actual damage consumers included within

4     this 1681e(b) non-employment group, then -- that the Court

5     could modify the class definition to exclude them the way that

6     *Stillmock v. Weis Markets* excluded individuals that had

7     identity theft damages.

8          THE COURT:  So just exclude actual damages.

9          MR. BENNETT:  Any consumers that asserted actual

10    damages in excess of a thousand dollars which is beyond the

11    statutory damage threshold.  That's an alternative argument

12    and, again, follows the Fourth Circuit's conclusion, but we

13    believe as our primary position, as our, I think, the absolute

14    true position is that the Court can accommodate opt-outs.

15         The Court -- this process allows for those

16    individuals whose damages arise -- that is they haven't made a

17    dispute, they haven't written to Equifax and triggered the

18    1681i reinvestigation claim that's the meat of most of fair

19    credit litigation, then that individual who has not made the

20    dispute, has some actual damages in excess of a thousand

21    dollars they believe that they could prove, they could opt out.

22    That's what they should do.

23         All of the jurisprudence we've cited in both our

24    initial and our reply briefs support this.  Fourth Circuit has

25    come down completely in that manner, and this Court has -- in

1   *Williams,* there could have been individuals that suffered

2   actual damages.  It turns out there were a decent amount of

3   opt-outs but not -- less than a percent.

4           In this instance, given that you've had only one

5   other individual besides Donna Soutter sue out of what we

6   estimate to be approximately 300,000 consumers offended, I

7   think that the likelihood that you're going to have a flood of

8   consumers claiming that they suffered greater damages, greater

9   than the statutory damage remedy provides, is minuscule.

10          THE COURT:  All right.

11          MR. BENNETT:  The -- while we're on the class

12  definition, the other issues, Judge, that Equifax asserts, and,

13  again, we believe with respect to identifiability is they're

14  ascertainability argument, their primary position challenges

15  the data that we have so far in phase one gathered.

16          We have obtained, through the executive secretary of

17  the Virginia Supreme Court, a database that answered an inquiry

18  that we defined.  That is the plaintiffs' counsel said, please

19  give us the following -- the names and addresses of the

20  individuals that meet the following criteria and other

21  information necessary to match them against Equifax's data.

22          Donna Soutter had her judgment vacated and then

23  subsequently dismissed.  We didn't ask for that code.  It's a

24  code that we could have asked for and we will ask for if we can

25  obtain certification, and we will have to pay more money as we

1    did to the -- to cover the state's expense in obtaining that

2    database, but as we've cited, Mr. Mittendorf, his deposition

3    testimony, he says we can do that, you just have to ask, and we

4    will ask in phase two, but all we needed to show for the

5    purpose of the first phase of this case is that it can be done.

6            We -- the plane has flown, and you know that flight

7    is possible, and now we can begin to build the full class list.

8    We are not suggesting that the defendant bear the burden.  We

9    have already absorbed the expenses and cost.  We would continue

10   to do so.  We will obtain the full database of individuals, and

11   Equifax as --

12           THE COURT:  Do they object to the 30-day period?

13           MR. BENNETT:  They have not, Judge, except to say --

14   they haven't objected to that as part of the class definition.

15   They have objected to the conclusion that we insist on that --

16   that Equifax should, on a merits argument, be picking all

17   these --

18           THE COURT:  That is the merits.

19           MR. BENNETT:  It is.

20           THE COURT:  That is an issue that doesn't have

21   anything to do with defining the class.

22           MR. BENNETT:  That's correct, Judge.

23           THE COURT:  Although to a certain extent, we are to

24   look at, in deciding class certification, questions of the

25   merits if we need to to ascertain not as to the validity vel

1   non but as to -- so we can use them in assessing the class

2   action criteria; isn't that right?

3          MR. BENNETT:  That is correct, Judge.  The defendant

4   takes it further.  The defendant -- the implication of its

5   argument is its conduct would be reasonable, procedures would

6   be reasonable, and that would be a merits consideration as

7   opposed to --

8          THE COURT:  I can't decide that now, can I?

9          MR. BENNETT:  You cannot.

10          THE COURT:  That would be beyond where the Court said

11   I could go; right?

12          MR. BENNETT:  Yes, sir.

13          THE COURT:  Why aren't we dealing with actual damages

14   here?

15          MR. BENNETT:  Well, Judge, because --

16          THE COURT:  She said she had actual damages according

17   to their brief, and you say, well, what she said was, at a time

18   when Webb was in the case, she had -- she was making Rule 26

19   disclosures, and she said that she had some actual damages.

20          MR. BENNETT:  No, sir.

21          THE COURT:  Then in deposition, she wouldn't back off

22   of that according to them.  They just -- she keeps insisting

23   that she had actual damages, and she's not pursuing them.  So

24   what is that all about?

25          MR. BENNETT:  Well, there's two different things.

1    First, with respect to the Rule 26(a)(1), there isn't a dispute

2    about that.  The Rule 26(a)(1) disclosures are contractually a

3    docket item --

4              THE COURT:  You claimed actual --

5              MR. BENNETT:  No, sir.

6              THE COURT:  You listed actual damages --

7              MR. BENNETT:  No, sir.

8              THE COURT:  -- in your disclosure or not?

9              MR. BENNETT:  No, sir.  It is -- without any

10   explanation, if you look at the document, it is segregated, and

11   it says, individual claims, like roman numeral one.  The only

12   individual claim was Mr. Webb's reinvestigation claim.  There

13   has never been an individual claim as to Equifax for Donna

14   Soutter.  She did not have a reinvestigation claim as to

15   Equifax.  It wouldn't have existed.  It's not that we didn't

16   file it or we haven't pursued her actual damages

17   reinvestigation claim.  She doesn't have one.

18             THE COURT:  What about all this stuff about emotional

19   distress and all that other stuff?

20             MR. BENNETT:  Because, Judge, she did, after making

21   disputes, go through this process, and she actually -- there is

22   a settlement where she received money, and it's confidential.

23   We have TransUnion's lawyers here, but we don't have

24   Experian's, but she was paid money for her 1681i

25   reinvestigation claim.

1          THE COURT:  Is that where the damages occurred?

2          MR. BENNETT:  Yes, sir;

3          THE COURT:  So she was answering in another case and

4    looking at -- they are talking about this 26(a)(1) disclosures

5    in another case and arguing that that shows she has actual

6    damages?

7          MR. BENNETT:  No, sir.

8          THE COURT:  What's going on about that --

9          MR. BENNETT:  There's two different things.  You are

10   combining them.  The 26(a)(1) isn't simply a red herring or a

11   misinterpretation.  It is totally factually wrong the way that

12   is it raining outside or not raining outside.  The initial

13   disclosures never claim --

14         THE COURT:  In this case.

15         MR. BENNETT:  In this case never claim that the

16   *Soutter v. Equifax* case, in any fashion, had actual damages.

17   They expressly separate themselves in the text, in the actual

18   Word and PDF and file document.  It says, individual claims,

19   here are the damages, and those are the only individual claims

20   that were ever asserted, were Mr. Webb's with respect to the

21   1681i, and he had actual damages as did my client with respect

22   to her reinvestigation claims.

23         THE COURT:  That's in another case.

24         MR. BENNETT:  Yes, sir.

25         THE COURT:  Why did you say that even?  All right,

1  now, so the only, what about -- they say that at her deposition

2  she claims she had --

3          MR. BENNETT:  She claims --

4          THE COURT:  -- actual damages.

5          MR. BENNETT:  She claimed, Judge -- in her

6  deposition, she testified that this had impacted her, that she

7  really felt that this had an effect on her.  She didn't have

8  damage assessment as in this is an actual damage amount, nor is

9  she, as counsel informed, as to separation of her actual damage

10 claim from one credit bureau to the other credit bureau to the

11 other credit bureau or one claim to the other.

12         THE COURT:  If she types that out right now, do you

13 think you can read it and understand it, what you just said,

14 because I can't?

15         MR. BENNETT:  If you couldn't, I couldn't, Judge.

16         THE COURT:  Let's try it in simple declarative

17 sentences.  Short ones would be helpful without any

18 embellishment, side excursions.  It will help me understand it;

19 okay?

20         MR. BENNETT:  Yes, sir.  As this Court knows, proof

21 of damages is complex.  It requires proof of causation amongst

22 many other things.  The plaintiff does not, in her deposition,

23 attempt to establish, or determine even, the causation for her

24 damages.

25         She knows, I went through this process, this process

```
1    affected me emotionally.  She doesn't attempt to, without
2    reliance on counsel's help, attribute her damage, her causation
3    to one event, one violation, one defendant versus another.
4              THE COURT:  You mean one credit reporting agency.
5              MR. BENNETT:  One credit reporting agency or one
6    violation.
7              THE COURT:  So she's not claiming -- she doesn't have
8    any actual damages.
9              MR. BENNETT:  Not with respect to Equifax.
10             THE COURT:  Why does that make her -- what do you
11   think they mean by saying she's not an adequate class
12   representative because she doesn't have any actual damages?
13             MR. BENNETT:  Well, because there have been some
14   courts that have found a plaintiff that is willing to throw the
15   class's significant claims under the bus just for certification
16   is in conflict with the class.
17             THE COURT:  So basically -- why does she have any
18   claims?  If nobody else has any claims over a thousand dollars,
19   why does she?
20             MR. BENNETT:  Well, she has -- well, first, Judge,
21   she has --
22             THE COURT:  That's where you get caught, because of
23   what you said in the other case, isn't it?
24             MR. BENNETT:  No, sir.  I'm not sure what -- she has
25   claims for statutory damages and for punitive damages.  The
```

1  *Saunders v. BB&T* case that we took to trial -- didn't try to.

2  We tried to avoid it, but we took it to trial and took it to

3  appeal.  The Fourth Circuit affirmed a thousand dollars of

4  statutory damages and 80,000 of punitive damages.

5         The difficulty in the *Saunders* case would be the

6  difficulty in almost all these, is establishing the causation

7  for a violation under 1681e Subsection B.

8         THE COURT:  It's your position that most people who

9  suffer this particular kind of damage don't have any actual

10  damages to speak of.

11         MR. BENNETT:  Or more correctly, that they do not

12  have the means, the ability, the evidence to prove, through the

13  causation burden, actual damages because of a 1681e Subsection

14  B claim.

15         THE COURT:  It's hard to prove any damages like that

16  anyway.

17         MR. BENNETT:  It is incredibly hard even under 1681i.

18  If you look at motions *in limine* that Equifax will file in any

19  of its cases, most of them will be related to your damage

20  proofs.

21         The *Cortez v. TransUnion* decision, 2010 in the Third

22  Circuit, outlined the Senate report on the Fair Credit

23  Reporting Act and discussed the great difficulty consumers have

24  and even knowing that a particular credit report caused a

25  particular damage item, when actually in *Cortez* it transitions

1   into why certain remedies exist, statutory and punitive damages

2   amongst others.

3            THE COURT:  What is this all about in the briefs

4   whether there's injunctive relief requested or not?  What's

5   that all about?

6            MR. BENNETT:  Well, I don't believe that the parties

7   are joined on that issue in the briefs.  There is a divide that

8   my side has so far lost soundly, not uniformly but soundly on

9   whether or not the Fair Credit Reporting Act allows for

10   injunctive relief for private individuals.

11            THE COURT:  The Fourth Circuit hasn't decided that,

12   have they?

13            MR. BENNETT:  The Fourth Circuit has not decided

14   that, Judge, but I lost the decision in a case that Judge

15   Dohnal ruled on against, of all places, the Virginia Employment

16   Commission as the defendant.  There was a sovereign immunity

17   defense, or rather -- I'm sorry -- a 10th Amendment defense,

18   and the defendant -- we argued, amongst other things, that even

19   if you can't obtain damages against the state or federal court,

20   you can obtain injunctive relief --

21            THE COURT:  What kind of injunctive relief?

22            MR. BENNETT:  In that instance, we were seeking --

23   the state does not tell you when it denies you employment based

24   on what's in a background check.  It doesn't tell you that.  It

25   doesn't give you a copy of the report, it doesn't give you --

1    THE COURT:  You were seeking preliminary mandatory

2    relief.  I mean you were seeking mandatory relief.  That is,

3    you have to change -- you have to do this, but you really want

4    a cease and desist, stop doing what you are doing unless you do

5    something else.

6    MR. BENNETT:  Yes, sir.  In fact --

7    THE COURT:  Has any court decided you can't have

8    that?

9    MR. BENNETT:  Yes, sir.  The Supreme Court has a case

10   -- not an Unfair Credit Reporting Act, but *Christiana* that

11   stands for the proposition that unless the statute expressly

12   bars the Court from injunctive -- such injunctive relief, it's

13   not barred.  If the Court recalls --

14   THE COURT:  Does the statute bar injunctive relief?

15   MR. BENNETT:  It does not, Judge.

16   THE COURT:  Why, then, doesn't the general rule that

17   injunctive relief can be had apply to this statute?

18   MR. BENNETT:  Without having to play devil's

19   advocate, the actual truth for me, Judge, is because the issue

20   was lost early by one or two cases, and they began to pile --

21   precedent began to pile negatively, and so few judges --

22   THE COURT:  What law is there -- you know, the

23   Supreme Court, in the *eBay® v. Merc* trade case, made it quite

24   clear that in the patent law context, courts need -- and that's

25   a specific kind of statutory relief that's permitted -- courts

```
1   need to use their general equity powers to assess whether
2   injunctive relief is appropriate or not.
3          I don't understand why injunctive relief is not
4   appropriate in a case like this.  Are you seeking it as part of
5   the class action?
6          MR. BENNETT:  We have not asked for a 23(b)(2) class.
7   That is, we've not asked for an injunctive relief class.
8          THE COURT:  That's not an issue then.
9          MR. BENNETT:  No, sir.  Equifax would argue --
10         THE COURT:  Do you know what a cynic once argued?  I
11  don't know whether Mr. Goheen was the cynic or who it was.  The
12  plaintiffs' bar doesn't want it because it would put them out
13  of business if they had to change practice.
14         MR. GOHEEN:  I don't think I'm that cynical, Your
15  Honor.
16         MR. BENNETT:  Judge, I have -- injunctive relief has
17  been what I personally, as on the board of directors of the
18  National Association of Consumer Advocates is a big political
19  activist in this field nationally, with Congress we've been
20  fighting to try to get, certainly pre-November, the house
21  financial services committee to impose injunctive relief
22  remedies or to allow them, and the advantage that is suggested,
23  the tantalizing overture is that it's the way to provide a
24  safety valve against the growing wave of Fair Credit Reporting
25  Act class actions, because failing an injunctive relief remedy,
```

1    what we are here today to do is the only means to correct the

2    reports of individuals, most of whom, to be honest, have no

3    idea they have a right.  They don't know they can sue, they

4    don't know that Mr. Bennett makes a living under this statute

5    or that there's a handful of other lawyers that can help them.

6    They do not know -- identity theft victims, employment

7    consumers, individuals like Ms. Soutter have no idea before --

8              THE COURT:  Okay.  I understand.  So we don't have

9    the issue of injunctive relief.

10             MR. BENNETT:  We don't, Judge, but the point that

11   this transitions into certainly is as to the superiority

12   argument.  The question is not whether a class action remedy is

13   perfect.  It's whether it's a superior option to doing nothing

14   at all, really, because that's what you have.

15             You have the defendant -- the only case besides Ms.

16   Soutter that the defendant identifies is a state court filing

17   by a general practice attorney, and in that case, he pled a

18   1681i reinvestigation claim, not an e(b) claim.

19             17,000 consumers made disputes.  At least 17,000 made

20   disputes of these items to Equifax within the last two years,

21   and not many individuals even knew that, but we're taking about

22   individuals, Judge, who paid off a judgment or who went to the

23   trouble of having it vacated or appealed it, and it wasn't

24   reentered.

25             THE COURT:  17,000 out of the 300,000?

1          MR. BENNETT:  Well, 17,000 -- Equifax provided a

2     partial list.  Equifax identifies that list as including only

3     the individuals it did not immediately correct, and it actually

4     tries to, in its brief, impeach its own discovery production by

5     arguing that we didn't give you all of the data, so for you to

6     try to generate a class list from the data we gave you is a

7     failed exercise because we only gave you data --

8          THE COURT:  You're going to get the rest of it later.

9          MR. BENNETT:  Yes, sir.

10         THE COURT:  Okay, thank you.  Have a seat.  Mr.

11    Goheen.

12         MR. GOHEEN:  May it please the Court, Barry Goheen,

13    John Montgomery representing Equifax.  Let me, if I could, Your

14    Honor, pick up on that actual damages testimony, just to make

15    sure.  This was in our papers.

16         THE COURT:  Well, now, that's the 26(a) disclosures.

17    He said that the disclosures in this case said she didn't have

18    any actual damages, and Webb did.  Which is the truth?

19         MR. GOHEEN:  There was confusion on that point, Your

20    Honor, and that's why in the deposition, I went through --

21         THE COURT:  I didn't ask you that.  I asked you what

22    the 26(a) disclosures said.

23         MR. GOHEEN:  26(a) disclosures, to my recollection,

24    were on behalf of the plaintiffs.  So in other words, I don't

25    recall it delineating one versus the other.  It just said,

1    these are the categories of actual damages, and that's why in

2    the deposition I went through, because by then, the Webb case

3    had been severed --

4            THE COURT:  Says, A, individual claims, itemization

5    of damages.

6            MR. GOHEEN:  Correct, Your Honor.

7            THE COURT:  Categories and types of actual damages in

8    individual claims, case law supporting actual damages and

9    individuals claims -- it's all sub-paragraphed -- and punitive

10   damages.  Class claims, subparagraph B, statutory damages,

11   101,000 per violation, punitive damages.  So it's clear that

12   they're not claiming actual damages in the class.

13           MR. GOHEEN:  Well, I read that, Your Honor, as

14   individual damages that are not delineated between the

15   plaintiffs.  I understand what the Court is saying, but that's

16   here's the class claim, here's the individual claim, but here's

17   -- because I was confused on the disclosures, I went into them

18   in the deposition, and that's what Mr. Bennett and Your Honor

19   were talking about, but here's what the testimony was, though,

20   under oath just so there's no misunderstanding about that.

21           This is at page 70, line 22.  This is my question:

22   Back to the disclosures, you said you were looking through each

23   of these.  I'm not going to go through them based on what your

24   counsel just said, but I'm going to ask you generally.  Do you

25   think you, for all seven of those subcategories, you believe

1   you have some level of actual damage?

2             Answer:  Yes.

3             That's her testimony under oath.  That is what we

4   rely upon in making our argument in the brief.

5             THE COURT:  So what?  It doesn't make any difference,

6   does it?  It's not much.

7             MR. GOHEEN:  We don't know that there's not much,

8   Your Honor.  They've not been quantified.

9             THE COURT:  I've never seen anywhere in any of these

10  cases where the damages individually, items of damages are very

11  significant.  Have you?

12            MR. GOHEEN:  Actual damages?

13            THE COURT:  Yes.

14            MR. GOHEEN:  There have been cases where there have

15  been some -- if we're wrapping in all the actual damages in

16  those seven subcategories with emotional distress and the like,

17  yes, they certainly have exceeded a thousand dollars.

18            THE COURT:  I know, but the worst case I ever saw was

19  where somebody caused a woman to lose her house, and she

20  couldn't get any financing because of it.  It wasn't you.  Its

21  Experian, I think.  Some fellow from Pennsylvania tried it.

22  No, it was TransUnion.

23            MR. GOHEEN:  We had a case, not -- in this district,

24  not in this division, for something similar happening, and

25  there was a similar verdict.  I'm not -- I don't want to pick

1   through that.  I guess my point, Your Honor, is that she's

2   claiming actual damages, and the complaint alleges --

3          THE COURT:  She's not claiming actual damages for the

4   class.

5          MR. GOHEEN:  Paragraph 26 of the complaint does, Your

6   Honor.  As a result of the conduct, actions, and inactions of

7   the defendant as alleged in this count, the plaintiff and other

8   class members suffered credit score damage.  So there are, Your

9   Honor --

10         THE COURT:  But you have to have that, don't you, for

11  -- you have to have some damage in order to get the thousand

12  dollars, don't you?

13         MR. GOHEEN:  Certainly my view, Your Honor, is that

14  there needs to be some sort of harm to the class.

15         THE COURT:  What paragraph?

16         MR. GOHEEN:  Paragraph 26 of the amended claim which,

17  I think, is document 26.  I think it's document 26, Your Honor,

18  but it's the amended complaint filed February 26th of last

19  year, and this is within the count.

20         THE COURT:  Says suffered credit score damage.  It

21  doesn't say actual damage.  Damage to your credit score.

22         MR. GOHEEN:  I don't know how that could be anything

23  other than actual damage, Your Honor.

24         THE COURT:  Because your credit score went down.

25  That's what that says.  It says your credit scores went down.

1   Damage to the credit score.  Anything good makes it go up or

2   stay the same.  Anything bad makes it go down.  That is the

3   only fair reading of that.

4           MR. GOHEEN:  With all due respect, I read it as an

5   allegation of damage.  Now, whether that --

6           THE COURT:  I don't, so let's move on.

7           MR. GOHEEN:  Okay.  I'll do that, Your Honor.  With

8   regard to the class definition, you were having a dialogue with

9   Mr. Bennett -- Your Honor was having a dialogue with Mr.

10  Bennett with regard to the fourth condition or factor, or

11  however you want to call it, if you will, in the class

12  definition out of their reply brief.

13          To read that again, at a time --

14          THE COURT:  A, you don't have any objection to all

15  natural persons; right?

16          MR. GOHEEN:  Correct.

17          THE COURT:  You don't have any objection to two, for

18  whom Equifax's records note that a hard inquiry credit report

19  was furnished to a third party; right?

20          MR. GOHEEN:  I think it would be hard to do that on a

21  class-wide basis.

22          THE COURT:  No, I'm talking about the definition

23  itself, the actual term.

24          MR. GOHEEN:  The term, no, not for the purposes of

25  the definition.  We note the difficulty in our papers, though.

```
 1              THE COURT:  That has to do with whether or not it's a
 2    superior form of resolution and other issues, not whether or
 3    not it's an adequate class definition.
 4              MR. GOHEEN:  I understand, Your Honor.
 5              THE COURT:  Three, other than for an employment
 6    purpose, you don't quarrel with that.
 7              MR. GOHEEN:  Right.
 8              THE COURT:  Now we're on four.  What part of four do
 9    you quarrel with?
10              MR. GOHEEN:  "In the court file" is one.
11              THE COURT:  What's wrong with that?  What's the issue
12    there insofar as you are concerned?
13              MR. GOHEEN:  Because, Your Honor, the Court file
14    would need to be accessed for each of the people to determine
15    class membership.  You have to go to the court file.  As that
16    phrase just says, in the court file.  We have to go to the
17    court file to determine whether the judgment was satisfied,
18    appealed, vacated more than 30 days earlier before it is
19    unpaid.  It says, "in the court file," so the court file would
20    have to be accessed.
21              THE COURT:  What's wrong with that?
22              MR. GOHEEN:  Because that's an individualized
23    assessment, Your Honor.  You have to prove your way into the
24    class by accessing the court file for every single proposed
25    member of the class, and that's just not, in our view,
```

1  supported by the law.  There's not an objective way --

2          THE COURT:  Tell me something.  How else does a

3  judgment get marked satisfied, appealed, or vacated if you

4  don't do it in a court file?

5          MR. GOHEEN:  I think that's the way to do it.

6          THE COURT:  If you went in and marked something

7  satisfied, you'd be committing fraud because you can't do that

8  under Virginia law at any rate.  Vacating, you can't do that

9  because that's a court action.

10         MR. GOHEEN:  I'm not saying that's the only way to do

11 it or not the only way to do it.  The argument, Your Honor, is

12 that you have to look at the court file to determine who is in

13 the class.

14         THE COURT:  But so what?  You have to look at

15 something to determine who is in the class anywhere.

16         MR. GOHEEN:  They believe there are 300,000 people

17 that might qualify for the class.  That's 300,000 times someone

18 is going to have to go to the court file.

19         THE COURT:  They have to do it, don't they?

20         MR. GOHEEN:  Not under all -- not under some of the

21 evidence that's been put before the Court.  For example,

22 sometimes where the court file is only accessible manually, the

23 clerk has to sit with the person checking it out to go through

24 the court files.  That was in Ms. Blount's declaration.  She's

25 the court clerk here in the General District Court of Richmond.

```
 1    That was her testimony.  You can't just go get a file and go

 2    rifle through it.  Sometimes you gotta have the court clerk

 3    there with you to maintain --

 4              THE COURT:  When did they put that procedure in?

 5              MR. GOHEEN:  I don't know, Your Honor.

 6              THE COURT:  I can't tell you how many court files

 7    I've looked at when I was doing General District Court work,

 8    but that was a long time ago, so I don't know what it is now.

 9              MR. GOHEEN:  That's her undisputed testimony under

10    oath.

11              THE COURT:  So what?  If the plaintiff has to do it,

12    the plaintiff has to do it.

13              MR. GOHEEN:  That would be a very laborious process

14    and --

15              THE COURT:  You're complaining about their labor.

16    What's that got to do with anything?

17              MR. GOHEEN:  We believe that's not the effective way

18    to ascertain a class, to go through it manually, one by one, up

19    to 300,000 or 100,000 or 17 or whatever it turns out it's going

20    to be.  First of all, how do we know how to oversee the

21    integrity of that process, whether it's them or their agents

22    doing it?  That's still, to me, subject to cross-examination.

23              THE COURT:  What should we do; let your people do it?

24              MR. GOHEEN:  No.  It's not an ascertainable class,

25    Your Honor.
```

```
1              THE COURT:  You're just talking about
2    identifiability.  Ascertainable is certainly -- I don't think
3    it's an issue.  You are talking about identifying class
4    members, it seems to me, Mr. Goheen.
5              MR. GOHEEN:  Your Honor, I think it's easy to --
6    maybe I'm confusing the two, but here we're talking about how
7    -- it's a method of ascertaining a class.  It's a method that
8    could take weeks, months, or years.
9              THE COURT:  So we take "in the court file" out.  Is
10   that okay then?
11             MR. GOHEEN:  Beg your pardon, Your Honor?
12             THE COURT:  We take "in the court file" out then.  Is
13   that okay?
14             MR. GOHEEN:  Then I don't know how we -- that we
15   could identify class members or ascertain who fits within the
16   class.
17             THE COURT:  Well, they're damned if they do and
18   damned if they don't, and you get by scot-free for doing
19   nothing.
20             MR. GOHEEN:  I don't believe we get by scot-free at
21   all.  We just talked about how she got substantial dollars
22   against another credit reporting agency based on the same
23   allegations.
24             THE COURT:  Did she get it from you?
25             MR. GOHEEN:  No.
```

```
1              THE COURT:  Okay.  So, anyway, it would be okay if we
2    took "in the court file" out, or it would not?
3              MR. GOHEEN:  It would not solve the problems whether
4    it's left in or whether it is taken out.
5              THE COURT:  Anything else in there?
6              MR. GOHEEN:  The "more than 30 days earlier" is a
7    problem because it assumes a homogeneity in pickup times with
8    regard to how these various judgment dispositions are retrieved
9    and reported on.
10             In Richmond -- City of Richmond General District
11   Court has its own frequency of pickup.  Perhaps a more rural,
12   or certainly a more rural jurisdiction in Virginia would have
13   much less a time because there are fewer judgment dispositions
14   that need to be picked up.  So imposing 30 days, we don't
15   believe --
16             THE COURT:  You're talking about pickup.  What do you
17   mean, pickup?
18             MR. GOHEEN:  Pick up the reporting of the judgment
19   dispositions and then updating --
20             THE COURT:  Supreme Court database, is that what you
21   are talking about?
22             MR. GOHEEN:  No, the actual -- well, however they are
23   picked up, whether it's physically, and there's testimony in
24   the record that the --
25             THE COURT:  I don't understand what you mean by
```

1   picked up.  That's what I'm trying to get at.

2          MR. GOHEEN:  Retrieving the records, Your Honor.

3          THE COURT:  Retrieving from where?

4          MR. GOHEEN:  From the courthouse, Your Honor.

5          THE COURT:  Who is retrieving them?

6          MR. GOHEEN:  Equifax through its public record

7   vendor.  It retrieves them.  It can retrieve them

8   electronically.  It can retrieve them by going physically to

9   the courthouse.  These are set out in our papers, but there are

10  different ways that these records are retrieved.  That's what

11  I'm talking about, Your Honor.

12         THE COURT:  That doesn't help me.

13         MR. GOHEEN:  That is the 30 days --

14         THE COURT:  More than 30 days earlier than what?

15         MR. GOHEEN:  As they say, more than 30 days when it

16  was reported in Equifax's file as remaining unpaid.

17         THE COURT:  I don't understand this language.

18         MR. GOHEEN:  I don't believe I understand it much as

19  well, Your Honor.

20         THE COURT:  Well, you all have been at it enough.

21  "At a time when any judgment that had been satisfied, appealed,

22  or vacated more than 30 days earlier," so it refers back to

23  when the judgment was satisfied, appealed, or vacated; is that

24  right?

25         MR. GOHEEN:  Yes, as reflected in the court file.  I

1  think that's how that is --

2          THE COURT:  So what is your problem with that?

3          MR. GOHEEN:  30 days is an arbitrary length of time,

4  Your Honor.

5          THE COURT:  Any time we're going to put on it is

6  going to be arbitrary.

7          MR. GOHEEN:  It can't be the same time, I don't

8  believe.  30 days might have been reasonable for Ms. Soutter.

9  It might not be reasonable for a more or less populous

10  jurisdiction.  It may be 60 days, it may be 20.  It may be much

11  more or much less.  Making it 30 days doesn't do anything --

12          THE COURT:  What evidence do you have to say that, to

13  say that there are different time periods in which judgments

14  are vacated?

15          MR. GOHEEN:  What evidence do I have -- I don't think

16  I understand the question, Your Honor.  If you're talking about

17  pickup -- if Your Honor is talking about pickup times --

18          THE COURT:  What does pickup mean?

19          MR. GOHEEN:  I'm using pickup probably inartfully.

20  What I mean is the retrieval of the disposition.

21          THE COURT:  From where by whom?

22          MR. GOHEEN:  By Equifax through its public --

23          THE COURT:  That's not what this says.

24          MR. GOHEEN:  From the court.

25          THE COURT:  No, it says, at a time when any Virginia

1    district court that had been satisfied or vacated more than

2    30 days before that."  So you look at the date of the

3    satisfaction, et cetera.  Isn't that what that 30 days relates

4    to?

5           MR. GOHEEN:  And my point, Your Honor, is that it may

6    not be picked up within 30 days, and it probably is -- almost

7    certainly it's not going to be picked up instantaneously.

8           THE COURT:  What does that have to do with defining

9    the class?

10          MR. GOHEEN:  Because it's difficult, Your Honor, to

11   -- this, to us, assumes that you've got to have an immediate

12   pickup once there's a reporting of a disposition by a court or

13   the entry of a judgment, disposition, whether it's vacating

14   appealed, satisfied, whatever it might be in here.

15          If it gets into the court file, as I read this, the

16   class definition is, okay, anyone -- there's a 30-day window

17   for that to have been in the court file but not retrieved by

18   Equifax.

19          THE COURT:  So you have 30 days to pick it up, right,

20   in your vernacular?

21          MR. GOHEEN:  That's the definition, yes.

22          THE COURT:  What's wrong with that as a class -- as a

23   definition of the class?

24          MR. GOHEEN:  I don't believe it's appropriate because

25   this is an extremely heterogeneous class that spreads over 250

1    courts in the Commonwealth of Virginia, each of which has its

2    own procedures --

3              THE COURT:  Is there anything in the state rules

4    which is analogue to the federal rules which requires the clerk

5    to docket judgments and orders when they are entered?

6              MR. GOHEEN:  I don't know the answer to that, Your

7    Honor.  I do know that with regard to satisfactions, which is

8    the largest -- appears to be, according to some of the data,

9    the largest percentage of people in the class, that's largely

10   at the -- the judgment creditor needs to report on that.

11             So even there, with satisfactions, to the extent

12   there are even these court clerk guidelines or rules that need

13   to be followed, there still has to be -- by Virginia statute,

14   the creditor has to come in and report it, and only then would

15   it filter back out into the file.

16             THE COURT:  If the creditor doesn't report it, then

17   you're not responsible for it.  If there's nothing in the court

18   file because the creditor hasn't brought it in, I don't

19   understand why that's a problem for you at all.  You're off the

20   hook.

21             MR. GOHEEN:  It goes back to the court file.  We have

22   to look at the court file to know any of it.

23             THE COURT:  So all this is just whether you have to

24   look at the court file; is that what your whole objection is?

25             MR. GOHEEN:  I don't know that all of it is.

1          THE COURT:  All of your objection to the 30 days is

2     having to go back and look at the court file.

3          MR. GOHEEN:  No, it's not, Your Honor.  The 30 days

4     is, as I understand it, common -- they propose that to be

5     common right across the entire Commonwealth, all 250 courts,

6     regardless of the jurisdiction, regardless of whether they are

7     General District Courts --

8          THE COURT:  What would you have them do?  You're

9     going to be responsible for something.  Do you want me to do

10    subclasses?  Tell me what subclasses I do.

11         MR. GOHEEN:  I don't know what they would be.  250 of

12    them, I suppose.

13         THE COURT:  Here's the rule:  If a defendant doesn't

14    make alternative suggestions, then one can conclude that any

15    suggestion before the Court is a reasonable one.  So I'm trying

16    to figure out, what is your proposal?

17         MR. GOHEEN:  The case began, Your Honor, with General

18    District Court, City of Richmond.  That is where the case

19    began.

20         THE COURT:  And you agree that that's a proper class.

21         MR. GOHEEN:  I agree that it's a heck of a lot

22    smaller --

23         THE COURT:  Do you agree that it's a proper class

24    with this definition?  In other words, if you just had the

25    Circuit Court of the City of Richmond, is that a proper class?

1          MR. GOHEEN:  I would agree it's more appropriate,

2     yes.

3          THE COURT:  Is it proper?

4          MR. GOHEEN:  I don't know that I would call it

5     proper because of all the other -- I'm sorry.  You're talking

6     about the definition; right?

7          THE COURT:  Yes.

8          MR. GOHEEN:  I'm sorry, Your Honor.  Yes.  That would

9     be a more proper definition --

10         THE COURT:  No.  Is it a proper definition of the

11    class, not a more proper one, but is it a properly defined

12    class?

13         MR. GOHEEN:  The one in the first complaint, yes --

14         THE COURT:  You've already said that it was a proper

15    class, haven't you, the earlier one?

16         MR. GOHEEN:  I don't believe we said that, but --

17         THE COURT:  But you agree that it would be.

18         MR. GOHEEN:  Yes.  That would be -- yes, that would

19    be proper in the sense of we've got a contained -- that would

20    be the, quote unquote, to use Your Honor's term, the subclass,

21    that one court.  It's one geography.  It's not 250 different

22    courts.  That's the only over way I know how to do it.

23         THE COURT:  So what you're really looking at, though,

24    is the date on which it appears in the court's records.  So if

25    there's a satisfaction, and it doesn't occur for, let's say,

1  300 days after the judgment, and you go in and pick it up after

2  the -- you look at the situation when the judgment has been

3  entered, and for 300 days nothing happens.  Even if it was

4  satisfied by the debtor to the third party in that 30-day

5  period, unless it comes to the court, you don't have any

6  liability anyway, do you?

7           MR. GOHEEN:  I think that would be our position.

8  Your Honor is talking about --

9           THE COURT:  You wouldn't have any liability --

10          MR. GOHEEN:  There's noncompliance by the judgment

11  creditor.  I think that would be right.

12          THE COURT:  Because the judgment creditor is the one

13  who says it's been satisfied.

14          MR. GOHEEN:  Required to do that, yes.

15          THE COURT:  Under Virginia law, you've got to say, my

16  judgment is satisfied if it's going to be marked satisfied;

17  right?

18          MR. GOHEEN:  That's my understanding, Your Honor,

19  yes.

20          THE COURT:  I think so, too.  The person whose ox is

21  being gored has to say, okay.  Now, how about appeal?  That has

22  to be noted in a set period of time under Virginia law, doesn't

23  it?

24          MR. GOHEEN:  That is my understanding, yes, Your

25  Honor.

1    THE COURT:  And that set period of time is less than

2  30 days from the date of the judgment, isn't it?

3    MR. GOHEEN:  That's my understanding, Your Honor.

4    THE COURT:  So you don't have any problem with 30

5  days.

6    MR. GOHEEN:  Yes, correct.

7    THE COURT:  All right, you don't have any problem

8  there.  Okay.  Or vacated.  Now, in order for it to be vacated,

9  the Court has to act; right?

10    MR. GOHEEN:  That would be my understanding.

11    THE COURT:  And there's something in the court

12  records that says vacated; right?

13    MR. GOHEEN:  Yes.

14    THE COURT:  All right.  So if it's vacated, but it's

15  not vacated until 80 days after the judgment, this definition

16  wouldn't it up.  It picks it up only if it's vacated and more

17  than 30 days passes; is that right?

18    MR. GOHEEN:  I think that's right.  I would add this:

19  Even with regard -- those seem like simple terms or legally

20  clear terms, satisfied, appealed, or vacated, but, again,

21  looking at this plaintiff's circumstances, here you had the

22  order, the order that's the subject of all this, said vacated

23  and -- something like set aside and dismissed without

24  prejudice.  It was an inartful combination of words by the

25  judge, and as a result, the code didn't pick it up under these

1  particular codes that these orders are categorized as.

2          So, again, you're dependent on what courts actually

3  use in the language.  Here you have -- as I said, you have the

4  judgment.  She had a default feloniously entered against her by

5  a credit union and worked out a payment plan and then

6  nevertheless had to file a motion to get the default judgment

7  set aside, and the judge said, I order that the judgment is

8  hereby set aside and dismissed without prejudice.  That's very

9  ambiguous language and --

10          THE COURT:  Is there a code for that in the Court of

11  Appeals -- in the Supreme Court's system of coding?

12          MR. GOHEEN:  Your Honor, I didn't understand the

13  first part of --

14          THE COURT:  Is there a code for that particular

15  entry?

16          MR. GOHEEN:  Not for those words.

17          THE COURT:  For any of those words?

18          MR. GOHEEN:  Yes, there is.

19          THE COURT:  And there's one for dismissed, isn't

20  there?

21          MR. GOHEEN:  Yes, there is.

22          THE COURT:  And is there one for set aside?

23          MR. GOHEEN:  There is.  You have to choose one.

24          THE COURT:  So you reform your inquiry to the state

25  database and say, we want any that have set aside, and we want

1    any that have set aside and dismissed or set aside within two

2    words of dismissed or something like that, don't you?

3                   MR. GOHEEN:  I don't know whether that can be done or

4    not.

5                   THE COURT:  Well, he says it can be done, and that

6    fellow -- what is his name -- Mendenhall said it can be done.

7    All you have to do is ask for it.

8                   MR. GOHEEN:  Mr. Mittendorf I think Your Honor is

9    referring to.

10                   THE COURT:  Mittendorf.

11                   MR. GOHEEN:  And that leads us to another thing Mr.

12    Mittendorf said, is they don't vouch for the accuracy of

13    anything, of any of their data.  If you look on the website,

14    there's this long disclaimer of don't rely on this, it may not

15    be accurate, it's subject to change at any time, and, of

16    course, they --

17                   THE COURT:  So you do see no evil, hear no evil.  You

18    don't go look at it, and you just let the people suffer with

19    their judgments.  They paid and everything, and you don't have

20    to go look at it; is that your contention?

21                   MR. GOHEEN:  No, it's not, Your Honor.  My contention

22    is -- I'm just citing the testimony of the Virginia Supreme

23    Court personnel who have been doing this for many years who

24    said, we make errors.  If there are errors --

25                   THE COURT:  Is there any endeavor undertaken by human

1  beings where errors are not made with the sole exception of the

2  rulings that I make?

3          MR. GOHEEN:  Taking that exception --

4          THE COURT:  Exclude that exception.

5          MR. GOHEEN:  Taking that exception into account, Your

6  Honor, I would say rarely.

7          THE COURT:  So you have somebody in your life who's

8  perfect.

9          MR. GOHEEN:  My boss is here.  I have to do

10  something, Your Honor.  I'm dancing here.  In all seriousness,

11  Your Honor, again, his testimony was, and I'm not trying to

12  overplay it and say our data is ripe with errors.  I'm not

13  trying to say that, but I am saying their testimony, more than

14  one, not just Mr. Mittendorf, but Ms. Bernard said, yes, there

15  could be and there are errors in the data.  It's difficult to

16  rely on, and that's why they have this extremely verbose

17  website disclaimer on the Supreme Court's website --

18          THE COURT:  How else is anybody to find this out, or

19  does this just go unremedied?

20          MR. GOHEEN:  I don't know.  I think the remedy is

21  exactly what has been done.  You can file an individual

22  lawsuit.  This was Judge Wilkinson's point, and Mr. Bennett

23  talked about the *Stillmock* case.

24          I believe other than a per curiam unreported opinion

25  that no one signs off on, I would take Judge Wilkinson's

1    opinion concurring where he went into great detail about, well,

2    there's plenty of incentives for people to file lawsuits,

3    whether it's under fact or the FCRA or any other case that has

4    a fee-shifting statute.  We cited the *Thorn* case --

5             THE COURT:  With respect, I think maybe that

6    indicates a certain lack of perception of what's happening and

7    what people know and don't know.  I think the majority opinion

8    is -- the procuring opinion is the controlling opinion, isn't

9    it, or is his concurrence necessary to make it an opinion of

10   the Court?

11            MR. GOHEEN:  I don't believe his concurrence is

12   necessary, if that was Your Honor's question.

13            THE COURT:  In other words, was it two to one some

14   way?

15            MR. GOHEEN:  I think it's two to one in a lot of

16   ways.  He did concur -- he concurred on a per consumer basis of

17   statutory damages.  That's clearly where Judge Wilkinson agreed

18   with the majority, but to make it clear --

19            THE COURT:  But he didn't dissent in that opinion,

20   did he?

21            MR. GOHEEN:  No, but I believe it's fair reading that

22   he had some --

23            THE COURT:  What is that; an advisory section of the

24   opinion that you think I ought to watch out for and take

25   guidance from?

```
 1            MR. GOHEEN:  I believe it's an esteemed judge on the
 2   Fourth Circuit who wrote the Broussard opinion among many
 3   others.  I think he's very well respected with all due respect.
 4            THE COURT:  I absolutely agree.
 5            MR. GOHEEN:  Within the Fourth Circuit with regard to
 6   class actions, he's had some of the major class action
 7   opinions.
 8            THE COURT:  Nobody respects Judge Wilkinson more than
 9   I do.
10            MR. GOHEEN:  To move forward, the Thorn case actually
11   agreed with the denial of class cert in a civil rights case
12   which, of course, has a fee-shifting statute, and the Court
13   there held we do not find error with the trial court's ruling
14   that because of the fee-shifting statute, there's plenty of
15   incentive for class members to file their own lawsuits.
16            That's Thorn v. Jefferson Pilot which was a pretty
17   controversial opinion when it came out in 2006, as this Court,
18   I'm sure, is aware, so that is a reported opinion that says
19   fee-shifting statutes do allow for incentive for people to go
20   file their lawsuits.  This is an e(b) claim, Your Honor.  I
21   don't know how many --
22            THE COURT:  Just out of curiosity -- let's take the
23   cases that's not -- that your client gets sued in, all right?
24   Your client gets sued, and it gets hit.  It gets hit time after
25   time after time after time.  Does it change what it's doing?
```

1    No.  What's the name of the case where we had that very issue?

2    Seven courts, I recall, or maybe five courts -- it wasn't

3    yours.  It was TransUnion's.  What is the name of that case?

4             MR. BENNETT:  *Mullins v. TransUnion*.

5             THE COURT:  *Mullins*.  Time after time after time.

6    They've been told by courts you are wrong, including circuit

7    courts.  No change.

8             So why is that then, this individual remedy, to be

9    considered an adequate remedy when this is an adequate

10   arrangement and an adequate incentive to sue when what the

11   record bespeaks is the credit reporting agencies basically tend

12   to take this as a cost of doing business?

13            Excuse me.  I need to take a brief recess.  I'll be

14   right back.

15

16            (Recess taken.)

17

18            THE COURT:  So the question is, under those

19   circumstances, Mr. Goheen, why should I conclude that the

20   superiority determination ought to be made your way?

21            MR. GOHEEN:  Because, Your Honor, we're facing a

22   lawsuit where the plaintiff has alleged actual damages, credit

23   score damage, along with willful conduct, and those issues can

24   be and are, hundreds of times a year, in an e(b) setting made

25   on an individual basis, and they are litigated.  Sometimes

1    they're resolved, sometimes they're tried, sometimes they're

2    dismissed for lack of merit, and with all due respect, I don't

3    see how that can be done for 300,000 Virginians crammed into a

4    class action here.

5              THE COURT:  Okay.

6              MR. GOHEEN:  Thank you, Your Honor.

7              THE COURT:  Mr. Bennett.  Why, Mr. Bennett, did we

8    get into something beyond the General District Court for the

9    City of Richmond and into a state-wide class here?  How did

10   that happen?

11             MR. BENNETT:  Judge, once we entered into discovery,

12   we saw the procedures were uniform.  Equifax's data gathering

13   was uniform.  They had ceased going to individual courthouses

14   almost entirely.  That was when -- when I filed the case

15   initially, it was based on my understanding of how things were

16   when I was Newport News General District Court litigating.

17             We learned in discovery in this case, and, in fact,

18   it is not, and Mr. Goheen, I don't think, suggests otherwise,

19   without -- I mean, it's not with objection.  Equifax's counsel

20   and I discussed whether we would -- you know, the -- whether

21   the class should be state-wide versus the City of Richmond.

22             The truth is, Equifax's position is we fight to the

23   death against either class definitions.  I don't believe that

24   Mr. Goheen or Equifax would suggest to the Court that it is

25   fine with a City of Richmond General District Court class.

1           THE COURT:  They agreed to it earlier, he said.

2           MR. BENNETT:  If he agrees to it -- if he'll

3    stipulate to that certification, I will shut up, Judge.

4           THE COURT:  Will you stipulate to it?

5           MR. GOHEEN:  As I said, Your Honor, only

6    definitionally.  It still is plagued with the same problems for

7    predominance and superiority that we discussed.

8           THE COURT:  From a definition, we've got a class then

9    if you agree to that.  Why don't you try that one and then --

10          MR. BENNETT:  Judge, because we can solve this

11   problem contrary to -- and we believe that we've answered these

12   arguments Mr. Goheen is suggesting in our briefing, but we

13   think that they are uniform, and I can start --

14          THE COURT:  What is uniform?

15          MR. BENNETT:  Well, let's start with the "in the

16   files" argument, all right?

17          THE COURT:  Yes.

18          MR. BENNETT:  When data enters a file, it's recorded

19   in a court computer.  That is the Supreme Court database.  We

20   have access to that.  We can buy that.

21          THE COURT:  Are you talking about in the Supreme

22   Court files or in the court of the General District Court or

23   the Circuit Court or 250 courts throughout the state?

24          MR. BENNETT:  Well, Judge, the executive secretary of

25   the Supreme Court of Virginia has a database that records

```
 1    electronically when a satisfaction, judgment, or vacate is
 2    entered in the file of a respective court.
 3              THE COURT:  Well, "in the court file" means the Court
 4    that entered the judgment.
 5              MR. BENNETT:  Yes, sir.  In the court --
 6              THE COURT:  You suggested, I thought, something about
 7    going and using the Supreme Court's files.
 8              MR. BENNETT:  No, but the executive secretary of the
 9    Supreme Court judicial database records electronically what is
10    in the court file the day that it enters the court file
11    for each of these courts.
12              THE COURT:  So you can find out by a computer run
13    what action is taken in a court file respecting a judgment.
14              MR. BENNETT:  Yes, sir.  And even before we obtained
15    the --
16              THE COURT:  And the date; right?
17              MR. BENNETT:  Yes, sir.
18              THE COURT:  So you can see a judgment was satisfied
19    on X, marked satisfied on X date.
20              MR. BENNETT:  Or dismissed or vacated or set aside or
21    judgment entered, how much judgment is entered, the names of
22    these -- even before we received that data, Mr. Pittman had met
23    with the City of Petersburg General District Court clerk, and
24    we have in our possession the complete list for ten years, I
25    believe, that we had to buy.  I think it was about $50.  The
```

1   Petersburg General District Court went on the computer, coded

2   it in, and Mr. Pittman had to pick up.  The printing was up

3   here at the executive secretary's office.

4           So before we were able to know that we could obtain

5   the Supreme Court's list, we were trying do it even court by

6   court.  The worst case scenario is we would have had the

7   electronic printout, one per court, 250.  That is still much

8   better than the defendant suggested and is still, of course,

9   unnecessary because the executive secretary of the Supreme

10  Court of Virginia has the database.  Mr. Mittendorf's

11  explanation, his deposition excerpt is page 11 of our reply,

12  docket 79, and he says --

13          THE COURT:  Is this one of the areas as in the

14  *Mullins* case where there have been numerous decisions that what

15  the defendant is doing is wrong and it hasn't done anything

16  about it or not?

17          MR. BENNETT:  As to the satisfactions of judgments,

18  it has not been litigated.

19          THE COURT:  So there aren't any court decisions

20  saying that what they are doing is wrong.

21          MR. BENNETT:  That's correct, that says this method,

22  this particular procedure is wrong.  That's correct, Judge.

23          THE COURT:  Are there any cases that you know of in

24  which judgments such as were made -- what was it -- by the

25  Third Circuit, I believe, that recounted all of the things that

```
1    TransUnion had been told and how many different courts had told

2    them they were doing wrong and acting not in accord with the

3    law?  Has there been conduct on the part of Equifax that has

4    been simply denoted as wrong by a number of courts?

5              MR. BENNETT:  Judge, we believe --

6              THE COURT:  Not in this area, but in any area.

7              MR. BENNETT:  Yes, sir, there is.

8              THE COURT:  What is that case?

9              MR. BENNETT:  Well, most recently, in the Drew v.

10   Equifax case in California, it was a large jury verdict against

11   Equifax for the same types of violations as were heard in

12   Mullins.  The post-trial briefing on that issue recounted a

13   number of the Equifax decisions.  There was -- in this

14   circuit --

15             THE COURT:  That involved the same conduct that was

16   involved in Drew?

17             MR. BENNETT:  Yes, sir.  In fact, the Fourth Circuit

18   has two back-to-back decisions in Robinson v. Equifax and

19   Sloane v. Equifax.  Judge Brinkema and Judge Lee tried jury

20   verdicts against Equifax, and the Fourth Circuit sustained them

21   on similar grounds.

22             THE COURT:  Were they the same claim?

23             MR. BENNETT:  Same claim, yes, sir.

24             THE COURT:  To the extent this has any pertinence, it

25   has to do with the utility vel non of class actions in
```

1    resolving questions.

2         MR. BENNETT:  It does, Judge.  My speaking on this

3    subject outside of the courtroom, the only way this problem

4    gets solved, the only way you get me into another area of law

5    is class actions, because without injunctive relief, the class

6    action remedy is the only way to solve it.

7         They can pay the five or six of us nationally that do

8    this, and there are significant barriers of entry when you have

9    to face the same -- everybody who litigates Fair Credit

10   Reporting Act cases against Equifax faces the defense team that

11   does nothing but that -- same with TransUnion -- at trials with

12   Experian, and the learning curve and barriers of entry for

13   other lawyers to get involved in this area of practice are

14   steep.

15        The only solution and the only way you're going to

16   correct the files of these individuals without us doing

17   wholesale solicitation and flooding the courts with individual

18   cases is this class remedy, and the idea that Equifax was --

19        THE COURT:  You mean if I don't rule for you, I get

20   to see you on television every night?

21        MR. BENNETT:  Well, Judge, we know, because of the

22   Virginia Supreme Court database, the names of everybody that

23   has a satisfaction vacated judgment.  The question is whether

24   Mr. Erausquin can pick up the tab and do mailings to 600,000

25   people.

1          THE COURT:  What about going to look at 300,000

2    files, as Mr. Goheen says?  Why should anybody have to do that,

3    and why isn't that an issue that says no class action?

4          MR. BENNETT:  Because you don't have to do that

5    because it's all electronic.  The only --

6          THE COURT:  That presupposes the electronic is right,

7    and he says the electronic entry comes with a major disclaimer

8    that they can't rely on.

9          MR. BENNETT:  Let me ask you, Judge, and this is

10   maybe a softball question Mr. Goheen tossed to me.  The Court

11   could proffer or ask Mr. Goheen, where does Equifax get any of

12   its data before it stopped providing it?  That is, before

13   Equifax stopped reporting any satisfactions, vacates, or

14   appeals, it received the data from the database it is now

15   attempting to impeach, and that is -- the argument that Equifax

16   misses that we make in our brief is that there's no requirement

17   that you report Virginia judgments in a credit report.

18          It's a private business.  If Equifax thinks the data

19   is so unreliable that it can't get a handle on it, it cannot

20   pick it up, then stop reporting it.  If it's too expensive to

21   pick up satisfactions, vacates, or appeals, don't report the

22   judgments.  They are one in the same.  A judgment, a vacate

23   within that file is one public record.  If Equifax is going to

24   argue in its briefing and publicly to this Court that the

25   system is so confusing for it and would be for us that it

1   cannot -- that the Court could not rely on electronic data or

2   examine the accuracy of court records, then it should not

3   report that.

4          The other arguments Equifax suggests, the

5   assumes-immediate-pickup argument, Equifax is arguing -- and

6   the violation alleged is related to the manner in which a

7   credit reports, reasonable procedures to ensure maximum

8   possible accuracy.

9          Equifax contracts with its vendor, only requires that

10  vendor to pick up satisfactions, vacates, and appeals as

11  opposed to judgments which is different.  Only requires to pick

12  up these dispositions if it's commercially reasonable to do so.

13  As a result, if you're in the Eastern Shore, if you're in

14  Bedford, Virginia, or Grundy, Virginia, your judgment

15  satisfaction may not be picked up for a year, and Equifax's

16  argument, and the reason Mr. Goheen is --

17          THE COURT:  That's what he's saying.

18          MR. BENNETT:  That's what he said --

19          THE COURT:  You're not agreeing with that, are you?

20          MR. BENNETT:  No, sir.  Absolutely not.  The credit

21  reporting standard is the same whether you happen to have an

22  address in Bedford or one in Alexandria, Virginia.  It is the

23  same procedure for credit reporting, and if Equifax cannot pick

24  up cost-effectively satisfactions, vacates, and appeals in

25  Grundy, Virginia, then it shouldn't report Grundy, Virginia

1    judgments.  If it cannot assure maximum possible accuracy for

2    those judgments, then it shouldn't report them.

3                THE COURT:  Wait a minute.  How are they supposed to

4    report a satisfied judgment if the person who holds the lien,

5    for example, doesn't mark the judgment satisfied?  Why should

6    they be held responsible for that?

7                MR. BENNETT:  They're not.

8                THE COURT:  There's no way they could know that.

9                MR. BENNETT:  There's no way they are responsible.

10   That was not pled as part of our claim.  That was the purpose

11   for the addition of "in the file" to address this red herring,

12   and, in fact, Judge, I don't believe that it would be a -- it's

13   not satisfied within the Virginia code until it's actually

14   recorded.

15               THE COURT:  Do you think that the class ought to

16   be -- it ought to say excluding people with actual damages more

17   than a thousand dollars?

18               MR. BENNETT:  Judge, I don't believe that that is

19   necessary.  I believe, Judge, that the jurisprudence in this

20   circuit does not require that, that is that the Fourth Circuit

21   accepts that an opt-out remedy is adequate, and if any outlier

22   has actual damages greater than that, I believe in the Fourth

23   Circuit, the opt-out remedy is appropriate.

24               THE COURT:  Anything else?

25               MR. BENNETT:  No, sir.

1              THE COURT:  Thank you very much.  There will be an

2     opinion issued shortly.  What I suggest is that you get about

3     planning class discovery so that if the opinion is that the

4     class is certified, we can get moving with that right away.  So

5     I'd suggest you start planning it, talking about it.  Thank you

6     all.

7              MR. BENNETT:  Thank you, Judge.

8

9                    (End of proceedings.)

10

11

12              I certify that the foregoing is a correct transcript

13     from the record of proceedings in the above-entitled matter.

14

15

16     _____/s/_____                 _____

       P. E. Peterson, RPR                      Date

17

18

19

20

21

22

23

24

25