FILED

APR 1 3 2011

U.S. Court of Appeals
Fourth Circuit

# ADDENDUM

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MAR 3 0 2011

DONNA K. SOUTTER, *For herself*
*and on behalf of all similarly*
*situated individuals,*

      Plaintiff

v.                        Civil Action No.: 3:10cv107

EQUIFAX INFORMATION
SERVICES, LLC,

      Defendant.

## MEMORANDUM OPINION

This matter is before the Court on PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (Docket No. 72). For the reasons that follow, the motion is GRANTED.

## BACKGROUND

### A. The Proposed Class and Class Claims

Plaintiff Donna K. Soutter filed a Class Complaint on behalf of herself and other similarly situated individuals against Equifax Information Services, LLC ("Equifax") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, et. seq. An Amended Complaint soon followed, adding Tony Webb as a Plaintiff. The Court subsequently granted Webb's motion to sever Counts Two and Three from the Amended Complaint and transfer them to the Eastern District of Pennsylvania. On

October 29, 2010, Soutter filed a Motion for Class
Certification.  The proposed class is defined as follows:

- All natural persons;

- For whom Equifax's records note that a credit report was
  furnished to a third party who requested the credit
  report in connection with an application for credit, on
  or after February 17, 2008 to the present;

- Other than for an employment purpose;

- At a time when any Virginia General District Court or
  Circuit Court judgment that had been satisfied, appealed,
  or vacated in the court file more than 30 days earlier
  was reported in Equifax's file as remaining unpaid;

- Which persons suffered actual damages less than $1,000 as
  a result of an erroneous report by Equifax.

Count One of the Amended Complaint alleges:

- Equifax violated 15 U.S.C. § 1681e(b) by failing to
  establish or to follow reasonable procedures to assure
  maximum possible accuracy in the preparation of the
  consumer reports it furnished regarding the Plaintiff and
  other class members;

- As a result of Equifax's conduct, actions, and inactions
  as alleged in Count One, the Plaintiff and other class
  members suffered credit score damage;

- Equifax's violation of 15 U.S.C. § 1681e(b) was willful,
  rendering Equifax liable under 15 U.S.C. § 1681n, or, in
  the alternative, Equifax was negligent, entitling the
  Plaintiffs to recover under 15 U.S.C. § 1681o.

**B.  Equifax's Collection of Information Through the use of
Public Records Vendors**

Equifax is a consumer reporting agency.  In its credit
reports, Equifax reports whether individuals have had judgments

2

entered against them. Equifax obtains that information by contracting with a public records vendor that specializes in gathering information related to court filings. The use of a public records vendor is a standard practice in the consumer reporting industry, and Equifax has maintained relationships with such vendors since at least the 1980s.

Since February 2007, Equifax has used LexisNexis as its public records vendor in Virginia. The contract between the two parties requires LexisNexis to meet certain quality and performance standards and to comply with all applicable laws and regulations. Equifax claims that it also performs certain data quality checks of the information provided by its public records vendors.

In Virginia, LexisNexis collects information about all civil judgments entered in cases in the general district courts, and a small number of judgments from the circuit courts. Soutter alleges that, sometime after 2006, Equifax and its vendors stopped the more careful process of in-person manual reviews of civil courthouse records, a process which had been in effect for some considerable time, and began collection of judgment information solely from automated resources. Both Soutter and Equifax agree that, when the change in method occurred, the Supreme Court of Virginia provided information

3

about district court judgments in bulk by way of electronic media. From the bulk feed, LexisNexis received the court name, case number, name and address of the defendant, name and address of the plaintiff, date filed, and judgment amount.

In addition to information provided by way of the bulk feed, Equifax asserts that LexisNexis also used independent contractors to perform in-person review of source documents at courthouses using a variety of methods. On this point, Equifax describes the variable access given to data collectors at the different courthouses and the fact that some courts use varied terminology and different forms of order to report "dispositions" of judgments. The term "dispositions" means whether a judgment has been satisfied, vacated, appealed, or otherwise had its effect terminated. LexisNexis, according to Equifax, also retrieved selected information about dispositions from the Supreme Court of Virginia's public access website. However, in December 2009, the Supreme Court of Virginia altered the access procedures for its website, thereby preventing the ability of LexisNexis to use the site.

Soutter alleges, that, at least since 2007, Equifax has not once sought to purchase data about satisfied, vacated or appealed judgments. Soutter further alleges that, under the terms of the contract between LexisNexis and Equifax, while

4

LexisNexis was obligated to collect and report the existence of judgments, it only was obligated to collect information about the disposition of judgments if LexisNexis determined that it was "commercially reasonable" to do so. According to Soutter, LexisNexis never concluded that it was commercially reasonable to collect and report dispositions of judgments.

In order to demonstrate that Equifax was aware of the procedures used by LexisNexis to gather Virginia judgment records, Soutter cites a requirement in Equifax's contract with LexisNexis that required LexisNexis to apprise Equifax of its procedures, and any changes to those procedures, and an email exchange between LexisNexis and Equifax when LexisNexis learned that it would no longer be allowed to buy judgment records in bulk. The contract plus the email exchange establish, according to Soutter, that Equifax was fully aware that it was not receiving information about satisfied, vacated, appealed or otherwise terminated judgments, and that access to the records of the district courts had been updated to a "Limited Access" status.

Soutter also alleges, that Equifax was aware that LexisNexis was having difficulty processing judgment records in a timely fashion, and ultimately became unable to obtain them at all at a certain point, the result being that Equifax did not

5

receive, or add to its files, any judgment records for over a year. That circumstance did not end until sometime in 2010. When, thereafter, LexisNexis did receive a large batch of termination records, Equifax refused to purchase them because the purchase price exceeded the amount Equifax had budgeted for that purpose, according to Soutter.

Soutter alleges that Equifax's conduct in seeking out, purchasing, and then integrating the judgment records into its credit reports, when it had no means to ensure the accuracy of that information, was unreasonable and willfully so.

## C.  Class Representative -- Donna Soutter

Donna Soutter is a Virginia resident who had a Visa Platinum credit card with Virginia Credit Union ("Credit Union"). In June 2007, Soutter, a self-employed court reporter, became sick, was unable to work and fell behind on her payment obligations. At that time, she owed approximately $15,000 to the Credit Union, which then sued Soutter in the General District Court for the City of Richmond by filing a Warrant in Debt on June 21, 2007. Shortly thereafter, she resolved the matter by entering into a payment plan with the Credit Union. However, the Credit Union failed to communicate the settlement to its attorney. As a result, the attorney obtained an uncontested civil judgment against Soutter on January 29, 2008

in the amount of $14,403.79. Soutter learned about the mistake when she received a copy of the judgment by mail, and she immediately contacted the Credit Union to have the matter corrected. Counsel for the Credit Union then filed a motion to have the judgment set aside, and the court entered an order on March 20, 2008 setting the judgment aside and dismissing the action without prejudice. Soutter concedes that the judgment was not appealed or marked "satisfied." The case was reported as dismissed.

Soutter then sent Equifax a letter to ensure that it did not report the judgment as unpaid. She explained that the judgment had been entered against her in error, and she also enclosed a copy of the order setting it aside and dismissing the case. Equifax responded on May 23, 2008, informing her that it was not reporting the judgment on her credit file. Soutter alleges that, by July 2008, Equifax in fact was reporting the judgment as unpaid and not vacated.[1] Soutter sent a second letter to Equifax on December 28, 2008 after she was denied credit because of an Equifax report. In that letter, she disputed the judgment and again enclosed the order setting it aside. In response, Equifax sent Soutter a letter on December

_____

[1] Technically, Soutter's judgment was set aside and dismissed, not vacated.

7

30, 2008 advising her that the judgment had been removed from her credit file.[2]   All told, Equifax furnished at least three credit reports with the inaccuracy.   Soutter's brief calls these "hard inquiry" reports which, in the trade usage, means reports made in response to a request by a credit card company or lender in connection with an application for credit that a consumer made to the requesting credit card company or lender.[3]

In addition to this action, Soutter previously has filed separate actions in this Court against Experian Information Solutions, Inc. and Trans Union LLC, asserting similar claims that arose from the same set of events.   Soutter settled with Experian for an undisclosed sum of money, dismissed the case, and did not seek class certification.   To date, she has not served Trans Union.

_____

[2]   Consumers who believe that a judgment is being inaccurately reported in their credit files can dispute the entry with Equifax.   If Equifax receives such a dispute, it contacts the public records vendor, which then contacts the original sources of the information, reviews the information, and reports the results to Equifax.   Equifax asserts that, if a dispute is lodged, it requires the public records vendor to verify all information from the "primary source," defined as the courthouse from which the record was obtained. Def.'s Resp. in Opp'n to Mot. for Class Certification at 5.

[3]   In contrast, a "soft inquiry," though not at issue in this case, is an inquiry that is not made in connection with any application for credit.   And, when a consumer requests her own credit report or credit score, that is not treated as an inquiry at all.

**D.  The Class Claim Under the FCRA**

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007); see also Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142, 147 (4th Cir. 2008).  "To this end, [the] FCRA requires [consumer reporting agencies] to follow procedures in reporting consumer credit information that both 'meet[] the needs of commerce' and are 'fair and equitable to the consumer.'"  Saunders, 526 F.3d at 147 (third alteration in original) (quoting 15 U.S.C. § 1681(b)).

Soutter claims that Equifax violated § 1681e(b) of the FCRA, which provides that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).  A consumer reporting agency violates § 1681e(b) if:  (1) the consumer report contains inaccurate information, and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy.  Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 415 (4th Cir. 2001).  More specifically, Soutter alleges that Equifax systematically ignored hundreds of thousands of

9

Case 3:10-cv-00107-REP Document 91 Filed 03/30/11 Page 10 of 41

public records showing that Virginia civil judgments had been satisfied, vacated, or appealed. Soutter claims that Equifax did not obtain any judgment dispositions for at least one year before 2010, and that, before then and to the present, "Equifax so inadequately incentivized its agents to collect such [disposition] records that they were often simply ignored." Pl.'s Mem. in Supp. of Mot. for Class Certification at 1. In addition, Soutter asserts that Equifax "concedes that it has never in its known history reviewed, audited, or otherwise sought to determine if its [third] party agents were adequately collecting such records," id. at 1-2, notwithstanding Equifax's claim that it "performs certain data quality checks of the information provided by the [public records vendor]," Def.'s Resp. in Opp'n to Mot. for Class Certification at 5.

### CLASS CERTIFICATION DISCUSSION

To obtain class certification, a plaintiff must satisfy the four prerequisites of Fed. R. Civ. P. 23(a). The case must be consistent with at least one of the classes defined in Fed. R. Civ. P. 23(b). Each will be addressed in turn.

**A. Rule 23(a)**

Rule 23(a)'s four prerequisites for class certification are that: (1) the class is so numerous that joinder of all members

10

is impracticable; (2) there are questions of law or fact common
to the class; (3) the representative's claims or defenses are
typical of those of the class; and (4) the representative will
fairly and adequately represent the interests of the class.  See
Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331,
337 (4th Cir. 1998) (noting that every class action must satisfy
the four requirements of Rule 23(a): numerosity, typicality,
commonality, and adequacy of representation, with "the final
three requirements . . . 'tend[ing] to merge'" (quoting Gen.
Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982))).

The plaintiff bears the burden of proving all requirements
of Rule 23.  Lienhart v. Dryvit Systs., Inc., 255 F.3d 138, 146
(4th Cir. 2001).  The Court is not required "to accept
plaintiffs' pleadings when assessing whether a class should be
certified."  Gariety v. Grant Thornton, LLP, 368 F.3d 356, 365
(4th Cir. 2004).  Rather, "[a]t the class certification phase,
the district court must take a 'close look' at the facts
relevant to the certification question and, if necessary, make
specific findings on the propriety of certification."  Thorn v.
Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006)
(quoting Gariety, 368 F.3d at 365).  "Such findings can be
necessary even if the issues tend to overlap into the merits of
the underlying case," but "[t]he likelihood of the plaintiffs'

11

success on the merits . . . is not relevant to the issue of whether certification is proper." <u>Id.</u> (internal citations omitted).

### 1. Ascertainability of the Proposed Class

In addition to the explicit requirements in Rule 23(a), "the definition of the class is an essential prerequisite to maintaining a class action." <u>Roman v. ESB, Inc.</u>, 550 F.2d 1343, 1348 (4th Cir. 1976); <u>see also</u> <u>Kirkman v. N.C. R. Co.</u>, 220 F.R.D. 49, 53 (M.D.N.C. 2004). "The court should not certify a class unless the class description is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" <u>Solo v. Bausch & Lomb Inc.</u>, C/A Nos. 2:06-MN-77777-DCN, 2:06-CV-02716-DCN, 2009 WL 4287706, at *4 (D.S.C. Sept. 25, 2009) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice & Procedure</u> § 1760 (3d ed. 2005)). "The proposed class definition must not depend on subjective criteria or the merits of the case or require an extensive factual inquiry to determine who is a class member." <u>Cuming v. S.C. Lottery Comm'n</u>, Civ. A. No. 3:05-cv-03608-MBS, 2008 WL 906705, at *1 (D.S.C. Mar. 31, 2008) (citing <u>In re Copper Antitrust Litig.</u>, 196 F.R.D. 348, 353 (W.D. Wis. 2000)); <u>see also</u> Wm. Moore et al., 5 <u>Moore's Federal Practice</u> § 23.21[1] (3d ed.) ("A class action is possible only

when the class definition provides a court with tangible and practicable standards for determining who is and who is not a member of the class."). Rather, "[f]or a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." Moore, _supra_, § 23.21[3][a]. "Where the practical issue of identifying class members is overly problematic, the court should consider that the administrative burdens of certification may outweigh the efficiencies expected in a class action." Cuming, 2008 WL 906705, at *1.

Equifax challenges the ascertainability of Soutter's proposed class definition in two ways. Equifax first argues that data supplied to Soutter by it in discovery and evidence obtained from the Supreme Court of Virginia does not identify members of the class. This contention was spawned as a result of evidence that Soutter offered to demonstrate numerosity and ascertainability in her opening brief. There, Soutter cited three sets of data: (1) Equifax's production of the names and addresses of consumers who, during the previous two years, disputed Virginia civil judgments upon the basis that the judgment had been satisfied, vacated, or appealed; (2) a list of consumers from three sample Virginia zip codes who had a

13

Virginia judgment in their Equifax file; and (3) a database of information Soutter's counsel requested from the Supreme Court of Virginia that contains each judgment satisfaction record and many of the vacated and appealed judgments in the state's judicial computer system.

With respect to the last set of data, Soutter claims that "[i]t is a simple exercise to compare judgment records in Equifax's files against the Supreme Court [d]atabase to determine which Equifax records continued to omit the accurate current status." Pl.'s Mem. in Supp. of Mot. for Class Certification at 12. In addition, she says that it is a simple "mathematical exercise to measure the length of delay between the date that the judgment was terminated (marked satisfied, vacated, or appealed) in the Court records and the month it was later updated by Equifax." Id. at 13.

In challenging the data, Equifax points out that Soutter's name does not appear in any of the three sets of data. Thus, how, says Equifax, can a class be ascertained and identified if Soutter's name does not appear in any of the data sets she has proffered as representative of her ability to define a class?

Soutter's name is not on the first data set because Equifax never annotated her credit file with a dispute code because it resolved her letter challenging the Credit Union judgment based

14

on the documents she provided to Equifax.   Her name does not
appear on the second data set because the judgment was deleted
from her file in December 2008 before the data at issue was
produced.   Finally, her name does not appear on the third data
set because she made no request for information from the Supreme
Court of Virginia about dismissed judgments after Equifax agreed
not to report the Credit Union judgment.

Soutter acknowledges that the data sets are incomplete,
explaining that they were obtained in the current form only:
(1)   to   show   that   certain   categories   of   data   exist
electronically; (2) to illustrate the breadth of the problem;
and (3) to illustrate the numerosity of the proposed class.
Soutter has explained why her name is not in any of the data
sets for logical reasons that do not in any way undermine use of
the data to determine numerosity.   Furthermore, as to the third
data set of which Equifax complains, Soutter represents that the
"full set of judgment data, without the data code limitations
that resulted in the exclusion of the Plaintiff's name from the
list, is available from the Virginia Supreme Court upon request
and payment."   Id. at 9.   Her counsel represents that the full
data set will be purchased and that counsel will simply design a
more complete and final data request to submit to the Supreme
Court of Virginia.   That puts to rest the aspect of the Equifax

15

argument based on the third data set.  In sum, the arguments of Equifax on those points are without merit.

The degree of precision that Equifax attempts to place on Soutter in ascertaining class members simply is not required in order to certify a class.  A "class does not have to be so ascertainable that every potential member can be identified at the commencement of the action," because "'[t]o place such a burden on plaintiffs would seem harsh and unnecessary . . . [and] make the maintenance of class actions . . . very difficult, if not impossible . . . .'"  Wright, Miller & Kane, supra, § 1760 (quoting Fischer v. Kletz, 41 F.R.D. 377, 384 (S.D.N.Y. 1966)).  Soutter's proposed class definition sets forth objective parameters with which a class can be ascertained and identified: either an individual has had a Virginia judgment, or not; either an individual has had that judgment modified, satisfied, vacated, appealed, dismissed or otherwise extinguished, or not; either Equifax reported the judgment, or it did not; and either Equifax reported the update to the judgment, or it did not.  Thus, Equifax's first argument on ascertainability fails.

Equifax's second argument challenging ascertainability is equally unavailing.  In that argument, Equifax contends that Soutter's proposed exclusion of those individuals who have

16

suffered actual damages in excess of $1,000 because of Equifax's alleged FCRA violations would allow putative class members to self-identify.    Self-identification  would  be  problematic, according to Equifax, because it would allow class members to await resolution of the case before they decide whether to include themselves in the class.  In this case, an exclusion of class members who have suffered actual damages in excess of $1,000 is not required in order to ascertain the class. Instead, allowing putative class members to opt-out under Rule 23 will be a sufficient mode to permit those who have suffered actual damages greater than $1,000 to seek redress from Equifax in other litigation.   Therefore Equifax's second challenge to ascertainability will be rejected.[4]

### 2.    Rule 23(a)(1) Numerosity

Rule 23(a)(1) provides that one of the requirements for a class action is that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "No specified number is needed to maintain a class action under Fed. R.  Civ.  P.  23;  [rather],  application  of  the  rule  is  to  be

---

[4]    Equifax also maintains in its papers that a class cannot be ascertained  because  the  class  definition  wrongly  assumes homogeneity in court processes, disposition volumes, and pick-up frequencies.    That  argument  must  be  addressed  in  another context,  but  it  does  not  bear  on  the  ascertainability requirement.

considered in light of the particular circumstances of the case
. . . ." Cypress v. Newport News Gen. & Nonsectarian Hosp.
Ass'n, 375 F.2d 648, 653 (4th Cir. 1967).

Soutter argues that the proposed class is more than
sufficiently numerous to make joinder impracticable. In support
of this assertion, she cites Equifax's stipulation that the
class size is at least 300. Equifax does not dispute that
statement. A class of 300 members is sufficient to make joinder
impracticable.[5] Thus, Soutter has established the numerosity of
the proposed class.

### 3.  Rule 23(a)(2) Commonality

Rule 23(a)(2) requires that there be questions of law or
fact common to the class. Fed. R. Civ. P. 23(a)(2); Lienhart v.
Dryvit Sys., Inc., 255 F.3d 138, 146 (4th Cir. 2001). The
commonality requirement focuses on the claims of the class as a
whole, and it "turn[s] on questions of law [or fact] applicable
in the same manner to each member of the class." Califano v.
Yamasaki, 442 U.S. 682, 701 (1979). To satisfy this
requirement, there need be only a single issue common to the

---

[5]     In her reply brief, Soutter points to data that Equifax
provided late in Phase I discovery that supports a conclusion
that, in reality, approximately 304,000 Virginians currently
remain subject to Equifax's inaccurate credit reporting of civil
judgments. Pl.'s Reply Mem. in Supp. of Mot. for Class
Certification at 1.

class.  See Cent. Wesleyan Coll. v. W.R. Grace & Co., 143 F.R.D.

628, 636 (D.S.C. 1992), aff'd 6 F.3d 177 (4th Cir. 1993).

In this case, Souter alleges that her claim presents a
number of common issues of law or fact.  These questions
include:

1.  Were Equifax's procedures for reporting Virginia civil
    judgments and judgment dispositions unreasonable?

2.  Did these procedures violate § 1681e(b)?

3.  Were credit reports that omitted the current status of
    a terminated judgment inaccurate?

4.  Were Equifax's FCRA violations willful?

5.  If Equifax's FCRA violations were willful, what is the
    proper damage measure per violation?

Pl.'s Mem. in Supp. of Mot. for Class Certification at 17.

These factual and legal issues are necessary to the
resolution of the litigation and are common to all putative
class members.  Furthermore, Equifax does not contest that
Soutter is able to satisfy the commonality prerequisite.
Nonetheless, the Court must be satisfied that all prerequisites
to certification are satisfied, and the record here shows that
the commonality requirement is met.

4.  Rule 23(a)(3) Typicality

While the numerosity and commonality prerequisites focus on
the characteristics of the class members in comparison to each

19

other, the typicality prerequisite focuses on the general
similarity of the named representative's legal and remedial
theories to those of the proposed class. See Jenkins v. Raymark
Indus., Inc., 782 F.2d 468, 472 (5th Cir. 1986). The Fourth
Circuit has described the typicality requirement as follows:

> The typicality requirement goes to the heart
> of a representative [party's] ability to
> represent a class, particularly as it tends
> to merge with the commonality and adequacy-
> of-representation requirements. The
> representative party's interest in
> prosecuting [her] own case must
> simultaneously tend to advance the interests
> of the absent class members. For that
> essential reason, plaintiff's claim cannot
> be so different from the claims of absent
> class members that their claims will not be
> advanced by plaintiff's proof of [her] own
> individual claim. That is not to say that
> typicality requires that the plaintiff's
> claim and the claims of class members be
> perfectly identical or perfectly aligned.
> But when the variation in claims strikes at
> the heart of the respective causes of
> actions, we have readily denied class
> certification. In the language of the Rule,
> therefore, the representative party may
> proceed to represent the class only if the
> plaintiff establishes that [her] claims or
> defenses are typical of the claims or
> defenses of the class.

Deiter v. Microsoft Corp., 436 F.3d 461, 466-67 (4th Cir. 2006)
(emphasis in original) (internal citations and quotation marks
omitted). Thus, the appropriate analysis of typicality
"involve[s] a comparison of the plaintiffs' claims or defenses

20

Case 3:10-cv-00107-REP  Document 91  Filed 03/30/11  Page 23 of Page ID# 1136

with those of the absent class members." Id. at 467. "To conduct that analysis, [the district court] begin[s] with a review of the elements of [the plaintiff's] prima facie case and the facts on which the plaintiff would necessarily rely to prove it." Id. Then, the district court must determine "the extent to which those facts would also prove the claims of the absent class members." Id.

To establish a violation of § 1681e(b), Soutter must prove two elements: (1) her consumer report contained inaccurate information; and (2) Equifax failed to follow reasonable procedures to assure maximum possible accuracy. Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 415 (4th Cir. 2001). "A report is inaccurate when it is 'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse []' effect." Id. (alterations in original) (quoting Sepulvado v. CSC Credit Servs., 158 F.3d 890, 895 (5th Cir. 1998)). Plaintiff bears the burden under § 1681e(b) of demonstrating that the consumer reporting agency did not follow reasonable procedures, though in the overwhelming majority of cases, this will be a jury question. Id. at 416.

According to Equifax, Soutter is not a typical class member for the reason that the facts needed to prove the inaccuracy of

21

her credit report will not advance the claims of absent class members because examination of individual court records and credit files will be required for each class member. In addition, Equifax asserts that the variety of procedures used in Virginia courts and by LexisNexis to gather information means that, even if Soutter can prove inaccurate reporting and unreasonable procedures in her specific case, the procedures may not be unreasonable with respect to other putative class members.

In response, Soutter has shown that examination of thousands, potentially hundreds of thousands, individual credit files will not be necessary because she can present a specific and detailed search request to the Supreme Court of Virginia that would encompass all judgment dispositions. The Executive Secretary of the Supreme Court of Virginia maintains a database that records electronically a judgment, satisfaction, vacation, dismissal, or appeal when it is entered in the court file the same day. It is then a matter of comparing relatively few data fields to determine whether the judgment disposition event occurred more than 30 days before the "snapshot date," i.e., the date on which Equifax takes a snapshot of a consumer's file at one discrete minute in time each month. Pl.'s Mem. in Supp. of Mot. for Class Certification at 14. Thus, comparison of the

Supreme Court of Virginia database with Equifax's records will prove the inaccuracy of Soutter's credit report as well as the inaccuracy of the putative class members' consumer reports and thus advance the interests of the class. This will not be an insubstantial undertaking, but it is sufficient to establish typicality.

With respect to the second element of a § 1681e(b) claim, Soutter is challenging Equifax's alleged uniform failure to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it furnished regarding Soutter and other class members. Equifax's knowledge of the allegedly unreasonable uniform procedures used by LexisNexis, the actual vendor collecting the information, was the same for Soutter, as for the class. Thus, the evidence Soutter would offer to prove the second element of the § 1681e(b) claim would also advance the claims of the other putative class members.

Equifax contends that some courts follow different procedures than others in the recording of judgment satisfactions, vacations, and appeals and that those differences foreclose a finding of typicality. Equifax offered no evidence to support this contention. Moreover, the substantive issue is not how the clerks of court do their jobs. The focus, instead,

23

is on what the official court records show once the clerks have made the entries respecting dispositions of judgments and when those entries were made. That information is readily obtainable from the Supreme Court of Virginia's database. Hence, the differences to which Equifax points do not stand as an impediment to a finding that the typicality requirement is met.

In sum, the record shows that Soutter's claim is typical of other class members' claims.

### 5.   Rule 23(a)(4) Adequacy of Representation

The adequacy of representation prerequisite requires the Court to be satisfied that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This standard is met if "the named plaintiff has interests common with, and not antagonistic to, the [c]lass' interests; and . . . the plaintiff's attorney is qualified, experienced and generally able to conduct the litigation." In re Se. Hotel Props. Ltd. P'ship Investor Litig., 151 F.R.D. 597, 606-07 (W.D.N.C. 1993).

Taking the second part of the standard first, the Court finds that Soutter's counsel is qualified, experienced, and able to conduct this litigation. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous

cases.    Furthermore,  Equifax  does  not  contest  Soutter's
counsel's adequacy.

Equifax,  however,  does  mount  a  challenge  to  Soutter's
adequacy  as  representative  for  the  class.   The  adequacy
prerequisite  seeks  to  ensure  that  the  named  plaintiff  will
protect  the  class  in  matters  germane  to  the  claims  in  the
litigation,  and  it  also  looks  to  the  personal  characteristics  of
the  named  plaintiff  to  see  whether  he  or  she  is  a  fit
representative.   See  Amchem Prods., Inc. v. Windsor,  521  U.S.
591,  625-26  (1997).   "The  premise  of  a  class  action  is  that
litigation  by  representative  parties  adjudicates  the  rights  of
all  class  members,  so  basic  due  process  requires  that  named
plaintiffs  possess  undivided  loyalties  to  absent  class  members."
Broussard v. Meineke Disc. Muffler Shops, Inc.,  155  F.3d  331,
338  (4th  Cir.  1998).

First,  Equifax  argues  that  Soutter  is  not  an  adequate
representative  because  she  previously  settled  her  case  against
Experian  and  dismissed  the  class  claim  in  that  case.   However,
Equifax  has  failed  to  explain  why  Soutter's  settlement  of  her
claim  against  Experian  renders  her  an  inadequate  representative
in  this  litigation.   Furthermore,  unlike  this  case,  Soutter's
case  against  Experian  alleged  an  individual  dispute

25

reinvestigation claim under § 1681i(a),[6] and the case occurred at

a point in time at which Soutter's counsel had far more limited

knowledge respecting Experian's source of information from

public records.   In that case, Soutter, to avoid any suggestion

of impropriety, also dismissed her own claim under § 1681e(b)

with prejudice and the class claim without prejudice.   For the

foregoing reasons, Equifax's challenge to Soutter's adequacy as

a class representative fails on this point.

Equifax also claims that Soutter does not satisfy the

adequacy of representation prerequisite because she has a

conflict of interest with the absent class members.   This is so,

---

[6]    This section of the FCRA states:

> Subject to subsection (f) of this section,
> if the completeness or accuracy of any item
> of information contained in a consumer's
> file at a consumer reporting agency is
> disputed by the consumer and the consumer
> notifies the agency directly, or indirectly
> through a reseller, of such dispute, the
> agency shall, free of charge, conduct a
> reasonable reinvestigation to determine
> whether the disputed information is
> inaccurate and record the current status of
> the disputed information, or delete the item
> from the file in accordance with paragraph
> (5), before the end of the 30-day period
> beginning on the date on which the agency
> receives the notice of the dispute from the
> consumer or reseller.

15 U.S.C. § 1681i(a).

argues Equifax, because Soutter has unilaterally capped any putative class member's recovery by asserting only statutory and punitive damages, and therefore is waiving actual damages as to herself and the putative class members. By choosing not to pursue actual damages for herself or on behalf of the class, Equifax argues that Soutter is in conflict with those in the class who may want to pursue actual damages. Furthermore, allowing opt-out, according to Equifax, will not ameliorate the problem with respect to those putative class members with significant actual damages claims under § 1681e(b) because, if that were the law, then there would be no need for Rule 23(a)(4). Soutter asserts that, notwithstanding the completion of Phase I discovery, Equifax has offered no proof or identification of putative class members who would seek to litigate substantial actual damage claims, nor does Equifax admit that Soutter or any class member could prove significant actual damages.

"For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.'" Ward v. Dixie Nat. Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010) (quoting Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003)). "A conflict is not fundamental when . . . all class members share common objectives and the same factual and

27

Case 3:10-cv-00107-REP Document 91 Filed 03/30/11 Page 28 of 41

legal positions and have the same interest in establishing the liability of [the defendant]. Moreover, a conflict will not defeat the adequacy requirement if it is merely speculative or hypothetical . . . ." <u>Id.</u> (citations and internal quotation marks omitted).

The conflict alleged by Equifax rests on the hypothetical and speculative prediction that there are numerous putative class members who would seek to litigate substantial actual damage claims. Equifax has identified only two individuals, a married couple, out of potentially hundreds of thousands of putative class members, who have sued Equifax for allegedly violating § 1681e(b) and claimed a substantial amount of actual damages. Def.'s Resp. in Opp'n to Mot. for Class Certification at 38 (citing <u>Holloway v. Sterling Church St. Furniture P'ship</u>, No. CL09-5897 (Cir. Ct. City of Norfolk, filed Sept. 15, 2009)).

The Court can discern no fundamental conflict between Soutter and putative class members who may wish to assert actual damages based on this record. <u>See Clark v. Experian Info. Solutions, Inc.</u>, Nos. Civ. A. 8:00-1217-24, 8:00-1218-24, 8:00-1219-24, 2002 WL 2005709, at *3 (D.S.C. June 26, 2002) (finding that plaintiffs adequately represented class despite seeking only statutory damages in claim under § 1681e(b) because over a three-year period, only twenty-two lawsuits out of a potential

class of 40,000 to 100,000 members had been filed against the defendants addressing the practices challenged by plaintiffs). Rule 23(c)(2) contemplates the protection of a class member's opt-out right, which is sufficient in this case to allow those class members who desire to pursue actual damage claims under § 1681e(b) to do so.  Thus, representation is not inappropriate on those grounds.

Because Soutter has demonstrated that both she and her counsel are adequate representatives of the putative class to conduct this litigation, the adequacy prerequisite is satisfied.

**B.  Rule 23(b)(3)**

In order to be certified as a class action, the class must satisfy at least one of the class categories defined in Rule 23(b).  Soutter here moves for certification under Rule 23(b)(3).[7]  Certification under Rule 23(b)(3) is appropriate where the Court finds that questions of law or fact common to the members of the class <u>predominate</u> over any questions affecting only individual members, and that a class action is

---

[7]    In the First Amended Class Complaint, Soutter also sought certification under Rule 23(b)(2) because Equifax allegedly has acted on grounds generally applicable to the class, making equitable injunctive relief appropriate.  Pl.'s First. Am. Class Compl., ¶ 34.  However, counsel for Soutter confirmed at oral argument that she was not seeking certification under Rule 23(b)(2).  Class Certification Hr'g Tr. at 20:8-10.

superior to other available methods for the fair and efficient adjudication of the controversy.

### 1.   Predominance

"Rule 23(b)(3)'s predominance requirement is 'far more demanding' than Rule 23(a)'s commonality requirement . . . ." Gariety v. Grant Thornton, LLP, 368 F.3d 356, 362 (4th Cir. 2004) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997)). "Whereas commonality requires little more than the presence of common questions of law and fact, Rule 23(b)(3) requires that 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members.'" Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006) (internal citation omitted) (quoting Fed. R. Civ. P. 23(b)(3)). The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Grant Thornton, 368 F.3d at 362 (internal citation and quotation marks omitted).

Soutter argues that questions of law or fact common to the members the class predominate over individual issues because "the most significant issues in the case all pertain to uniform conduct by Equifax -- its uniform credit reporting procedures[;] its knowledge and notice of the defects in its systems; the

Case 3:10-cv-00107-REP   Document 91   Filed 03/30/11   Page 31 of 41

willfulness of its conduct." Pl.'s Mem. in Support of Mot. for Class Certification at 25. Individual inquiries, Soutter states, are minimal if extant at all. The record to date establishes that the members of the proposed class have the following facts in common: (1) they are individuals who had a judgment entered against them; (2) at some point, this judgment was satisfied, appealed, or vacated, and that disposition was entered into a court file; and (3) at least 30 days after the entry into the court file of the satisfaction, appeal, or vacation, Equifax failed to reflect the satisfaction, appeal, or vacation when it issued a "hard inquiry" credit report. Therefore the issue of whether Equifax's failure to update class members' credit files with the satisfaction, appeal, or vacation renders the subsequently issued credit reports inaccurate is a common question for all class members. Other common issues are whether Equifax had a uniform procedure for collecting judgment dispositions or whether, as Soutter alleges, it had a standard practice of not collecting judgment dispositions and whether that standard practice was reasonable.

Equifax claims that common questions of law or fact do not predominate, for three reasons. First, Equifax asserts that inaccuracy is an individual issue that cannot be made on a classwide basis because a determination of inaccuracy will

require an assessment of whether or not each class member's report was inaccurate. As discussed above, however, Soutter's counsel has paid for judgment data from the Supreme Court of Virginia, which for illustrative purposes, has been matched against Equifax data as to three categories of judgments: satisfied, appealed, and vacated judgments.[8] That process illustrates that there exists a ready source of proof as to the accuracy of class member credit reports. Of course, as Soutter explains, the task of demonstrating inaccuracy for the entire class likely will involve substantial work, but that does not mean that the predominance requirement has not been established.

Indeed, Equifax's argument is essentially that the task will involve comparing a large volume of documents (its reports and the data from the Supreme Court of Virginia), the reconciliation of which will be time-consuming. Tasks of this sort are regularly accompanied in complex civil litigation in the federal courts with the use of expert witness and reliance

---

[8]  As an example of this matching process, Soutter explains that on September 16, 2004, a default judgment was entered against a consumer in Chesterfield County, Virginia in the amount of $110.00. This consumer's judgment satisfaction was recorded with the Chesterfield County General District Court on July 27, 2007, but three years later, the judgment was still shown as outstanding in Equifax's records. Pl.'s Reply Mem. in Support of Mot. for Class Certification, Ex. 1, Erausquin Decl., ¶ 11.

32

on Federal Rule of Evidence 1006. Both tools are commonly employed in class actions.

For the foregoing reasons, notwithstanding Equifax's assertion to the contrary, Soutter has demonstrated how she can prove inaccuracy on a classwide basis.

Furthermore, the two cases that Equifax cites in support of its argument with respect to inaccuracy are distinguishable from the facts in this action. In Owner-Operator Independent Drivers Ass'n, Inc. v. USIS Commercial Services, Inc., 537 F.3d 1184, 1194 (10th Cir. 2008), the Tenth Circuit affirmed a district court's denial of class certification under § 1681e(b) because the district court found that determining the inaccuracy of a report may require an individualized inquiry. However, Owner-Operator involved plaintiffs who were alleging that the defendant company violated the FCRA when it disseminated their employment histories with inaccurate information, id. at 1186, a far different situation than assessing whether Equifax inaccurately reported a judgment as owing when the public record indicates otherwise.

Equifax also cites Harper v. Trans Union, LLC, Civ. A. No. 04-3510, 2006 WL 3762035 (E.D. Pa. Dec. 20, 2006), wherein the district court, after determining that the plaintiffs' claim under § 1681e(b) satisfied the four Rule 23(a) prerequisites,

found that determining whether credit reports contained inaccurate information and whether individual consumers' injuries were caused by the inclusion of the inaccuracies would "require highly individualized proofs as to the injuries suffered by the putative class members." Id. at *8. The district court thus denied certification. Id. at *9.

However, the plaintiff in Harper conceded that individual factual inquiries into damages would be required for those class members choosing to pursue actual damages because both statutory and actual damages were asserted on behalf of the class. Id. at *8. In this action, Soutter seeks only statutory and punitive damages for the putative class, and those putative class members who wish to pursue actual damages may opt out, thus rendering the individualized inquiries into actual damages and harm suffered that the district court worried about in Harper inapposite in this litigation.

Second, Equifax argues that the issue of "reasonable procedures" cannot be determined on a classwide basis because the procedures used in the Virginia courts vary widely, and there is no single, uniform procedure followed. Equifax's argument that Virginia courts go about the process of docketing and reporting judgment dispositions obfuscates the fact that LexisNexis, and Equifax, were obligated to use "reasonable

34

procedures" to ensure the maximum possible accuracy of credit reports. The FCRA does not tolerate a different degree of inaccuracy for consumers who live in more rural jurisdictions than it does for those in metropolitan areas simply because LexisNexis and Equifax do not find it economically advantageous to visit rural jurisdictions more often.

Moreover, the inquiry at the core of this action is what the court records reflect, not how the clerks of court go about their docketing duties. Thus, even if different courts use different docketing procedures, that will present no barrier to proof of whether the procedures used by Equifax, or LexisNexis on its behalf, reasonably accurately capture the results recorded by the state courts.

In a related argument, Equifax asserts that, because LexisNexis sometimes used different methods to record data obtained from the Virginia courts, whether there were reasonable procedures is incapable of being decided on a classwide basis. That argument, too, misses the point. Again, it is whether the procedures used accurately captured recorded results that is the focus of the issue here.

Moreover, Soutter alleges, and already has made a credible showing that, the procedure used never captured the facts that a judgment was satisfied, vacated, or appealed. Of course, if the

35

procedure was thusly infirm, the differences in Equifax's method in reporting on the fact of judgment would make no difference.

To support its argument, Equifax has made only general assertions about unspecified differences in the LexisNexis procedure.  That information lies uniquely within the knowledge of Equifax and its vendor, and the failure to be specific has to be resolved against Equifax, not against Soutter.

Finally, Equifax claims that statutory damages are an individualized issue because Soutter stated that the amount of damages between $100 and $1000 will depend on the number of violations suffered by each respective customer.  In Stillmock v. Weis Markets, Inc., 385 F. App'x 267 (4th Cir. 2010), the Fourth Circuit rejected the district court's conclusion that under the Fair and Accurate Credit Transactions Act of 2003 ("FACTA"), determining the quantum of damages with respect to each class member who had a receipt printed with his or her 10-digit credit card number would be too individualized for classwide treatment under Rule 23(b)(3), id. at 272.  In Stillmock, the plaintiffs had asserted statutory and punitive damages under the same type of damages scheme that is at issue in the present case.  Id. at 268.  In rejecting the district court's conclusions, the Fourth Circuit found that the predominance test is qualitative rather than quantitative.  Id.

at 273. "[T]he qualitatively overarching issue," held the
court, "is the liability issue of the defendant's willfulness,
and the purported class members were exposed to the same risk of
harm every time the defendant violated the statute in the
identical manner," and the "individual statutory damages issues
are insufficient to defeat class certification under Rule
23(b)(3)." Id.

        In this case, the qualitatively overarching issues are
whether the class members' credit reports contained inaccurate
information and whether Equifax used reasonable procedures to
assure maximum possible accuracy when issuing those credit
reports. The putative class members were exposed to the same
risk of harm every time an inaccurate credit report was
furnished because of Equifax's allegedly unreasonable procedures
for collecting judgment information. The amount of individual
statutory damages for each consumer will necessitate a very
simple individualized computation of damages, but that, under
Stillmock, is insufficient to defeat certification of this class
under Rule 23(b)(3). Indeed, mathematical calculations based on
the number of shares owned and share prices at different dates
must be done on most securities fraud class actions. The
"individualized" calculations at the base of Equifax's
contention are no more complicated than those regularly done in

securities fraud class actions.  Thus, they do not militate against satisfaction of the predominance requirement.

For the foregoing reasons, the Court finds that Soutter has fulfilled the predominance prerequisite.

### 2.   Superiority

Superiority requires that use of a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3). Superiority "'depends greatly on the circumstances surrounding each case,'" but "'[t]he rule requires the court to find that the objectives of the class-action procedure really will be achieved.'"  Stillmock, 385 F. App'x at 274 (quoting 7A Wright, Miller & Kane, supra, § 1779).  "'In determining whether the answer to this inquiry is to be affirmative, the court initially must consider what other procedures, if any, exist for disposing of the dispute before it.  The court must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy . . . and to assume the risk of prejudice'" to putative class members not before it.  Id.

Soutter argues that a class action is superior because: (1) it is the only realistic means of adjudicating these disputes; (2) the statutory damages under the FCRA are too

38

slight to support individual suits; (3) large majorities of
class members may be unaware that their rights have been
violated; (4) class treatment will not raise any significant
manageability hurdles because of the common issues; and (5)
judicial resources are best economized and focused by handling
this case as a class action. Equifax, of course, disputes that
class treatment is superior in this case, specifically citing
the presence of the FCRA's fee-shifting provision and Souter's
own lawsuit as reasons why individual actions are an appropriate
way to adjudicate this controversy.

In *Stillmock*, the defendant asserted that the availability
of attorney's fees and punitive damages under FACTA makes
individual lawsuits feasible, and therefore the class action
device was not the superior method of adjudication. *Id.* The
Fourth Circuit cited four reasons why this was an untenable
position. First, the Court of Appeals found that the low amount
of statutory damages available, the same amount at issue in the
present case, means "no big punitive damages award on the
horizon, thus making an individual action unattractive from a
plaintiff's perspective." *Id.* Second, the Court of Appeals
determined that there is no basis to conclude that the fact that
an individual plaintiff can recover attorney's fees in addition
to $1,000 in statutory damages will result in individual

39

enforcement of FACTA on a comparable scale to potential enforcement by way of a class action. Id. Equifax's own evidence in the present case demonstrates this point with respect to the FCRA. Only two other individuals, a married couple, have brought a lawsuit in Virginia alleging a violation of § 1681e(b) and seeking actual damages. Two individuals filing a lawsuit, out of hundreds (perhaps many more) of class members that likely will be represented in a class action, illustrates that individual enforcement under the FCRA cannot occur on a comparable scale to a class action, and therefore the class action is a superior method to trying this claim. Third, there was no indication in Stillmock, nor is there any indication in the present case given the one other suit filed, that class members would have a strong interest in individual litigation. Id. at 275. Finally, class certification would promote consistency of results, id., another factor which would occur in the present case as well, and support a finding of superiority.

Thus, a class action is a superior method for the fair and efficient adjudication of Soutter's claim.

### CONCLUSION

For the reasons set forth above, the Plaintiff's MOTION FOR CLASS CERTIFICATION (Docket No. 72) is granted. The class will be defined as: All natural persons, for whom Equifax's records note that a credit report was furnished to a third party who requested the credit report in connection with an application for credit on or after February 17, 2008 to February 17, 2010, other than for an employment purpose, at a time when any Virginia General District Court or Circuit Court judgment that had been satisfied, appealed, or vacated in the court file more than 30 days earlier was reported in Equifax's file as remaining unpaid, which persons suffered actual damages of less than $1,000 as a result of a report by Equifax that did not accurately report that the judgment had been satisfied, appealed, or vacated.

It is so ORDERED.

_____ /s/ _____ REP _____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March 30, 2011

41

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MAR 30 2011

DONNA K. SOUTTER, *For herself
and on behalf of all similarly
situated individuals,*

    Plaintiff

v.                  Civil Action No.: 3:10cv107

EQUIFAX INFORMATION
SERVICES, LLC,

    Defendant.

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, PLAINTIFF'S MOTION FOR CLASS CERTIFICATIONS (Docket No. 72) is granted. The class is defined as: All natural persons, for whom Equifax's records note that a credit report was furnished to a third party who requested the credit report in connection with an application for credit on or after February 17, 2008 to February 17, 2010, other than for an employment purpose, at a time when any Virginia General District Court or Circuit Court judgment that had been satisfied, appealed, or vacated in the court file more than 30 days earlier was reported in Equifax's file as remaining unpaid, which persons suffered actual damages of less than $1,000 as a result of a report by

Equifax that did not accurately report that the judgment had been satisfied, appealed, or vacated.

Counsel shall confer and establish a schedule and procedures for notifying the class, including notification of the opt-out rights, and for completing the discovery and shall discuss a trial date. A status conference will be held in Chambers on April 13, 2011 at 10:00 a.m. By April 11, 2011, counsel shall submit a written proposal for class notification, concluding pretrial discovery and a trial date.

It is so ORDERED.

_____/s/_____  REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March 30, 2011

2

# EXHIBIT C

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE EASTERN DISTRICT OF VIRGINIA |
| 3 | RICHMOND DIVISION |
| 4 | |
| 5 | ---------------------------------------- |
| 6 | DONNA K. SOUTTER, for herself and : |
| | on behalf of all similarly : Civil Action No. |
| | situated individuals : 3:10-CV-107 |
| 7 | : |
| 8 | vs. : |
| | : February 22, 2011 |
| 9 | EQUIFAX INFORMATION SERVICES, LLC : |
| | ---------------------------------------- |
| 10 | |
| 11 | COMPLETE TRANSCRIPT OF THE MOTIONS HEARING |
| 12 | BEFORE THE HONORABLE ROBERT E. PAYNE |
| 13 | UNITED STATES DISTRICT JUDGE |
| 14 | |
| 15 | APPEARANCES: |
| 16 | Leonard A. Bennett, Esquire |
| | Matthew J. Erausquin, Esquire |
| 17 | Consumer Litigation Association, PC |
| | 12515 Warwick Boulevard |
| 18 | Suite 100 |
| | Newport News, Virginia  23606 |
| 19 | Counsel for the plaintiffs |
| 20 | John W. Montgomery, Jr., Esquire |
| | Montgomery & Simpson, LLP |
| 21 | 2116 Dabney Road |
| | Suite A-1 |
| 22 | Richmond, Virginia  23230 |
| 23 | |
| 24 | Peppy Peterson, RPR |
| | Official Court Reporter |
| 25 | United States District Court |

```
 1   APPEARANCES:  (cont'g)

 2   Barry Goheen, Esquire
     King & Spalding
 3   1180 Peachtree Street NE
     Atlanta, Georgia  30309
 4   Counsel for the defendant

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3          THE CLERK:  Civil action number 3:10CV00107, Donna K.

4    Soutter, for herself and on behalf of all other similarly

5    situated individuals, et al, versus Equifax Information

6    Services, LLC.  Mr. Leonard A. Bennett and Mr. Matthew J.

7    Erausquin represent the plaintiffs.

8          Mr. John W. Montgomery, Jr., and Mr. Barry Goheen

9    represent the defendant.  Are counsel ready to proceed?

10          MR. BENNETT:  Ready for Soutter.

11          MR. GOHEEN:  Equifax is, Your Honor.

12          THE COURT:  All right.  Plaintiff has the burden on

13    this motion.  So Mr. Bennett.

14          MR. BENNETT:  Yes, Your Honor.

15          THE COURT:  Mr. Bennett, I think the first task is I

16    really need to -- I understand my responsibility in defining

17    the class, but I need to know what you think the class is and

18    what it should do.

19          There's been a lot of briefing on the topic, but this

20    giving me a dartboard to throw at doesn't help me much.  I want

21    to know what the class is now that you think ought to be

22    certified.

23          MR. BENNETT:  Judge, at page 13 of our reply brief,

24    which is docket number 79, we proffer it as, of course, all

25    natural persons to whom Equifax's records note that a hard

1    inquiry credit report was furnished to a third party.

2            There is some dispute in the law as to -- well, to

3    have a violation or to establish a violation --

4            THE COURT:  You are getting off on the tangents.

5            MR. BENNETT:  A hard inquiry, Judge, is a publication

6    of a credit report by Equifax to a third party.  It maintains

7    that history of hard inquiries of credit reports it has

8    furnished in its database.

9            THE COURT:  That's not a class definition I'm going

10   to adopt because that was so sufficiently confused that I had a

11   little trouble following.  I think the class might have trouble

12   following it, too, so why don't you tell me what the class is,

13   please.

14           MR. BENNETT:  It is drafted on -- again, the proposed

15   definition --

16           THE COURT:  That's the one you want, is on page 13 of

17   your reply brief.

18           MR. BENNETT:  Yes, Judge.  The language that the

19   Court has just described as more cumbersome than ideal --

20           THE COURT:  I didn't describe that language.  I

21   described what you said, because it had a lot of tangents in

22   it, as more cumbersome.

23           MR. BENNETT:  Yes, sir.

24           THE COURT:  All natural persons.

25           MR. BENNETT:  For whom --

1     THE COURT: Everybody agrees with that, don't they?

2 Is there any conflict over that?

3     MR. BENNETT: Not from us.

4     THE COURT: From anybody. I mean, you read the

5 briefs.

6     MR. BENNETT: There isn't, Judge.

7     THE COURT: For whom Equifax's records note that a

8 "hard inquiry" credit report was furnished to a third party.

9 Is there any dispute over that?

10     MR. BENNETT: There's none in the briefing.

11     THE COURT: Other than for employment purpose, any

12 dispute over that?

13     MR. BENNETT: Not in the briefing.

14     THE COURT: At a time when any Virginia General

15 District Court or Circuit Court judgment that had been

16 satisfied, appealed, or vacated in the court file more than

17 30 days earlier was reported in Equifax's file as remaining

18 unpaid. There's where the dispute lies; right?

19     MR. BENNETT: Yes, sir.

20     THE COURT: Now, where is the dispute? In all that

21 paragraph, that fourth criteria, where is the dispute?

22     MR. BENNETT: Well, in fact, this part of the brief

23 is addressing one of those disputes. That is, Equifax argues

24 that the definition we proposed would not be ascertainable.

25 More correctly, we think not identifiable, this argument,

1   because --

2           THE COURT:  My first question was, where is the

3   disagreement in paragraph four?  Over what text of the fourth

4   component of the class?  What's the disagreement over it as you

5   understand it?  It's not at a time when any Virginia General

6   District Court or Circuit Court judgment, is it?

7           MR. BENNETT:  No, sir.

8           THE COURT:  Is it within the text "that had been

9   satisfied, appealed, or vacated"?

10          MR. BENNETT:  I'm not aware of a dispute about any of

11  the language in four in terms of whether or not it is

12  identifiable.

13          THE COURT:  So they talk about whether it's

14  ascertainable.

15          MR. BENNETT:  Yes, sir.

16          THE COURT:  I think I understand the

17  ascertainability.  What is the next issue?

18          MR. BENNETT:  This class definition, Judge, the other

19  issue is what to do with outlier circumstances in which the --

20  which a consumer has a 1681e(b) credit actual damage claim,

21  and --

22          THE COURT:  That has to do with adequacy of her

23  representation; is that right?  Because she's not pursuing

24  actual damages for the class.

25          MR. BENNETT:  That is one argument that they are

1    making.  The other argument, Judge, is the argument that if we

2    were to definitionally -- if the Court were to definitionally

3    follow the lead of the *Stillmock v. Weis Markets* decision that

4    the Fourth Circuit rendered in which they reversed denial of a

5    class -- Fair Credit Reporting Act class action out of the

6    District of Maryland.

7              The Fourth Circuit noted a definitional exclusion

8    that wasn't in the actual text of the definition but was in the

9    text of the decision that followed it that excluded as class

10   members any individuals that had suffered identity theft

11   damages as a result.

12             We have proposed as one of the really two

13   alternatives for the Court's consideration a circumstance in

14   which the Court could exclude any individual that has --

15   asserts damages in excess of a thousand dollars.

16             THE COURT:  That's not in this definition.

17             MR. BENNETT:  That is not in the definition on this

18   page.

19             THE COURT:  Well, the one I asked you about is what

20   is it that you want me to adopt as a definition.  What is it?

21             MR. BENNETT:  Judge, we don't believe that the Court

22   needs do anything other than what is in this to properly --

23             THE COURT:  "This" meaning paragraph --

24             MR. BENNETT:  That's correct.

25             THE COURT:  -- 13.

1      MR. BENNETT:  That's correct.  We have argued in the

2   alternative that if the Court is somehow persuaded that there

3   would be a flood of actual damage consumers included within

4   this 1681e(b) non-employment group, then -- that the Court

5   could modify the class definition to exclude them the way that

6   *Stillmock v. Weis Markets* excluded individuals that had

7   identity theft damages.

8      THE COURT:  So just exclude actual damages.

9      MR. BENNETT:  Any consumers that asserted actual

10   damages in excess of a thousand dollars which is beyond the

11   statutory damage threshold.  That's an alternative argument

12   and, again, follows the Fourth Circuit's conclusion, but we

13   believe as our primary position, as our, I think, the absolute

14   true position is that the Court can accommodate opt-outs.

15      The Court -- this process allows for those

16   individuals whose damages arise -- that is they haven't made a

17   dispute, they haven't written to Equifax and triggered the

18   1681i reinvestigation claim that's the meat of most of fair

19   credit litigation, then that individual who has not made the

20   dispute, has some actual damages in excess of a thousand

21   dollars they believe that they could prove, they could opt out.

22   That's what they should do.

23      All of the jurisprudence we've cited in both our

24   initial and our reply briefs support this.  Fourth Circuit has

25   come down completely in that manner, and this Court has -- in

1   *Williams,* there could have been individuals that suffered

2   actual damages.  It turns out there were a decent amount of

3   opt-outs but not -- less than a percent.

4          In this instance, given that you've had only one

5   other individual besides Donna Soutter sue out of what we

6   estimate to be approximately 300,000 consumers offended, I

7   think that the likelihood that you're going to have a flood of

8   consumers claiming that they suffered greater damages, greater

9   than the statutory damage remedy provides, is minuscule.

10         THE COURT:  All right.

11         MR. BENNETT:  The -- while we're on the class

12  definition, the other issues, Judge, that Equifax asserts, and,

13  again, we believe with respect to identifiability is they're

14  ascertainability argument, their primary position challenges

15  the data that we have so far in phase one gathered.

16         We have obtained, through the executive secretary of

17  the Virginia Supreme Court, a database that answered an inquiry

18  that we defined.  That is the plaintiffs' counsel said, please

19  give us the following -- the names and addresses of the

20  individuals that meet the following criteria and other

21  information necessary to match them against Equifax's data.

22         Donna Soutter had her judgment vacated and then

23  subsequently dismissed.  We didn't ask for that code.  It's a

24  code that we could have asked for and we will ask for if we can

25  obtain certification, and we will have to pay more money as we

1    did to the -- to cover the state's expense in obtaining that

2    database, but as we've cited, Mr. Mittendorf, his deposition

3    testimony, he says we can do that, you just have to ask, and we

4    will ask in phase two, but all we needed to show for the

5    purpose of the first phase of this case is that it can be done.

6          We -- the plane has flown, and you know that flight

7    is possible, and now we can begin to build the full class list.

8    We are not suggesting that the defendant bear the burden. We

9    have already absorbed the expenses and cost. We would continue

10   to do so. We will obtain the full database of individuals, and

11   Equifax as --

12          THE COURT: Do they object to the 30-day period?

13          MR. BENNETT: They have not, Judge, except to say --

14   they haven't objected to that as part of the class definition.

15   They have objected to the conclusion that we insist on that --

16   that Equifax should, on a merits argument, be picking all

17   these --

18          THE COURT: That is the merits.

19          MR. BENNETT: It is.

20          THE COURT: That is an issue that doesn't have

21   anything to do with defining the class.

22          MR. BENNETT: That's correct, Judge.

23          THE COURT: Although to a certain extent, we are to

24   look at, in deciding class certification, questions of the

25   merits if we need to to ascertain not as to the validity vel

1  non but as to -- so we can use them in assessing the class

2  action criteria; isn't that right?

3          MR. BENNETT:  That is correct, Judge.  The defendant

4  takes it further.  The defendant -- the implication of its

5  argument is its conduct would be reasonable, procedures would

6  be reasonable, and that would be a merits consideration as

7  opposed to --

8          THE COURT:  I can't decide that now, can I?

9          MR. BENNETT:  You cannot.

10          THE COURT:  That would be beyond where the Court said

11  I could go; right?

12          MR. BENNETT:  Yes, sir.

13          THE COURT:  Why aren't we dealing with actual damages

14  here?

15          MR. BENNETT:  Well, Judge, because --

16          THE COURT:  She said she had actual damages according

17  to their brief, and you say, well, what she said was, at a time

18  when Webb was in the case, she had -- she was making Rule 26

19  disclosures, and she said that she had some actual damages.

20          MR. BENNETT:  No, sir.

21          THE COURT:  Then in deposition, she wouldn't back off

22  of that according to them.  They just -- she keeps insisting

23  that she had actual damages, and she's not pursuing them.  So

24  what is that all about?

25          MR. BENNETT:  Well, there's two different things.

1    First, with respect to the Rule 26(a)(1), there isn't a dispute

2    about that.  The Rule 26(a)(1) disclosures are contractually a

3    docket item --

4              THE COURT:  You claimed actual --

5              MR. BENNETT:  No, sir.

6              THE COURT:  You listed actual damages --

7              MR. BENNETT:  No, sir.

8              THE COURT:  -- in your disclosure or not?

9              MR. BENNETT:  No, sir.  It is -- without any

10   explanation, if you look at the document, it is segregated, and

11   it says, individual claims, like roman numeral one.  The only

12   individual claim was Mr. Webb's reinvestigation claim.  There

13   has never been an individual claim as to Equifax for Donna

14   Soutter.  She did not have a reinvestigation claim as to

15   Equifax.  It wouldn't have existed.  It's not that we didn't

16   file it or we haven't pursued her actual damages

17   reinvestigation claim.  She doesn't have one.

18             THE COURT:  What about all this stuff about emotional

19   distress and all that other stuff?

20             MR. BENNETT:  Because, Judge, she did, after making

21   disputes, go through this process, and she actually -- there is

22   a settlement where she received money, and it's confidential.

23   We have TransUnion's lawyers here, but we don't have

24   Experian's, but she was paid money for her 1681i

25   reinvestigation claim.

1        THE COURT:  Is that where the damages occurred?

2        MR. BENNETT:  Yes, sir;

3        THE COURT:  So she was answering in another case and

4  looking at -- they are talking about this 26(a)(1) disclosures

5  in another case and arguing that that shows she has actual

6  damages?

7        MR. BENNETT:  No, sir.

8        THE COURT:  What's going on about that --

9        MR. BENNETT:  There's two different things.  You are

10  combining them.  The 26(a)(1) isn't simply a red herring or a

11  misinterpretation.  It is totally factually wrong the way that

12  is it raining outside or not raining outside.  The initial

13  disclosures never claim --

14        THE COURT:  In this case.

15        MR. BENNETT:  In this case never claim that the

16  *Soutter v. Equifax* case, in any fashion, had actual damages.

17  They expressly separate themselves in the text, in the actual

18  Word and PDF and file document.  It says, individual claims,

19  here are the damages, and those are the only individual claims

20  that were ever asserted, were Mr. Webb's with respect to the

21  1681i, and he had actual damages as did my client with respect

22  to her reinvestigation claims.

23        THE COURT:  That's in another case.

24        MR. BENNETT:  Yes, sir.

25        THE COURT:  Why did you say that even?  All right,

1    now, so the only, what about -- they say that at her deposition

2    she claims she had --

3              MR. BENNETT:  She claims --

4              THE COURT:  -- actual damages.

5              MR. BENNETT:  She claimed, Judge -- in her

6    deposition, she testified that this had impacted her, that she

7    really felt that this had an effect on her.  She didn't have

8    damage assessment as in this is an actual damage amount, nor is

9    she, as counsel informed, as to separation of her actual damage

10   claim from one credit bureau to the other credit bureau to the

11   other credit bureau or one claim to the other.

12             THE COURT:  If she types that out right now, do you

13   think you can read it and understand it, what you just said,

14   because I can't?

15             MR. BENNETT:  If you couldn't, I couldn't, Judge.

16             THE COURT:  Let's try it in simple declarative

17   sentences.  Short ones would be helpful without any

18   embellishment, side excursions.  It will help me understand it;

19   okay?

20             MR. BENNETT:  Yes, sir.  As this Court knows, proof

21   of damages is complex.  It requires proof of causation amongst

22   many other things.  The plaintiff does not, in her deposition,

23   attempt to establish, or determine even, the causation for her

24   damages.

25             She knows, I went through this process, this process

1   affected me emotionally.  She doesn't attempt to, without

2   reliance on counsel's help, attribute her damage, her causation

3   to one event, one violation, one defendant versus another.

4          THE COURT:  You mean one credit reporting agency.

5          MR. BENNETT:  One credit reporting agency or one

6   violation.

7          THE COURT:  So she's not claiming -- she doesn't have

8   any actual damages.

9          MR. BENNETT:  Not with respect to Equifax.

10          THE COURT:  Why does that make her -- what do you

11   think they mean by saying she's not an adequate class

12   representative because she doesn't have any actual damages?

13          MR. BENNETT:  Well, because there have been some

14   courts that have found a plaintiff that is willing to throw the

15   class's significant claims under the bus just for certification

16   is in conflict with the class.

17          THE COURT:  So basically -- why does she have any

18   claims?  If nobody else has any claims over a thousand dollars,

19   why does she?

20          MR. BENNETT:  Well, she has -- well, first, Judge,

21   she has --

22          THE COURT:  That's where you get caught, because of

23   what you said in the other case, isn't it?

24          MR. BENNETT:  No, sir.  I'm not sure what -- she has

25   claims for statutory damages and for punitive damages.  The

1    *Saunders v. BB&T* case that we took to trial -- didn't try to.

2    We tried to avoid it, but we took it to trial and took it to

3    appeal.  The Fourth Circuit affirmed a thousand dollars of

4    statutory damages and 80,000 of punitive damages.

5          The difficulty in the *Saunders* case would be the

6    difficulty in almost all these, is establishing the causation

7    for a violation under 1681e Subsection B.

8          THE COURT:  It's your position that most people who

9    suffer this particular kind of damage don't have any actual

10   damages to speak of.

11         MR. BENNETT:  Or more correctly, that they do not

12   have the means, the ability, the evidence to prove, through the

13   causation burden, actual damages because of a 1681e Subsection

14   B claim.

15         THE COURT:  It's hard to prove any damages like that

16   anyway.

17         MR. BENNETT:  It is incredibly hard even under 1681i.

18   If you look at motions *in limine* that Equifax will file in any

19   of its cases, most of them will be related to your damage

20   proofs.

21         The *Cortez v. TransUnion* decision, 2010 in the Third

22   Circuit, outlined the Senate report on the Fair Credit

23   Reporting Act and discussed the great difficulty consumers have

24   and even knowing that a particular credit report caused a

25   particular damage item, when actually in *Cortez* it transitions

1    into why certain remedies exist, statutory and punitive damages

2    amongst others.

3            THE COURT:  What is this all about in the briefs

4    whether there's injunctive relief requested or not?  What's

5    that all about?

6            MR. BENNETT:  Well, I don't believe that the parties

7    are joined on that issue in the briefs.  There is a divide that

8    my side has so far lost soundly, not uniformly but soundly on

9    whether or not the Fair Credit Reporting Act allows for

10   injunctive relief for private individuals.

11           THE COURT:  The Fourth Circuit hasn't decided that,

12   have they?

13           MR. BENNETT:  The Fourth Circuit has not decided

14   that, Judge, but I lost the decision in a case that Judge

15   Dohnal ruled on against, of all places, the Virginia Employment

16   Commission as the defendant.  There was a sovereign immunity

17   defense, or rather -- I'm sorry -- a 10th Amendment defense,

18   and the defendant -- we argued, amongst other things, that even

19   if you can't obtain damages against the state or federal court,

20   you can obtain injunctive relief --

21           THE COURT:  What kind of injunctive relief?

22           MR. BENNETT:  In that instance, we were seeking --

23   the state does not tell you when it denies you employment based

24   on what's in a background check.  It doesn't tell you that.  It

25   doesn't give you a copy of the report, it doesn't give you --

1  THE COURT:  You were seeking preliminary mandatory

2  relief.  I mean you were seeking mandatory relief.  That is,

3  you have to change -- you have to do this, but you really want

4  a cease and desist, stop doing what you are doing unless you do

5  something else.

6  MR. BENNETT:  Yes, sir.  In fact --

7  THE COURT:  Has any court decided you can't have

8  that?

9  MR. BENNETT:  Yes, sir.  The Supreme Court has a case

10  -- not an Unfair Credit Reporting Act, but *Christiana* that

11  stands for the proposition that unless the statute expressly

12  bars the Court from injunctive -- such injunctive relief, it's

13  not barred.  If the Court recalls --

14  THE COURT:  Does the statute bar injunctive relief?

15  MR. BENNETT:  It does not, Judge.

16  THE COURT:  Why, then, doesn't the general rule that

17  injunctive relief can be had apply to this statute?

18  MR. BENNETT:  Without having to play devil's

19  advocate, the actual truth for me, Judge, is because the issue

20  was lost early by one or two cases, and they began to pile --

21  precedent began to pile negatively, and so few judges --

22  THE COURT:  What law is there -- you know, the

23  Supreme Court, in the *eBay*® *v. Merc* trade case, made it quite

24  clear that in the patent law context, courts need -- and that's

25  a specific kind of statutory relief that's permitted -- courts

1   need to use their general equity powers to assess whether

2   injunctive relief is appropriate or not.

3        I don't understand why injunctive relief is not

4   appropriate in a case like this.  Are you seeking it as part of

5   the class action?

6        MR. BENNETT:  We have not asked for a 23(b)(2) class.

7   That is, we've not asked for an injunctive relief class.

8        THE COURT:  That's not an issue then.

9        MR. BENNETT:  No, sir.  Equifax would argue --

10       THE COURT:  Do you know what a cynic once argued?  I

11   don't know whether Mr. Goheen was the cynic or who it was.  The

12   plaintiffs' bar doesn't want it because it would put them out

13   of business if they had to change practice.

14       MR. GOHEEN:  I don't think I'm that cynical, Your

15   Honor.

16       MR. BENNETT:  Judge, I have -- injunctive relief has

17   been what I personally, as on the board of directors of the

18   National Association of Consumer Advocates is a big political

19   activist in this field nationally, with Congress we've been

20   fighting to try to get, certainly pre-November, the house

21   financial services committee to impose injunctive relief

22   remedies or to allow them, and the advantage that is suggested,

23   the tantalizing overture is that it's the way to provide a

24   safety valve against the growing wave of Fair Credit Reporting

25   Act class actions, because failing an injunctive relief remedy,

1    what we are here today to do is the only means to correct the

2    reports of individuals, most of whom, to be honest, have no

3    idea they have a right.  They don't know they can sue, they

4    don't know that Mr. Bennett makes a living under this statute

5    or that there's a handful of other lawyers that can help them.

6    They do not know -- identity theft victims, employment

7    consumers, individuals like Ms. Soutter have no idea before --

8         THE COURT:  Okay.  I understand.  So we don't have

9    the issue of injunctive relief.

10        MR. BENNETT:  We don't, Judge, but the point that

11   this transitions into certainly is as to the superiority

12   argument.  The question is not whether a class action remedy is

13   perfect.  It's whether it's a superior option to doing nothing

14   at all, really, because that's what you have.

15        You have the defendant -- the only case besides Ms.

16   Soutter that the defendant identifies is a state court filing

17   by a general practice attorney, and in that case, he pled a

18   1681i reinvestigation claim, not an e(b) claim.

19        17,000 consumers made disputes.  At least 17,000 made

20   disputes of these items to Equifax within the last two years,

21   and not many individuals even knew that, but we're taking about

22   individuals, Judge, who paid off a judgment or who went to the

23   trouble of having it vacated or appealed it, and it wasn't

24   reentered.

25        THE COURT:  17,000 out of the 300,000?

1        MR. BENNETT:  Well, 17,000 -- Equifax provided a

2  partial list.  Equifax identifies that list as including only

3  the individuals it did not immediately correct, and it actually

4  tries to, in its brief, impeach its own discovery production by

5  arguing that we didn't give you all of the data, so for you to

6  try to generate a class list from the data we gave you is a

7  failed exercise because we only gave you data --

8        THE COURT:  You're going to get the rest of it later.

9        MR. BENNETT:  Yes, sir.

10       THE COURT:  Okay, thank you.  Have a seat.  Mr.

11  Goheen.

12       MR. GOHEEN:  May it please the Court, Barry Goheen,

13  John Montgomery representing Equifax.  Let me, if I could, Your

14  Honor, pick up on that actual damages testimony, just to make

15  sure.  This was in our papers.

16       THE COURT:  Well, now, that's the 26(a) disclosures.

17  He said that the disclosures in this case said she didn't have

18  any actual damages, and Webb did.  Which is the truth?

19       MR. GOHEEN:  There was confusion on that point, Your

20  Honor, and that's why in the deposition, I went through --

21       THE COURT:  I didn't ask you that.  I asked you what

22  the 26(a) disclosures said.

23       MR. GOHEEN:  26(a) disclosures, to my recollection,

24  were on behalf of the plaintiffs.  So in other words, I don't

25  recall it delineating one versus the other.  It just said,

1   these are the categories of actual damages, and that's why in

2   the deposition I went through, because by then, the Webb case

3   had been severed --

4           THE COURT:  Says, A, individual claims, itemization

5   of damages.

6           MR. GOHEEN:  Correct, Your Honor.

7           THE COURT:  Categories and types of actual damages in

8   individual claims, case law supporting actual damages and

9   individuals claims -- it's all sub-paragraphed -- and punitive

10  damages.  Class claims, subparagraph B, statutory damages,

11  101,000 per violation, punitive damages.  So it's clear that

12  they're not claiming actual damages in the class.

13          MR. GOHEEN:  Well, I read that, Your Honor, as

14  individual damages that are not delineated between the

15  plaintiffs.  I understand what the Court is saying, but that's

16  here's the class claim, here's the individual claim, but here's

17  -- because I was confused on the disclosures, I went into them

18  in the deposition, and that's what Mr. Bennett and Your Honor

19  were talking about, but here's what the testimony was, though,

20  under oath just so there's no misunderstanding about that.

21          This is at page 70, line 22.  This is my question:

22  Back to the disclosures, you said you were looking through each

23  of these.  I'm not going to go through them based on what your

24  counsel just said, but I'm going to ask you generally.  Do you

25  think you, for all seven of those subcategories, you believe

1    you have some level of actual damage?

2            Answer:  Yes.

3            That's her testimony under oath.  That is what we

4    rely upon in making our argument in the brief.

5            THE COURT:  So what?  It doesn't make any difference,

6    does it?  It's not much.

7            MR. GOHEEN:  We don't know that there's not much,

8    Your Honor.  They've not been quantified.

9            THE COURT:  I've never seen anywhere in any of these

10   cases where the damages individually, items of damages are very

11   significant.  Have you?

12           MR. GOHEEN:  Actual damages?

13           THE COURT:  Yes.

14           MR. GOHEEN:  There have been cases where there have

15   been some -- if we're wrapping in all the actual damages in

16   those seven subcategories with emotional distress and the like,

17   yes, they certainly have exceeded a thousand dollars.

18           THE COURT:  I know, but the worst case I ever saw was

19   where somebody caused a woman to lose her house, and she

20   couldn't get any financing because of it.  It wasn't you.  Its

21   Experian, I think.  Some fellow from Pennsylvania tried it.

22   No, it was TransUnion.

23           MR. GOHEEN:  We had a case, not -- in this district,

24   not in this division, for something similar happening, and

25   there was a similar verdict.  I'm not -- I don't want to pick

1    through that.  I guess my point, Your Honor, is that she's

2    claiming actual damages, and the complaint alleges --

3           THE COURT:  She's not claiming actual damages for the

4    class.

5           MR. GOHEEN:  Paragraph 26 of the complaint does, Your

6    Honor.  As a result of the conduct, actions, and inactions of

7    the defendant as alleged in this count, the plaintiff and other

8    class members suffered credit score damage.  So there are, Your

9    Honor --

10          THE COURT:  But you have to have that, don't you, for

11   -- you have to have some damage in order to get the thousand

12   dollars, don't you?

13          MR. GOHEEN:  Certainly my view, Your Honor, is that

14   there needs to be some sort of harm to the class.

15          THE COURT:  What paragraph?

16          MR. GOHEEN:  Paragraph 26 of the amended claim which,

17   I think, is document 26.  I think it's document 26, Your Honor,

18   but it's the amended complaint filed February 26th of last

19   year, and this is within the count.

20          THE COURT:  Says suffered credit score damage.  It

21   doesn't say actual damage.  Damage to your credit score.

22          MR. GOHEEN:  I don't know how that could be anything

23   other than actual damage, Your Honor.

24          THE COURT:  Because your credit score went down.

25   That's what that says.  It says your credit scores went down.

1   Damage to the credit score.  Anything good makes it go up or

2   stay the same.  Anything bad makes it go down.  That is the

3   only fair reading of that.

4           MR. GOHEEN:  With all due respect, I read it as an

5   allegation of damage.  Now, whether that --

6           THE COURT:  I don't, so let's move on.

7           MR. GOHEEN:  Okay.  I'll do that, Your Honor.  With

8   regard to the class definition, you were having a dialogue with

9   Mr. Bennett -- Your Honor was having a dialogue with Mr.

10  Bennett with regard to the fourth condition or factor, or

11  however you want to call it, if you will, in the class

12  definition out of their reply brief.

13          To read that again, at a time --

14          THE COURT:  A, you don't have any objection to all

15  natural persons; right?

16          MR. GOHEEN:  Correct.

17          THE COURT:  You don't have any objection to two, for

18  whom Equifax's records note that a hard inquiry credit report

19  was furnished to a third party; right?

20          MR. GOHEEN:  I think it would be hard to do that on a

21  class-wide basis.

22          THE COURT:  No, I'm talking about the definition

23  itself, the actual term.

24          MR. GOHEEN:  The term, no, not for the purposes of

25  the definition.  We note the difficulty in our papers, though.

1          THE COURT:  That has to do with whether or not it's a

2  superior form of resolution and other issues, not whether or

3  not it's an adequate class definition.

4          MR. GOHEEN:  I understand, Your Honor.

5          THE COURT:  Three, other than for an employment

6  purpose, you don't quarrel with that.

7          MR. GOHEEN:  Right.

8          THE COURT:  Now we're on four.  What part of four do

9  you quarrel with?

10         MR. GOHEEN:  "In the court file" is one.

11         THE COURT:  What's wrong with that?  What's the issue

12  there insofar as you are concerned?

13         MR. GOHEEN:  Because, Your Honor, the Court file

14  would need to be accessed for each of the people to determine

15  class membership.  You have to go to the court file.  As that

16  phrase just says, in the court file.  We have to go to the

17  court file to determine whether the judgment was satisfied,

18  appealed, vacated more than 30 days earlier before it is

19  unpaid.  It says, "in the court file," so the court file would

20  have to be accessed.

21         THE COURT:  What's wrong with that?

22         MR. GOHEEN:  Because that's an individualized

23  assessment, Your Honor.  You have to prove your way into the

24  class by accessing the court file for every single proposed

25  member of the class, and that's just not, in our view,

1    supported by the law.  There's not an objective way --

2              THE COURT:  Tell me something.  How else does a

3    judgment get marked satisfied, appealed, or vacated if you

4    don't do it in a court file?

5              MR. GOHEEN:  I think that's the way to do it.

6              THE COURT:  If you went in and marked something

7    satisfied, you'd be committing fraud because you can't do that

8    under Virginia law at any rate.  Vacating, you can't do that

9    because that's a court action.

10             MR. GOHEEN:  I'm not saying that's the only way to do

11   it or not the only way to do it.  The argument, Your Honor, is

12   that you have to look at the court file to determine who is in

13   the class.

14             THE COURT:  But so what?  You have to look at

15   something to determine who is in the class anywhere.

16             MR. GOHEEN:  They believe there are 300,000 people

17   that might qualify for the class.  That's 300,000 times someone

18   is going to have to go to the court file.

19             THE COURT:  They have to do it, don't they?

20             MR. GOHEEN:  Not under all -- not under some of the

21   evidence that's been put before the Court.  For example,

22   sometimes where the court file is only accessible manually, the

23   clerk has to sit with the person checking it out to go through

24   the court files.  That was in Ms. Blount's declaration.  She's

25   the court clerk here in the General District Court of Richmond.

1    That was her testimony.  You can't just go get a file and go

2    rifle through it.  Sometimes you gotta have the court clerk

3    there with you to maintain --

4         THE COURT:  When did they put that procedure in?

5         MR. GOHEEN:  I don't know, Your Honor.

6         THE COURT:  I can't tell you how many court files

7    I've looked at when I was doing General District Court work,

8    but that was a long time ago, so I don't know what it is now.

9         MR. GOHEEN:  That's her undisputed testimony under

10   oath.

11        THE COURT:  So what?  If the plaintiff has to do it,

12   the plaintiff has to do it.

13        MR. GOHEEN:  That would be a very laborious process

14   and --

15        THE COURT:  You're complaining about their labor.

16   What's that got to do with anything?

17        MR. GOHEEN:  We believe that's not the effective way

18   to ascertain a class, to go through it manually, one by one, up

19   to 300,000 or 100,000 or 17 or whatever it turns out it's going

20   to be.  First of all, how do we know how to oversee the

21   integrity of that process, whether it's them or their agents

22   doing it?  That's still, to me, subject to cross-examination.

23        THE COURT:  What should we do; let your people do it?

24        MR. GOHEEN:  No.  It's not an ascertainable class,

25   Your Honor.

```
 1            THE COURT:  You're just talking about
 2   identifiability.  Ascertainable is certainly -- I don't think
 3   it's an issue.  You are talking about identifying class
 4   members, it seems to me, Mr. Goheen.
 5            MR. GOHEEN:  Your Honor, I think it's easy to --
 6   maybe I'm confusing the two, but here we're talking about how
 7   -- it's a method of ascertaining a class.  It's a method that
 8   could take weeks, months, or years.
 9            THE COURT:  So we take "in the court file" out.  Is
10   that okay then?
11            MR. GOHEEN:  Beg your pardon, Your Honor?
12            THE COURT:  We take "in the court file" out then.  Is
13   that okay?
14            MR. GOHEEN:  Then I don't know how we -- that we
15   could identify class members or ascertain who fits within the
16   class.
17            THE COURT:  Well, they're damned if they do and
18   damned if they don't, and you get by scot-free for doing
19   nothing.
20            MR. GOHEEN:  I don't believe we get by scot-free at
21   all.  We just talked about how she got substantial dollars
22   against another credit reporting agency based on the same
23   allegations.
24            THE COURT:  Did she get it from you?
25            MR. GOHEEN:  No.
```

1      THE COURT: Okay. So, anyway, it would be okay if we

2  took "in the court file" out, or it would not?

3      MR. GOHEEN: It would not solve the problems whether

4  it's left in or whether it is taken out.

5      THE COURT: Anything else in there?

6      MR. GOHEEN: The "more than 30 days earlier" is a

7  problem because it assumes a homogeneity in pickup times with

8  regard to how these various judgment dispositions are retrieved

9  and reported on.

10     In Richmond -- City of Richmond General District

11  Court has its own frequency of pickup. Perhaps a more rural,

12  or certainly a more rural jurisdiction in Virginia would have

13  much less a time because there are fewer judgment dispositions

14  that need to be picked up. So imposing 30 days, we don't

15  believe --

16     THE COURT: You're talking about pickup. What do you

17  mean, pickup?

18     MR. GOHEEN: Pick up the reporting of the judgment

19  dispositions and then updating --

20     THE COURT: Supreme Court database, is that what you

21  are talking about?

22     MR. GOHEEN: No, the actual -- well, however they are

23  picked up, whether it's physically, and there's testimony in

24  the record that the --

25     THE COURT: I don't understand what you mean by

1    picked up.  That's what I'm trying to get at.

2              MR. GOHEEN:  Retrieving the records, Your Honor.

3              THE COURT:  Retrieving from where?

4              MR. GOHEEN:  From the courthouse, Your Honor.

5              THE COURT:  Who is retrieving them?

6              MR. GOHEEN:  Equifax through its public record

7    vendor.  It retrieves them.  It can retrieve them

8    electronically.  It can retrieve them by going physically to

9    the courthouse.  These are set out in our papers, but there are

10   different ways that these records are retrieved.  That's what

11   I'm talking about, Your Honor.

12             THE COURT:  That doesn't help me.

13             MR. GOHEEN:  That is the 30 days --

14             THE COURT:  More than 30 days earlier than what?

15             MR. GOHEEN:  As they say, more than 30 days when it

16   was reported in Equifax's file as remaining unpaid.

17             THE COURT:  I don't understand this language.

18             MR. GOHEEN:  I don't believe I understand it much as

19   well, Your Honor.

20             THE COURT:  Well, you all have been at it enough.

21   "At a time when any judgment that had been satisfied, appealed,

22   or vacated more than 30 days earlier," so it refers back to

23   when the judgment was satisfied, appealed, or vacated; is that

24   right?

25             MR. GOHEEN:  Yes, as reflected in the court file.  I

1  think that's how that is --

2  THE COURT:  So what is your problem with that?

3  MR. GOHEEN:  30 days is an arbitrary length of time,

4  Your Honor.

5  THE COURT:  Any time we're going to put on it is

6  going to be arbitrary.

7  MR. GOHEEN:  It can't be the same time, I don't

8  believe.  30 days might have been reasonable for Ms. Soutter.

9  It might not be reasonable for a more or less populous

10  jurisdiction.  It may be 60 days, it may be 20.  It may be much

11  more or much less.  Making it 30 days doesn't do anything --

12  THE COURT:  What evidence do you have to say that, to

13  say that there are different time periods in which judgments

14  are vacated?

15  MR. GOHEEN:  What evidence do I have -- I don't think

16  I understand the question, Your Honor.  If you're talking about

17  pickup -- if Your Honor is talking about pickup times --

18  THE COURT:  What does pickup mean?

19  MR. GOHEEN:  I'm using pickup probably inartfully.

20  What I mean is the retrieval of the disposition.

21  THE COURT:  From where by whom?

22  MR. GOHEEN:  By Equifax through its public --

23  THE COURT:  That's not what this says.

24  MR. GOHEEN:  From the court.

25  THE COURT:  No, it says, at a time when any Virginia

1    district court that had been satisfied or vacated more than

2    30 days before that." So you look at the date of the

3    satisfaction, et cetera. Isn't that what that 30 days relates

4    to?

5             MR. GOHEEN: And my point, Your Honor, is that it may

6    not be picked up within 30 days, and it probably is -- almost

7    certainly it's not going to be picked up instantaneously.

8             THE COURT: What does that have to do with defining

9    the class?

10            MR. GOHEEN: Because it's difficult, Your Honor, to

11   -- this, to us, assumes that you've got to have an immediate

12   pickup once there's a reporting of a disposition by a court or

13   the entry of a judgment, disposition, whether it's vacating

14   appealed, satisfied, whatever it might be in here.

15            If it gets into the court file, as I read this, the

16   class definition is, okay, anyone -- there's a 30-day window

17   for that to have been in the court file but not retrieved by

18   Equifax.

19            THE COURT: So you have 30 days to pick it up, right,

20   in your vernacular?

21            MR. GOHEEN: That's the definition, yes.

22            THE COURT: What's wrong with that as a class -- as a

23   definition of the class?

24            MR. GOHEEN: I don't believe it's appropriate because

25   this is an extremely heterogeneous class that spreads over 250

1    courts in the Commonwealth of Virginia, each of which has its

2    own procedures --

3            THE COURT:  Is there anything in the state rules

4    which is analogue to the federal rules which requires the clerk

5    to docket judgments and orders when they are entered?

6            MR. GOHEEN:  I don't know the answer to that, Your

7    Honor.  I do know that with regard to satisfactions, which is

8    the largest -- appears to be, according to some of the data,

9    the largest percentage of people in the class, that's largely

10   at the -- the judgment creditor needs to report on that.

11           So even there, with satisfactions, to the extent

12   there are even these court clerk guidelines or rules that need

13   to be followed, there still has to be -- by Virginia statute,

14   the creditor has to come in and report it, and only then would

15   it filter back out into the file.

16           THE COURT:  If the creditor doesn't report it, then

17   you're not responsible for it.  If there's nothing in the court

18   file because the creditor hasn't brought it in, I don't

19   understand why that's a problem for you at all.  You're off the

20   hook.

21           MR. GOHEEN:  It goes back to the court file.  We have

22   to look at the court file to know any of it.

23           THE COURT:  So all this is just whether you have to

24   look at the court file; is that what your whole objection is?

25           MR. GOHEEN:  I don't know that all of it is.

1 THE COURT: All of your objection to the 30 days is

2 having to go back and look at the court file.

3 MR. GOHEEN: No, it's not, Your Honor. The 30 days

4 is, as I understand it, common -- they propose that to be

5 common right across the entire Commonwealth, all 250 courts,

6 regardless of the jurisdiction, regardless of whether they are

7 General District Courts --

8 THE COURT: What would you have them do? You're

9 going to be responsible for something. Do you want me to do

10 subclasses? Tell me what subclasses I do.

11 MR. GOHEEN: I don't know what they would be. 250 of

12 them, I suppose.

13 THE COURT: Here's the rule: If a defendant doesn't

14 make alternative suggestions, then one can conclude that any

15 suggestion before the Court is a reasonable one. So I'm trying

16 to figure out, what is your proposal?

17 MR. GOHEEN: The case began, Your Honor, with General

18 District Court, City of Richmond. That is where the case

19 began.

20 THE COURT: And you agree that that's a proper class.

21 MR. GOHEEN: I agree that it's a heck of a lot

22 smaller --

23 THE COURT: Do you agree that it's a proper class

24 with this definition? In other words, if you just had the

25 Circuit Court of the City of Richmond, is that a proper class?

```
 1              MR. GOHEEN:  I would agree it's more appropriate,

 2   yes.

 3              THE COURT:  Is it proper?

 4              MR. GOHEEN:  I don't know that I would call it

 5   proper because of all the other -- I'm sorry.  You're talking

 6   about the definition; right?

 7              THE COURT:  Yes.

 8              MR. GOHEEN:  I'm sorry, Your Honor.  Yes.  That would

 9   be a more proper definition --

10              THE COURT:  No.  Is it a proper definition of the

11   class, not a more proper one, but is it a properly defined

12   class?

13              MR. GOHEEN:  The one in the first complaint, yes --

14              THE COURT:  You've already said that it was a proper

15   class, haven't you, the earlier one?

16              MR. GOHEEN:  I don't believe we said that, but --

17              THE COURT:  But you agree that it would be.

18              MR. GOHEEN:  Yes.  That would be -- yes, that would

19   be proper in the sense of we've got a contained -- that would

20   be the, quote unquote, to use Your Honor's term, the subclass,

21   that one court.  It's one geography.  It's not 250 different

22   courts.  That's the only over way I know how to do it.

23              THE COURT:  So what you're really looking at, though,

24   is the date on which it appears in the court's records.  So if

25   there's a satisfaction, and it doesn't occur for, let's say,
```

1  300 days after the judgment, and you go in and pick it up after

2  the -- you look at the situation when the judgment has been

3  entered, and for 300 days nothing happens.  Even if it was

4  satisfied by the debtor to the third party in that 30-day

5  period, unless it comes to the court, you don't have any

6  liability anyway, do you?

7         MR. GOHEEN:  I think that would be our position.

8  Your Honor is talking about --

9         THE COURT:  You wouldn't have any liability --

10        MR. GOHEEN:  There's noncompliance by the judgment

11  creditor.  I think that would be right.

12        THE COURT:  Because the judgment creditor is the one

13  who says it's been satisfied.

14        MR. GOHEEN:  Required to do that, yes.

15        THE COURT:  Under Virginia law, you've got to say, my

16  judgment is satisfied if it's going to be marked satisfied;

17  right?

18        MR. GOHEEN:  That's my understanding, Your Honor,

19  yes.

20        THE COURT:  I think so, too.  The person whose ox is

21  being gored has to say, okay.  Now, how about appeal?  That has

22  to be noted in a set period of time under Virginia law, doesn't

23  it?

24        MR. GOHEEN:  That is my understanding, yes, Your

25  Honor.

1      THE COURT:  And that set period of time is less than

2  30 days from the date of the judgment, isn't it?

3      MR. GOHEEN:  That's my understanding, Your Honor.

4      THE COURT:  So you don't have any problem with 30

5  days.

6      MR. GOHEEN:  Yes, correct.

7      THE COURT:  All right, you don't have any problem

8  there.  Okay.  Or vacated.  Now, in order for it to be vacated,

9  the Court has to act; right?

10      MR. GOHEEN:  That would be my understanding.

11      THE COURT:  And there's something in the court

12  records that says vacated; right?

13      MR. GOHEEN:  Yes.

14      THE COURT:  All right.  So if it's vacated, but it's

15  not vacated until 80 days after the judgment, this definition

16  wouldn't it up.  It picks it up only if it's vacated and more

17  than 30 days passes; is that right?

18      MR. GOHEEN:  I think that's right.  I would add this:

19  Even with regard -- those seem like simple terms or legally

20  clear terms, satisfied, appealed, or vacated, but, again,

21  looking at this plaintiff's circumstances, here you had the

22  order, the order that's the subject of all this, said vacated

23  and -- something like set aside and dismissed without

24  prejudice.  It was an inartful combination of words by the

25  judge, and as a result, the code didn't pick it up under these

1    particular codes that these orders are categorized as.

2           So, again, you're dependent on what courts actually

3    use in the language. Here you have -- as I said, you have the

4    judgment. She had a default feloniously entered against her by

5    a credit union and worked out a payment plan and then

6    nevertheless had to file a motion to get the default judgment

7    set aside, and the judge said, I order that the judgment is

8    hereby set aside and dismissed without prejudice. That's very

9    ambiguous language and --

10          THE COURT: Is there a code for that in the Court of

11   Appeals -- in the Supreme Court's system of coding?

12          MR. GOHEEN: Your Honor, I didn't understand the

13   first part of --

14          THE COURT: Is there a code for that particular

15   entry?

16          MR. GOHEEN: Not for those words.

17          THE COURT: For any of those words?

18          MR. GOHEEN: Yes, there is.

19          THE COURT: And there's one for dismissed, isn't

20   there?

21          MR. GOHEEN: Yes, there is.

22          THE COURT: And is there one for set aside?

23          MR. GOHEEN: There is. You have to choose one.

24          THE COURT: So you reform your inquiry to the state

25   database and say, we want any that have set aside, and we want

1    any that have set aside and dismissed or set aside within two

2    words of dismissed or something like that, don't you?

3           MR. GOHEEN:  I don't know whether that can be done or

4    not.

5           THE COURT:  Well, he says it can be done, and that

6    fellow -- what is his name -- Mendenhall said it can be done.

7    All you have to do is ask for it.

8           MR. GOHEEN:  Mr. Mittendorf I think Your Honor is

9    referring to.

10          THE COURT:  Mittendorf.

11          MR. GOHEEN:  And that leads us to another thing Mr.

12    Mittendorf said, is they don't vouch for the accuracy of

13    anything, of any of their data.  If you look on the website,

14    there's this long disclaimer of don't rely on this, it may not

15    be accurate, it's subject to change at any time, and, of

16    course, they --

17          THE COURT:  So you do see no evil, hear no evil.  You

18    don't go look at it, and you just let the people suffer with

19    their judgments.  They paid and everything, and you don't have

20    to go look at it; is that your contention?

21          MR. GOHEEN:  No, it's not, Your Honor.  My contention

22    is -- I'm just citing the testimony of the Virginia Supreme

23    Court personnel who have been doing this for many years who

24    said, we make errors.  If there are errors --

25          THE COURT:  Is there any endeavor undertaken by human

1   beings where errors are not made with the sole exception of the

2   rulings that I make?

3           MR. GOHEEN:  Taking that exception --

4           THE COURT:  Exclude that exception.

5           MR. GOHEEN:  Taking that exception into account, Your

6   Honor, I would say rarely.

7           THE COURT:  So you have somebody in your life who's

8   perfect.

9           MR. GOHEEN:  My boss is here.  I have to do

10  something, Your Honor.  I'm dancing here.  In all seriousness,

11  Your Honor, again, his testimony was, and I'm not trying to

12  overplay it and say our data is ripe with errors.  I'm not

13  trying to say that, but I am saying their testimony, more than

14  one, not just Mr. Mittendorf, but Ms. Bernard said, yes, there

15  could be and there are errors in the data.  It's difficult to

16  rely on, and that's why they have this extremely verbose

17  website disclaimer on the Supreme Court's website --

18          THE COURT:  How else is anybody to find this out, or

19  does this just go unremedied?

20          MR. GOHEEN:  I don't know.  I think the remedy is

21  exactly what has been done.  You can file an individual

22  lawsuit.  This was Judge Wilkinson's point, and Mr. Bennett

23  talked about the *Stillmock* case.

24          I believe other than a per curiam unreported opinion

25  that no one signs off on, I would take Judge Wilkinson's

1  opinion concurring where he went into great detail about, well,

2  there's plenty of incentives for people to file lawsuits,

3  whether it's under fact or the FCRA or any other case that has

4  a fee-shifting statute.  We cited the *Thorn* case --

5       THE COURT:  With respect, I think maybe that

6  indicates a certain lack of perception of what's happening and

7  what people know and don't know.  I think the majority opinion

8  is -- the procuring opinion is the controlling opinion, isn't

9  it, or is his concurrence necessary to make it an opinion of

10  the Court?

11       MR. GOHEEN:  I don't believe his concurrence is

12  necessary, if that was Your Honor's question.

13       THE COURT:  In other words, was it two to one some

14  way?

15       MR. GOHEEN:  I think it's two to one in a lot of

16  ways.  He did concur -- he concurred on a per consumer basis of

17  statutory damages.  That's clearly where Judge Wilkinson agreed

18  with the majority, but to make it clear --

19       THE COURT:  But he didn't dissent in that opinion,

20  did he?

21       MR. GOHEEN:  No, but I believe it's fair reading that

22  he had some --

23       THE COURT:  What is that; an advisory section of the

24  opinion that you think I ought to watch out for and take

25  guidance from?

1        MR. GOHEEN:  I believe it's an esteemed judge on the

2   Fourth Circuit who wrote the *Broussard* opinion among many

3   others.  I think he's very well respected with all due respect.

4        THE COURT:  I absolutely agree.

5        MR. GOHEEN:  Within the Fourth Circuit with regard to

6   class actions, he's had some of the major class action

7   opinions.

8        THE COURT:  Nobody respects Judge Wilkinson more than

9   I do.

10       MR. GOHEEN:  To move forward, the *Thorn* case actually

11  agreed with the denial of class cert in a civil rights case

12  which, of course, has a fee-shifting statute, and the Court

13  there held we do not find error with the trial court's ruling

14  that because of the fee-shifting statute, there's plenty of

15  incentive for class members to file their own lawsuits.

16       That's *Thorn v. Jefferson Pilot* which was a pretty

17  controversial opinion when it came out in 2006, as this Court,

18  I'm sure, is aware, so that is a reported opinion that says

19  fee-shifting statutes do allow for incentive for people to go

20  file their lawsuits.  This is an e(b) claim, Your Honor.  I

21  don't know how many --

22       THE COURT:  Just out of curiosity -- let's take the

23  cases that's not -- that your client gets sued in, all right?

24  Your client gets sued, and it gets hit.  It gets hit time after

25  time after time after time.  Does it change what it's doing?

1  No. What's the name of the case where we had that very issue?

2  Seven courts, I recall, or maybe five courts -- it wasn't

3  yours. It was TransUnion's. What is the name of that case?

4         MR. BENNETT: *Mullins v. TransUnion.*

5         THE COURT: *Mullins.* Time after time after time.

6  They've been told by courts you are wrong, including circuit

7  courts. No change.

8         So why is that then, this individual remedy, to be

9  considered an adequate remedy when this is an adequate

10  arrangement and an adequate incentive to sue when what the

11  record bespeaks is the credit reporting agencies basically tend

12  to take this as a cost of doing business?

13         Excuse me. I need to take a brief recess. I'll be

14  right back.

15

16         (Recess taken.)

17

18         THE COURT: So the question is, under those

19  circumstances, Mr. Goheen, why should I conclude that the

20  superiority determination ought to be made your way?

21         MR. GOHEEN: Because, Your Honor, we're facing a

22  lawsuit where the plaintiff has alleged actual damages, credit

23  score damage, along with willful conduct, and those issues can

24  be and are, hundreds of times a year, in an e(b) setting made

25  on an individual basis, and they are litigated. Sometimes

1   they're resolved, sometimes they're tried, sometimes they're

2   dismissed for lack of merit, and with all due respect, I don't

3   see how that can be done for 300,000 Virginians crammed into a

4   class action here.

5          THE COURT:  Okay.

6          MR. GOHEEN:  Thank you, Your Honor.

7          THE COURT:  Mr. Bennett.  Why, Mr. Bennett, did we

8   get into something beyond the General District Court for the

9   City of Richmond and into a state-wide class here?  How did

10  that happen?

11         MR. BENNETT:  Judge, once we entered into discovery,

12  we saw the procedures were uniform.  Equifax's data gathering

13  was uniform.  They had ceased going to individual courthouses

14  almost entirely.  That was when -- when I filed the case

15  initially, it was based on my understanding of how things were

16  when I was Newport News General District Court litigating.

17         We learned in discovery in this case, and, in fact,

18  it is not, and Mr. Goheen, I don't think, suggests otherwise,

19  without -- I mean, it's not with objection.  Equifax's counsel

20  and I discussed whether we would -- you know, the -- whether

21  the class should be state-wide versus the City of Richmond.

22         The truth is, Equifax's position is we fight to the

23  death against either class definitions.  I don't believe that

24  Mr. Goheen or Equifax would suggest to the Court that it is

25  fine with a City of Richmond General District Court class.

1        THE COURT: They agreed to it earlier, he said.

2        MR. BENNETT: If he agrees to it -- if he'll

3 stipulate to that certification, I will shut up, Judge.

4        THE COURT: Will you stipulate to it?

5        MR. GOHEEN: As I said, Your Honor, only

6 definitionally. It still is plagued with the same problems for

7 predominance and superiority that we discussed.

8        THE COURT: From a definition, we've got a class then

9 if you agree to that. Why don't you try that one and then --

10        MR. BENNETT: Judge, because we can solve this

11 problem contrary to -- and we believe that we've answered these

12 arguments Mr. Goheen is suggesting in our briefing, but we

13 think that they are uniform, and I can start --

14        THE COURT: What is uniform?

15        MR. BENNETT: Well, let's start with the "in the

16 files" argument, all right?

17        THE COURT: Yes.

18        MR. BENNETT: When data enters a file, it's recorded

19 in a court computer. That is the Supreme Court database. We

20 have access to that. We can buy that.

21        THE COURT: Are you talking about in the Supreme

22 Court files or in the court of the General District Court or

23 the Circuit Court or 250 courts throughout the state?

24        MR. BENNETT: Well, Judge, the executive secretary of

25 the Supreme Court of Virginia has a database that records

1    electronically when a satisfaction, judgment, or vacate is

2    entered in the file of a respective court.

3              THE COURT:  Well, "in the court file" means the Court

4    that entered the judgment.

5              MR. BENNETT:  Yes, sir.  In the court --

6              THE COURT:  You suggested, I thought, something about

7    going and using the Supreme Court's files.

8              MR. BENNETT:  No, but the executive secretary of the

9    Supreme Court judicial database records electronically what is

10   in the court file the day that it enters the court file

11   for each of these courts.

12             THE COURT:  So you can find out by a computer run

13   what action is taken in a court file respecting a judgment.

14             MR. BENNETT:  Yes, sir.  And even before we obtained

15   the --

16             THE COURT:  And the date; right?

17             MR. BENNETT:  Yes, sir.

18             THE COURT:  So you can see a judgment was satisfied

19   on X, marked satisfied on X date.

20             MR. BENNETT:  Or dismissed or vacated or set aside or

21   judgment entered, how much judgment is entered, the names of

22   these -- even before we received that data, Mr. Pittman had met

23   with the City of Petersburg General District Court clerk, and

24   we have in our possession the complete list for ten years, I

25   believe, that we had to buy.  I think it was about $50.  The

1    Petersburg General District Court went on the computer, coded

2    it in, and Mr. Pittman had to pick up.  The printing was up

3    here at the executive secretary's office.

4         So before we were able to know that we could obtain

5    the Supreme Court's list, we were trying do it even court by

6    court.  The worst case scenario is we would have had the

7    electronic printout, one per court, 250.  That is still much

8    better than the defendant suggested and is still, of course,

9    unnecessary because the executive secretary of the Supreme

10   Court of Virginia has the database.  Mr. Mittendorf's

11   explanation, his deposition excerpt is page 11 of our reply,

12   docket 79, and he says --

13        THE COURT:  Is this one of the areas as in the

14   *Mullins* case where there have been numerous decisions that what

15   the defendant is doing is wrong and it hasn't done anything

16   about it or not?

17        MR. BENNETT:  As to the satisfactions of judgments,

18   it has not been litigated.

19        THE COURT:  So there aren't any court decisions

20   saying that what they are doing is wrong.

21        MR. BENNETT:  That's correct, that says this method,

22   this particular procedure is wrong.  That's correct, Judge.

23        THE COURT:  Are there any cases that you know of in

24   which judgments such as were made -- what was it -- by the

25   Third Circuit, I believe, that recounted all of the things that

1  TransUnion had been told and how many different courts had told

2  them they were doing wrong and acting not in accord with the

3  law?  Has there been conduct on the part of Equifax that has

4  been simply denoted as wrong by a number of courts?

5          MR. BENNETT:  Judge, we believe --

6          THE COURT:  Not in this area, but in any area.

7          MR. BENNETT:  Yes, sir, there is.

8          THE COURT:  What is that case?

9          MR. BENNETT:  Well, most recently, in the *Drew v.*

10 *Equifax* case in California, it was a large jury verdict against

11 Equifax for the same types of violations as were heard in

12 *Mullins*.  The post-trial briefing on that issue recounted a

13 number of the Equifax decisions.  There was -- in this

14 circuit --

15         THE COURT:  That involved the same conduct that was

16 involved in *Drew*?

17         MR. BENNETT:  Yes, sir.  In fact, the Fourth Circuit

18 has two back-to-back decisions in *Robinson v. Equifax* and

19 *Sloane v. Equifax.*  Judge Brinkema and Judge Lee tried jury

20 verdicts against Equifax, and the Fourth Circuit sustained them

21 on similar grounds.

22         THE COURT:  Were they the same claim?

23         MR. BENNETT:  Same claim, yes, sir.

24         THE COURT:  To the extent this has any pertinence, it

25 has to do with the utility vel non of class actions in

1    resolving questions.

2            MR. BENNETT:  It does, Judge.  My speaking on this

3    subject outside of the courtroom, the only way this problem

4    gets solved, the only way you get me into another area of law

5    is class actions, because without injunctive relief, the class

6    action remedy is the only way to solve it.

7            They can pay the five or six of us nationally that do

8    this, and there are significant barriers of entry when you have

9    to face the same -- everybody who litigates Fair Credit

10   Reporting Act cases against Equifax faces the defense team that

11   does nothing but that -- same with TransUnion -- at trials with

12   Experian, and the learning curve and barriers of entry for

13   other lawyers to get involved in this area of practice are

14   steep.

15           The only solution and the only way you're going to

16   correct the files of these individuals without us doing

17   wholesale solicitation and flooding the courts with individual

18   cases is this class remedy, and the idea that Equifax was --

19           THE COURT:  You mean if I don't rule for you, I get

20   to see you on television every night?

21           MR. BENNETT:  Well, Judge, we know, because of the

22   Virginia Supreme Court database, the names of everybody that

23   has a satisfaction vacated judgment.  The question is whether

24   Mr. Erausquin can pick up the tab and do mailings to 600,000

25   people.

1         THE COURT:  What about going to look at 300,000

2   files, as Mr. Goheen says?  Why should anybody have to do that,

3   and why isn't that an issue that says no class action?

4         MR. BENNETT:  Because you don't have to do that

5   because it's all electronic.  The only --

6         THE COURT:  That presupposes the electronic is right,

7   and he says the electronic entry comes with a major disclaimer

8   that they can't rely on.

9         MR. BENNETT:  Let me ask you, Judge, and this is

10  maybe a softball question Mr. Goheen tossed to me.  The Court

11  could proffer or ask Mr. Goheen, where does Equifax get any of

12  its data before it stopped providing it?  That is, before

13  Equifax stopped reporting any satisfactions, vacates, or

14  appeals, it received the data from the database it is now

15  attempting to impeach, and that is -- the argument that Equifax

16  misses that we make in our brief is that there's no requirement

17  that you report Virginia judgments in a credit report.

18        It's a private business.  If Equifax thinks the data

19  is so unreliable that it can't get a handle on it, it cannot

20  pick it up, then stop reporting it.  If it's too expensive to

21  pick up satisfactions, vacates, or appeals, don't report the

22  judgments.  They are one in the same.  A judgment, a vacate

23  within that file is one public record.  If Equifax is going to

24  argue in its briefing and publicly to this Court that the

25  system is so confusing for it and would be for us that it

1    cannot -- that the Court could not rely on electronic data or
2    examine the accuracy of court records, then it should not
3    report that.
4          The other arguments Equifax suggests, the
5    assumes-immediate-pickup argument, Equifax is arguing -- and
6    the violation alleged is related to the manner in which a
7    credit reports, reasonable procedures to ensure maximum
8    possible accuracy.
9          Equifax contracts with its vendor, only requires that
10   vendor to pick up satisfactions, vacates, and appeals as
11   opposed to judgments which is different.  Only requires to pick
12   up these dispositions if it's commercially reasonable to do so.
13   As a result, if you're in the Eastern Shore, if you're in
14   Bedford, Virginia, or Grundy, Virginia, your judgment
15   satisfaction may not be picked up for a year, and Equifax's
16   argument, and the reason Mr. Goheen is --
17         THE COURT:  That's what he's saying.
18         MR. BENNETT:  That's what he said --
19         THE COURT:  You're not agreeing with that, are you?
20         MR. BENNETT:  No, sir.  Absolutely not.  The credit
21   reporting standard is the same whether you happen to have an
22   address in Bedford or one in Alexandria, Virginia.  It is the
23   same procedure for credit reporting, and if Equifax cannot pick
24   up cost-effectively satisfactions, vacates, and appeals in
25   Grundy, Virginia, then it shouldn't report Grundy, Virginia

1     judgments. If it cannot assure maximum possible accuracy for

2     those judgments, then it shouldn't report them.

3         THE COURT: Wait a minute. How are they supposed to

4     report a satisfied judgment if the person who holds the lien,

5     for example, doesn't mark the judgment satisfied? Why should

6     they be held responsible for that?

7         MR. BENNETT: They're not.

8         THE COURT: There's no way they could know that.

9         MR. BENNETT: There's no way they are responsible.

10    That was not pled as part of our claim. That was the purpose

11    for the addition of "in the file" to address this red herring,

12    and, in fact, Judge, I don't believe that it would be a -- it's

13    not satisfied within the Virginia code until it's actually

14    recorded.

15        THE COURT: Do you think that the class ought to

16    be -- it ought to say excluding people with actual damages more

17    than a thousand dollars?

18        MR. BENNETT: Judge, I don't believe that that is

19    necessary. I believe, Judge, that the jurisprudence in this

20    circuit does not require that, that is that the Fourth Circuit

21    accepts that an opt-out remedy is adequate, and if any outlier

22    has actual damages greater than that, I believe in the Fourth

23    Circuit, the opt-out remedy is appropriate.

24        THE COURT: Anything else?

25        MR. BENNETT: No, sir.

```
1          THE COURT:  Thank you very much.  There will be an
2    opinion issued shortly.  What I suggest is that you get about
3    planning class discovery so that if the opinion is that the
4    class is certified, we can get moving with that right away.  So
5    I'd suggest you start planning it, talking about it.  Thank you
6    all.
7          MR. BENNETT:  Thank you, Judge.
8
9                    (End of proceedings.)
10
11
12          I certify that the foregoing is a correct transcript
13    from the record of proceedings in the above-entitled matter.
14
15
16    _____/s/_____          _____
      P. E. Peterson, RPR           Date
17
18
19
20
21
22
23
24
25
```