```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    RICHMOND DIVISION

 3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                       :
 4   DONNA K. SOUTTER,                 :
          on behalf of herself and     :
 5        those similarly situated,     :
                                       :
 6                    Plaintiffs,      :
      v                                : Civil Action
 7                                     : No. 3:10CV107
     EQUIFAX INFORMATION SERVICES,     :
 8                                     : May 4, 2011
                      Defendant.       :
 9   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

10

11

12        COMPLETE TRANSCRIPT OF CONFERENCE CALL
           BEFORE THE HONORABLE ROBERT E. PAYNE
13            UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES: (All via telephone)

16   Leonard A. Bennett, Esq.
     Matthew J. Erausquin, Esq.
17   Consumer Litigation Associates, PC
     3615-H Chain Bridge Road
18   Fairfax, VA   22030

19   Dale W. Pittman, Esq.
     The Law Office of Dale W. Pittman, P.C.
20   112-A W. Tabb Street
     Petersburg, VA   23803-3212
21
                  Counsel for the Plaintiffs
22

23              DIANE J. DAFFRON, RPR
                OFFICIAL COURT REPORTER
24            UNITED STATES DISTRICT COURT

25
```

1   APPEARANCES:   (Cont'd.)

2   Barry Goheen, Esq.
    John A. Love, Esq.
3   King & Spalding
    1180 Peachtreet Street, NE
4   Atlanta, GA    30309-3521

5   John W. Montgomery, Jr., Esq.
    Montgomery & Simpson
6   2116 Dabney Road, Suite A-1
    Richmond, VA    23230

7
            Counsel for the defendant
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The conference call in this matter

2    commenced at 1:34 p.m.)

3

4          THE COURT:  Hello.  This is Soutter against

5    Equifax, No. 3:10CV107.  Who's here for whom starting

6    with counsel for the plaintiff?

7          MR. BENNETT:  Your Honor, this is Leonard

8    Bennett for the plaintiff.  Also on the line are my

9    cocounsel, Dale Pittman and Matthew Erausquin.

10         MR. GOHEEN:  Your Honor, Barry Goheen and

11   Tony Love for Equifax.  Also John Montgomery on the

12   phone for Equifax.

13         THE COURT:  All right.  This is a status

14   conference to consider how we're going to proceed

15   henceforth in this matter, the case having been

16   certified.

17         I have received suggestions from each side.

18   The plaintiff's suggestions, proposed schedule and

19   procedures for class notification, for completing

20   discovery, and to set a trial date is Docket No. 94.

21   And the defendant's objections and its own

22   suggestions, alternatively, is Docket No. 95, and I

23   have read that as well.

24         And then the plaintiff has set forth another

25   one, docket No. 100.  What's this all about,

1   Mr. Bennett?  I've got one from Mr. Goheen.  It's

2   Docket No. 95, and it's April the 11th.  And I've got

3   one from Mr. Goheen, Docket No. 98, and it's dated May

4   the 3rd, which is yesterday.  Then one from you dated

5   May the 3rd.

6            Are these, No. 98 and No. 100, the final

7   proposed versions of these things?  Is that what we

8   have here?

9            MR. BENNETT:  That's correct, Judge.  And in

10  the interim, the Court will recall, the original order

11  had set a deadline of April 11 to file the parties'

12  position.

13           During that interim, we were already

14  certainly engaged with defense counsel, not

15  adversarially, that is we were attempting to meet and

16  confer properly between the two parties but had not

17  succeeded or determined whether that would be

18  possible, whether an agreed outcome would be possible,

19  and subsequent to that we continued that process with

20  the defendant having informed us off docket of their

21  respective positions, our side having done the same.

22           After really the last person to person or

23  telephonic meet-and-confer call there were significant

24  differences that are fleshed out in respective

25  filings.  The defendant filed -- really the last two

1 filings crossed paths, so they are not directly

2 responsive to one another.  But Equifax filed its

3 opposition to our proposal.  We in our more recent

4 filing adapted it to accommodate a couple of the

5 matters that they had raised and to attach the notice

6 that we had sent them at the end of last week.

7 　　　　The defendant has also communicated this

8 morning some additional concerns to us that had not

9 been incorporated within either parties respective

10 positions to the Court.

11 　　　　MR. GOHEEN:  Your Honor, this is Barry

12 Goheen.  Just to follow-up.  I think Mr. Bennett has

13 set it forth accurately.  If I would just kind of

14 flesh out just a tad.  I think the filings Your Honor

15 mentioned a few moments ago that were dated in April

16 were, for lack of a better term, I guess one might

17 call them conditional.  The status conference was

18 continued until today.  I think it was April 13, and I

19 think that was because of maybe conflicts we had, and

20 we certainly appreciate the Court's indulgence in

21 that, but I think we were, both sides, both

22 plaintiffs' counsel, Mr. Bennett and his team, and our

23 team for Equifax, had filed what we filed, as

24 Mr. Bennett said, in seeking to comply with the

25 Court's original order in advance of that April 13

1   date.   Once the continuance of this conference was

2   made official and sent through, we then, and

3   Mr. Bennett did point out and he's right, we met and

4   conferred, and not surprisingly there were some things

5   we agreed on and some things we had differences on,

6   but I would suggest yesterday's filings, which he's

7   right, pretty much crossed paths or pretty much came

8   one after another on the filings, do reflect the

9   latest and probably, I would say at least from

10  Equifax's point of view, the operative proposed plan

11  from our side anyway, Your Honor.

12              THE COURT:  All right.

13              Well, I've read all four of them.  I just

14  wanted to make sure.  It looked to me like you-all

15  weren't really very far apart from what you filed in

16  April in how to proceed and on what timetable to

17  proceed.

18              MR. GOHEEN:  I do think, Your Honor -- this

19  is Barry Goheen again for Equifax.  I do think there

20  are some agreements.  I think we've had some

21  productive communications.

22              I believe that the parties are in agreement

23  on the length of the discovery, if you will, the

24  discovery period, as well as the post dispositive

25  motions schedule following that, and I think that's

1  where we do have some common ground.

2         And I think that we're on other issues.  And

3  notice, for example, there are some things that we,

4  again, agree with on the proposed notice.  There are

5  others that we communicated to Mr. Bennett some kind

6  of larger areas of agreement without getting into

7  flyspecking the line item thing, but I do believe we

8  have found some common ground.

9         THE COURT:  I don't have a notice here.  Have

10  you all actually given a notice in here that I don't

11  have?

12         MR. BENNETT:  The plaintiff has proposed one

13  that's attached to Docket No. 100, Your Honor.

14         THE COURT:  But that's not the one -- you

15  don't agree on it?

16         MR. BENNETT:  No, sir.

17         MR. GOHEEN:  Right.  This is Barry Goheen.

18  Your Honor.  This is something Mr. Bennett proposed in

19  his filing of yesterday was that he did send that as

20  pointed out on last Friday afternoon, which is

21  April 29, and proposed for Equifax to respond in one

22  week, and then assuming the parties cannot work out

23  their differences to meet and confer, and then submit

24  their proposals to the Court.  I believe it says May 9

25  here.

1        We believe it can be a little bit longer than

2    that to respond.  But in any event, that's the reason

3    there's been one submitted and only one proposal

4    submitted to the Court.

5        MR. BENNETT:  Your Honor, this is

6    Mr. Bennett.  If the Court would accommodate this, I

7    believe I could -- there are really three disputes

8    that appear to be causing the greatest difficulty

9    between the parties, and a number of the matters, the

10    process matters, the scheduling, the length of time

11    for preparation and those types of matters, we have

12    worked or will be able to work out, but the three

13    matters that seem to be causing the great difficulty,

14    I think, are as follows:

15        The first is that there is a different

16    opinion between the parties that's actually reflected

17    in the appellate briefing about what your order and

18    memo and class definition mean.

19        THE COURT:  I haven't read your appellate --

20    I've got a copy of it, but I haven't read it.

21        MR. BENNETT:  Yes, Your Honor.  If I could

22    summarize.  One of the arguments, if the Court recalls

23    the class certification argument in the briefing

24    before the district court, there's a question of how

25    you accommodate the individuals that want to or

 1   believe that they could prove causation significant

 2   actual damages.

 3          And we advocated, and I believed, as our --

 4   we had an alternate position, which we abandoned, and

 5   at the hearing advocated that if you have actual

 6   damages, your remedy is to opt out of the class.  And

 7   that is reflected.  The Court so ruled.  And that is

 8   reflected in the Court's memorandum.

 9          The order doesn't contain the explanation

10   that this court included within the memorandum.  And,

11   thus, the defendant has taken the position that what

12   your order means is that class members will have to

13   make an individualized election as to whether or not

14   they have actual damages over a thousand dollars and

15   that that election based on the way your order is

16   drafted could occur at any time including after

17   judgment, after trial.

18          We have taken the position that what your

19   order, the way that this court interpreted that order,

20   as outlined in the memorandum, is that by not opting

21   out they have -- the class member has elected not to

22   pursue those damages greater than $1,000.

23          And, again, you haven't read the appellate

24   briefing, but that's one of the four arguments that

25   are at issue is this different opinion as to what this

1  court -- what the Court's order meant.  Our side

2  arguing that it means that if you do not opt out, you

3  have elected not to pursue actual damages greater than

4  $1,000, and the defendant arguing that there is this

5  separate stage that this court contemplated where at

6  some point later, and it argued at some undeterminable

7  time, it could be even at the end of the case, the

8  class member could elect to -- could assert that it

9  has damages greater than $1,000.  And this becomes

10  difficult because in the meet-and-confer process, the

11  class notice, the defendant has taken the position

12  that our class notice needs to incorporate a separate

13  non-opt out related process for the, as it calls, self

14  election for actual damages.

15          And we very much disagreed that that's what

16  this Court's order says, but, of course, I'm the

17  plaintiff, and they're the defendant, and Your Honor

18  is the Court.

19          The second issue, if the Court please, is --

20          THE COURT:  Well, the order doesn't say

21  anything about opting out one way or the other.

22          MR. BENNETT:  No, sir.

23          THE COURT:  That's because you-all need to

24  put all that in the notice.

25          MR. BENNETT:  Yes, sir, but the question is,

1    do we also, in addition to the opting out, does the

2    Court contemplate that there would be really a

3    separate independent procedure, separate and apart

4    from the opt out, where class members would prove

5    their actual damages for class membership.

6           We believe this is a tactical misread of the

7    Court's order.  The defendant's position has remained

8    that the class can't be identifiable on appeal, so

9    they are taking the position now similarly that this

10   Court's order contemplated a procedure separate and

11   apart from the opt out procedure whereby a

12   determination would be made as to class membership

13   based on actual damages.  And our belief is, our

14   interpretation of the order, is that, and informed by

15   the memorandum, is that when a class member stays in

16   the class, it does not opt out.  They have made that

17   election.  They stay in the class.  They cannot get

18   actual damages greater than $1,000.  And if they opt

19   out, they can do whatever they choose.

20           THE COURT:  Mr. Goheen.

21           MR. GOHEEN:  Your Honor, obviously, I don't

22   think the Court would want to hear me argue on class

23   cert, but to respond to that briefly, I don't think

24   there's quite as big a disagreement on that as I was

25   hearing from Mr. Bennett.

1          The issue, and it sounds like he's limiting

2     that to just the draft notice, and we did raise that

3     issue in our comments on his notice, and we

4     communicated with him already, but the Court's order,

5     I'm looking at it right now, and this is the order,

6     not the memorandum, and I'm not going to get into the

7     whole class definition because it is a little lengthy,

8     but it does say which persons suffered actual damages

9     of less than $1,000 as a result of a report by Equifax

10    that did not accurately report that the judgment had

11    been satisfied, appealed or vacated.

12         The issue is in the notice that needs to be

13    in the notice.  I don't see that there is any -- that

14    there is any reference to that in the notice.  It

15    seems to me that a fundamental part of a class notice

16    is to provide the class definition, whatever it is,

17    and that is not in the notice.

18         So whether we get into positions on they need

19    to prove them or it's a fluid thing that we had in our

20    brief, and so forth and so on, regardless of

21    whatever is in the 23(f) petition, they get a point

22    for notice, which is what we're talking about right

23    now is that that needs to be disclosed to class

24    members.

25         If a class member believes the person has

1  actual damages, to quote the order, actual damages of

2  less than $1,000 as a result of a report by Equifax

3  that did not accurately report that the judgment had

4  been disposed of, then that person is in the class.

5         If a consumer has belief he or she has actual

6  damages of more than $1,000, my reading anyway, that

7  person is not in the class.  And I just think the

8  notice would want to reflect that.

9         THE COURT:  Mr. Bennett, what are you talking

10  about doing in this case for people who suffered

11  actual damages of less than $1,000?  What happens if a

12  person says that?

13         MR. BENNETT:  I'm sorry.  Are you asking the

14  plaintiff?

15         THE COURT:  Yes, you, Mr. Bennett.

16         MR. BENNETT:  Judge, if they opt out, then

17  they cannot pursue --

18         THE COURT:  That's not the question.  The

19  question is what about people who don't opt out and

20  say they have damages between 0 and $1,000 actual

21  damages?

22         MR. BENNETT:  Judge, we don't contemplate and

23  did not read your memo and your order to seek an

24  election of individuals to make a statement to us or

25  to the Court that they -- as to what their actual

1    damages are.  We're seeking statutory damage remedy.

2         THE COURT:  I didn't ask you that.  What I

3    asked you is what do you propose to do about these

4    actual damages of less than $1,000?

5         MR. BENNETT:  We don't propose to do

6    anything, Judge.  We propose to seek statutory

7    damages.

8         THE COURT:  The purpose of your suggestion

9    about suffering actual damages of less than $1,000 as

10   a limit was what?

11        MR. BENNETT:  Because statutory damages at

12   that point, Judge, are offered within the statue as a

13   proxy or as an alternative to those actual damages.

14   If the defendant concedes, that is the purpose of the

15   statutory damage remedy is that it is an alternative

16   remedy when actual damages are below $1,000.

17        THE COURT:  So why do we need that language

18   in the class definition at all?

19        MR. BENNETT:  I don't believe we need it in

20   the class definition, Judge, but to the extent that it

21   was included within the class definition, we believe

22   that Your Honor informed the parties in the memorandum

23   that the election to stay in the class meant that they

24   were not going to be able to pursue their actual

25   damages.

1      THE COURT:  Are you of the view that that

2   language ought to not be in the class certification

3   language?

4      MR. BENNETT:  Well --

5      THE COURT:  Which person suffered actual

6   damages of less than $1,000?

7      MR. BENNETT:  I believe, Judge, it's

8   unnecessary.  I don't believe it's incorrect.

9      THE COURT:  I thought we got it from you.  I

10  thought that language came from you in your briefs.

11     MR. BENNETT:  Judge, it --

12     THE COURT:  Yeah, it did, didn't it?

13     MR. BENNETT:  Well, we offered a second

14  alternative, Judge.

15     THE COURT:  Why do you keep doing that?  Why

16  don't you just do the right thing and quit creating

17  problems of alternatives.  Why don't we just take that

18  language out of there?  What does that do in the case?

19     MR. BENNETT:  It doesn't do anything in the

20  case, Judge.

21     THE COURT:  Mr. Goheen?

22     MR. GOHEEN:  I think that came from their

23  briefs.  We certainly have argued that, and I don't

24  believe it does anything.  That's Your Honor's

25  question, so I think it does seem to be an

1   appendage -- an unnecessary appendage, excuse me.

2           THE COURT:  Why don't I do an order amending

3   the class definition to take out "which" and see how

4   it would read then?  It would just be a period after

5   unpaid; is that right?

6           MR. BENNETT:  Yes, Your Honor.

7           THE COURT:  Is that what you're saying,

8   Mr. Goheen?

9           MR. GOHEEN:  I'm reading it as well, Your

10  Honor.

11          THE COURT:  All right.  Well, take a minute

12  and read it.

13          MR. GOHEEN:  As I understand it, Your Honor,

14  maybe Mr. Bennett is better to respond to this, we

15  take that out, so the definition is going to include,

16  and, again, I'm not going to read it all, but it will

17  close with "At a time when any Virginia General

18  District Court or Circuit Court judgment" --

19          THE COURT:  Slow down, Mr. Goheen.  Start all

20  over.  You're going too fast.

21          MR. GOHEEN:  I'm sorry.  I apologize.  I was.

22  It was a problem I had in the hearing, as I recall.

23  I'll just read the whole thing up to the period.  This

24  is off the order.  "All natural persons for whom

25  Equifax's records note that a credit report was

1   furnished to a third party who requested the credit

2   report in connection with an application for credit on

3   or after February 17, 2008, to February 17, 2010,

4   other than for an employment purpose at a time when

5   any Virginia General District Court or Circuit Court

6   judgment that had been satisfied, appealed or vacated

7   in the court file more than 30 days earlier was

8   reported in Equifax's file as remaining unpaid,"

9   period.

10          THE COURT:  Is that what you think needs to

11  be done, Mr. Bennett?

12          MR. BENNETT:  Yes, Your Honor, and --

13          THE COURT:  Now, wait.  Don't talk.  Every

14  time you say something, it gets more convoluted.

15          Mr. Goheen, is that what you think needs to

16  be done?

17          MR. GOHEEN:  I believe that it does cure one

18  of the issues that is we had, yes.  I think that was

19  one of the things we argued was the point Mr. Bennett

20  was raising, which was how do we know someone has less

21  than or more than $1,000.  That's a

22  self-identification point, I guess, for lack of a

23  better term.

24          THE COURT:  I'm kind of inclined to believe

25  that I was trying to solve the problem that you raised

1    by taking the solution that Mr. Bennett suggested and

2    it may have created more problems than it solved

3    actually, I guess, but the notice would clearly have

4    to say also that you're not pursuing actual damages,

5    isn't that right, Mr. Bennett?

6         MR. BENNETT:  Yes, sir, it would have to say

7    that.

8         THE COURT:  Yes.

9         MR. GOHEEN:  I think that was to go back to

10   where this part of the discussion started, Your Honor.

11   I think that was our point, that the draft didn't.

12   Maybe it did.

13        THE COURT:  It doesn't make any difference.

14   That was the point you were saying it needed to deal

15   with.  All right.

16        All right.  I think that after talking with

17   you-all the right thing to do is to amend the class

18   certification notice to put a period after the word

19   "unpaid" in that paragraph and delete the language

20   "which person suffered actual damages of less than

21   $1,000 as a result of a report by Equifax that did not

22   accurately report that the judgment had been

23   satisfied, appealed or vacated," period.  And that

24   would come out.

25        Since I haven't read the appeal papers, I

1    have no idea what that does to your appeal, but I'm

2    sure you can straighten that out in your subsequent

3    briefing with the Court of Appeals.

4              MR. BENNETT:  Yes, sir.

5              THE COURT:  And then if they don't like what

6    was done, they will at least know that maybe there

7    isn't this issue involved or whatever it is that

8    you-all conclude that comes from that.  But for our

9    purposes, I think that's the solution, and that's what

10   I will do.  And I'll just simply report having

11   conferred with counsel and concluding on the basis of

12   their views that it's proper so to do, that order is

13   amended to read, and just retype the whole order with

14   that out of there.  Okay?  Or the class notice, class

15   definition would read that way.

16             I do think it needs to be in the notice that

17   people are not going to be getting any actual damages

18   if they think they had actual damages.

19             All right?  Now, let's move on.

20             MR. BENNETT:  Yes, sir.  The second issue

21   regards the timing of both the start of discovery and

22   of the class notice or a list generation process.

23   Both discovery and the class list generation process

24   will take some time, and the plaintiffs' view is that

25   the parties need to start that right away.

1          The defendant holds the view that it would

2    like either an actual or de facto stay of anything in

3    this case until after a disposition of the Rule 23(f)

4    appeal that it has lodged in the Fourth Circuit.

5          THE COURT:  When is your brief due on that?

6          MR. BENNETT:  It's already briefed, Judge,

7    and, historically, the last two times Equifax filed a

8    23(f), they were denied within about a two- to

9    three-month window of time.  Similarly in our *Williams*

10   case.

11         THE COURT:  Well, the problem I have is that

12   the timing that you're dealing with now has the Court

13   basically gone after this month.  They don't sit

14   anymore after this month until September.

15         MR. GOHEEN:  Your Honor, this is Mr. Goheen

16   for Equifax, if I may.  This is the exact timing on

17   that.  The petition was filed on behalf of Equifax on

18   April 13, 2011.  Plaintiff, through its counsel here

19   on the call, responded or filed the response to the

20   petition on April 27.  So I think that was last week.

21   So it is now pending as Mr. Bennett just said.

22         THE COURT:  Have you filed a reply?

23         MR. GOHEEN:  There is not a provision for a

24   reply, and no, we're not --

25         THE COURT:  There is a provision for a reply

1  if they ask you for it, isn't it?

2       MR. GOHEEN:  I believe that would be the only

3  basis, Your Honor, and that has not been requested by

4  the Court at least as of the present time.

5       THE COURT:  Okay.

6       MR. GOHEEN:  So if it turns out that the

7  Court is not in session through or, I'm sorry, after

8  May, that was news to me, obviously I'd defer to the

9  Court's experience, of course, on that, and I was

10 unaware of that, but that is the issue, and to

11 follow-up on --

12      THE COURT:  Mr. Goheen, their last argument

13 session is May 10 through 13, and then it resumes

14 again September 20 through 23.

15      MR. GOHEEN:  Okay.  Thank you, Your Honor.

16      THE COURT:  Let me see.  I'm going to the

17 docket to see if there's anything on the docket about

18 this issue.  There wasn't when I looked at it before,

19 but I looked at it -- I think I would have noticed it,

20 but I wasn't looking for this.

21      MR. GOHEEN:  What I've been advised is that

22 it seems consistent, I think, with what Mr. Bennett

23 maybe just said is that the Fourth Circuit's history

24 is that it tends to be rather prompt, but usually

25 within the 30 to 60-day time frame that it will

1   dispose of 23(f) petitions for the very reason we're

2   having this discussion right now.  If the case

3   continues to end in the District Court and whether

4   proceedings are stayed or partial or no stay, the

5   bottom line is it's difficult to manage two courts.

6   So I think that's part of what we've tried to set

7   forth in our papers that we submitted yesterday.

8           The other issue is, and this probably is

9   something Mr. Bennett was getting to perhaps on his

10  third issue, is that this is going to be in addition

11  to a rather time consuming process, particularly with

12  regards to class list, which he just mentioned.  It's

13  also going to be rather intensive.

14          THE COURT:  Mr. Goheen, we are losing a lot

15  of your communication.  You're sort of breaking off at

16  the end of some words, and I don't know what it is,

17  but it's hard for me to hear, and I'm sure it's hard

18  for the court reporter.  Are you on a squawk box?

19          MR. GOHEEN:  I apologize.  I took the

20  handset.  Does that sound better?

21          THE COURT:  Yes, it does.

22          MR. GOHEEN:  Okay.  Thank you, Your Honor.

23  I'm on the handset because Mr. Love and I are in a

24  conference room.  That's why we were on the speaker

25  phone, but I'll pick up that handset.

 1          THE COURT:  Well, you are still crackling

 2    some.

 3          MR. GOHEEN:  I'm going to do the best that I

 4    can, Your Honor.

 5          THE COURT:  Okay.

 6          MR. GOHEEN:  I'll try to speak a little more

 7    loudly.

 8          (Unintelligible) for preparing or generating,

 9    compiling, if you will, the class list is going to be

10    a rather lengthy process, as Mr. Bennett just

11    suggested, in terms of time, but it's also going to be

12    fairly expensive, and we're not talking about millions

13    of dollars, but we are talking about pretty

14    substantial costs, and I think there's going to be

15    disagreement on who bears those costs.  But that issue

16    aside for the moment, it is rather expensive, and we

17    believe that that would also -- at least counsel --

18    and I'm waiting to us see what the Fourth Circuit is

19    going to do or at least giving the Fourth Circuit a

20    little time, say, until maybe the end of May, if

21    that's when the Court is going to break for an

22    extended period to see what the Fourth Circuit does.

23          Obviously (unintelligible.)

24          THE COURT:  We're losing you.  I don't know

25    what it is.  For instance, when you say "process," we

1  lose everything.  When you say "deny," as I think

2  that's what you were saying, we lost everything but

3  the D sound.  I don't know what's happening.

4         MR. GOHEEN:  I'm having difficulty hearing

5  the Court as well.

6         THE COURT:  You are?  How did this call get

7  going?

8         MR. BENNETT:  Your Honor, this is a private

9  conference call bridge, and the parties have called

10  into it, and we have three-wayed Your Honor in.

11         THE COURT:  Why don't you get them back on

12  the line and start again?  If he's having trouble

13  hearing me and I'm having trouble hearing him, we've

14  got a problem.

15         MR. BENNETT:  Yes, Your Honor.  We can either

16  call you back or I'd suggest maybe Mr. Goheen calls

17  in.  You know, hangs up and calls into the --

18         THE COURT:  Would you try that, Mr. Goheen,

19  because I think you need to hear what I'm saying as

20  well as I need to hear what you're saying?

21         MR. GOHEEN:  Okay.  What are you suggesting?

22         THE COURT:  I think Mr. Bennett says you hang

23  up and dial back in.

24         MR. BENNETT:  Yes, that's what I'm

25  suggesting.

1    MR. GOHEEN:  All right.  We'll try that and

2  come right back.

3    THE COURT:  All right.  Let's see what

4  happens.

5    MR. MONTGOMERY:  Mr. Goheen, if you could do

6  it from another line, perhaps it might be helpful.  It

7  seems like it might be your phone that you're using.

8    MR. GOHEEN:  Okay.  That's a good idea, John.

9  We'll try that.

10    THE COURT:  Hello.

11    MR. GOHEEN:  Hello.

12    THE COURT:  Is this Mr. Goheen?

13    MR. GOHEEN:  Yes, Your Honor.  Better?

14    THE COURT:  No, not really.  Talk a little

15  bit and let's see.  Recite the Declaration of

16  Independence or something.

17    MR. GOHEEN:  I was going to say, Your Honor,

18  that I went to the Final Four, and I was pretty

19  freaking disappointed in Kentucky.

20    THE COURT:  Well, I was, too.  We're still

21  having some of the same problem, I think.

22    MR. GOHEEN:  Well --

23    THE COURT:  Are you having the same problem

24  with me?

25    MR. GOHEEN:  Yes, Your Honor, and when Mr.

 1   Bennett was talking right before I disconnected a few

 2   minutes ago, he was going in and out as well.

 3          THE COURT:  I don't know who it is, but I've

 4   had calls on this telephone today and I haven't had

 5   the problem.  So, Mr. Bennett, get hold of your

 6   facility.  We'll all hang up and you get us back in.

 7          MR. BENNETT:  Yes, sir.

 8          THE COURT:  Thank you.

 9          MR. BENNETT:  Thank you.

10          (Brief recess taken.)

11          THE COURT:  Hello.

12          MR. GOHEEN:  Judge, this is Barry Goheen.

13   Does that sound any better?

14          THE COURT:  That's a whole lot better for me.

15   How about for you?

16          MR. GOHEEN:  Better on our end, and I

17   understand from Mr. Bennett and the other participants

18   telephonically it's better for them as well.

19          THE COURT:  All right.  Good.

20          MR. GOHEEN:  I apologize for that, Your

21   Honor.  I want to, obviously, go back through what the

22   Court was having difficulty hearing.

23          THE COURT:  I think we've got most of it.

24   The bottom line is that we don't know when the Fourth

25   Circuit is going to act, but they generally try on

1   these to act fairly quickly on these matters when they

2   are briefed.  They send them to a panel.  And it may

3   be that next week when they're here they'll kind of

4   confer over it and decide it next week.

5           MR. GOHEEN:  Based on -- this is Barry Goheen

6   again.  Based on what Your Honor said with regard to

7   the schedule, I would be extremely surprised if the

8   Court in going into some sort of a break after this

9   month or after some point this month that the petition

10  would not be ruled upon one way or another by the time

11  the Court broke for the reasons that we've just been

12  discussing.

13          THE COURT:  They also, though, Mr. Goheen,

14  it's not unusual that these panels will adjourn

15  without making decisions, not just these, but on any

16  interim matter, and they'll continue to focus on them

17  whether the court has sessions or not.  They don't

18  just take off and stop work, although some of them,

19  the judges take off, but I think this court is pretty

20  careful about trying to manage its docket and handle

21  things as expeditiously as they can.

22          So I don't think that's a problem.  We're not

23  looking at a forever time frame.  That's for sure.

24          MR. GOHEEN:  Correct, Your Honor.

25          THE COURT:  But on the other hand, I'm

1  concerned about delay, and I don't know why we can't

2  get started with the case, and then if the Court

3  grants the appeal, I think it's appropriate to stop

4  the case, but you need to get going with the class

5  list.

6        How are you going to get the class list?

7        MR. BENNETT:  Judge, this was the third

8  issue.  The proposal we have for the class list is the

9  plaintiff will hire a company called Rust, which was

10  actually the administrator that was used in the

11  *Williams v. LexisNexis* case.  There are a number of

12  others approved in the Eastern District of Virginia,

13  but it's seen as the gold standard of administration

14  companies.  It costs a little bit more, but they have

15  significant experience in actually putting together

16  from disparate databases class list information.  And

17  our proposal had been one -- and we offered what we

18  thought was a cooperative proposal, and Equifax

19  opposed it, so in our more recent filing we have

20  offered an alternative that isn't dependent on

21  Equifax's cooperation.

22        The first suggestion we have, and the purpose

23  would be to minimize burden on the defendant, would be

24  that Rust would be retained and paid by the plaintiff

25  but responsible to the Court, as the notice process

1    is, would meet with a responsible person or person

2    responsible at Equifax for its archive database and

3    put together a computer protocol that will minimize

4    the burden on Equifax while generating an accurate

5    class list.  The defendant opposes providing any

6    person to interact with Rust.

7            So our alternative, which is supported by the

8    rules, is that Equifax will provide a mirror

9    electronic copy of its archive, and Rust will then use

10   that data to generate the class list.

11           We want to go back to the Virginia Supreme

12   Court only one time just because we don't want to be

13   disruptive and overly burden that third party, that

14   non-party, but that Rust would then have the data from

15   the two databases and use on a system-wide basis the

16   extraction and matching system that we believe is very

17   successful on the sampling basis precertification.

18           To simplify, our position is either the

19   defendant cooperates and maintains complete ownership

20   and control over its data, it asserts certainly a

21   business interest in that control, and we work to

22   minimize its burden, or alternately if it continues to

23   oppose and, we think, obstruct, then we don't

24   necessarily have to have anything to do with the

25   defendant.  It just turns over those searchable

1   archives, and we have Rust do the extraction.

2         Equifax doesn't want to turn over its

3   database.  We understand why.  So we have tried to

4   come up with an alternative that gives its executives

5   piece of mind knowing that it has maintained full

6   control over that database.  But to the extent that

7   Equifax begins to, we believe, manufacture or

8   contrive, and our belief is based on actual discovery,

9   not just supposition, internal expenses or costs that

10  it is asserting for extracting or doing searches of

11  its archive, we believe that the proper way to

12  generate the list, the least expensive way, and the

13  way in which the generation --

14        THE COURT:  Will you do me a favor, Mr.

15  Bennett, and quite larding the statement up?  Just get

16  me to the bottom line of what the proposal is without

17  all the argument, without all the parentheticals.

18  Just get right to it so I can follow.  You all are so

19  far ahead of me in your knowledge base it's not

20  helpful to get all these deviations.  So give me

21  exactly what you're saying you want to do.

22        MR. BENNETT:  Yes, sir.

23        Either Equifax extracts the archived monthly

24  files because it maintains a report on every consumer

25  snapshotted on a monthly basis.

1          THE COURT:  That's a lot of parentheticals.

2     Cut it down and tell me exactly what you want done

3     leaving the parentheticals out.

4          MR. BENNETT:  I want Equifax, Judge, to

5     either (A) provide the monthly snapshots for all

6     consumers with Virginia judgments in them so that Rust

7     can then overlay them with the Supreme Court data or

8     (B) I want Equifax to provide to Rust under a

9     protective order a mirror copy of its full archive

10    database so that Rust will do the searches and

11    extraction and generate the list in the same way.

12         THE COURT:  All right.  Thank you.

13         All right.  Mr. Goheen.

14         MR. GOHEEN:  Your Honor, this is Mr. Goheen.

15    Mr. Love will respond to a lot of those details, but

16    let me quickly just touch on one thing.  Mr. Bennett

17    mentioned if someone within Equifax working with Rust

18    or whoever the class administrator is, he's correct

19    that in a prior communication we did resist that.  I

20    did resist that.  And we continue to do so to the

21    extent that it's someone who's devoted, I think we put

22    this in our papers, too, if someone's, essentially,

23    nine to five job would be working with Rust, but the

24    crux of the situation, as I mentioned a moment ago --

25         THE COURT:  Mr. Goheen, you are getting down

1    and you're getting Bennettitis.

2              MR. GOHEEN:  Oh, no.

3              THE COURT:  Yes, you are, and that's a bad

4    thing for you.

5              Do you want to do the first choice, the

6    snapshot of the Virginia judgments at X point in time,

7    whatever we're talking about, or give out all

8    archives?  Which do you want to do?

9              MR. GOHEEN:  I'm going to let Mr. Love handle

10   that, Your Honor.

11             THE COURT:  And I want the answer first.

12             MR. LOVE:  Equifax is unwilling, and I'll

13   explain why.

14             THE COURT:  I don't need any parentheticals.

15   You're getting Bennettitis, too.  I'll give you a

16   chance to do that.  I need to understand the issues

17   first, Mr. Love.  Which do you want to do of those

18   two?

19             MR. LOVE:  Equifax would not want to do

20   either of those, Your Honor.

21             THE COURT:  Tell me what you want to do

22   without a bunch of sidebar, and once I get the issues

23   organized, we can deal with the reasons.  What is it

24   you want to do?

25             MR. LOVE:  Equifax has offered to give

1   Plaintiff 24 months of frozen scan data in electronic

2   format.  Equifax has indicated that there is a

3   substantial cost associated with that, which is in the

4   hundreds of thousands of dollars.  We have conveyed

5   Equifax's offer to plaintiff.

6        We would have to agree with what the search

7   criteria were going to be for that 24 months of frozen

8   scan data.  Even if we get past the cost issue, we

9   would have to agree.  For example, Mr. Bennett said

10  that his wish list A was monthly snapshots of Virginia

11  consumers with a judgment on their file.

12       Well, when Equifax searches for this type of

13  information, it has to create a program like a

14  computer program that searches for certain criteria.

15  The more criteria you search for and the more nuanced

16  it becomes, the more expensive it becomes, and the

17  more time consuming it becomes, and the more complex

18  it becomes.

19       For example, would we be searching for

20  consumers who only have a current Virginia address on

21  file or would we be searching for consumers who ever

22  had a Virginia address on their file?  That is but one

23  example of what makes this type of search complex.

24       THE COURT:  It's the kind of search that

25  people do all the time all over the world in all kinds

1    of businesses.  The question is how do you do it and

2    how do you do it at the most reasonable cost.

3              MR. LOVE:  That's right, Your Honor.

4              THE COURT:  This is not the first time this

5    has come up, and it ain't going to be the last time.

6    And I have found in the past that sometimes that the

7    estimates that companies come up with are pretty heavy

8    in the front end, and when they actually have to get

9    down to doing it it's not nearly as heavy.

10             MR. LOVE:  I thought that would be the case

11   here to be sure.

12             THE COURT:  And I think that the general

13   tendency that I've experienced in dealing with

14   electronic discovery in this area and in general is

15   that the IT people in-house manage to see great

16   bogeymen in the cost department.  So you're bound to

17   have some experience along that line.

18             So, okay, you want 24-month frozen scan data

19   in electronic format and agreement on the search

20   criteria.

21             Mr. Bennett, what do you say about that?

22             MR. BENNETT:  Judge, this is the first time

23   that they have made that offer.

24             THE COURT:  I don't need anything.

25             MR. BENNETT:  That would be (A), Judge.  That

1   is option A.  And if that is what they are willing to

2   do, then that's agreeable to us.  We certainly

3   disagree that there's any out of ordinary expense or

4   costs, and, again, our disagreement is based on

5   evidence, not on supposition.

6           THE COURT:  All right.  Have you all not then

7   talked about search criteria because it hadn't gotten

8   to you yet?

9           MR. BENNETT:  That's correct, Judge.

10          (Mr. Pittman is joining the conference call.)

11          THE COURT:  All right.  So you'd have to

12  define the 24-month period, and that's basically the

13  class period, isn't it?

14          MR. BENNETT:  Yes, sir, that is the class

15  period.

16          THE COURT:  What is the frozen scan data?

17  What does that mean?  One month, one time?

18          MR. BENNETT:  Yes, sir.  Each month is

19  archived.

20          THE COURT:  So you're doing one for each

21  month.

22          MR. LOVE:  Under an individual consumer's

23  file at a point in time.  Generally once a month.

24          THE COURT:  All right.  Well, it seems to me

25  you-all ought to be able to work that out.

1      MR. LOVE:  The issues, Your Honor, to

2  negotiate, and certainly we're willing to continue our

3  negotiations over the 24 months of scans with

4  plaintiff, the issues are costs, which we've talked

5  about, time, even if the search criteria -- even if an

6  agreement can be reached on search criteria to

7  generate this data, Equifax estimates that it could

8  take months to generate this data.

9      So there's the cost, there's the time, and

10  the search criteria.

11      THE COURT:  Okay.  Mr. Love, let me tell you,

12  you go back and talk to your client because that just

13  doesn't make any sense based on my experience in

14  presiding over electronic discovery disputes.  And

15  this is again bogeymen coming up out of the ground.

16  And it can be worked out, but this idea that it's

17  going to take months is really quite silly.

18      I have found that turning your data over to

19  professionals results in a whole lot more expeditious

20  work product in other cases involving this same kind

21  of information, not necessarily this information.  So

22  I can't buy that it's a many months process.  And if

23  you think that this court is going to wait months,

24  that's an option that we're not really going to work

25  on.  We're going to find some other way to do it.

1          And I'll be glad to turn it over to somebody,

2     a third party, and let them do it with your data if

3     Mr. Bennett pays for it.  He's going to have to pay

4     for it one way or the other anyway.

5          Equifax needs to have a can do attitude

6     instead of a can't do attitude.  That's the basic

7     problem.

8          MR. LOVE:  Your Honor, I understand what the

9     Court's saying and I'm not going to argue with that.

10    It's really a technological issue, not a human

11    resource issue, but I understand what the Court is

12    saying.

13         THE COURT:  I understand what you're talking

14    about.  Technology exists to do this kind of thing.

15         Mr. Bennett, what do you have in the way of

16    an estimate of time and cost?

17         MR. BENNETT:  Well, Judge --

18         THE COURT:  If anything.

19         MR. BENNETT:  -- I don't have much except

20    that this same argument is made in every individual

21    case where Equifax has for years until at least we

22    started serving discovery requests and saying, Well,

23    then give us the details as to why it takes so long

24    and why it costs so much, and we've never heard this

25    argument again until this case.

1          THE COURT:  Well, I'm going to tell you have

2    what we're going to have in this case, and that is if

3    there's an issue respecting that it takes so much time

4    and it costs so much money, we're going to have a

5    detailed explanation of why that is so under oath in

6    such a way as these people will take seriously what it

7    is that they're doing in telling the Court that it

8    takes time and it takes money.

9          I know it takes time.  I know it takes money.

10   The question is:  How much of each?  And it has been

11   my experience that when people have to provide

12   something that they are accountable for in court, the

13   information becomes much more focused, the cost

14   becomes less, and the time becomes less.

15         Equifax can either do it the easy way or the

16   hard way.  And it's going to be up to you, Mr. Love.

17   I think you-all need to talk about this a little

18   further, don't you?

19         MR. BENNETT:  Yes, sir.

20         THE COURT:  Given that this just came up.

21   But just understand, Mr. Love, that whatever you say

22   is the cost, whatever you say is the time, it's going

23   to have to be backed up by somebody under oath with

24   figures, and they can't have months or weeks to put it

25   together.  This is not a difficult process.

1        MR. LOVE:  Yes, Your Honor.  We will confer

2   further with Mr. Bennett on this issue.

3        THE COURT:  And if I get put to it, I'm just

4   going to let Mr. Bennett hire an expert, and I'm going

5   to require you to turn over the data and let the

6   expert formulate the process to get it done simply and

7   to save your client the money that it ought to be

8   trying to save itself.

9        Mr. Bennett, you need to be reasonable in the

10  search criteria as well.

11       MR. BENNETT:  Yes, Your Honor.

12       THE COURT:  And I expect you-all to talk

13  about it.  Also with this revision.  I'd like to have

14  another notice.  I'd like to have all that by the end

15  of next week.  I'd like to have the plan for how we're

16  going to do the class list and the notice by the end

17  of next week.  That would be Friday.  On what day is

18  that?

19       MR. GOHEEN:  Friday the 13th, Your Honor.

20       THE COURT:  That's a bad date.

21       MR. GOHEEN:  Yeah, how about Saturday, the

22  14th?

23       THE COURT:  How about the 12th, Thursday the

24  12?  All right.

25       And I'm inclined that then we will have a

1    discovery schedule about the type that is outlined in

2    the plaintiff's filing.  Why do you need all these

3    interrogatories and depositions, Mr. --

4           MR. BENNETT:  Well, Judge, the

5    interrogatories are because we're going to have to

6    deal with a range of different issues that --

7    liability, the reasonable procedures issues, the

8    uniformity of those issues that the defendant

9    continues to oppose, and then willfulness.

10          The interrogatories, we believe, Judge,

11   provide a more effective tool to avoid, you know,

12   often, I don't want to the say fishing expedition,

13   although it's proper, but a wider net of deposition

14   attempts.  So the interrogatories, they're not

15   terribly burdensome for -- this is a class action,

16   it's been certified, that alleges a multimillion

17   dollar exposure by the defendant, and for this

18   defendant to have to answer 45 interrogatories is not

19   unduly burdensome.

20          THE COURT:  Mr. Goheen.

21          MR. GOHEEN:  My proposal, Your Honor, would

22   be why don't we go with the standard of 25 and 10, and

23   if Mr. Bennett believes he needs more and can

24   establish the standard for it, let's address it at

25   that time, but I think a blank check for almost twice

1    the number of interrogatories, and then 50 percent

2    more on depositions when there's already been an

3    initial phase of discovery just seems, without any

4    other basis, just seems improper at this point.

5              MR. BENNETT:  Judge, there are already

6    remedies under the federal rules if we ask

7    interrogatories that are not reasonably calculated to

8    advance the ball in this case, and we also have an

9    obligation to continue to meet and confer.  And to

10   Equifax's credit, in discovery it does that.  We do

11   that.  And so it's -- you don't give anybody a blank

12   check to go off reservation on any of this stuff,

13   Judge.

14             THE COURT:  All right.

15             MR. GOHEEN:  I take that back.  You're right.

16   I shouldn't have said it in that way.  I apologize to

17   you, Mr. Bennett, and to the Court, but my point was

18   it seems, based only on what Mr. Bennett just said,

19   and that's the only thing we've heard as to why he may

20   need extra interrogatories, it just seems a little

21   premature to allow that.

22             THE COURT:  All right.  I understand.

23             I think that in a case like this 45

24   interrogatories and 15 depositions is not in concept

25   unusual, nor is it burdensome, nor should it be

1    unexpected, but I also think this, that you're best

2    able do that by receiving the 45 interrogatories and

3    looking at the depositions that are proposed to be

4    made, and then if there's a problem, you can bring it

5    to me.  And if they are overreaching, I'll deal with

6    that.  If they are not, Mr. Goheen, then you won't

7    even be here at all.  But the door will be open for

8    you to address this in a more specific context.

9              MR. GOHEEN:  Thank you, Your Honor.

10             THE COURT:  Then you-all can work that out.

11             I think right now haven't we done about all

12   we can do right now or is there anything else we need

13   to do right now?

14             MR. BENNETT:  I think that's all, Judge.

15             THE COURT:  I will talk to you.  I was

16   proposing to set a trial date.  I actually was

17   proposing to set the trial date in either February or

18   March, but I need to look at some other things that

19   are developments that are happening on my docket in

20   order to make a proposal, in other words, to talk to

21   you all if it's going to be a week long case.

22             So the question is:  Have you all talked

23   about a trial date so I can take that into account in

24   my planning as well?

25             MR. BENNETT:  Your Honor, this is Leonard

1    Bennett.  We've talked about a schedule that the

2    parties have agreed to.  We've not talked about a

3    specific trial date, but we have talked about a

4    schedule that would place this trial in that same time

5    period.

6          I think the current proposal of the plaintiff

7    was the discovery would end in December.  We are not

8    opposed to defendant's idea that before Your Honor

9    sets a specific trial date that you have an

10   opportunity to receive summary judgment motions from

11   the parties and that the trial date would be set after

12   that.

13         Our initial proposal conformed more to what

14   the ordinary custom in this courthouse is, which is to

15   set a trial date, and then track back from that for a

16   dispositive motions deadline, but given the

17   significance of the case, Judge, I don't believe the

18   defendant's position is unreasonable, but certainly we

19   would accommodate whichever the Court's preference

20   would be.

21         THE COURT:  What about the notice?  Do we

22   have to send out another notice of the trial date?

23         MR. BENNETT:  No, sir.  The proposed notice

24   that we have says the trial date will occur on or

25   after this particular date, but they're not obligated

1  to receive direct notice or mail notice of an exact

2  trial date.  And, in fact, Your Honor has discretion

3  to move dates going in the future.

4          THE COURT:  Yes.  Well, I need to assess

5  what's going on in some other cases that have some

6  priority over yours, but I'm looking at either

7  February or March and a pretrial conference ahead of

8  that by about 30 days.  So we'll see.  I'll go from

9  there.  All right.  And we'll decide.  But I'll

10  certainly talk with you-all before any trial date is

11  set.

12          MR. BENNETT:  Yes, sir.

13          MR. GOHEEN:  Thank you, Your Honor.

14          THE COURT:  All right.  Anything else we need

15  to deal with today?  All right.  Then we need to get

16  back together then and see where we are as of May the

17  12th.  So you're going to have all that done by May

18  the 13th?

19          MR. BENNETT:  Yes, sir.

20          THE COURT:  Why don't we have a report from

21  you-all on May the 16th at 10 o'clock in the morning.

22  Is that okay?

23          MR. GOHEEN:  Did Your Honor say 10 o'clock in

24  the morning?

25          THE COURT:  Yes.

1        MR. GOHEEN:  Yes, Your Honor.

2        THE COURT:  And we may know by then what the

3   Fourth Circuit's done, too.  But if we don't, we're in

4   a position that we can move forward.

5        It is not my belief that it's appropriate

6   once the Fourth Circuit grants an appeal of this

7   issue, if they do, to be proceeding with expensive

8   discovery.  So I'd like to see where we are and keep a

9   close watch on this matter so we don't trench on what

10  you-all are doing with the Court of Appeals or cost

11  anybody any unnecessary money.

12       MR. GOHEEN:  This is Barry Goheen.  Will this

13  also be a telephonic report on the 16th?

14       THE COURT:  I think so.  And I'll receive a

15  status report on the afternoon of the 13th by fax.

16  All right?

17       MR. BENNETT:  Yes, sir.

18       THE COURT:  All right.  You can either file a

19  joint one or you can each file your own.

20       Anything else that needs to be done,

21  gentlemen?  All right.  Thank y'all a lot.

22       MR. BENNETT:  Thank you.

23       THE COURT:  Bye.

24

25       (The proceedings were adjourned at 2:43 p.m.)

1        I, Diane J. Daffron, certify that the

2   foregoing is a true and accurate transcription of my

3   stenographic notes.

4                          /s/

5   _____   _____

6        DIANE J. DAFFRON, RPR, CCR      DATE