IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

DONNA K. SOUTTER, *for herself and on behalf of all similarly situated individuals*,

                       Plaintiff,

     v.

EQUIFAX INFORMATION
SERVICES LLC,

                    Defendant.

CIVIL ACTION NO.

3:10-CV-00107-REP

**EQUIFAX INFORMATION SERVICES LLC'S**

**RESPONSE IN OPPOSITION TO**

**PLAINTIFF'S AMENDED MOTION FOR CLASS CERTIFICATION**

## INTRODUCTION

Last December, the Fourth Circuit reversed this Court's certification of a sprawling statewide class. *See Soutter v. Equifax Info. Services, LLC*, 2012 WL 5992207 (4th Cir. Dec. 3, 2012). In response, Plaintiff has purported to narrow the class slightly (eliminating circuit courts but still including all General District Courts ("GDCs") in the Commonwealth) and reducing the end date of the class period to April 2009. Those adjustments cannot save certification; indeed, even with the elimination of circuit courts, there remain 140 General District Courts whose processes, procedures, and judgment dispositions remain at issue. The same factors of reliability, disposition volume, potential for clerical or data entry error, and myriad other issues remain, any of which, and certainly all of which collectively, preclude Plaintiff's ability to carry her burden of ascertaining the class and showing that class certification is appropriate.

Furthermore, Plaintiff simply refuses to come to terms with the Supreme Court's opinion in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), which was issued after this Court's order certifying the first class in March 2011. By any standard, *Dukes* is a game-changer for class certification, and Plaintiff makes absolutely no effort to fit her amended motion within the confines of *Dukes*. Moreover, just last month the Supreme Court issued a second game-changer, *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), which again demonstrates the Supreme Court's conservative view of class actions. Plaintiff's 2011 effort was, as the Fourth Circuit held, improperly certified; in light of these latest Supreme Court opinions, her amended motion is even weaker. The Court should deny Plaintiff's amended motion for class certification.

## RELEVANT FACTUAL BACKGROUND

The relevant facts are set forth in Equifax's response to the 2010 motion for class certification, *see* Doc. 77 at 1-17 and Exs. 1-21. Equifax incorporates those facts and exhibits

herein by reference and will refer to them in this brief as necessary. Facts relevant to Plaintiff's amended motion for class certification and addressing new issues Plaintiff raised in her brief (Doc. 132) are set forth below. In particular, Plaintiff asserts that the class in this case can be ascertained and identified through the use of (1) bulk data that she has received from the Virginia Supreme Court; (2) frozen scan data from Equifax; and (3) ACIS cases from Equifax. (Doc. 132 at 14-18.) Plaintiff's assumptions concerning this data that are inaccurate. Plaintiff's confusing, piecemeal, plan to "fuse together" information from these varied, unrelated, and in some instances unreliable, sources is unwieldy, unworkable, individualized, and does not facilitate class certification.

I.    **THE BULK FEED DATA PLAINTIFF SEEKS TO USE FOR CLASS IDENTIFICATION IS RIDDLED WITH ERRORS AND INAPPROPRIATE FOR THE TASK OF IDENTIFYING CLASS MEMBERS.**

One of the assumptions underlying Plaintiff's methodology of identifying putative class members and establishing liability as to Equifax is that the Virginia Supreme Court's database contains reliable and accurate judgment information. (Doc. 132 at 14-15.) That assumption, however, is unfounded. In fact, Equifax's public records vendor, LexisNexis, conducted a review and noted a number of inaccuracies between the data reflected in the actual hard copy files and information in the database. (Decl. of M. Johnson (Ex. 1), ¶¶ 6-16.)

(1)    *Brown*:   The public website shows for case no. GV07015612-00 (Defendant Willie Brown) that a judgment was obtained on October 19, 2007 and that the "Date Satisfaction Filed" was October 27, 2007. *Id*., ¶ 10 & Ex. A.) The October 27, 2007 date also appears in the Supreme Court Database. (*Id*.) The actual paper file for the case, filed in the Roanoke GDC, shows that notice of satisfaction was filed by the judgment creditor's agent on June 19, 2009.

(*Id.*, ¶ 11 & Ex. B.)  The notice of satisfaction shows the judgment was paid as of October 27, 2007, but the first time that fact was made of record and so publicly available was by the notice filed on June 19, 2009.  (*Id.*)  The Virginia Supreme Court Database inaccurately lists the date of satisfaction as the date the *notice* of satisfaction was filed.  (*Id.*)

      (2)    *Jennings*:  The public website shows for case no. GV 08000265-00 (Defendants: Mark Jennings, *et al.*) that a judgment was entered on November 24, 2008 and that the "Date Satisfaction Filed" was October 24, 2008.  (*Id.*, 12 & Ex. C.)  The record on its face reflects an impossible date for notice of satisfaction of judgment:  it is one month *before* there was a judgment.  (*Id.*)  The October 24, 2008 date also appears in the Virginia Supreme Court Database.  (*Id.*)  Using the date of judgment as the date of notice of satisfaction would not be accurate, either.  (*Id.*, ¶ 13 & Ex. D.)  The actual paper file for the case, which was filed in the Dinwiddie County GDC, shows a letter to the clerk from the accounts receivable manager of the judgment creditor dated April 29, 2009, and informing the clerk that the judgment had been satisfied.  (*Id.*)  The letter bears a handwritten notation, apparently from the clerk, of "5-4-09." (*Id.*)  The paper record also shows a hearing date of November 24, 2008.  The clerk apparently entered the November 24, 2008 date into the Virginia Supreme Court Database as the date that notice of satisfaction was filed, when in fact the notice of satisfaction could not have been made public and part of the record before May 4, 2009.  (*Id.*)

      (3)    *Lane*:  The public website shows for case no. GV 09004001-00 (Defendant: Kevin Lane, filed in Spotsylvania County GDC), that a judgment was entered on July 1, 2009 and that the "Date Satisfaction Filed" was June 27, 2009.  (*Id.*, ¶ 14 & Ex. E.)  Again, the computer record on its face reflects an impossible date for notice of satisfaction of judgment:  it

is shown as occurring before there was a judgment.  (*Id.*)

(4)     *Pate*:   The  public  website  shows  for  case  no.  GV  08007722-00  (Defendant

Jennifer Pate) that a judgment was obtained on June 12, 2008 and that the "Date Satisfaction

Filed" was July 7, 2008.  (*Id.*, ¶ 15 & Ex. F.)  The July 7, 2008 date also appears in the Virginia

Supreme Court database.  (*Id.*)  In this instance, in contrast to the *Lane* case, the record on its

face is plausible as to dates, but review of actual paper files show that it is also inaccurate.  (*Id.*)

The actual paper file for the case, which was filed in the Roanoke GDC, shows that the notice of

satisfaction was filed by the judgment creditor on March 11, 2009.  (*Id.*, ¶ 16 & Ex. G.)  The

notice of satisfaction shows that the judgment was paid as of July 7, 2008, but the first time that

fact was made of record and thus publicly available was March 11, 2009.  (*Id.*)  The Virginia

Supreme  Court  database  inaccurately  lists  the  date  of  payment  as  the  date  the  notice  of

satisfaction was filed.  (*Id.*)

That these discrepancies were  discovered  in just a small  sample of records  from the

Supreme Court database is hardly surprising.   Indeed, the entry portal to the CMS website

contains  a  lengthy  disclaimer  that  users  "may  encounter  come  inaccurate  or  outdated

information" and that OES "makes no warranties regarding the accuracy, legality, reliability, or

content  of  the  information  provided,"  and  that  "[i]f  the  official  records  or  official  printed

publications of the individual courts differ from the contents of records or publications included

in this system, the official records or written publications should be relied upon."  (*See* Ex. 2.)

## II.     PLAINTIFF'S ASSUMPTIONS CONCERNING FROZEN SCAN DATA ARE INACCURATE AND FROZEN SCANS ARE NOT A RELIABLE METHOD OF IDENTIFYING CLASS MEMBERS.

Plaintiff suggests that Equifax's frozen scans can be used in conjunction with the data she

has obtained from the Virginia Supreme Court to determine the class members in this case. (Doc. 132 at 6-18.)  Frozen scans must be created using archived data containing once-a-month snapshots of information in Equifax's dynamic consumer database.  (Decl. of M. Leslie (Ex. 3), ¶ 5.)  They are snapshots of what a consumer's credit file looked like at the end of a month.  (*Id.*) As such, a frozen scan provides, at best, a record of information that was on a consumer's credit file on a particular day at a particular time, usually at the end of the month.  (*Id.*, ¶ 8.)  A frozen scan does not show what was on a consumer's credit file at any other time during the month. (Id.)  For example, if a frozen scan was created on January 31, 2009, it would only show what was on the credit file on January 31, 2009 and not the other 30 days of that month.  (*Id.*)  Given this limitation, comparisons of frozen scans for a particular consumer can provide only imprecise information; if a judgment appears on a frozen scan for one month but not the next, Equifax could state that the judgment was removed within the 30-day period of time between frozen scans, but would not be able to narrow the date of removal further.  (*Id.*, ¶ 10.)

To support her piecemeal approach to class member identification, Plaintiff cites the deposition testimony of Margaret Leslie, which discusses certain "assumptions" that a person would have to make concerning the frozen scans.  (Doc. 132 at 16-17.)  Those are, however, just assumptions and there is no way to be absolutely certain what was on the credit file on any particular day of a month other than the day at the end of the month when it was generated. (Leslie Decl., ¶¶ 8, 10.)

## III.   PLAINTIFF'S PIECEMEAL "METHODOLOGY" FOR IDENTIFYING CLASS MEMBERS WOULD REQUIRE A MANUAL, CASE-BY-CASE, REVIEW.

The final component in Plaintiff's piecemeal methodology of identifying class members and proving liability is her reliance on Equifax's ACIS cases.  (Doc. 132 at 15-18.)  An ACIS

case is an electronically stored record of a consumer's dispute to Equifax and Equifax's response.  (Decl. of A. Fluellen (Ex. 4), ¶ 4.)  An ACIS case contains a copy of any dispute letters or other supporting documents sent in by the consumer in support of their dispute as well as information placed in the relevant information field of any ACDV.  (*Id.*, ¶¶ 4-5.)  To review the letters and accompanying documentation in each ACIS case for each consumer that might be a class member would require a manual review of each ACIS case to determine exactly what was aid in each dispute, what information was included in each dispute, what information was in the relevant information field of the ACDV, and what supporting documentation, if any, was provided.  (Id., ¶ 6.)  Even Plaintiff concedes this fact in her motion for class certification when she refers to the "letters Defendant has archived."  (Doc. 132 at 16-17 n.5.)

## ARGUMENT

Plaintiff attempts to prevent Equifax from arguing, and the Court from analyzing, any issue on the amended motion other than the one the Fourth Circuit held was sufficient for reversal by arguing that "[this] Court's conclusions that were not reversed remain the law of the case."  Doc. 132 at 2.  That is absurd.  Indeed, the Fourth Circuit specifically stated that it was *not* addressing Equifax's other arguments on appeal given that Plaintiff's failure to satisfy the typicality requirement was deemed sufficient, standing alone, for reversal.  *See Souter*, 2012 WL 5992207, n.* ("Because we conclude that Souter failed to satisfy Rule 23(a)(3)'s typicality requirement, we have not addressed Equifax's additional arguments on appeal.").  The law in this Circuit could not be clearer:  "The law of the case doctrine does not govern issues which the

appellate court did not address." *Smith v. Bounds*, 813 F.2d 1299, 1306 (4th Cir. 1987).[1]  The

law of the case doctrine does not apply here.

## I.   PLAINTIFF'S AMENDED CLASS DEFINITION IS NOT WORKABLE.

### A.   The Proposed Class Is Not Ascertainable Absent Individualized Inquiries.

Plaintiff's amended class definition is as infirm as the definition of the failed 2011 class.

Reduced to its basics, Plaintiff seeks certification of a class of consumers for whom:

> 1.   The computer database of the Executive Secretary of the Supreme Court of Virginia shows that a judgment against the individual was dismissed, satisfied, appealed, or vacated on or before April 1, 2009;
>
> 2.   Equifax received a dispute from the individual regarding the accuracy of the judgment as reported; and
>
> 3.   Equifax issued a consumer report regarding the individual to a third party –
>
>> a)   after receiving the individual's dispute,
>>
>> b)   at least 30 days after the judgment was dismissed, satisfied, appealed, or vacated, and
>>
>> c)   before Equifax updated the consumer's credit file to reflect the new judgment disposition.

*See* Doc. 132 at 9-10, 16.[2]  For purposes of identifying class members, Plaintiff states that she

will obtain a list of names from the Virginia Supreme Court database.  *See id.* at 14-15.  Equifax

---

[1] The Fourth Circuit's holding in *Smith* is in harmony with the other circuit courts.  *See*, *e.g.*, *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003); *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1186 (9th Cir. 2001).

[2] The class definition provided by Plaintiff does not state that the consumer report must be issued *before* the update.  (*See* Doc. 132 at 9-10.)  Elsewhere in her brief, however, Plaintiff states that the report must have been issued "before any corrective update."  (*Id*. at 16.)  Equifax, therefore, assumes that Plaintiff intended to include this qualifier in the class definition.  Indeed, if the qualifier were not included, the class definition would cover individuals for whom Equifax did not issue an inaccurate consumer report, making the definition overly broad.  *See*, *e.g.*, *Kohen v. Pacific Inv. Management Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009).

then must:  (1) find a credit file for each consumer on the list provided by Plaintiff; (2) review each credit file and related ACIS documents to determine whether the consumer disputed a civil judgment; (3) if so, determine when, if at all, Equifax updated that consumer's credit file to reflect the change in judgment; (4) determine whether Equifax – after the consumer disputed the judgment, but before Equifax made a "corrective update" – furnished a consumer report to a third party regarding that consumer.  *Id.* at 15-16.  Contrary to Plaintiff's characterization of these steps as "mechanical," none of the steps can be accomplished through a mere database search; most will require significant individualized inquiries by Equifax employees.

For example, Plaintiff's proposed second step -- a review of each credit file and related ACIS case documents to determine whether each consumer disputed a civil judgment -- presents significant problems.  Each consumer file must be manually reviewed to determine the precise nature of each dispute and whether it concerned the particular judgment at issue.  Because consumer disputes are frequently unclear as to their purpose, this task will inevitably require judgment calls, which could in turn require Court intervention to resolve disputes regarding individual consumers.

Plaintiff also suggests that Equifax can obtain the date of the "corrective update" by reviewing frozen scans for each consumer.  *See* Doc. 132 at 16.  Frozen scans, however, are not readily available to Equifax.  *See* Leslie Decl. ¶ 6.  They must be generated from archived monthly snapshots of Equifax's consumer database, which will require significant use of Equifax's computer and human resources.  *Id*. ¶¶ 6-7.  Compounding this problem is the fact that Equifax will not necessarily know the timeframe for each update; as a result, multiple frozen scans will have to be produced for each consumer, potentially spanning several years.  *Id*. ¶ 8.

Those scans will then have to be individually examined to determine the month in which a change in judgment status occurred. *Id.* ¶ 10. The more significant problem is that Equifax will not be able to determine from the frozen scans the precise day within an identified month on which a corrective action took place. *Id.* At most, Equifax will be able to identify a 30-day period of time (one month) during which the update likely occurred. *Id.*]

Furthermore, Equifax must determine whether it issued a consumer report regarding each identified consumer and whether the report was issued both *after* the consumer disputed the judgment and *before* Equifax made the "corrective update." While Equifax can determine (based on review of individual files and frozen scans) the precise date on which it received a consumer dispute and the precise date on which it issued a consumer report, this information will be of only limited use given that Equifax can determine the date of the corrective update only within a 30-day window. So, for example, if an update was made sometime between December 31, 2008 and January 31, 2009 and that a consumer report was issued on January 15, 2009, Equifax will be unable to determine whether the report preceded the update or vice versa. *Id.*

In sum, each of the steps Plaintiff envisions for identification of class members will require extensive individualized inquiries. At a minimum, identification of class members – if even possible given the 30-day-window problem – will require extensive review of multiple files for each potential class member and exercise of judgment to determine who is in and who is out. As numerous courts have held, "[t]he Court should not have to engage in lengthy, individualized inquiries in order to identify members of the class." *Duchardt v. Midland Nat. Life Ins. Co.*, 265 F.R.D. 436, 443 (S.D. Iowa 2009); *see also*, *e.g.*, *Marcus v. BMW of N. Am.*, 687 F.3d 583, 593 (3d Cir. 2012) ("If class members are impossible to identify without extensive and individualized

fact-finding or 'mini-trials,' then a class action is inappropriate."); *Romberio v. Unumprovident Corp.*, 385 Fed. Appx. 423, 431 (6th Cir. 2009) ("the need for such individualized fact-finding makes [a] class definition unsatisfactory"); *Newton v. So. Wood Piedmont Co.*, 163 F.R.D. 625, 632 (S.D. Ga. 1995) (class definition "fundamentally defective because it is not based upon any operative facts or specific incident in the case" and determination of class membership would require answering questions "of a highly individualized nature").  Because Plaintiff's proposed class can be ascertained, if at all, only through extensive individualized inquires, Plaintiff's motion for class certification should be denied.

**B.    Plaintiff's Arbitrary Imposition Of A 30-Day Requirement For Equifax To Retrieve And Report Judgment Dispositions Violates the FCRA.**

Aside from the individualized inquiries to ascertain the proposed class, the amended class definition imposes a 30-day requirement on Equifax to report judgment dispositions that is nowhere to be found in the FCRA.  The dispositive issue in any case alleging violation of FCRA § 1681e(b) is whether the CRA followed "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).  Where, as here, the plaintiff's allegation is that the CRA's procedures were willfully unreasonable (the only claim Plaintiff asserts), the content of the updates and the frequency with which the updating process is completed will necessarily be part of the liability determination. Plaintiff's amended class definition interferes with this liability determination by sweeping into the class anyone, regardless of the circumstances, who disputed a judgment status with Equifax that remained on the consumer's Equifax credit file "at least thirty (30) days after the disposition date" as reflected by the Virginia Supreme Court's database.  Doc. 132 at 9-10.  Thus, the class definition itself implicitly, if not expressly, establishes 30 days as the period of time by which

10

Equifax should have updated every putative class member's credit file with subsequent civil judgment disposition information.

In that regard, Plaintiff would have this Court engraft on to the FCRA a mandatory 30-day requirement for Equifax to retrieve and report judgment disposition information, regardless of the circumstances, even though neither Congress nor the Federal Trade Commission, for over 40 years, has seen fit to do so. Plaintiff cites no case that would authorize this or any other Court to usurp Congress's power in such an arbitrary manner. Indeed, if this were an individual case, Plaintiff could never propose a jury instruction advising the jury that Equifax was required by the FCRA to update Plaintiff's credit file with judgment disposition information within 30 days of a court's entry of the disposition order, for the simple reason that there is no such requirement under the FCRA. Seen in that light, it is obvious the Plaintiff's bright-line 30-day requirement for class membership alters Equifax's substantive rights given the complete absence of such a bright-line rule in the FCRA itself, which violates settled law. By seeking to impose, by judicial fiat or otherwise, a 30-day requirement on Equifax to retrieve judgment dispositions and update each putative class member's credit file, the amended class definition is unworkable. *See Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.*, 601 F.3d 1159, 1176 (11th Cir. 2010) ("The Rules Enabling Act, 28 U.S.C. § 2072 – and due process – prevents the use of class actions from abridging the substantive rights of any party.").

## II.   PLAINTIFF DOES NOT SATISFY THE REQUIREMENTS OF RULE 23(a).

The Fourth Circuit has stressed that "it is not the defendant who bears the burden of showing that the proposed class does not comply with Rule 23." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006). Rather, the party seeking class certification must "be

prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Comcast*, 133 S. Ct. at 1432 (emphasis original).  Plaintiff does not satisfy Rule 23(a) here.[3]

A.   **Plaintiff Cannot Demonstrate That This Case Will Generate Common Answers To Common Questions Sufficient To Establish Commonality.**

Plaintiff devotes exactly three paragraphs, spanning barely a single page, to commonality. *See* Doc. 132 at 18-19.  In fact, Plaintiff's 30-page brief does not cite *Dukes* other than including it as part of a quote from another case, *see id.* at 18, a failure that speaks volumes.  In any event, Plaintiff has identified five purportedly "common" questions of law or fact in this case:

1.   Were Equifax's procedures for obtaining and reporting the status of civil judgments updated prior to May 2009 unreasonable?

2.   Did these procedures violate § 1681e(b)?

3.   Were credit reports that omitted the current status of a terminated judgment inaccurate?

4.   Were Equifax's FCRA violations willful?

5.   If so, what is the proper damage measure per violation?

*See* Doc. 132 at 19.  Obviously, Plaintiff is undaunted by the Fourth Circuit's reversal; these are the same five allegedly "common" questions she proposed over two years ago.  *See* Doc. 91 at

---

[3] Plaintiff asserts that this Court "should resolve any doubt regarding the propriety of certification in favor of allowing certification."  Doc. 132 at 10.  That makes no sense in light of *Dukes* and *Comcast*.  Plaintiff's view cannot be squared with the principle, which the Supreme Court reiterated just last month, that "[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast*, 133 S. Ct. at 1432 (quotations omitted).  It defies logic that, a class action being an "exception" to usual litigation, all doubts should be resolved in favor of the "exception."

19.   None of these questions satisfies commonality under *Dukes*, a "landmark" decision[4] that requires Plaintiff to show "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."   131 S. Ct. at 2551 (emphasis original).   As this Court held last year, "[l]ittle in *Wal-Mart Stores* [*v. Dukes*] can be said to suggest that the standard for commonality is one that is easily met."   *Valerino v. Holder*, 283 F.R.D. 302, 311 (E.D. Va. 2012) (denying certification).   When assessed under the required "rigorous analysis," it is clear that Plaintiff does not satisfy the commonality standard here.

### (a)      "Reasonableness" Is Not A Common Issue.

Plaintiff's first question, whether "Equifax's procedures for obtaining and reporting the status of civil judgments prior to May 2009 [were] unreasonable," does not satisfy *Dukes*.   The first problem is that the question is phrased at "an unacceptably general level."   *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006).   About the only issue that was "common" during the proposed class period was the fact that Equifax used LexisNexis as its public records vendor, but Plaintiff does not assert (nor can she) that such an arrangement willfully violates the FCRA, and the Court acknowledged two years ago that the "use of a public records vendor is a standard practice in the consumer reporting industry."   Doc. 91 at 3.

Beyond that, there is no commonality that enables the Court to assess Equifax's "reasonable procedures."   The undisputed evidence in this case demonstrates that the circumstances under which LexisNexis and Equifax gather information from Virginia courts

---

[4] *See, e.g.*, *Phipps v. Wal-Mart Stores, Inc.*, ___ F. Supp. 2d ___, 2013 WL 752152, *1 (M.D. Tenn. Feb. 20, 2013) ("landmark decision"); *Maloney v. Microsoft Corp.*, 2012 WL 715856, *4 (D.N.J. Mar. 9, 2012) ("landmark Supreme Court case"); *Scott v. First America Title Ins. Co.*, 276 F.R.D. 471, 477 (E.D. Ky. 2011) ("landmark decision").

vary from court to court and from time to time. The 140 GDCs Plaintiff attempts to sweep into this lawsuit are different with respect to procedures, number of cases, accessibility, degree of automation, types of cases, and amount of cooperation provided to LexisNexis's representatives. Determination of whether a particular procedure was reasonable under one set of circumstances will not resolve whether other procedures were reasonable in other circumstances, or even whether that same procedure was reasonable under different circumstances.

Until May 2009, which is the latest date in the proposed class period, the Virginia Supreme Court provided regular bulk feeds of electronic case data, which included, among other things, information about the parties, judgment amount and date, and satisfactions, if any. Doc. 77-12 (Johnson Decl.) ¶ 6. During this timeframe, to compile accurate data, LexisNexis also employed independent contractors to collect information regarding case dispositions in person at courthouses across the Commonwealth. *Id*. ¶ 10. It is undisputed that LexisNexis's in-person collection methods varied widely by jurisdiction type and size. For example, LexisNexis collected records every 14 days from larger jurisdictions, such as the Richmond GDC; every 31 days from other jurisdictions, such as the Alexandria GDC; and every year from jurisdictions with much lower volumes of judgment dispositions. Doc. 77-7 (DeGrace Decl.) ¶ 8.

In short, "reasonableness" is quintessentially a fact-specific, individualized inquiry. "There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." *Go-Bart Importing Co. v. U.S.*, 282 U.S. 344, 357 (1931); *see also O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 742 (5th Cir. 2003) (class certification inappropriate in Real Estate Settlement Procedures Act case where court would have to assess "reasonableness on a transaction-by-transaction basis"). The 140 different courts and

materially different case volumes and pickup times lumped together in the proposed class here demonstrate that there is no "common answer" to the question of reasonableness.

### (b) The Question Of Whether The Defendant Violated The Law Is Wholly Insufficient Under *Dukes*.

*Dukes* makes clear that the question whether a defendant violated the law does not satisfy Rule 23(a)(2).  There, the Supreme Court held that the question "Is that an unlawful employment practice?" was "not sufficient to obtain class certification."  131 S. Ct. at 2551.  The Fourth Circuit agreed in this case, holding that "members of a proposed class do not establish that 'their claims can productively be litigated at once,' merely by alleging a violation of the same legal provision by the same defendant."  *Souter*, 2012 WL 5992207, *5 (quoting *Dukes*, 131 S. Ct. at 2551 (quotations omitted)).  The "violated the law" question does not satisfy *Dukes*.[5]

### (c) The Inaccuracy Issue Cannot Be Resolved In "One Stroke."

Inaccuracy is an uncommon, individualized issue.  For a claim to succeed under FCRA § 1681e(b) – which is the only claim Plaintiff asserts here – the consumer must demonstrate an inaccuracy in her consumer report.  *See Souter*, 2012 WL 5992207, *5.  Again, *Dukes* presents an insurmountable barrier for Plaintiff.  Plaintiff asserts that the issues of when "Equifax updated the judgment status" and whether, "after the consumer notice to Equifax, but before any

---

[5] Even if Plaintiff could establish that the first two questions are truly "common" under *Dukes*, they are irrelevant to this case anyway.  Those questions merely ask whether Equifax's procedures were "unreasonable" and whether those procedures "violate" the FCRA.  Neither question, however, would establish any liability in this case because Plaintiff has imposed on herself (and, of course, the putative class members) the burden of establishing *willful* FCRA violations by Equifax.  Thus, whether Equifax's procedures were "unreasonable" does not establish liability at all; the burden Plaintiff has set for herself and the putative class requires her to prove *willful* unreasonableness and *willful* violations, not just that procedures were negligently

corrective update, Equifax then furnished a credit report to a third party" are capable of resolution through the so-called "mechanical step" of reviewing each consumer's "Frozen Scans." Doc. 132 at 16. In other words, Plaintiff proposes a process whereby Equifax must produce "the consumer communication file and other documents in the ACIS as well as a set of frozen scans for each person" in the proposed class, *i.e.*, "those who had been sued in Virginia General District Court, had a status other than judgment at the time the class list is created, and who had made a direct communication with Equifax after the date of this disposition." *Id.* at 17. As detailed above, that process is far from "mechanical" and, regardless, does not satisfy *Dukes*.[6] In any event, *Dukes* settles the question once and for all that the "common contention," whether it be inaccuracy, reasonableness, or any of the other uncommon issues Plaintiff contends actually are "common" – "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims *in one stroke*." *Dukes*, 131 S. Ct. at 2551 (emphasis added). Plaintiff makes no effort whatsoever to assert that the determination of accuracy can be accomplished in "one stroke" as required by *Dukes*, and for good reason – no such method exists.

Even if the process of determining accuracy (or, for that matter, class membership) were "mechanical," which it is not as detailed above, the fact that Plaintiff must undertake this Supreme Court database/frozen scan/ACIS cross-matching/analysis inquiry to determine the

---

unreasonable or that Equifax may have negligently violated § 1681e(b). Thus, the first two "common" questions are irrelevant to what Plaintiff must prove to establish liability.

[6] Plaintiff once again urges the Court to "certify first, ask questions later" by asserting that the frozen scan/ACIS process would occur "after certification." Doc. 132 at 17. Needless to say, that "process" gets things backwards – if Plaintiff cannot identify a process to objectively ascertain the putative class members *before* certification, no class should be certified.

accuracy of each putative class member's report, which thereby qualifies the person for entry into the proposed class, renders accuracy an individual issue. In other words, simply repeating the process countless times, whether it is 500, 2,000, or 100,000 times, violates the *Dukes* "one stroke" mandate for an issue truly to be called "common" for purposes of Rule 23(a)(2). *See Scott*, 276 F.R.D. at 483 ("Whether objective methods exist to assess liability is not the [relevant] inquiry. The [relevant] inquiry is whether there is an objective touchstone common to the class for resolving the inquiry in the first instance.").[7]

Other courts agree that the accuracy determination is individualized and precludes certification. *See Owner-Operator Independent Drivers Ass'n, Inc. v. USIS Commercial Svcs., Inc.*, 537 F.3d 1184, 1194 (10th Cir. 2008) (affirming denial of certification and district court's ruling that "the accuracy of each individual's [report], an essential element of a § 1681e(b) claim, required a particularized inquiry"); *Harper v. TransUnion, LLC*, 2006 WL 3762035, *9 (E.D. Pa. Dec. 20, 2006) (denying certification in § 1681e(b) case where defendants would be "challenging plaintiff's assertion that defendants issued inaccurate credit reports to the individual class members, so a plaintiff's inquiry would have to extend to the financial history of each putative class member"). The inaccuracy question is uncommon and does not satisfy *Dukes*.

### (d) The Question Of Willfulness Is Highly Individualized.

Because reasonableness itself depends on the varying circumstances described above,

---

[7] In essence, Plaintiff attempts to avoid the obvious commonality problems with the proposed class by pushing the inaccuracy determination into the class definition. But Plaintiff should not be allowed to avoid the commonality problems inherent in that inquiry by asking the Court to make the inaccuracy determination through application of the class definition. Class definitions that require a liability determination – here, proof of an inaccuracy in a credit file, which any FCRA plaintiff must prove under § 1681e(b) – are improper.

17

whether any violation was willfully unreasonable necessarily will require individualized inquires.  Any given inaccuracy could be due to Equifax procedures that were imperfect but reasonable, or to procedures that were unreasonable but not willfully so.  *See, e.g., Stevenson v. TRW Inc.*, 987 F.2d 288, 294 (5th Cir. 1993) (finding defendant "negligent in its compliance with the [FCRA's] prompt deletion requirement" but not willfully unreasonable).  Whether the procedures that caused a given inaccuracy were willfully unreasonable thus cannot be determined without considering the circumstances surrounding the use of those procedures, and, as shown above, those circumstances varied across multiple dimensions during the class period.

The determination as to whether Equifax's procedures were unreasonable will necessarily involve consideration of Equifax's complex file updating process and the frequency with which it must bear those costs -- to meet the efficiency needs of commerce -- as well as the consumers' interests in the accuracy of the information maintained in Equifax's files about the consumer. Where to strike that balance concerning the frequency with which a particular consumer's file should have been updated -- whether at 15 days, 30 days, 60 days, or some other period -- is a question that is specific and based on the circumstances particular to each consumer.

Moreover, even if the frequency were deemed to be unreasonable, a liability determination under claims like those alleged by Plaintiff would still require a determination as to whether the frequency of the file updating process was *willfully* unreasonable -- that is, whether Equifax not only violated § 1681e(b), but did so through the adoption of procedures that, in the words of the Supreme Court, "ran a risk of violating the law substantially greater than the risk associated with a reading [of the law] that was merely careless."  *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 69 (2007).  That cannot be assessed on a classwide basis.

Plaintiff's bright-line 30-day rule is particularly problematic here.  The Court should not limit the jury's ability to determine the reasonableness of Equifax's procedures by presupposing that anything more than 30 days is unreasonable and that anything less is not.  There cannot be a "one size fits all" assessment of willfulness given the substantial variations in court procedures, processes, and disposition volume.  Furthermore, even if "one size fits all" were appropriate, Plaintiff nowhere explains why 30 days is the appropriate number, or why Plaintiff, as opposed to the jury, is entitled to select the number of days.

Further, the Fourth Circuit expressly held that Soutter's sending "letters to Equifax informing [it] of the possible inaccuracy before it occurred … bears upon whether Equifax's behavior was willful."  *Soutter*, 2012 WL 5992207, *4.  As discussed above, reviewing such dispute letters is a manual process and Equifax is entitled to an individual review of each alleged dispute letter received from a putative class member to determine whether it is sufficient to place Equifax on such notice that its conduct could be determined to be willful.

In short, willfulness is an uncommon question that, like accuracy, cannot be resolved in "one stroke," as mandated by *Dukes*.  131 S. Ct. at 2551.  The willfulness question does not satisfy the *Dukes* commonality standard.

**(e)     Damages Issues Are Individualized.**

Finally, questions of damages do not yield the required "common answers" as *Dukes* requires.  Indeed, even Plaintiff admits that "the amount of statutory damages" is an "individual issue for each class member."  Doc. 132 at 24.  That concession should end any argument that damages issues can satisfy the *Dukes* standard, notwithstanding Plaintiff's assertion elsewhere in her brief that "the proper damage measure per violation" is a common issue.  *Id*. at 19.

Regardless, Plaintiff again ignores the Fourth Circuit's opinion in this case when she argues that "Plaintiff's statutory damage claims raise no individual questions in relation to the amount of damages." *Id*. To the contrary, the Fourth Circuit explicitly held, in reversing class certification, that "statutory damages … *typically require an individualized inquiry*." *Souter*, 2012 WL 5992207, *5 (emphasis added). To reinforce that point, the court then quoted Judge Wilkinson's concurring opinion in *Stillmock* for the proposition that "because statutory damages are intended to address harms that are small or difficult to quantify, evidence about particular class members is highly relevant to a jury charged with this task." *Id*. (quoting *Stillmock v. Weis Markets, Inc*., 385 Fed. Appx. 267, 277 (4th Cir. 2010) (Wilkinson, J., concurring)).[8] Plaintiff's proposed damages question is uncommon, as she concedes in her brief.

Even a common-sense view, let alone the required "rigorous analysis," of this case demonstrates the highly individualized nature of statutory damage issues. In the unlikely event the Court would usurp Congress and adopt Plaintiff's bright-line "30-day" rule for willfulness, even under that rule statutory damages amounts would be highly individualized. Would a "31-day" consumer be entitled to the same statutory damages (if any) as a "120-day" consumer? Of course not. Would a "40-day" consumer that disputed a judgment status five times be entitled to the same statutory damages as a "40-day" consumer who disputed only once? Would Equifax's

---

[8] The fact that the Fourth Circuit did not cite the *Stillmock* panel opinion at all in reversing the Court's 2011 certification order should end any debate as to its applicability to this case; it has none, and its absence from the Fourth Circuit's analysis plainly signals that court's intention to cabin *Stillmock* to its unique FACTA setting. Conversely, that the Fourth Circuit essentially adopted Judge Wilkinson's concurrence on the issue that, where liability is disputed (which is the case here, unlike in *Stillmock*), individual issues are relevant to the amount of a statutory damages award signals that court's intention to apply Judge Wilkinson's opinion more broadly to FCRA cases where, as here, liability is disputed.

"corrective update" to the consumer's file (a necessary inquiry, *see* Doc. 132 at 16) taken four days after notice by the consumer and 32 days after the judgment disposition yield the same statutory damages as a "corrective update" made 22 days after the consumer's notice to Equifax and 64 days after the judgment disposition?  The possibilities are practically endless, which is why the Fourth Circuit held here, and Plaintiff wisely has acknowledged now, that the amount of statutory damages is an individual issue that depends on the unique circumstances of each putative class member.  And that issue is not remotely common under *Dukes* as it is not capable of the "one stroke" determination mandated by *Dukes* to satisfy Rule 23(a)(2).

### B.     Plaintiff Does Not Satisfy The Typicality Requirement.

One would think that, the Fourth Circuit having reversed certification because Plaintiff failed to establish typicality, Plaintiff would make a concerted effort to establish typicality the second time around.  But one would be wrong to think that.  Indeed, beyond reciting portions of the Fourth Circuit's holding, Plaintiff's argument on typicality consists of exactly one paragraph (Doc. 172 at 20) – a remarkably brazen abdication of her burden.  Even more remarkably, Plaintiff cites no case law and no facts in her typicality section; she just makes unsupported (if not false) statements and hopes that the Court will accept them.  Anything approaching the required "rigorous analysis" will doom Plaintiff's unsupported typicality argument.

First, merely "alleg[ing] a violation of the same FCRA provision" (*id*.) is wholly insufficient under *Dukes*.  Other statements by Plaintiff (untethered to any record cite) are patently false, such as "[d]uring the period at issue in this case, those records were gathered from a single source – the Virginia Supreme Court's website."  *Id*.  That's not even true; the record indisputably establishes otherwise.  Doc. 77-12, ¶ 10.  Other statements are so vague as to be

incomprehensible, such as "Equifax's notice and knowledge of the challenged reporting problem is the same for Plaintiff as for the Class." Doc. 132 at 20. What the "challenged reporting problem" might be is left to the reader's imagination, and there are no facts or case law that would give the Court the proper basis to agree with it anyway.

Typicality "goes to the heart of a representative['s] ability to represent a class." *Deiter*, 436 F.3d at 466. It "tend[s] to merge" with commonality, insofar as both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 158 n.13 (1982). Thus, "[t]he essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter*, 436 F.3d at 466 (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)). The analysis "begin[s] with a review of the elements of [the] plaintiff['s] *prima facie* case *and the facts on which the plaintiff would necessarily rely to prove it*. [The court must] then determine the extent to which those facts would also prove the claims of the absent class members." *Id*. at 466 (emphasis added). Plaintiff simply makes no effort to satisfy that binding Fourth Circuit requirement here. That failure, though, is understandable because proof of Soutter's individual case will not "also prove the claims of the absent class members" as *Deiter* requires. [9]

---

[9] Plaintiff's individual claim for willful FCRA violations is exceptionally weak. First, her claim for relief is based, as she admitted at argument in 2011, on a novel theory of reasonable judgment-disposition retrieval practices that no court has ever held to violate the FCRA. Accordingly, it will be extremely difficult for Plaintiff to prove that Equifax acted willfully when

In short, resolution of Plaintiff's claim does nothing to resolve the claims of other class members, who must prove their own claims under whatever unique facts and circumstances surrounded their judgment dispositions, their retrieval, Equifax's reporting of them and ultimate removal of them.  As the Fourth Circuit held in *Dieter*, "plaintiffs' proof" that Equifax willfully violated the FCRA as to Plaintiff "would hardly prove" that Equifax willfully violated the FCRA as to any other consumer.  *Id*. at 468.  Plaintiff's lack of effort to demonstrate typicality is telling, and dispositive.

### C.    Plaintiff Does Not Satisfy The Adequacy Requirement.

The problem with adequacy is Plaintiff's decision to exclude from her latest putative class any consumer that sustained actual damages:  "Plaintiff is not seeking class treatment with regard to actual damage determinations."  Doc. 132 at 24 n.6.  Thus, Plaintiff has attempted to gerrymander out of the putative class anyone that sustained actual damages – or, at a minimum, has capped any putative class member's recovery at the maximum of $1,000 statutory damages. Plaintiff is an inadequate representative as a result.

Indeed, while Plaintiff claims that she does not seek actual damages, she testified at her deposition that she, in fact, had sustained "actual, cognizable damages."  Doc. 77-13, 69:8-13. As her testimony indicates – especially if she is, as she claims, an adequate representative of the putative class – the class will include individuals with actual damage claims, notwithstanding Plaintiff's benign footnote purporting to sweep them out of the class.  It is clear in this Circuit

---

no judicial decisions provided notice of what procedures would be reasonable under what circumstances.  Moreover, Equifax acted quickly and reasonably to respond to Plaintiff's claim that her report was inaccurate.  When she first contacted Equifax (in May 2008), she learned that

that "basic due process requires that named plaintiffs possess undivided loyalties to absent class members." *Broussard*, 155 F.3d at 338.  Plaintiff cannot possibly meet that standard here.  If Plaintiff has, indeed, sustained actual damages, then her claims cannot be typical or adequate of the class she proposes to represent because she has expressly attempted to exclude "actual damage determinations" from the class.

In short, Plaintiff's latest change to the class definition has, once again, exposed her inadequacy.  It is inconceivable that a would-be class representative could testify that she sustained actual damages and still be deemed adequate when that same representative purports to exclude from the class anyone who had, in fact, sustained actual damages.  Plaintiff cites no case that has approved such a result, and in light of *Dukes* and *Comcast*, it is highly unlikely any court would allow such an approach.  Plaintiff has failed to carry her burden to establish adequacy.[10]

## III.    PLAINTIFF DOES NOT SATISFY THE REQUIREMENTS OF RULE 23(b)(3).

"Rule 23(b)(3) has two components:  predominance and superiority." *Thorn*, 445 F.3d at 319.  Plaintiff satisfies neither.

### A.    Individual Issues Predominate Over Any Common Issues.

As the Supreme Court recently confirmed, "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 133 S. Ct. at 1432 (citing cases).  As a result, if Plaintiff "cannot establish commonality under Rule 23(a), then, *a fortiori*, [she] cannot satisfy

---

the judgment was not even reporting yet, and following her second contact (in December 2008), Equifax immediately removed the judgment from her file.  Doc. 77-9 (Fluellen Decl.), ¶¶ 7-10.

[10] Plaintiff absurdly asserts that the "burden is on the defendant to demonstrate that the representation is inadequate."  Doc. 132 at 21 (quotations and brackets omitted).  The law in this Circuit is that "it is *not the defendant* who bears the burden of showing that the proposed class

the more stringent requirements of Rule 23(b)." *Valerino*, 283 F.R.D. at 310.  Plaintiff's failure

to establish the Rule 23(a) standards dooms her 23(b)(3) effort.

> **1.      Individual Issues Of Reasonableness, Willfulness, Inaccuracy, And Damages Predominate Over Any Common Issues.**

As detailed above, the issues of reasonable procedures, willfulness, inaccuracy, and

statutory damages are highly individualized and do not satisfy *Dukes*.  Therefore, those issues

necessarily predominate over any common issues for purposes of the Rule 23(b)(3) analysis.

Equifax will not repeat those arguments here in the interest of space, but with regard to

reasonableness, the law is clear that the "standard of conduct by which the trier of fact must

judge the adequacy of agency procedures as what a reasonably prudent person would do under

the circumstances." *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 513 (5th

Cir. 1982).  Thus, for a § 1681e(b) claim, "[i]n determining whether a procedure was reasonable,

the court must consider the circumstances in which the procedure was undertaken." *Anderson v.

Trans Union*, 405 F. Supp. 2d 977, 984 (W.D. Wis. 2005).

As detailed above, there is no one-size-fits-all way to determine the "circumstances"

under which to gauge the reasonableness of Equifax's conduct toward any specific consumer;

that analysis cannot be performed on a classwide basis, and Plaintiff makes no meaningful effort

to demonstrate that it could be.  A reasonable (or unreasonable) procedure with regard to

consumers in a rural part of the Commonwealth cannot be applied to the same procedure,

employed under different circumstances and with the potentially different approaches of court

clerks, in Richmond or a more populous jurisdiction, and vice versa.  Those questions are highly

---

*does not comply* with Rule 23, but that it *is the plaintiff* who bears the burden of showing that the

individualized and predominate over any "common" issues.

Likewise, the willfulness inquiry, as detailed above, will necessitate an individualized analysis of each putative class member's circumstances.  A simple conclusion that any failure by Equifax to note a judgment disposition status 30 or more days from the date the disposition was entered by any GDC in the entire Commonwealth cannot be assessed on a classwide basis. Whether the procedures that caused a given alleged inaccuracy were willfully unreasonable cannot be determined without considering the circumstances surrounding the use of those procedures and, as detailed above, those circumstances varied across multiple dimensions during the class period.

Similarly, the question of inaccuracy is inherently individualized.  As the Tenth Circuit held in *Owner-Operator*, "the accuracy of each individual's [report], an essential element of a § 1681e(b) claim, require[s] a particularized inquiry."  537 F.3d at 1194.  Furthermore, Plaintiff simply assumes that any inaccuracies were entirely the fault of Equifax, and there is no basis for such an unsupported assumption.  Indeed, some inaccuracies could have been caused by misinterpretations of ambiguous notations in the court file, rather than a failure to retrieve the court file within Plaintiff's arbitrarily-imposed 30-day time limit.  The possibility of third-party involvement is an additional reason why a given inaccuracy may not be attributable to willfully unreasonable procedures on Equifax's part, as well as a predominant individual issue.

Furthermore, even putting aside Plaintiff's inappropriate effort to gerrymander actual damages issues out of the class (which, as detailed above, renders her inadequate), the Fourth Circuit's ruling in this case establishes that individual circumstances are important to the

---

class *does comply* with Rule 23."  *Thorn*, 445 F.3d at 321 (emphasis original).

assessment of statutory damages. *See Soutter*, 2012 WL 5992207, *5 ("Soutter is claiming only statutory damages, which typically require an individualized inquiry").  Plaintiff simply ignores the Fourth Circuit's ruling, under the apparent belief that if she ignores it, this Court will too.  Of course, the Court cannot do that.  The myriad circumstances under which each putative class member's judgment disposition was retrieved, reported, and removed foreclose any possibility of determining statutory damages on a classwide basis.  As the Fourth Circuit held in this case, following Judge Wilkinson's opinion in *Stillmock*, "evidence about particular class members is highly relevant to a jury charged with [the] task" of assessing statutory damages. *Id.* (quoting *Stillmock*, 385 Fed. Appx. at 277 (Wilkinson, J., concurring)).  Because Plaintiff concedes that "the amount of statutory damages … for each class member" is an "individual issue" (Doc. 132 at 24), the amount of statutory damages plainly is a predominant individual issue.

### 2.    Plaintiff's Conceded Individual Issues Predominate Over Any Common Issues.

Even Plaintiff is forced to admit that there are numerous additional individual questions that must be answered for every member of the putative class, including:

1.    Did Equifax furnish a credit report about that consumer in response to a "hard inquiry" by one of its customers?

2.    Did Equifax receive notice from the consumer regarding the inaccuracy?

3.    Did the credit report contained a dismissed, appealed, satisfied, or vacated Virginia General District Court civil judgment as unpaid after such notice?

4.    How many times did Equifax commit this violation for that consumer?

*See* Doc. 132 at 23.  Each of those individual issues predominates over any "common" issues.

Stated simply, there is no way for a factfinder to resolve the issues of whether (1) Equifax furnished a credit report about a given consumer in response to a "hard inquiry"; (2) Equifax received notice from the consumer regarding an alleged inaccuracy; (3) the credit report contained a dismissed, appealed, satisfied, or vacated GDC civil judgment as unpaid after the alleged notice; and (4) the number of times Equifax allegedly committed the purported violation for each putative class member on a classwide basis; each of those issues is individualized, and Plaintiff makes no effort to argue to the contrary.   She has not carried her burden on predominance.

### B.    A Class Action Is Not The Superior Method Of Adjudication.

"The superiority requirement ensures that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'"  *Thorn*, 445 F.3d at 319 (quoting Fed. R. Civ. P. 23(b)(3)).  Plaintiff does not satisfy the superiority requirement.

### 1.    The FCRA's Fee-Shifting Mechanism Precludes Superiority.

The law is settled that superiority is not met when the plaintiff's claims implicate statutes allowing the successful plaintiff to recover her attorneys' fees.  Courts have applied this principle in the FCRA context.  *See*, *e.g.*, *Harper*, 2006 WL 3762035, *10 ("I am … persuaded by Defendants' argument that the FCRA, by providing for the award of attorneys' fees, already provides an incentive for the putative class members to bring individual claims."); *see also Anderson v. Capital One Bank*, 224 F.R.D. 444, 451 (W.D. Wis. 2004) (holding that a "class action is not necessary to give injured parties an opportunity for relief that would be too expensive to obtain if they were limited to individual suits" because "their suits are essentially costless because they are entitled to an award of attorney fees and costs they incur in bringing

suit"); *Campos v. ChoicePoint, Inc.*, 237 F.R.D. 478, 490 (N.D. Ga. 2006) (class certification unnecessary for "the statutory provision entitling a plaintiff to recover costs and attorney's fees, should provide sufficient motivation for individual adversely affected plaintiffs to bring suit").

The Fourth Circuit agreed in *Thorn*, which was brought under civil rights statutes that contain, like the FCRA, a fee-shifting provision. Affirming the district court's denial of certification in that case, the Fourth Circuit approved the lower court's finding that "the class-action device was not necessarily superior to individual trials":

> Significantly, the district court noted that the small amount of each class member's claim would not dissuade an attorney from taking class member's individual cases because 42 U.S.C.A. § 1988 (West 2003) allows prevailing plaintiffs in § 1981 and 1982 actions to recover attorney's fees.

*Thorn*, 445 F.3d at 328. Superiority is, therefore, lacking on this basis.[11]

### 2. Courts Should Not Certify Novel Claims And Theories Absent A Track Record Of Trials.

In 2011, Plaintiff agreed with the Court that "there aren't any court decisions saying what [Equifax is] doing is wrong." Doc. 86 at 48. That hasn't changed in the last two years – no court has held that Equifax's procedures for retrieving judgment dispositions even negligently, let

---

[11] Moreover, it is undisputed that Plaintiff pursued, and settled, her own individual claim arising from similar facts against another CRA, Experian. *See* Doc. 77-20. Further proof that these claims can be maintained individually is her statement at oral argument that, if class certification were denied, the alternative would be "flood[] the courts with individual cases." Doc. 86 at 50. Now, however, Soutter attempts a one-eighty from that prior admission by contending, with no factual support whatsoever, that "[t]here simply is no other practical means for this class to challenge a practice which stands in clear violation of federal law." Doc. 132 at 28. Plaintiff cannot have it both ways, and she apparently does not grasp the irony – if not hypocrisy – of that statement, given that she pursued and settled, on an individual basis, her lawsuit against Experian, thus choosing to take tens of thousands of dollars for herself rather than

alone willfully, violates the FCRA.  That reality, coupled with Plaintiff's acknowledgement of the novelty of her legal theory, forecloses any finding of superiority.

Courts consistently have held that allowing novel claims carrying enormous aggregated statutory (and potentially punitive) damages to proceed initially as a class action creates enormous settlement pressure, threatens to ensure that the merits of novel claims such as those pursued here never are tested, and do not satisfy Rule 23's superiority requirement.  *See In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1299 (7th Cir. 1995) (class certification in case pursuing novel legal theory inappropriate where defendants are forced "to stake their companies on the outcome of a single trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability"); *In re New Motor Vehicles Canadian Export Antitrust Lit.*, 522 F.3d 6, 26 (1st Cir. 2008) ("[W]e . . . hold that when a Rule 23 requirement relies on a novel or complex theory as to injury, . . . the district  court must engage in a searching inquiry into the viability of that theory and the existence of the facts necessary for the theory to succeed.").

Novel claims like Plaintiff's should not be certified under settled interpretations of Rule 23.  *See, e.g.*, *Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 393 (D. Kan. 1999) ("The court balks at the prospect of binding such a large and diverse class of Kansans to decisions of one court and one jury when such novel issues have never been presented to a court in any individual litigation within the state.").  Plaintiff's effort to establish superiority fails on this alternative basis.

---

continue to "challenge a practice" that supposedly was "in clear violation" of the FCRA.  The Court should ignore such disingenuous (and factually unsupported) arguments.

30

## CONCLUSION

Plaintiff's Motion for Class Certification should be denied.

Respectfully submitted this 19th day of April, 2013.

/s/_____

John W. Montgomery

Virginia State Bar No. 37149

Counsel for Equifax Information Services, LLC

MONTGOMERY & SIMPSON, LLP

2116 Dabney Road, Suite A-1

Richmond, Virginia 23230

Telephone:  (804) 355-8744

Facsimile:  (804) 355-8748

Email: jmontgomery@jwm-law.com

31

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of April, 2013, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

> Leonard A. Bennett
> Robin A. Abbott
> Consumer Litigation Associates PC
> 12515 Warwick Boulevard
> Suite 100
> Newport News, Virginia 23606
>
> Dale Wood Pittman
> The Law Office of Dale W. Pittman, P.C.
> 112-A W Tabb St
> Petersburg, VA 23803-3212
>
> Matthew James Erausquin
> Consumer Litigation Associates PC
> 1800 Diagonal Road
> Suite 600
> Alexandria, VA 22314

Dated:  April 19, 2013

> /s/_____
> John W. Montgomery
> Virginia State Bar No. 37149
> Counsel for Equifax Information Services, LLC
> MONTGOMERY & SIMPSON, LLP
> 2116 Dabney Road, Suite A-1
> Richmond, Virginia 23230
> Telephone:  (804) 355-8744
> Facsimile:  (804) 355-8748
> Email: jmontgomery@jwm-law.com

32