# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

|  |  |  |
|---|---|---|
| | : | |
| DONNA K. SOUTTER, *for herself* | : | |
| *and on behalf of all similarly situated* | : | |
| *individuals*, | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | 3:10-CV-00107-REP |
| | : | |
| v. | : | |
| | : | |
| EQUIFAX INFORMATION | : | |
| SERVICES LLC, | : | |
| | : | |
| Defendant. | : | |

## EQUIFAX INFORMATION SERVICES LLC'S

## SUR-REPLY IN OPPOSITION TO

## <u>PLAINTIFF'S AMENDED MOTION FOR CLASS CERTIFICATION</u>

## INTRODUCTION

Ignoring, as the Court should, Plaintiff's condescending remarks, sarcastic asides, and ad hominem attacks on Equifax, it becomes clear that Plaintiff has utterly failed to carry her burden of proving why this Court should rule any differently than the Fourth Circuit did one year ago that this case is inappropriate for class certification.  In fact, it is not a particularly close question.

Indeed, despite having been given seven months to conduct additional discovery prior to filing her reply brief, Plaintiff practically ignores many of the newly-developed facts and simply restates most of the same arguments she made in prior briefs – many of which the Fourth Circuit explicitly rejected.  Those arguments did not carry the day with the Fourth Circuit and they should, likewise, be inadequate now.  Plaintiff carried her burden of proving any of the Rule 23(a) requirements, particularly commonality, nor has she demonstrated any of the Rule 23(b)(3) requirements.  After nearly four years of litigation, it is now apparent that class certification is wholly inappropriate for this case.  Plaintiff's Renewed Motion for Class Certification should, therefore, be denied.

## FACTS OBTAINED IN LEXISNEXIS DEPOSITIONS

Plaintiff filed her Renewed Motion for Class Certification on February 21, 2013 (Doc. 132), followed by Equifax's response on April 19, 2013 (Doc. 135).  Thereafter, Plaintiff was allowed additional time for discovery, and she deposed a representative of LexisNexis and four LexisNexis contractors responsible for collection of judgment data from some of Virginia's General District Courts ("GDCs").  Those depositions were accompanied by extensive document requests to each of the five deponents.  None of the depositions or documents produced assists Plaintiff in demonstrating that class certification is appropriate.  Indeed, as detailed below, the evidence is even clearer that (1) the methods of judgment disposition retrieval are not uniform

across GDCs and, in fact, vary significantly; and (2) despite the best efforts of the Virginia

Supreme Court ("VSC") and individual court clerks within the GDCs, errors occur in the

reporting of whether and how judgments are satisfied, vacated, or appealed.

## I.     LEXISNEXIS CONTRACTORS

Plaintiff deposed four LexisNexis contractors – Sandra Arrington, Karen Christian,

Cynthia Long, and Pamela Vicari (excerpts attached as Exhibits A, B, C, and D, respectively).

None of these depositions revealed any facts that would support certification.  Having sought

their depositions as a reason to obtain more time for her reply, Plaintiff completely ignores even

referring to the contractor depositions in her reply.  That omission is understandable – their

testimony does not assist Plaintiff at all, and for the most part helps Equifax.

### A.     Sandra Arrington's Public Records Procedures

Ms. Arrington has worked as a contractor for LexisNexis and its predecessor companies

for approximately 20 years.  (Ex. A at 9:7-11.)  She and her daughter collect judgments and

judgment dispositions from the GDCs in eight counties.  (*Id.* at 11:22-12:21.)

Some, but not all, of the courthouses have publicly available computer terminals for

obtaining case information, but Ms. Arrington generally does not use those computers to

complete her work.  (*Id.* at 15:6-16:6.)  She uses binders prepared by the court clerks containing

copies of court judgments and dispositions.  (*Id*. at 15:8-10, 16:3-6.)  She collects the judgments

by reviewing a binder in the courthouses.  (*Id*. at 15:7-12.)  She does not use the computers in the

clerks' offices to collect the information.  (*Id*. at 15:9.)  In fact, the courthouse in Martinsville

does not even have a computer that she could access.  (*Id*. at 15:14-16.)  Significantly, she does

not know whether the information that she could access in the computer (at courthouses that

have one) is the same as what is in the binders that she uses.  (*Id*. at 15:25-16:3.)

With respect to dispositions of judgments (such as satisfactions), Ms. Arrington testified that the court clerks "at one time . . . did a printout for us at the courthouse and put satisfactions, but they stopped." (*Id*. at 25:1-17.) When asked how she collected the dispositions without the printouts, Ms. Arrington explained that she obtains them from the underlying court record folders. (*Id*. at 25:13-27:1.) And when asked whether there were any "systematic problems or accuracy problems with the way any of their towns keep track of their judgment or judgment disposition data," Ms. Arrington testified that "[w]ell, sometimes when I am working, like the amount of certain things, maybe a date or something doesn't look clear, I will ask the clerk, you know, to verify the amount; or if there is something that doesn't look right, I will ask her a question about it and she will look it up for me." (*Id*. at 28:20-29:4.)

**B.      Karen Christian's Public Records Procedures**

Ms. Christian, who has worked for nearly 25 years, collects public records from the GDCs in 18 counties. (Ex. B at 10:8, 11:12-13.) She collects judgments by going to the courthouses and using the publicly available computer to look up the indexes. (*Id*. at 15:3-18.) She then puts in the dates that she is searching and obtains all the pertinent information. (*Id*.)

Ms. Christian testified that "some of them are smaller counties that don't even have a public computer, so I have gained permission to look at the original documents. So I go in and I'm able to just physically look at the original documents. So I go in and I'm able to just physically look at the original documents. Most of the larger counties have public computer terminals for us to use so I use those to get the data." (*Id*. at 17:19-18: 5.) Significantly, when asked about the similarities in the data on the computers (where they are available) and the data in the original court files, Ms. Christian explained, "The only difference is a clerk, if I'm looking at a computer screen, a clerk has entered that data rather than, you know, from the original

4

document." (*Id*. at 18:18-19:2.)  As for collection of dispositions, Ms. Christian testified that the process "depended on the county" and "[i]t depended on whether the clerk wanted to cooperate with us or not.  Some counties would provide me with a monthly printout of all of the releases and then they would put the vacated judgments in a file folder and I would pick those up.  Some counties just absolutely refused.  The clerks just would not do that for us." (*Id*. at 21:8-21.)

With respect to inaccuracies in the court data, Ms. Christian testified that "Goochland [County] did not record the correct date on their computer system of updates, releases" and that she has seen similar "human error" in dates listed in public records in other courts during her career including a recent error in a court record in Chesterfield County where a judgment amount was incorrectly entered in a case that had been transferred to another venue.  (*Id*. at 25:13-26:15.) She explained that the court clerk had to pull the actual hard copy file to review it to determine what actually occurred and the clerk admitted that "[n]o, there wasn't a judgment rendered; we shouldn't have put the amount in there.  I believe it was Norfolk." (*Id*. at 26:13-15.)

## C.     Cynthia Long's Public Records Procedures

Ms. Long testified that she has worked as a contractor for LexisNexis and its predecessor companies for at least 17 years and currently covers collection of judgment information for 13 GDCs in Virginia.  (Ex. C. at 6:17-18, 17:19-22.)  When she collected records for LexisNexis's predecessor, she would take her computer to the courthouse and the clerks provided access to the original court documents.  (*Id*. at 35:24-36: 12.)   She also received printouts of some court records from some clerks.  (*Id*. at 36:23- 37:1.)  She also used the publicly available computers, the clerk's computers, or the original court documents.  (*Id*. at 41:19-43:10.)

With respect to Plaintiff's attacks on the differences between various courts, Ms. Long testified that "I have found in my years of doing this that almost every court can be different."

5

(*Id*. at 55:2-21.)  With respect to Plaintiff's questions about the systematic collection of vacates, Ms. Long explained that "[i]n my courts, vacated judgments, if they are available, have been held out for me by the court, the clerk, and, therefore, if they're available, then they're collected and then it goes to LexisNexis." (*Id*. at 63:12-23.)  With respect to satisfieds, she testified that some courts will provide copies for her in a box.  (*Id*. at 64:19-65:21.)

Ms. Long was asked about situations where errors occur in the court records because the date of satisfaction that is entered into the computer pre-dates the date of the judgment itself and testified that such events occur "really more often than your three in a hundred seems to be.  It seems like – it's an aggravation to me as a researcher, you know, inputting the information and when I see something that's not correct, you know, then it's kind of upsetting, and I do remember – you're saying three in a hundred." (*Id*. at 85:11-23.)

### D.    Pamela Vicari's Public Records Procedures

Ms. Vicari testified that she has worked in the industry for approximately 12 years and covers collection of judgment information for ten GDCs.  (Ex. D at 9:17-21, 12:4-7.)  She has used court printouts, public access computers, and copies of court documents to gather judgment information, depending on the court.  (*See id.* at 24-26.) Ms. Vicari testified that, since 2011, she handled some of her public record collections from home using a system called LOPAS that permitted her to have remote access to the information that was available through publicly available computers in the courts.  (*Id*. at 13:3-25.)   Ms. Vicari also shed light on the burdensomeness of any sort of extensive manual review of the original court records to check court records dating back to 2007 when she explained that "[i]f they wanted me to do that, it would have taken me days because you would have to go back to each and every day and see if

6

there was a court date and see if there was a judgment and write all those down and then go back again to see if they were satisfied." (*Id*. at 19:10-22.)

## II.     MARK JOHNSON

Mark Johnson has worked for LexisNexis and its predecessor company for approximately 16 years and currently serves as Vice President for Data Services.  (Ex. E at 7:21-24, 12:16-13:10.)  Mr. Johnson testified that, from 2005 through May 2009, the VSC provided LexisNexis with information regarding judgments and dispositions through a "bulk feed." (*Id*. at 101:16-24.) Not all dispositions, however, were available through the bulk feed, however; information regarding vacated judgments had to be collected manually.  (*Id*. at 101:25-102:9, 104:18-105:6*.*)

Plaintiff asserts that "LexisNexis has NEVER obtained these satisfactions, vacatures, dismissals or appeals through the courthouse," and that "Mr. Johnson actually never said that the disposition collections that are the subject of this case were collected in the courthouses or in a way that varied over time." (Doc. 158 at 10-11 (emphasis original).)  These statements are false, and Mr. Johnson's deposition excerpts cited by Plaintiff do not support her position:

Q.     Well, how about presently.  How does LexisNexis *today* collect judgment information and 18 judgment disposition information?

A.     We collect it through manual collection, the filings are collected manually through our laptop collection effort that we would call civil acquisition. And the dispositions are collected from a web scrape that we call civil automation.  So it's a combination of the two.

\* \* \* \*

Q.     And then judgment dispositions, what does that mean to you by the way? What are judgment dispositions?

A.     Satisfaction or a vacate.

Q.     What about an appeal of a judgment?

7

A.      We don't collect those.

Q.      What about a judgment that is later dismissed?

A.      A judgment that's dismissed is considered a vacate.

Q.      And so is there a uniform manner in which you *currently* collect dismissals, vacatures or satisfactions?

A.      Yes.

Q.      How long has that uniform collection method been in place as LexisNexis?

A.      Since about the same time.  *When the bulk feeds stopped*, we went to manual collection for the filings and web scrape collection for the satisfactions and vacates.

(Ex. E at 29:16-24, 31:21-32:15 (emphasis added).)  As the quoted passage demonstrates, Mr.

Johnson was not testifying about LexisNexis procedures during the time period now relevant to

this lawsuit (through May 2009), but rather about LexisNexis's current practices.  Later, Mr.

Johnson testified that courthouse collections were required for some dispositions during the

relevant time period because they were not available through from the bulk feed:

Q.      [Quoting from Mr. Johnson's declaration:] "Until May of 2009, the Supreme Court of Virginia made available information regarding judgments and dispositions through regularly scheduled Bulk Feeds." And that's true.  Correct?

A.      Yes.

Q.      And how far back before May, 2009 was this the procedure for LexisNexis to pick up judgments from the Virginia District Courts?

A.      I recall that began in about 2005.

Q.      So between 2005 and May of 2009 there was one uniform method used by LexisNexis to pick up judgment and filings in case dispositions, and that was the bulk feed from the Supreme Court of Virginia.  Correct?

A.      Not entirely.  No.

8

Q.      Not entirely.  What was different about it?  What was wrong about what I just said?

A.      Well, I recall that we collected vacates through our manual process . . . .

*  *  *  *

Q.      I am, again, not talking about the individualized dispute pick-ups.  And so is it your testimony that LexisNexis requested and received from, or believed it was receiving from the Virginia Supreme Court vacates or dismissals prior to May of 2009?

A.      My recollection is we were aware that vacates were not a part of the feed.

Q.      And then is it – do you have personal knowledge that your subcontractors on a regular basis, not based on disputes, but on a regular basis were tasked with gathering all vacatures or dismissals from the courts manually –

A.      That's my understanding.

Q.      – prior to May of – Okay.

*  *  *  *

Q.      And the last sentence in Paragraph 7 says, "To supplement known gaps in the Bulk Feed related to vacates" you "employed independent contractors to conduct in-person reviews as described below."  Do you have any personal knowledge about how often or how regularlized the check for vacates was prior to May of 2009?

A.      Can you clarify that?  I'm not quite sure what you're asking.

Q.      Sure. . . .

Q.      Yes.  Do you know – Is it your testimony or do you have personal knowledge that between 2005 and May of 2009, LexisNexis had a procedure in place to have its subcontractors check every court house on some regular basis for every vacate?  I'm recognizing that it might not have been 100-percent successful but that the objective was to try to pick up every vacate from every court house in Virginia. . . .

A.      Yeah.  I mean, the – again, "everything" and "always," I always avoid those statements.  Directionally, our intent was to collect the vacates that we knew were not in the bulk feed.  I can further clarify that as we had no customers for that feed until we acquired customers from ChoicePoint in

9

2007.  And at that point in time it became more important for us to collect
vacates more diligently.  So prior to the time that we had customers for the
data, we may not have been as diligent in collecting vacates.  We have no
contractors in the state.

(*Id*. at 101:16-102:9, 104:18-105:7, 105:21-107:9.)

## ARGUMENT

## I.   PLAINTIFF'S NOVEL "LAW OF THE CASE" THEORY IS FLAWED AND SHOULD BE DISREGARDED.

Having been granted seven months to pursue discovery that might fortify her Renewed

Motion for Class Certification, Plaintiff chooses to lead off her brief with the weakest argument

imaginable – a "law of the case" type argument that posits that "the Court should presume the

correctness of its prior rulings to the extent they were not reversed by the Court of Appeals."

Doc. 158 at 1.  It is nonsensical to assert that, the Fourth Circuit having reversed certification on

the only issue it deemed necessary to address (typicality), the Court should "presume the

correctness of its prior rulings."   Indeed, to do so would directly violate the  Fourth Circuit's

ruling, which stated that in light of plaintiff's failure to establish typicality, "we have not

addressed Equifax's additional arguments on appeal" and mandated that any "renewed request

for certification" be "subject to the 'rigorous analysis' under all four Rule 23(a) factors."  *Souter*

*v. Equifax Info. Services, LLC*, 498 Fed. Appx. 260, 266 n.* (4th Cir. 2012).

Even if some variation of "law of the case" could apply to a renewed motion for

certification of a class that was decertified on appeal, that general doctrine would not apply here.

Indeed, since the court first addressed certification in March 2011, the Supreme Court has issued

at least two game changers on class certification – *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.

2541 (2011), and *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  Those two cases address

such issues as commonality, damages, and the general rigor with which courts must assess

requests for class certification. Plaintiff's implied request that the Court ignore these two controlling opinions, both of which have been issued since the Court's first opinion on class certification nearly three years ago, should be rejected.

## II.   THE LEXISNEXIS DEPOSITIONS DID NOT YIELD ANY EVIDENCE SUFFICIENT TO CURE DEFICIENCIES WITH RESPECT TO THE RULE 23(a) REQUIREMENTS OF COMMONALITY AND TYPICALITY.

### A.   The LexisNexis Depositions Further Demonstrate That Plaintiff Cannot Identify Any Common Questions Capable Of Resolution For All Class Members In One Stroke.

Rule 23(a)(2) requires Plaintiff to demonstrate that "questions of law or fact common to the class" are present. None of the questions proposed by Plaintiff satisfies the requirements of *Dukes*, which requires Plaintiff to do more than raise a common question: The central concern for class certification "is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." 131 S. Ct. at 2551 (emphasis original). In other words, the common question must be "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Whether assessed under the *Dukes* "common answers" standard for commonality or the "far more demanding" standard of Rule 23(b)(3) predominance, *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-64 (1997), the supposedly common questions identified by Plaintiff are insufficient for class certification.

### 1.   Whether Equifax's Procedures Were Unreasonable Is Not A Common Question Capable Of Generating The Required "Common Answers."

Plaintiff argues that the bulk feed, used by LexisNexis until May 2009 to obtain judgments and judgment dispositions, was a uniform process: "During the entire class period,

11

LexisNexis obtained the judgment information – initial judgments AND dispositions – from the VSC website data." Doc. 158 at 10. That assertion is demonstrably false. While LexisNexis did use the bulk feed for collection of judgments and some dispositions during this time period, it collected some dispositions directly from individual courts,. *See* Ex. E, Johnson Dep. at 101:12-104:25. As the LexisNexis contractor testimony establishes, collection procedures for Virginia's GDCs are not consistent. *See* Ex. A at 15:6-16:6; Ex. B at 17:19-19:2, 21:8-21; Ex. C at 16:17-18, 17:19-22, 35:24-36:12, 41:19-43:10; Ex. D at 13:3-25.

In short, given the variation in, among other things, (1) pick-up intervals at each GDC (which is determined by historical judgment disposition volumes), (2) degrees of court access and clerk cooperation within each GDC, and (3) reliability of the information provided through the various methods, the question of whether Equifax's procedures were reasonable is not capable of generating common answers with respect to all class members, and certainly not with the "one stroke" required by *Dukes*.[1]

## 2. Whether Equifax's Procedures Violated § 1681e(b) Is Not A Common Question.

Plaintiff scarcely spends any time addressing the insufficient supposedly "common" question of whether Equifax violated the FCRA. In rhetorical form, Plaintiff argues: "*Equifax always does X. Does X violate the FCRA?* How can this not be a common issue?" Doc. 158 at 11 (emphasis original). The answer is: "Because the Supreme Court says it's not." Indeed, in *Dukes*, the Court expressly held that the plaintiff cannot establish commonality "merely" by

---

[1] Furthermore, as Equifax noted in its Response Brief, the question of basic "reasonableness" is largely irrelevant to this case anyway because Plaintiff must prove that Equifax's procedures are *willfully* unreasonable given that she has abandoned any claims for negligent FCRA violations. In other words, Plaintiff cannot establish commonality merely by

asserting that the class members "have all suffered a violation of the same provision of law." *Dukes*, 131 S. Ct. at 2551.

More to the point, in her quixotic effort to erase the Fourth Circuit's opinion in this case, Plaintiff simply ignores what that court held less than a year ago on exactly this issue: "Members of a proposed class do not establish that 'their claims can productively be litigated at once,' merely by alleging a violation of the same legal provision by the same defendant." *Soutter*, 498 Fed. Appx. at 265 (quoting *M.D. ex rel. Stuckenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (quoting, in turn, *Dukes*, 131 S. Ct. at 2551)). The Fourth Circuit, therefore, has rejected, in this case, the notion that bland allegations that Equifax "violated the FCRA" are sufficient to establish commonality.[2] Plaintiff's failure to come to grips with the Fourth Circuit's opinion on this issue, as well as many others, is telling, and dispositive.[3]

### 3.    Inaccuracy Is Not A Common Question.

Plaintiff practically abandons any effort to establish inaccuracy as a common question, spending only one paragraph and citing zero cases to support her argument. *See* Doc. 158 at 11-12. That "effort," of course, is not remotely sufficient to carry Plaintiff's burden. Inaccuracy is inescapably an individual issue: There is no way to determine whether a given individual's report was accurate without examining that individual's report and that individual's court file.

---

asking whether Equifax's procedures are "reasonable" when she can only establish liability by proving that Equifax's procedures were *willfully* unreasonable.

[2] If, as the Fourth Circuit held, "Soutter cannot establish typicality simply by asserting a violation of § 1681e(b) by Equifax," 498 Fed. Appx. at 266, then she logically cannot establish commonality by making the same "violated the law" assertion.

[3] Thus, Plaintiff's citation to a passel of pre-*Dukes* cases (Doc. 158 at 11) is completely irrelevant, both because those cases carry no weight in light of *Dukes* and because the Fourth Circuit expressly held in this case that "violations of the law" allegations do not suffice to establish commonality.

In fact, inaccuracy is a textbook example for application of the *Dukes* "one stroke" requirement.  Plaintiff asks:  "Was it inaccurate to report that a judgment was unpaid and owing when it had already been satisfied, vacated or dismissed?"  *Id.* at 11.  There is no way that question can be resolved in "one stroke" as required by *Dukes*, and Plaintiff makes no argument to the contrary – nor can she.  In a case that post-dated this Court's first certification opinion and, like this one, involved public records, a Georgia federal court denied certification in part because in accuracy is an individual issue in a case.  In *Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688, 703 (N.D. Ga. 2012), the court held that "it will be necessary to conduct a highly individualized inquiry into the content of each consumer's report in order to determine if the adverse information in that report is complete and up to date."  The same result should obtain here.

### 4.      The Question Of Willfulness Is Not Common.

Plaintiff's argument on willfulness is a perfect example of posing a supposedly "common" question at an "unacceptably general level," which is insufficient to establish commonality.  *See Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006).  Plaintiff argues that "Equifax can have only one understanding of the requirements of § 1681e(b), which must be either objectively reasonable or objectively unreasonable; this step of the *Safeco* analysis clearly requires no reference whatsoever to the circumstances of individual class members."  Doc. 158 at 12.  But that "question" – if it is one – has nothing to do with proving any putative class member's case, including Plaintiff's.  If all any plaintiff had to do was assert that a defendant's "knowledge" of the law was a "common question," commonality would be established in every case and *Dukes* would have no meaning.  Indeed, Plaintiff's "understanding of the law" issue is not far removed from the "violation of the law" question, which as discussed above does not suffice to establish commonality under *Dukes* and the Fourth Circuit's opinion in this case.

14

Regardless, Plaintiff yet again ignores the appellate court's ruling in this case. Reciting the unique facts of Plaintiff's case, the Fourth Circuit held: "Proof that Equifax's conduct was willful toward Soutter because she sent letters in advance informing Equifax that the case against her was dismissed will not advance the claims of other class members." *Soutter*, 498 Fed. Appx. at 265. That holding identified just one of the innumerable variations in individual consumer fact patterns that would bear on the question of willfulness. For example, would the willfulness assessment be affected by the fact that one consumer asked for removal of the judgment five times instead of once? Of course it would. Would that determination be affected by the fact that one consumer had a judgment disposition that was not retrieved for 120 days while another's disposition was not retrieved for 35 days? Or 90 days? Of course it would, and a jury obviously would be entitled to hear such facts.

The court's denial of class certification in *Singletery v. Equifax Info. Services, LLC*, 2011 WL 9133115 (N.D. Ala. Sept. 22, 2011) (R&R), *adopted*, 2012 WL 4329273 (N.D. Ala. Sept. 18, 2012), *aff'd*, – Fed. Appx. –, 2013 WL 5486740 (11th Cir. Oct. 3, 2013), another unsuccessful FCRA class action that post-dated this Court's 2011 opinion, is instructive. That case proposed a class action based on Equifax's alleged failure to provide consumers with annual free disclosures within 30 days as required by law – not unlike Plaintiff's requirement here that Equifax report judgment dispositions within 30 days (the only difference being that, in *Singletery*, the FCRA actually imposes the 30-day requirement, whereas in this case the 30-day pickup requirement is imposed by Plaintiff). Relying on *Dukes* and holding that Plaintiff had failed to establish commonality, the court held that "[t]he only common issues among these class members is the fact that they did not receive the requested disclosure on some occasions," which

was not enough under Rule 23(a)(2): "They made requests in different ways and experienced different difficulties, which may or may not have been the product of any recklessness on the part of Equifax. It is not clear that there is a common factual issue concerning the alleged willfulness or recklessness of Equifax in failing to make these disclosures." *Singletery*, 2011 WL 9133115, *19. Similarly, in this case, it is clear from the evidence, as confirmed by the LexisNexis depositions, that pickup intervals, access to court files, clerical errors, and many other factors preclude any finding that "there is a common factual issue" as to whether the reporting (or lack thereof) of a judgment disposition on any individual consumer's credit file was the willful, reckless, negligent, or not a violation of the FCRA at all.

### 5. The Question Of Statutory Damages Is Not Common.

Remarkably, Plaintiff argues that statutory damages are a common issue based on the supposedly "governing law in this Circuit" of *Stillmock v. Weis Markets, Inc.*, 385 Fed. Appx. 267 (4th Cir. 2010). Doc. 158 at 14. That assertion comes perilously close to violating Rule 11; indeed, the Fourth Circuit's only citation to *Stillmock* fatally undermines Plaintiff's argument: "[B]ecause statutory damages are intended to address harms that are small or difficult to quantify, evidence about particular class members is highly relevant to a jury charged with this task." *Souter*, 498 Fed. Appx. at 265 (quoting *Stillmock*, 385 Fed. Appx. at 277 (Wilkinson, J., concurring)). Relying on Judge Wilkinson's *Stillmock* concurrence, the Fourth Circuit in this case held that "statutory damages … typically require an individualized inquiry." *Id.* There can be no reasonable doubt, based on the Fourth Circuit's single citation of *Stillmock* for the point that contested statutory damages issues *require* individualized analysis and, therefore, are inappropriate for class certification, that *Stillmock*, if anything, demonstrates the impropriety of class certification. Whether it is "governing law" as a general matter is highly suspect anyway,

16

but the irrefutable point, at this stage of this case, is that the Fourth Circuit refused to apply *Stillmock* – a case in which liability was not disputed, unlike here – to a case where the parties vigorously dispute whether any FCRA violation occurred, let alone a willful one.

In short, the "governing law" in this case at this point is the Fourth Circuit's opinion from less than a year ago. And the court held in *this* case that statutory damages "typically require an individualized inquiry," and Plaintiff has done absolutely nothing to rebut that controlling statement in her two post-appeal briefs. Statutory damages are an uncommon issue.

**B.      Plaintiff's Claim Is Typical Only At An "Unacceptably General Level," Especially With Respect To Willfulness, And, Therefore, Fails To Satisfy The Requirements Of Rule 23(a).**

"The typicality and commonality requirements of the Federal Rules ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (quotations omitted). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter*, 436 F.3d at 466 (quoting *Broussard*, 155 F.3d at 340).

In this case, the Fourth Circuit held that Plaintiff's first motion for class certification should not have been granted because she could not establish typicality. *See Souter*, 498 Fed. Appx. at 264-66. To determine whether Plaintiff had shown typicality, the Fourth Circuit "compare[d] her claims and Equifax's defenses to her claims with those of purported class members by reviewing the elements of Souter's prima facie case and the fact[s] supporting those elements and examining 'the extent' to which those facts 'would also prove the claims of the absent class members.'" *Id.* at 265 (quoting *Deiter*, 436 F.3d at 467). Plaintiff's claim under FCRA § 1681e(b) "requires her to prove that (1) her credit report was inaccurate; (2) Equifax's

17

unreasonable procedures caused the inaccuracy; and (3) Equifax's behavior was willful."  *Id*. Plaintiff's evidence, however, demonstrated that her claim was "'typical' only on an 'unacceptably general level.'"  *Id*. (quoting *Deiter*, 436 F.3d at 467).  That court observed that "a 'substantial gap' exists between Soutter's proof and that of class members."  *Id*. at 266 (quoting *Deiter*).

One of those "gaps," both then and now, relates to the proof requirements for willfulness. As the Fourth Circuit concluded:  "Proof that Equifax's conduct was willful toward Soutter because she sent letters in *advance* informing Equifax that the case against her was dismissed will not advance the claims of other class members."  *Id*. at 265 (emphasis added).  Plaintiff, in contrast to many class members, "sent letters to Equifax informing them of the possible inaccuracy *before* it occurred."  *Id*. (emphasis added).  This fact has not changed and again prevents Plaintiff from proving typicality.  For this reason and others discussed in Equifax's opening brief (Doc. 135 at 21-23), Plaintiff cannot establish typicality or bridge the "substantial gap" between her proofs and that of other class members.  *See Deiter*, 436 F.3d at 468.

## C.    Plaintiff Has Not Established That She Is An Adequate Representative.

With regard to adequacy, Plaintiff once again attempts to divert attention from the actual issue by asserting that Equifax "offers no proof or identification of putative class members who would seek to litigate substantial actual damages claims."  Doc. 158 at 17.  Putting aside the improper implication that Equifax somehow has a burden of proof on any issue regarding class certification, which is wrong, *see Behrend*, 133 S. Ct. at 1432, whether putative class members might "seek to litigate substantial actual damage claims" is completely irrelevant to the adequacy issue.  Indeed, it is undisputed, evidenced by Plaintiff's refusal even to acknowledge the point, let alone attempt to rebut it, that Plaintiff herself testified that she sustained "actual, cognizable

18

damages." Doc. 77-13, 69:8-13. Nearly four years into the litigation, Plaintiff is yet to cite a case where a would-be class plaintiff claimed that she had sustained actual damages, and then was held to be an adequate class representative when she, as Plaintiff has done here, jettisoned actual damages for the entire class even though the named plaintiff testified that she had sustained actual damages. Nothing under Rule 23 would justify such a ruling.

Furthermore, under Plaintiff's reformulated class definition, Plaintiff is not even a member of the class. The final component of Plaintiff's multi-factor class definition requires that, for each putative class member, "Equifax's records note that *a credit report regarding the person was furnished to a third party* who requested the credit report, other than for an employment purpose: (1) no earlier than February 17, 2008, (2) no later than February 21, 2013, (3) after the date Equifax's records note its receipt of the consumer dispute regarding a judgment status, and (4) at least 30 days after the disposition date." Doc. 132 at 9-10 (emphasis added). Thus, under this requirement for class membership, Equifax must have sent "a credit report regarding" the consumer to "a third party who requested the credit report" at some point "after the date Equifax's records note its receipt of the consumer dispute regarding a judgment status." That did not happen here.

Here, the judgment was entered against Plaintiff on January 29, 2008, and vacated on March 20, 2008. *See* Doc. 77, Exs. 12-13. After being denied credit in the fall of 2008, Plaintiff sent a dispute to Equifax, which it received on December 28, 2008. *Id.*, Ex. 8 (Fluellen Decl.) ¶ 10. Equifax promptly removed the judgment from Plaintiff's credit file on December 30, 2008.

19

*Id.*[4]   Accordingly, for purposes of Plaintiff's new class definition, which requires that Equifax have sent a credit report of the consumer to a third party after it was notified by the consumer that the judgment was reporting on her credit file, Plaintiff does not fit within that class definition because, as is undisputed, Equifax promptly removed the judgment from Plaintiff's credit file two days after Plaintiff notified Equifax that the judgment was then reporting on her credit file.   Thus, Equifax did not furnish a credit report on Plaintiff to a third party after the date of "its receipt of the consumer dispute regarding a judgment status," and Plaintiff has defined herself out of the class as a result.   Because it is clear that "a class representative must be part of the class" she purports to represent, *East Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977), Plaintiff's failure to fall within her own reformulated class definition renders her inadequate for this independent reason.   *See, e.g.*, *Jones v. Roy*, 202 F.R.D. 658, 663 (M.D. Ala. 2001) ("If the proposed class representative is not a member of the class he claims to represent, then representation is clearly inadequate." (quotations omitted).

## III.   PLAINTIFF CANNOT ESTABLISH THE REQUIREMENTS OF RULE 23(b)(3).

"Rule 23(b)(3) has two components:  predominance and superiority." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).  Plaintiff establishes neither here.

First, as detailed above, Plaintiff has completely failed even to establish commonality on her proposed "common questions."   That being the case, she obviously cannot establish Rule 23(b)(3)'s "far more demanding" standard of predominance, *Amchem*, 521 U.S. at 623-24, on such issues as reasonableness, inaccuracy, and statutory dames (among others).   *See, e.g.*,

---

[4] Plaintiff submitted a dispute to Equifax in May 2008, but the judgment was not reporting on her file at that time. Doc. 77, Ex. 8 ¶¶ 7-9. Plaintiff, in fact, is not basing any part of her lawsuit against Equifax on this first dispute, and, therefore, it is irrelevant for purposes of the class membership analysis.

*Farmer*, 285 F.R.D. at 703 (individual issues precluding finding of predominance included inaccuracy, which "will entail an individual inquiry into the contents of each consumer report issued by defendant" and, along with other individual issues, "will require the presentation of significant amounts of new evidence for each putative class member").  Accordingly, she has not carried her burden of proving predominance.

Second, Plaintiff has failed to carry her burden of establishing that class treatment is the superior method of adjudication, and her contradictory statements on the subject are dizzying. Similar to her strategy of trying to sweep the Fourth Circuit's opinion in this case under the rug, now Plaintiff tries to run away from her own counsel's statement before this Court at oral argument on her first, unsuccessful motion for class certification that they would "flood[] the courts with individual cases" if the Court did not accede to Plaintiff's demands and certify the class.  Doc. 86 at 50.  But Plaintiff then reverses course to argue that the "choice" is "between no individual cases (or one) and a class case."  Doc. 158 at 20.  And then she reverses course yet again to say that "Plaintiff's counsel" could not "possib[ly] . . . accept and prosecute this volume of individual FCRA cases" that would be filed if certification were denied.  *Id.* at 19.  Obviously, the ability, or lack thereof, of Plaintiff's counsel to "prosecute" individual cases is not remotely a requirement for assessing superiority, and Plaintiff cites no case even suggesting such a proposition.

Moreover, the FCRA's fee-shifting provision is dispositive of the superiority issue.[5]  Yet again, Plaintiff's only "authority" in this Circuit on that issue is *Stillmock*, which as detailed

---

[5] Plaintiff's brief states that Equifax makes this assertion "apparently with a straight face."  Doc. 158 at 19.  Such ridiculous, ad hominem attacks on a party and its counsel have no

above was implicitly rejected by the Fourth Circuit and, therefore, carries no weight at all at this point in the case.  In fact, the reported, controlling case in this Circuit, Thorn, affirmed the denial of class certification in part because the statute at issue, like the FCRA here, "allows prevailing plaintiffs . . . to recover attorney's fees."  445 F.3d at 328.  That Plaintiff might not cite *Thorn* is understandable; but to ignore it in favor of the non-precedential case of *Stillmock*, which the Fourth Circuit refused to follow less than a year ago when Plaintiff presented it with the opportunity to do so, is completely inexplicable.  Superiority is lacking here.[6]

## IV. PLAINTIFF'S DEPOSITIONS OF THE LEXISNEXIS REPRESENTATIVES FURTHER PROVE THAT THE CLASS IN NOT ASCERTAINABLE AND, THEREFORE, SHOULD NOT BE CERTIFIED.

In its opening brief, Equifax argued that Plaintiff's class definition suffers from both conceptual and practical problems.  Specifically, Equifax argued that: (1) data from the VSC database is not reliable and therefore not suitable for class-member identification (Doc. 135 at 2-4); (2) class members are not identifiable without extensive individualized factual inquiries (*id.*

---

place in a federal court brief, and that statement – one of many that pollute Plaintiff's reply – should be stricken.

[6] In a brief filled with misstatements of the law, distortions of some facts and an outright refusal to acknowledge others (such as the LexisNexis contractor depositions), and unnecessary editorial remarks aimed at Equifax and its counsel, Plaintiff saved her most outrageous statement for the end, purporting to rebut Equifax's argument that the Court should not certify this novel theory of FCRA liability because, she says, "a § 1681e(b) claim and the standard to establish a violation have long been established."  Doc. 158 at 20.  That ridiculous statement demonstrates how desperate Plaintiff is to change the conversation on a certain issue.  The issue is not whether the *cause of action* (in this case, § 1681e(b) violation) is novel.  The issue is whether the *legal theory* is novel in the sense that is has not been tested by any judge or jury.  See, e.g., *In re New Motor Vehicles Canadian Export Antitrust Lit.*, 522 F.3d 6, 26 (1st Cir. 2008) (certification likely improper where "a novel or complex *theory*" is asserted) (emphasis added).  Plaintiff conceded in 2011 that "there aren't any court decisions saying what [Equifax is] doing is wrong."  Doc. 86 at 48.  Nearly three years later, that is still the case – no court or jury has ever held that Equifax's procedures for judgment disposition retrieval even negligently, let alone

at 7-10); and (3) use of a 30-day window for updates in the class definition impermissibly intrudes on the jury's function of determining the reasonableness of Equifax's procedures (*id.* at 10-12).   Plaintiff pointlessly argues that Equifax has blurred the distinction between ascertainability and identifiability and that "what Equifax is really challenging is the administrative feasibility of 'identifying' class members – manageability."   Doc. 158 at 5. Ascertainability and identifiability overlap and serve the same ultimate purpose – to eliminate putative class actions where barriers (whether theoretical or practical) prevent the court from isolating class members from the general population.

### A.    Data From The Virginia Supreme Court Is Not Reliable.

In response to Equifax's arguments regarding the VSC database, Plaintiff asserts that Equifax has "no basis for its suggestion" that the database "is systemically incorrect."   Doc. 158 at 3.   She also disparages the fact that Equifax presented only four examples of errors in the database, asserting that "it is actually remarkable that there were not more."   Doc. 158 at 4. Equifax did not suggest that the four examples it provided were the only inaccuracies it was able to locate.   In fact, the four examples "were discovered in just a small sample of records" from the VSC database.   Doc. 135 at 4.   Furthermore, Plaintiff has the burden of demonstrating the database's reliability, not Equifax.

With respect to the database, VSC procedures require clerks to record the date of receipt of the notice of satisfaction, as opposed to the date the judgment was actually paid.   *See* Ex. F, Mittendorff Dep. at 73:4-6.   In practice this policy is not consistently followed.   In three of the four examples provided by Equifax (Doc. 135 at 2-4) the date of payment is listed, as opposed to

---

willfully, violate the FCRA, and that reality supplies yet another reason to find that superiority is lacking, notwithstanding Plaintiff's highly disingenuous effort to argue otherwise.

the date the court received a notice of satisfaction.  So, for example, in *Pate*, the VSC database listed the "Date Satisfaction Filed" as July 7, 2008, when in fact the lower court did not receive notification of the satisfaction until March 11, 2009 (the "disposition date").  *Id*. at 4.  The depositions of LexisNexis's contractors further demonstrate the prevalence of this type of error. Ms. Christian, for example, testified that in one court she covers the actual date of satisfaction, as opposed to the date the court received notice of the satisfaction, was regularly used in the "Date Satisfaction Filed" field for a for a period of time.  *See* Ex. A at 24:4-14.  Ms. Christian further testified that she had seen similar errors in other courts.  *See id.* at 24:17-26:15.  Indeed, in the week immediately preceding her deposition, Ms. Christian discovered a case in which a judgment had been entered incorrectly.  *See id.* at 26:3-15.  The prevalence of errors such as these in the database will draw into the class numerous consumers for whom credit reports were issued *before* the actual disposition date.

**B.     Plaintiff's Piecemeal Proposal For Identification Of Class Members Is Not Administratively Feasible.**

Plaintiff initially proposed a method for class identification requiring manual comparisons of information from four different data sources: (1) the VSC database; (2) Equifax's consumer database; (3) Equifax's consumer-dispute database (ACIS); and (4) Equifax's archived data ("frozen scans").  *See* Doc. 132 at 14-17.  In response to Equifax's argument regarding the limitations of frozen scans (Doc. 135 at 8-9), Plaintiff now suggests that a *fifth* source of information be added to the mix – records from LexisNexis regarding when it supplied Equifax with updated information regarding judgment dispositions.  Doc. 158 at 4.

Putting aside this and other problems associated with the individual sources of information suggested by Plaintiff (discussed further in Equifax's opening Brief, Doc. 135 at 2-

24

5), the overall process proposed by Plaintiff – which would require individualized cross-checks of five different data sources – is simply not administratively feasible.  It could require tens of thousands of individualized computer searches and cross-checking of data for thousands of individual consumers.[7]  When "the process of identifying class members would be cumbersome, expensive, and fraught with managerial problems," class certification is not appropriate.  *Melton*, 283 F.R.D. at 286 n.5; *see also Brooks v. GAF Materials Corp.*, 284 F.R.D. 352, 363 (D.S.C. 2012); *Cuming v. South Carolina Lottery Com'n*, 2008 WL 90605, *3 (D.S.C. Mar. 31, 2008).[8]

## CONCLUSION

For the reasons stated here and in Equifax's initial brief (Doc. 135), Plaintiff's Amended Motion for Class Certification (Doc. 131) should be denied.

Respectfully submitted this 20th day of November 2013.

---

[7] Plaintiff suggests, without a supporting citation, that the proposed class "is small – perhaps only about 1,000 consumers."  Doc. 158 at 6.  Even if this does turn out to be the case, the process Plaintiff proposes requires initial identification of a much larger group of individuals that is gradually reduced through comparison to the various data sources.

[8] Plaintiff does little to contest her unaccountable imposition of a 30-day pickup requirement on Equifax as part of the class definition other than to claim that Equifax is making "a premature merits argument."  Doc. 158 at 8.  That makes no sense, evidenced by Plaintiff's failure to cite any case that would support such an argument, and even if it did, Rule 23 does not allow a plaintiff or a court to impose a statutory requirement on a defendant (in this case, a pickup of all judgment dispositions across an entire commonwealth in 30 days) that the statute supposedly violated does not impose for the simple expedient of obtaining class certification; Rule 23 precludes such a result.  The 30-day requirement Plaintiff purports to impose here illustrates her total failure to propose an ascertainable class that Rule 23 requires.

/s/_____
John W. Montgomery, Jr.
Virginia State Bar No. 37149
Counsel for Equifax Information Services LLC
John W. Montgomery, Jr., Attorney, PLC
2116 Dabney Road, Suite A-1
Richmond, VA 23230
Telephone (804) 355-8744
Facsimile (804) 355-8748
Email jmontgomery@jwm-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of November, 2013, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing (NEF) to the following:

Leonard A. Bennett
Robin A. Abbott
Consumer Litigation Associates PC
12515 Warwick Boulevard
Suite 100
Newport News, Virginia 23606

Dale Wood Pittman
The Law Office of Dale W. Pittman, P.C.
112-A W Tabb St
Petersburg, VA 23803-3212

Matthew James Erausquin
Consumer Litigation Associates PC
1800 Diagonal Road
Suite 600
Alexandria, VA 22314

Dated:  November 20, 2013

/s/_____
John W. Montgomery, Jr.
Virginia State Bar No. 37149
Counsel for Equifax Information Services, LLC
John W. Montgomery, Jr., Attorney, PLC
2116 Dabney Road, Suite A-1
Richmond, VA 23230
Telephone (804) 355-8744
Facsimile (804) 355-8748
Email jmontgomery@jwm-law.com