# EXHIBIT C

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     RICHMOND DIVISION

 3

 4
    DONNA K. SOUTTER, for herself
 5  and on behalf of all similarly
    situated individuals,
 6
                Plaintiff,
 7         v.                            Civil Action No.
                                         3:10-cv-00107
 8  EQUIFAX INFORMATION SERVICES,
    LLC,
 9
                Defendant.
10

11

12

13
                DEPOSITION OF CYNTHIA LONG
14

15
                     August 28, 2013
16
                     Richmond, Virginia
17

18

19

20

21

22

23       HALASZ REPORTING & VIDEOCONFERENCE
                     P.O. Box 1644
24       Richmond, Virginia 23218-1644
                     (804) 708-0025
25    Reported by:  Lori Jo Krenik, CCR, RPR, CRR
```

```
 1        Q     Okay.  Roughly what age were you when you
 2   went -- left the law firm and entered as you described
 3   this kind of work?
 4        A     I left the law firm when my son was born,
 5   the day my son was born, and I was 30.
 6        Q     So it's been about 23 years -- I'm good at
 7   math -- that you have been doing what you described as
 8   doing this kind of work?
 9        A     Well, actually, there was a period of time
10   where I was raising my son.  I've been doing -- I'm
11   sorry.  Are you asking about working with the
12   attorneys or working now with --
13        Q     I'm done with the attorney.
14        A     Okay.
15        Q     I'm probably done with anything before the
16   age of 30.
17        A     Okay.  I have worked in the record
18   collection end probably about 17, 18 years.
19        Q     Let me do a better job of getting through
20   some of the formalities as well.  I asked you before
21   have you ever yourself had your deposition taken, and
22   your answer was?
23        A     No.
24        Q     No.  Have you ever watched a deposition
25   being taken?
```

```
                                                              Page 17
 1        Q      Maybe in the same month?
 2        A      I don't think that close.  Maybe a couple
 3   months.
 4        Q      But after those conversations, when was
 5   the next time that you had any interaction with anyone
 6   about this case until you were rudely served a
 7   subpoena?  By his office, by the way, not by mine.
 8        A      Thank you.  I really don't remember
 9   anything else.  I didn't -- I've never concentrated on
10   this case happening.  I just don't remember anything
11   else going on.
12        Q      Would it be fair to say -- well, I want to
13   make sure I understand.  Is it that you don't have any
14   memory of any conversations between the Ron Raether
15   and subpoena time period, or is it that you cannot
16   pinpoint such conversations precisely?
17        A      I really don't remember anything in
18   between.
19        Q      Now, what are your territories today?
20        A      Today?  You want me to list them all?
21        Q      Please.
22        A      It should be 13 courts.
23        Q      Let me write these down so I can --
24        A      I'll have to count, too.  Caroline.
25        Q      Which is near Fredericksburg?
```

```
 1   changed it some, but I just -- I can't remember if NDR
 2   ever had a whole computer program or not.  I just
 3   don't remember.  But that was our biggest change is it
 4   used to be written and then after that it was always,
 5   you know, computer programmed.
 6         Q    And who provided you the laptop that you
 7   would use?
 8         A    It started out where we had to have our
 9   own and so the lady that I worked for first, she gave
10   me one that she had.  In fact, she allowed me to keep
11   that one when she quit working so I was able to
12   continue to work and didn't have an added expense.  I
13   honestly can't remember if Choice Point gave us their
14   own.  I know LexisNexis did, but I can't remember
15   about Choice Point.
16         Q    So you would take a laptop -- with NDR you
17   would take a laptop to the courthouse?
18         A    I'm not sure that I was definitely typing
19   on the computer with NDR so I would take forms to the
20   courthouse with NDR.
21         Q    Let's start with Choice Point.
22         A    All right.  Choice Point, yes, we were
23   definitely using a computer.
24         Q    Tell me when you started with Choice Point
25   how you would attain and gather and convey these
```

1  records.
2      A    Okay. I would take the computer with me
3  to the courthouse and -- going back many years, so
4  some courts would allow us to have original documents.
5      Q    What do you mean by that?
6      A    It was actually like the warrant in debt
7  and they would allow us access back to where they
8  were, where the clerk, the deputy clerks were. And we
9  could actually take a judgment information off of the
10 original document and then key it in. I think way
11 back then there may not have been public access
12 computers, but I can't remember. But then, of course,
13 now we have public access computers. So you had
14 original documents, public access. Oh, some of the
15 courts didn't have, even when they first started
16 having the public access, if you're lucky, one of the
17 clerks would let you use one of theirs, like what
18 their deputy clerks would use if there was an empty
19 desk.
20     Q    Their computer?
21     A    Uh-huh.
22     Q    Yes.
23     A    So we could do that. And one of my courts
24 allowed me to have a printout. They would print it
25 out for us, and they would have all the information

```
Page 41
```

1  paid differently -- my courts that is closest to me,
2  and this is for present, that I don't have to drive as
3  far is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and my furthest out one would
4  have been ▓▓▓▓▓▓▓▓▓▓▓▓▓.  And those are very, very
5  small courts so there's not many records.
6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13 BY MR. BENNETT:
14      Q    So at some point we're still in the Choice
15 Point period.  I'm trying to come forward
16 chronologically.  You've just described the way that
17 you gathered the information; correct?
18      A    Yes.
19      Q    And for a civil judgment, your testimony
20 was there were three ways that you would obtain it and
21 it would just be the same fields from each of the
22 three ways; correct?
23      A    It was kind of four ways.
24      Q    Four ways.  Okay.
25      A    Because one is actually the computer

```
1    screen but one has more -- a little bit more
2    information because it's the clerk's behind the scenes
3    and then you have the public access.  So I don't know
4    how specific you want to be.
5         Q    Let's do that again.  So can you tell me
6    the four ways and describe them?
7         A    The public access computer, which would be
8    on the outside of the clerk's office, passed their
9    glass window.  And then if they allow you back there
10   to use one of their computers, so it would be
11   considered one of the clerk's computers.
12        Q    But you would access the same computer
13   program screens?
14        A    Yes.  Well, they have an extra field I
15   think that they can add more stuff, but we can get the
16   same information if that's what you're asking.
17        Q    They can add remarks?
18        A    Yes.
19        Q    But you don't use the remarks field?
20        A    No.
21        Q    So for your purposes, the computer screen,
22   the public access computer screen or the clerk's
23   computer screen are the same?
24        A    Yes.
25        Q    It's just physically in the office where
```

```
 1   you would access the computer; correct?
 2        A    Yes.
 3        Q    Yes.  All right.  So what are the other
 4   ways?
 5        A    Printout, although I don't have that
 6   capability anymore, but that was one.  So it was
 7   computer screens, printout --
 8        Q    And the printout is just a printout of the
 9   computer screen?
10        A    That's correct.  And original documents.
11        Q    And then original documents.  And the
12   original documents, when you looked at the original
13   documents, your job would be to obtain from the
14   original warrant in debt, for example, the same
15   information that was in the computer screen?
16        A    That's correct.
17        Q    And whichever those ways that you gathered
18   those fields, it was the same fields that you were
19   obtaining; correct?
20        A    That's correct.
21        Q    And you would consider them all equally
22   reliable?
23        A    I believe so.
24        Q    And then you would input that into the
25   computer in that instance the computer program that
```

Page 55

1  seeing.

2    Q    All right. So some representations have
3  been made that the courthouse gathering process is
4  inconsistent or unreliable because of the way that a
5  LexisNexis contractor could obtain information in one
6  courthouse would be different than the way it would
7  obtain information in a different courthouse. Do you
8  have an opinion about that?

9    A    Can you be more specific on your question?

10    Q    Sure. The accusation that your ability as
11  a contractor to gather information from one courthouse
12  to another, the accusation is that that is a process
13  that is not automatic. The process used in one court
14  will be totally different in one court versus another
15  court and, thus, the information that could be
16  obtained in one instance might be different than in
17  another. The reliability in one court would be
18  different than the reliability of another because of
19  these different ways that you gather.

20    A    I have found in my years doing this that
21  almost every court can be different.

22    Q    And how does that -- and those
23  differences, we talked about them; right?

24    A    Yes.

25    Q    How do those differences impact --

```
                                                                Page 63
 1         A     I just say vacated judgments, vacates?
 2         Q     That's even better.  So I want to talk
 3   about vacated judgments or vacaturs.  Your book refers
 4   to them as set-asides also?
 5         A     Okay.
 6         Q     What process has LexisNexis or did Choice
 7   Point before it have for you to systematically gather
 8   vacates?  So trying to gather every vacate as it comes
 9   through, what process, if any, did they have?
10         A     Process for LexisNexis or the courts'
11   process for me to get it?
12         Q     For LexisNexis.  That is, we've had some
13   testimony that LexisNexis does not gather that
14   information systematically for vacates.  And you're
15   the first contractor I'm able to ask the question
16   about.
17         A     Okay.
18               MR. RAETHER:  Object to the form.  Go
19   ahead.
20         A     In my courts, vacated judgments, if they
21   are available, have been held out for me by the court,
22   the clerk, and, therefore, if they're available, then
23   they're collected and then it goes to LexisNexis.
24         Q     For Choice Point, did Choice Point pay you
25   to gather what I'm calling category 2, the systematic
```

```
 1   vacates as opposed to specific case files?
 2        A     Yes.  I don't recall any difference, you
 3   know, changes from Choice Point to LexisNexis.
 4        Q     And was that true with satisfactions as
 5   well?
 6        A     Ask the question more --
 7        Q     Sure.  Let me tell you what I know and
 8   I'll use Newport News General District Court.  That's
 9   what I know.  That's where I grew up litigating.  Have
10   you ever had that court?
11        A     No.
12        Q     Back in 2001, 2002 when I was just getting
13   into this field, there were different record getters
14   that would come into the courthouse.  Choice Point and
15   there were other ones; right?
16        A     Right.
17        Q     And you would see other people back then?
18        A     Yes, I would.
19        Q     And during that period, the process for
20   satisfactions was that the court would print out on
21   dot matrix kind of paper and every single vendor would
22   have a file and they would put in that file cabinet
23   that weeks' satisfactions printout.  Have you ever
24   seen something like that?
25        A     I did have one court that upon my request
```

```
 1   at one point in time in my career of doing this that
 2   would give me a printout of some of satisfieds.  They
 3   don't do it any longer.
 4        Q    So how do you access satisfieds?
 5        A    Again, same with the vacates.  If they're
 6   provided by the court, the clerk's office, then I will
 7   collect them.  I will also as I'm collecting my
 8   records from the computer, when I come across a
 9   satisfied, then I go ahead and collect it also.
10        Q    Let's start with that first category.  If
11   the clerk gives it to you.
12        A    Or makes it available.
13        Q    How do they make it available if only one
14   of your courts use a printout?
15        A    They'll have a box and it will specify
16   that they're satisfieds.
17        Q    They will have copies of actual
18   certificates of satisfieds in that box?
19        A    They will have copies or I've also seen a
20   original certificate of satisfaction.  You do it right
21   there in the court.
22        Q    And have you found any court that
23   LexisNexis has you go to that is unwilling to provide
24   you that information?
25        A    Yes.
```

```
 1   exactly.  But I can't sit here and let an impression
 2   that this is a common occurrence lie, and so I'm going
 3   to have to sit here and work with you to come up with
 4   your most precise estimate, and that's going to go on
 5   for as long as we can until Mr. Raether moves for a
 6   protective order; all right?
 7        A     Well, I understand that --
 8              MR. RAETHER:  Hold on.  I'm going to
 9   object.  Is there a question pending?
10   BY MR. BENNETT:
11        Q     So what is your best estimate of how
12   common it is for the satisfaction date input into a
13   computer screen that predates the date of judgment?
14              MR. GOHEEN:  Object to the form.
15        A     Again, trying to be truthful, even an
16   estimate is hard to give.  It is more -- I know you're
17   wanting to look at, say, three in a hundred, but it
18   really is more often than your three in a hundred
19   seems to be.  It seems like -- it's an aggravation to
20   me as a researcher, you know, inputting the
21   information and when I see something that's not
22   correct, you know, then it's kind of upsetting, and I
23   do remember -- you're saying three in a hundred.
24        Q     No, I'm saying several out of you said
25   thousands.  You've done thousands of judgments and you
```