# EXHIBIT E

CONFIDENTIAL

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF OKLAHOMA
 3
    DONNA K. SOUTTER        )
 4  on behalf of herself and )
    those similarly situated,)
 5                          )
        Plaintiff(s),       ) CIVIL ACTION NO.
 6                          ) 3:10-cv-00107(REP)
    -vs-                    ) (Pending in the Eastern
 7                          ) District of Virgina,
    EQUIFAX INFORMATION      ) Richmond Division)
 8  SERVICES, LLC,          )
                            )
 9      Defendant(s).       )
10  _____  )
11
12
            FOR ATTORNEY'S EYES ONLY
13
              PROTECTIVE ORDER
14
         DEPOSITION OF MARK JOHNSON
15
              TAKEN ON BEHALF OF
16
              THE PLAINTIFF(S)
17
         IN OKLAHOMA CITY, OKLAHOMA
18
              ON JUNE 12, 2013
19
              10:02 A.M. - 2:23 P.M.
20
21
22
23
24
25      REPORTED BY:  SHELLEY MARBURGER, CSR
```

Page 1

CONFIDENTIAL

```
1    we know that those public records include civil

2    judgment, bankruptcy and civil lien records.

3    Right?

4        A.   Correct.

5        Q.   Does your company also collect criminal

6    records?

7        A.   No.

8        Q.   So LexisNexis Risk Data Retrieval

9    Services only obtains civil records?

10       A.   No.

11       Q.   What else do you obtain?

12       A.   We obtain bankruptcy and we obtain

13   property data, certain types of tax assessor, deed

14   and mortgage.

15       Q.   Some jurisdictions have utility liens

16   reported within credit reports.  Does your company

17   obtain and sell those also?

18            MR. RAETHER:  Objection to form.

19       A.   That's not a type of lien that we

20   collect.

21       Q.   (By Mr. Bennett) And your declaration

22   says that your title is vice president of data

23   services.  Correct?

24       A.   Correct.

25            MR. RAETHER:  Objection to form.
```

Page 7

CONFIDENTIAL

```
 1      A.   No.

 2      Q.   Did you do anything else to prepare for

 3   the deposition today?

 4      A.   Reviewed the analysis that we did on the

 5   data, I believe that you obtained under FIFO

 6   freedom of information from the Supreme Court in

 7   Virginia, so reviewed our analysis of that.

 8      Q.   Anything else?

 9      A.   Reviewed a few documents from that

10   review.

11      Q.   What documents?

12      A.   There was a spread sheet that was

13   summarizing the data analysis.

14      Q.   Anything else?

15      A.   Not that comes to mind.

16      Q.   How long have you worked for LexisNexis

17   Risk Data Retrieval Services, LLC?

18      A.   That entity, I believe was created about

19   four years ago, four or five years ago.

20      Q.   And you have worked for that entity for

21   that entire period since it was created?

22      A.   I'm not aware of the time line of that

23   entity.  I am aware that we were reorganized under

24   that entity about four or five years ago.

25      Q.   And prior to the reorganization of that
```

Page 12

CONFIDENTIAL

```
1    entity for whom were you employed?

2        A.   I believe the entity was Hogan

3    Information.

4        Q.   And then Hogan was purchased by

5    LexisNexis?

6        A.   Correct.

7        Q.   How long were you employed for Hogan

8    before that purchase?

9        A.   I believe I was employed under Hogan from

10   like '97 until maybe '08 or '09.

11       Q.   And prior to '97 how were you employed?

12       A.   Prior to Hogan, I -- at the -- prior to

13   Hogan, I believe I worked for myself as a

14   consultant.

15       Q.   And what services did you consult upon?

16       A.   Programming.

17       Q.   What type of programming?

18       A.   Well, it was a programming language

19   called Clipper.

20       Q.   Did you have a expertise in any other

21   system or program language besides Clipper?

22       A.   That was primarily it.  We're going way

23   back.

24       Q.   We are?  You go back to my I.T.

25   education.
```

Page 13

CONFIDENTIAL

```
 1       Q.   Well, right now I'm asking you,
 2   personally.
 3       A.   Yeah.  So, I mean, are you --
 4       Q.   Not what --
 5       A.   I mean, personally, I know that --
 6       Q.   Well, have you ever had --
 7       A.   Go ahead.
 8       Q.   I'm sorry.  Go ahead.
 9       A.   You were going to clarify something.
10       Q.   Sure.  I'm going to ask you, as to the --
11   what the company knows, but right now I'd like to
12   know what you personally know through your own
13   observations as to how judgment information is
14   collected about Virginia judgments.
15       A.   For what period of time?
16       Q.   Well, how about presently.  How does
17   LexisNexis today collect judgment information and
18   judgment disposition information?
19       A.   We collect it through manual collection,
20   the filings are collected manually through our
21   laptop collection effort that we would call civil
22   acquisition.  And the dispositions are collected
23   from a web scrape that we call civil automation.
24   So it's a combination of the two.
25       Q.   And when you -- So let's talk about the
```

Page 29

CONFIDENTIAL

1      Q.   And have you or has LexisNexis tried to

2   buy the bulk feeds from the executive secretary in

3   2012 or 2013?

4      A.   Not that I'm aware of.

5      Q.   Has LexisNexis tried to buy those -- the

6   bulk feed judgment information from the Virginia

7   courts in 2011?

8      A.   Not that I'm aware of.

9      Q.   Why not?

10     A.   If I recall, the judge or the supreme

11  court stating or making it clear that the bulk

12  feed would no longer be available.

13     Q.   And that was in 2009?

14     A.   That sounds about right.

15     Q.   And so it's remained consistent, the

16  manner of which LexisNexis collects the actual

17  judgment filings has remained consistent and

18  uniform since that date?

19     A.   As far as manual collection of new

20  filings, correct.

21     Q.   And then judgment dispositions, what does

22  that mean to you by the way?  What are judgment

23  dispositions?

24     A.   Satisfaction or a vacate.

25     Q.   What about an appeal of a judgment?

Page 31

CONFIDENTIAL

1        A.    We don't collect those.

2        Q.    What about a judgment that is later

3    dismissed?

4        A.    A judgment that's dismissed is considered

5    a vacate.

6        Q.    And so is there a uniform manner in which

7    you currently collect dismissals, vacatures or

8    satisfactions?

9        A.    Yes.

10       Q.    How long has that uniform collection

11   method been in place as LexisNexis?

12       A.    Since about the same time.  When the bulk

13   feeds stopped, we went to manual collection for

14   the filings and web scrape collection for the

15   satisfactions and vacates.

16       Q.    Now, for the collection of satisfactions,

17   vacates how does your procedure differ or vary by

18   particular Virginia court jurisdiction?  So

19   Newport News General District Court versus

20   Petersburg District Court, for example?

21       A.    I'm probably not aware of any differences

22   at that level.  I'm -- Court by court collection,

23   there probably is some variance in how court

24   collection occurs in a manual process from a web

25   scrape process it should be consistent.

Page 32

CONFIDENTIAL

1        A.    To some degree.  I mean, personal

2    knowledge to me is formed from a lot of different

3    awarenesses and learnings and it's not always just

4    the direct hands-on experience.

5                        (Plaintiffs' Exhibit No. 3 marked

6                        for identification purposes and

7                        made a part of the record.)

8        Q.    (By Mr. Bennett) Then let's go into the

9    second -- or I mean, the first dec again, Exhibit

10   2.

11       A.    Okay.

12       Q.    And I'm going to skip to Page 3 of --

13   this is the first -- this is the 2010 exhibit, I'm

14   going to skip to Page 3.  So 2003 -- I mean, 2009,

15   it's Page 3, Paragraph 6, your first declaration

16   stated that, "Until May of 2009, the Supreme Court

17   of Virginia made available information regarding

18   judgments and dispositions through regularly

19   scheduled Bulk Feeds."  And that's true.  Correct?

20       A.    Yes.

21       Q.    And how far back before May, 2009 was

22   this the procedure for LexisNexis to pick up

23   judgments from the Virginia District Courts?

24       A.    I recall that began in about 2005.

25       Q.    So between 2005 and May of 2009 there was

                                                     Page 101

CONFIDENTIAL

1    one uniform method used by LexisNexis to pick up

2    judgment and filings in case dispositions, and

3    that was the bulk feed from the Supreme Court of

4    Virginia.  Correct?

5        A.   Not entirely.  No.

6        Q.   Not entirely.  What was different about

7    it?  What was wrong about what I just said?

8        A.   Well, I recall that we collected vacates

9    through our manual process and I recall that the

10   district courts were a different process than the

11   -- I forget the name of the other court system.

12       Q.   Right.  The circuit court, but we're not

13   talking about that.  Right?  Right now this

14   declaration and my question is limited to the

15   Virginia District Courts.

16            But this paragraph, Paragraph 6, says

17   that you were "advised," the last sentence, "by

18   personnel at the Virginia Supreme Court that the

19   disposition date shown in some records was the

20   date a satisfaction was recorded, or the date a

21   judgment was vacated by order of the court or

22   after an appeal."  Do you see that?

23       A.   I do.

24       Q.   And do you have any personal knowledge

25   that that's what you were told by the -- that

Page 102

CONFIDENTIAL

1   about the information in these declarations and I

2   think that's going to be the end of my day.  But I

3   want to be very clear, and I'd like it if you

4   would be very clear, in making any distinctions

5   between the way that you pick up information on an

6   ongoing regular basis versus in response to an

7   inquiry by LexisNexis or a consumer directly or

8   Equifax, TransUnion or Experian about a specific

9   case.  So I'm not talking about what you do when a

10   dispute is received or when you're contacted about

11   a specific case, I am only talking about the

12   ordinary process by which LexisNexis, on an

13   ongoing regularized basis, picks up judgments from

14   general district courts or picks up dispositions

15   of judgments from general district courts.  Do you

16   understand?

17       A.   I do.

18       Q.   I am, again, not talking about the

19   individualized dispute pick-ups.  And so is it

20   your testimony that LexisNexis requested and

21   received from, or believed it was receiving from

22   the Virginia Supreme Court vacates or dismissals

23   prior to May of 2009?

24       A.   My recollection is we were aware that

25   vacates were not a part of the feed.

Page 104

CONFIDENTIAL

1       Q.    And then is it -- do you have personal

2   knowledge that your subcontractors on a regular

3   basis, not based on disputes, but on a regular

4   basis were tasked with gathering all vacatures or

5   dismissals from the courts manually --

6       A.    That's my understanding.

7       Q.    -- prior to May of -- Okay.

8             And then in Paragraph 7 of this Exhibit

9   2, it says, the LexisNexis "also conducted

10   standard quality assurance reviews of the Bulk

11   Feeds and monitored the volumes of case

12   dispositions relative to civil judgements and

13   other statistics" with -- "for consistency with

14   its historical experience."  And then the

15   "methodologies were conducted routinely."

16             Are those methodologies, data analysis,

17   statistics, where are those kept and stored or

18   archived?

19       A.    Within the list of departments document

20   process repository.

21       Q.    And the last sentence in Paragraph 7

22   says, "To supplement known gaps in the Bulk Feed

23   related to vacates" you "employed independent

24   contractors to conduct in-person reviews as

25   described below."  Do you have any personal

CONFIDENTIAL

1    knowledge about how often or how regularlized the

2    check for vacates was prior to May of 2009?

3        A.   Can you clarify that?  I'm not quite sure

4    what you're asking.

5        Q.   Sure.

6             MR. RAETHER:  Turn the page.  I think

7    he's on the wrong page, Len.

8        Q.   (By Mr. Bennett) Page 4.

9        A.   Oh, okay.

10       Q.   The first full sentence at the top.

11       A.   And is there a question associated with

12   that?

13       Q.   Yes.  Do you know -- Is it your testimony

14   or do you have personal knowledge that between

15   2005 and May of 2009, LexisNexis had a procedure

16   in place to have its subcontractors check every

17   court house on some regular basis for every

18   vacate?  I'm recognizing that it might not have

19   been 100-percent successful but that the objective

20   was to try to pick up every vacate from every

21   court house in Virginia.

22            MR. RAETHER:  Objection to form.

23       A.   Yeah.  I mean, the -- again, "everything"

24   and "always," I always avoid those statements.

25   Directionally, our intent was to collect the

Page 106

CONFIDENTIAL

1    vacates that we knew were not in the bulk feed.  I
2    can further clarify that as we had no customers
3    for that feed until we acquired customers from
4    ChoicePoint in 2007.  And at that point in time it
5    became more important for us to collect vacates
6    more diligently.  So prior to the time that we had
7    customers for the data, we may not have been as
8    diligent in collecting vacates.  We have no
9    contractors in the state.
10       Q.   (By Mr. Bennett) Roughly, how many
11   contractors do you have today in the state?
12       A.   I'm not entirely sure.  I would -- I can
13   surmise that it's -- I don't know exactly.
14       Q.   What would you surmise it to be?
15       A.   10 to 20.
16       Q.   And I understand you don't know the exact
17   number, but how has that number varied, generally,
18   since 2005?
19       A.   I don't know.  Since 2005, we had zero in
20   2005.  At some time in 2007, we had contractors to
21   cover the state; how it's changed since then,
22   probably not much.
23       Q.   But today you pick up every single
24   judgment manually?
25       A.   Every filing.  Correct.

Page 107