# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

DONNA K. SOUTTER,
for herself and on behalf of all
similarly situated individuals,

      Plaintiff,

v.                                   Civil Action No. 3:10-cv-00107

EQUIFAX INFORMATION SERVICES, LLC,

      Defendant.

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER
### SECOND AMENDED MOTION FOR CLASS CERTIFICATION

Plaintiff, Donna K. Soutter, on behalf of herself and all other similarly situated individuals submits her Memorandum in Support of her Second Amended Motion for Class Certification.[1]

## STATEMENT OF FACTS AND PROPOSED CLASS CLAIMS

### A.     Plaintiff alleges Equifax violated 15 U.S.C. § 1681e(b).

As this Court has held, "In recognition of the critical role that [consumer reporting agencies] play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care[.]" *Burke v. Experian Info. Solutions, Inc.*, 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011). The FCRA obligates CRAs to follow "reasonable procedures to assure maximum possible accuracy" in their credit reporting. 15 U.S.C. § 1681e(b). "[A] consumer reporting agency violates § 1681e(b) if (1) the consumer report contains inaccurate information and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy."[2] *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001).

"Reasonable procedures are those that a reasonably prudent person would [undertake] under the circumstances." *Schweitzer v. Equifax Info. Solutions, LLC*, 441 F. App'x 896, 903 (3d Cir. 2011) (internal quotations and citations omitted). "[W]hen a consumer reporting agency learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its

---

[1] The Plaintiff's Summary of Class Certification Issues, as required by this Court's August 8 and August 22 Orders (Dkt. Nos. 197 and 200) is attached as Exhibit A.
[2] Both sides will also agree that element implied by this formulation is that a consumer report was actually furnished by the CRA.

reporting system, or otherwise) it must review its procedures for assuring accuracy." 16 C.F.R. Part 600 FTC Commentary App'x 607 (3)(A). In short, CRAs should be doing everything reasonably prudent to ensure maximum possible accuracy. Equifax does not escape its FCRA liability by relying on its public records vendor. *Thompson v. Equifax Credit Info. Servs., Inc.*, CIV.A. 00-D-1468-S, 2001 WL 34142847 (M.D. Ala. Dec. 14, 2001); *Dennis v. BEH-1 LLC,* 520 F.3d 1066 (9th Cir. 2008).

Donna Souter is currently a self-employed court reporter and previously was a senior dispatcher for the Virginia State Police. Dep. of Donna Soutter, 8:1–6; 11:5–9 (attached as Exhibit B). She has no criminal history. Pl.'s Resps. to Def.'s Interrogs., No. 13 (attached as Exhibit C). She is committed to the class and this multi-year litigation process because she understands this issue has significantly affected the lives of other Virginians. Ex. B, Soutter Dep., at 40:5–10; 41:16–21.

In June 2007, Ms. Soutter became sick, was unable to work, and fell behind on a Virginia Credit Union credit card. *Id.*, 20:3–7. Prior to this, she had otherwise exemplary credit. The credit union sued her in Richmond General District Court. *See Virginia Credit Union, Inc. v. Donna Soutter*, GV07-034182 (Richmond GDC) (attached as Exhibit D). Almost immediately, she made payment arrangements with the credit union (and has continued to meet this obligation to this day). Ex. B, Soutter Dep., at 23:6–10; 27:9–18. However, there was a miscommunication between the credit union and its attorney. Without Ms. Soutter's knowledge, the credit union's attorney obtained an uncontested civil judgment on January 29, 2008 for $14,403.79. *Id.* at 23:10–19. The Plaintiff learned about the mistake when she received a mailed copy of the judgment. *Id.* She immediately contacted the credit union to get the matter corrected. Internally, credit union employees documented this contact.

On February 25, 2008, the credit union's attorney filed a motion to vacate the mistaken judgment, which was granted on March 20, 2008.  Upon vacating the judgment, the Richmond General District Court then dismissed the case. *See* Ex. D.

After the judgment was vacated, Plaintiff almost immediately contacted Equifax to preemptively ensure that it did not report the judgment as unpaid. Ex. C,  Pl.'s Resps. to Def.'s Interrogs., No. 1. On May 23, 2008, in response to her April 11, 2008 letter, Equifax informed Ms. Soutter that it was not reporting the Virginia Credit Union judgment. *Id.* Whether or not this was true at that time, by July 2008, Equifax was reporting the judgment and was reporting it as unpaid and not as vacated.  Def.'s Resps. to Pl.'s Interrogs., No. 3 (attached as Exhibit E). The Plaintiff's Equifax file was not corrected until December 30, 2008. Ex. C, Pl.'s Resps. to Def.'s Interrogs., No. 1. **After Plaintiff provided her notice of the disputed judgment to Equifax, Equifax furnished at least three (3) hard inquiry credit reports inaccurately stating that the judgment was unpaid and owing**. Ex. E, Def.'s Resps. to Pl.'s Interrogs., No. 3. These consumer reports were furnished on October 19, 2008, November 6, 2008, and December 16, 2008. *Id.* As detailed herein, § 1681e(b) is violated when a consumer report is furnished.  Thus the response to the Court's inquiry in paragraph 3(b.) of its Order as to both (i.) and (ii.) is that the Plaintiff's alleged violations of § 1681e(b) did not occur in either the April/May 2008 or the November/December 2008 window.   They occurred on the dates the inaccurate reports were furnished—October 19, 2008, November 6, 2008, and December 16, 2008. The April/May events simply put Equifax on notice that the Plaintiff's judgment was dismissed.  And the November/December 2008 events have nothing at all to do with the § 1681e(b) claims, having occurred months after Equifax had already violated the statute. It also furnished three account review credit reports to Plaintiff's existing creditors. *Id.*

3

Unlike credit accounts, Equifax affirmatively seeks out and purchases public records data, including Virginia civil judgments, to report to the world about Virginians when it sells their credit files.  It proactively gathers and disseminates this derogatory information even though there is nothing in the FCRA that requires it to do so.  Equifax has used a series of different vendors over the years. However, for the entire class period, Equifax has used the same vendor, and vendor has obtained **judgment dispositions**[3] in the same manner. *See infra* at 24– 26. In fact, Equifax's vendor has never once picked up any dispositions beyond some satisfactions until the filing of this lawsuit. Dep. of Ken Mittendorf at 69:22-70:5 (attached as Exhibit F). And the only "in person" review to verify the automated data was attempted only after a consumer made a formal dispute, and even then only rarely.  This is a distinction that Equifax knowingly omitted in drafting its earlier declarations for Mark Johnson. (Dkt. No. 77–9). This Court properly found that Mr. Johnson's contested testimony was not based on personal knowledge and should therefore be excluded.[4]

Under the terms of its contract with Equifax, LexisNexis was obligated to collect and provide all affirmative judgments.  However, in contrast, it was only obligated to collect judgment terminations if it determined it was "commercially reasonable" to do so.  *Equifax/LexisNexis Agreement*, Exhibit "A" to Agreement, ¶C.3.d.  Equifax has always been

---

[3] In its initial briefing of class certification and on appeal, Equifax blurred the important distinctions between the manner in which it picks up the original judgment and the manner in which it separately picks up judgment dispositions.

[4] In earlier motions practice and on appeal, Equifax represented that there was a material distinction in the manner with which it and its vendor collected judgment and disposition information prior to May 2009, versus after that time.  The Court of Appeals based its decision upon this representation—offered through Equifax's Mark Johnson declaration.  *Souter v. Equifax Info. Servs., LLC*, 498 Fed. App'x 260 (4th Cir. 2012) (hereafter referred to as "*Souter II*").  However, Plaintiff has now established that Equifax's claim was completely false. *See infra* at 24– 26. The Court has properly excluded Mr. Johnson's testimony because he did not possess any personal knowledge as to how Virginia judgment dispositions were actually collected.  (Dkt. No. 184).

fully aware of the procedures used by LexisNexis to gather Virginia judgment records. Its contract with the vendor states:

> LexisNexis will provide Equifax with its' procedures for collecting dispositions. LexisNexis must provide changes to these procedures to Equifax 10 business days prior to implementation. If the proposed change adversely affects any Equifax businesses, or puts Equifax in a position of non-compliance with any local, state or federal legislation, Equifax reserves the right to reject the procedure change with stated reasons. Equifax will not unreasonably withhold its' approval from LexisNexis.

*Equifax/LexisNexis Agreement*, Exhibit "A" to Agreement, ¶C.3.d.

However, perhaps the most striking fact is that for a numerous class of consumers as pled for this amended motion, stipulated to exceed 1,000 such persons, Equifax received direct notice from the consumer regarding the judgment status prior to such time as it made the conscious decision to sell a report that contained information that it had already been warned by the consumer was not accurate and complete. Plaintiff alleges that these procedures followed by Equifax to seek out, purchase and integrate judgment records about which it had no means to ensure completeness—that is, whether the judgment obligation has been terminated—are unreasonable. Willfully so.

### B.      The Proposed Amended Class Definition.

The breadth of the previously ordered class definition was the sole basis for the appellate reversal. The Fourth Circuit found that it included (1.) consumers who fell into time periods in which Equifax claimed, through the now stricken declaration of Mark Johnson, different methods of gathering judgment information, (2.) because the class definition included Circuit Court judgments and (3.) because it included both consumers who had previously notified Equifax of the judgment disposition prior to the publication of the inaccurate reports, as well as those who had not. *Souter II*, at 265. ("Souter's claim simply varies from any potential class

plaintiff with a circuit court judgment, and from many potential plaintiffs with general district court judgments, depending on the date of the judgment.[5] In addition, to recover statutory damages, Soutter must show willfulness. Proof that Equifax's conduct was willful toward Soutter because she sent letters in advance informing Equifax that the case against her was dismissed will not advance the claims of other class members."). Though the facts are now established as otherwise and the Johnson testimony has been stricken, Plaintiff still seeks to certify a class definition that is consistent with the road map framed by the Fourth Circuit decision. Accordingly, as pled in the Second Amended Complaint, the Court should certify a class as follows:

> All natural persons who meet every one of the following definitional requirements:
>
> a.     the computer database of the Executive Secretary of the Supreme Court of Virginia shows that the person was the defendant in a Virginia General District Court civil action or judgment;
>
> b.     the computer database of the Executive Secretary of the Supreme Court of Virginia shows that as of the date 20 days after the Court's certification of this class, the civil action or judgment was dismissed, satisfied, appealed, or vacated on or before April 1, 2009 ("the disposition date");
>
> c.     Equifax's records note receipt of a communication or dispute from that person about the accuracy of Equifax's reporting of that civil action or judgment status; and
>
> d.     Equifax's records note that a credit report regarding the person was furnished to a third party who requested the credit report, other than for an employment purpose: (1.) no earlier than February 17, 2008, (2.) no later than February 21, 2013, (3.) after the date that Equifax's records note its receipt of the consumer dispute regarding the judgment status, and (4.) at least thirty (30) days after the disposition date but before the judgment notation was corrected by Equifax to report that it was satisfied, appealed or vacated.

---

[5] Plaintiff interprets the "date of judgment" to mean the "date of the disposition of the judgment." No other construction makes sense in the context of the text of the Fourth Circuit's unpublished opinion.

While Plaintiff submits that this definition is now very narrow, perhaps around 1,000 people by Equifax's stipulation, the Court retains its discretion to adapt or modify the class definition to resolve typicality, predominance or other defense concerns it concludes have merit. Fed. R. Civ. P. 23(c)(1)(C) gives District Courts broad discretion to modify the class definition until there is a decision on the merits.  *See* 2 H. NEWBERG AND A. CONTE, NEWBERG ON CLASS ACTIONS § 6.14 (4th ed. 2006) ("broad discretion [under Rule 23] to modify the definition of the class even after certification.").

## ARGUMENT

## I.   PLAINTIFF'S CLAIM SATISFIES EACH OF THE THRESHOLD REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(a).

In this case, the Fourth Circuit has explained the basic Rule 23(a) and 23(b)(3) thresholds required for class certification:

> Under Rule 23(a), a party moving for class certification must meet the following four prerequisites: (1) the class is so numerous that joinder is impossible; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representative are typical of the claims or defenses of the class; and (4) the representative will adequately protect the class interests. Fed. R. Civ. P. 23(a). These requirements are referred to as numerosity, commonality, typicality, and adequacy of representation. Rule 23(b) further requires that the class meet one of three additional requirements. As relevant here, Rule 23(b)(3) provides for class certification if the court determines that common questions of law or fact predominate over any questions affecting only individuals and that a class action is superior to other available litigation methods.

*Soutter II*, at 263–64.

Federal courts have long regarded "consumer claims" as "particularly appropriate for class resolution."  *see Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997); *In re Mexican Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001); *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 395-96 (N.D. Ill. 2006) ("[c]onsumer claims are among the most commonly certified for class treatment").  As set forth below, there is no basis for regarding this case any differently.

### A.      The Class is Sufficiently Numerous to make Joinder Impracticable.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." *Talbott v. GC Servs., Ltd. P'ship.*, 191 F.R.D. 99, 102 (W.D. Va. 2000). *See Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312 (4th Cir. 1978). Where the class numbers 25 or more, joinder is usually impracticable. *Cypress v. Newport News General & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967).

In this case, the proposed class is more than sufficiently numerous to make joinder impossible. Equifax has stipulated to numerosity with an estimate that the class will include roughly 1,000 persons. Decl. of Leonard Bennett, ¶ 7, Ex 1, Ex. 2 (attached as Exhibit G).

### 1.      An Ascertainable and Identifiable Class Exists.

"Though not specified in the Rule, establishment of a class action implicitly requires both that there be an identifiable class and that the plaintiff or plaintiffs be a member of such class. 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure:* Civil 2d § 1760, pp. 115 *et seq.* (2d ed. 1986)." The Fourth Circuit has recently reaffirmed the applicability of this long-standing requirement, summarizing the burden as follows:

> Rule 23 contains an implicit threshold requirement that the members of a proposed class be "readily identifiable." Our sister circuits have described this rule as an "ascertainability" requirement. However phrased, the requirement is the same. A class cannot be certified unless a court can readily identify the class members in reference to objective criteria. The plaintiffs need not be able to identify every class member at the time of certification. But "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."

*EQT Prod. Co. v. Adair*, 13-414, 2014 WL 4070457, at *6–7 (4th Cir. Aug. 19, 2014) (citations omitted). The question for the Court is whether it "is administratively feasible for the court to determine whether a particular individual is a member." *Id.* (citing and quoting 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1760 (3d ed. 2005)).

"Where the plaintiff has demonstrated that the class of persons he or she wishes to represent exists, that they are not specifically identifiable supports rather than bars the bringing of a class action, because joinder is impracticable." *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 645 (4th Cir. 1975) (citing cases under both Rule 23(b)(2) and 23(b)(3)).  A class like this one is ascertainable because it is "defined by the activities of the defendant[.]" *Alliance to End Repression v. Rochford*, 565 F.2d 975, 978 (7th Cir. 1977); see also *Lewis v. Tully*, 96 F.R.D. 370, 376 (N.D. Ill. 1982) *on reconsideration,* 99 F.R.D. 632 (N.D. Ill. 1983) ("a class that is defined by the contested practices of the defendant is sufficiently ascertainable."). Membership is determined by whether or not Equifax furnished a credit report regarding that person and the manner in which it did so.

Class membership is readily ascertainable as the definition is based entirely on objective criteria and class members are identifiable, mostly even through electronic data analysis. Ex. G, Bennett Decl., ¶¶ 6, 8.  Equifax has resisted an ascertainability stipulation on the grounds that it believes Plaintiff could not identify all such persons without some amount of reading and document review. The degree of precision Equifax has to date suggested is unnecessary. *Soutter v. Equifax Info. Servs., LLC*, 3:10CV107, 2011 WL 1226025, at *6 (E.D. Va. Mar. 30, 2011) *rev'd and remanded*, 498 F. App'x 260 (4th Cir. 2012) (afterwards referred to as "*Soutter I*") ("The degree of precision that Equifax attempts to place on Soutter in ascertaining class members simply is not required in order to certify a class."). Instead, "Every potential member of the class is not required to be identifiable, but merely circumscribed by some objective set of criteria." FPP § 1760, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed.) citing *Hendrix v. Faulkner*, 525 F. Supp. 435 (D.C. Ind. 1981) *affirmed in part, vacated in part on other grounds sub nom*. *Wellman v. Faulkner*, 715 F.2d 269 (7th Cir. 1983).  Even if there was more than a handful of

persons with uncertain class membership status, they could be easily carved out of the Court's certified class definition.  Class members may be readily identified by comparing just two information sources: (a.) Equifax's own records; and (b.) the electronic copy of the database of the Executive Secretary of the Supreme Court of Virginia.

This case sharply contrasts with the difficulties posed in a case in which there is not any specific set of documents that can provide that near-complete class identity.  For example, in *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012), cited in *Adair*, the Third Circuit considered a lawsuit about defective "run flat" tires sold by an auto manufacturer.  BMW argued on appeal that it did not retain records as to whether or not a particular automobile was sold with the "run flat" tires, let alone whether those tires were later replaced or repaired by a third party. *Id.* The court remanded the case to the district court to "resolve the critical issue of whether the defendants' records can ascertain class members and, if not, whether there is a reliable, administratively feasible alternative" and rejected the alternative of simply counting on "class members' [to] say so[.]" *Id*.

The difficulties in *Adair* were even greater.  In *Marcus*, the problem was that a critical fact—whether a class member purchased the run flat tires—could not be objectively determined.  In *Adair*, the question was subjective, requiring a legal resolution as to who actually owned an interest in the subject real estate. The Fourth Circuit held that part of the class would be ascertainable—the part that was determinable from the Defendant's internal records (schedules). *Adair*, 2014 WL 4070457 at *7 ("When ownership has not changed hands, identifying class membership may be as simple as cross-referencing the ownership schedules the defendants themselves prepared.").  However, part of the class was more difficult to ascertain because "[s]ome of the schedules were prepared some twenty years ago, and they have not been updated

to account for changes in ownership" and "numerous heirship, intestacy, and title-defect issues plague many of the potential class members' claims[.]" *Id.*[6]

In this case, the newly narrowed class is simple to both ascertain and identify. And in fact, Equifax's theoretical nits are dwarfed by the empirical proof that the class can be identified. First, in *Soutter v. Trans Union, LLC*, present Plaintiff's counsel, Trans Union, and the third party class administrator successfully determined class membership for a class in excess of 150,000, including whether or not such class members had made a previous dispute about their Virginia judgment. *See* Settlement Agreement at ¶ 7.5, *Soutter v. Trans Union, LLC*, Civ. Action No. 3:10cv541, (E.D. Va. Dec. 9, 2013) (ECF No. 46.1) (attached as Exhibit H); Final Approval Order at 2, *Soutter v. Trans Union,* LLC, Civ. Action No. 3:10cv541, (E.D. Va. June 4, 2014) (ECF No. 46.1) (attached as Exhibit I). This Court granted class certification and approved the ultimate settlement in that case. *Id.* Second, Equifax itself has proven its ability to determine whether and when a consumer has notified it of an inaccurate Virginia judgment. Defendant agreed to a stipulated order requiring that:

> (1.) Equifax [] provide plaintiff with a list of the names and addresses of each consumer who made a dispute concerning a Virginia judgment on their file at any time since February 17, 2008 under dispute codes 101, 102, 103, and/or 112. Equifax will provide this list to Plaintiff's counsel Leonard A. Bennett by 3 p.m. September 24, 2010. [and]

> (2) For each consumer named in the list described in paragraph 1, Equifax will also include whether the consumer currently has a Virginia judgment on his or her file and, if so, the date of the judgment, the amount, the plaintiff and the case number. Equifax will provide this list to Plaintiff's counsel Leonard A. Bennett by 3 p.m. September 24, 2010.

---

[6] Still, even upon those facts, the Court of Appeals did not find that the ownership class could not be certified, instead remanding for "greater consideration to the administrative challenges it will face when using land records to determine current ownership, and [to] assess whether any trial management tools are available to ease this process." *Adair*, 2014 WL 4070457 at *8.

(Dkt. No. 61 at ¶ 1). Equifax thereafter produced the data as ordered—every consumer who had provided it a dispute about an inaccurate Virginia judgment, together with details necessary to determine whether such judgment remained in the consumer's file, the judgment date and the judgment case number. *Id*. Equifax is certainly estopped from arguing either that it did not comply with the Court's Order or that the dispute/notice element cannot be otherwise ascertained. When a defendant treats records as accurate for its own business purposes, courts do not look favorably on arguments they are not accurate enough to define a class. *See, e.g.*, *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 674 (N.D. Cal. 2011) ("What was ascertainable to Ocwen in the course of adhering to its own policy is ascertainable for the purposes of identifying members of the class."). Equifax cannot now reasonably claim that what is sufficiently reliable for the purpose of obeying a court order and generating FCRA-compliant consumer reports is not sufficiently reliable for the purpose of identifying the class.

The first two class definition elements are based upon a review of the database available from the Executive Secretary of the Supreme Court of Virginia. Ex. G, Bennett Decl., ¶¶ 11–12. A set of consumers will be narrowed from the database to include only those identified as a defendant in a Virginia General District Court civil action or judgment. GENERAL DISTRICT COURT CASE MANAGEMENT SYSTEM USER'S GUIDE: QUICK REFERENCE GUIDES, Executive Secretary of the Supreme Court of Virginia, July 2012, at A-4.[7] The second element is also simple. The Supreme Court of Virginia database includes the name and address of the

---

[7] Plaintiff proffers the content of the General District Court Case Management System User's Guide, a copy of which Equifax has earlier received. Although the document is technically not subject to the Court's protective order, the Office of the Executive Secretary has requested that the manual not be publically distributed. Plaintiff asks Equifax's agreement to accept this proffer. If it objects in opposition, Plaintiff will provide the actual document in Reply.

consumer defendant. It contains the case number and Plaintiff. *Id*. This is the information used by Equifax to match a judgment record to a particular consumer.

The Supreme Court of Virginia database also includes, for civil judgments, two fields that are easily used to identify the case and judgment status. *Id*. at A-5. The first field is connected separately to each defendant in the case and reflects the most recent "judgment status code" for each specific defendant/debtor. A case record will show either a blank field, which indicates that no disposition has occurred, or one of these values:



*Id*. A case that has been dismissed as to the specific consumer is indicated with judgment status code "I" for that consumer; a judgment that is vacated as to the specific consumer will be indicated with judgment status code "A" as to the specific consumer, until it is then either again entered as a judgment against the defendant, with a code "P", or dismissed, at which point the judgment status code will indicate dismissal with code "I". *Id*. If a judgment is appealed, the case will be noted with a judgment status code of "P" or "D", but an additional "Appeal" field will note that the case was appealed. *Id*. Finally, a satisfied judgment is indicated with a judgment status code of "P" or "D", reflecting a verdict for the Plaintiff or counter-claim Defendant, but an additional "Satisfied Date" field will reflect the date that the satisfaction was filed with the Clerk. *Id*.



The third class definition requirement substantially narrows the class. Equifax's records

note receipt of a communication or dispute from that person about the accuracy of Equifax's reporting of that civil action or judgment status. Ex. G, Bennett Decl., ¶¶ 9–10, 13. In addition, Equifax retains an archived copy of every written communication received from a consumer and every written communication it sends to a consumer. *Id*. ¶13. The substance of such communications is also retained electronically in Equifax's "Automated Consumer Interview System," referred to by Equifax as "ACIS," and outputted as various related documents such as the Equifax maintenance sheet. Equifax has produced each of these documents in this case regarding Donna Soutter. Equifax's documents include the Plaintiff's letters received by Equifax even before the subject judgment was inserted into her credit reports. *Id.* ¶ 9. Defendant regularly produces such documents in its standard Rule 26(a)(1) disclosures in individual FCRA cases. *Id.* ¶ 14. And Equifax regularly relies on these documents to objectively determine what a consumer was disputing and when the dispute was made. *Id*. Equifax would simply do a search for each consumer included in the narrowed list of individuals culled from the judicial database. (This list itself would already be narrowed and would include only consumers who were sued and had the judgment and case dismissed, vacated, appealed or satisfied prior to May 2009). Of those with whom it has a record of communication, it would generate an even shorter list.

It is unremarkable that actual human beings may be involved in the review of documents to determine class membership. Certainly both parties must agree that all of the outlier faults and nits that Equifax may theorize—a transposed satisfaction date; uncertainty as to the day of the month judgment information was received by Equifax; whether a consumer dispute pertained to a Virginia GDC judgment—can be objectively discovered. What Equifax is really arguing is that such discovery would in some cases require an attorney or a class administrator to confirm

status as a class member by reviewing the actual documents or file for that consumer. But the present class is admittedly only about 1,000 consumers. If Equifax produces the files for this small set, actual human beings can read that set to confirm the correctness of the date or dispute sorting otherwise grouped by the electronic computer search. It is not remarkable that the parties might actually read a document or a file to confirm class membership. Use of such digital search tools, accompanied by manual review, is a proper method of class identification. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012); *see also In re Wal-Mart Stores, Inc. Wage and Hour Litig.*, No C 06-2069 SBA, 2008 WL 413749, at *6–7 (N.D. Cal. Feb. 13, 2008); 1 McLaughlin on Class Actions § 4:2 (9th ed.) ("Several courts have clarified that the defendant may have to assist the plaintiff in ascertaining the identity of putative class members, and that administrative burden necessary to identify class members ordinarily does not constitute an inability to identify class members.") (citing *Dunnigan v. Metropolitan Life Ins. Co.*, 214 F.R.D. 125, 136 (S.D. N.Y. 2003). Such a process is particularly well suited to a database business like Equifax's, whose very purpose is to gather, distill, and report information from a wide variety of sources.

Once Equifax has generated this list, the only remaining mechanical step is to determine for each person in the remaining small set: (1) when, if at all, Equifax updated the judgment status[8]; and (2) whether, after the consumer notice to Equifax, but before any corrective update, Equifax then furnished a credit report to a third party. This information is contained in an archived file for each consumer that Equifax has named its "Frozen Scans." Ex. G, Bennett Decl., ¶ 16. Margaret Leslie, Equifax's responsible employee, testified that there were few if any

---

[8] The nature of the consumer's communication and Equifax's communication in response are also easily determinable by the letters Defendant has archived. Any changes to update the judgment status as a result of the communication would be available in the ACIS case and maintenance sheet documents. Ex. G, Bennett Decl., ¶ 9.

meaningful limitations to the Frozen Scan data:

> Then if you see a judgment on a frozen scan and the next month see it on the frozen scan and it is in the same state, the same data, the same state, I would then make the assumption that I had not seen any update to that, that it's -- there were no changes during the month. I don't have a problem with making that assumption because generally that would be true.
>
> Then if you had a hard inquiry on the file during that time between those two snapshots, then in all likelihood that judgment was a part of credit report information returned with that hard inquiry.
> [...]
> Now, I was also saying that if they are exact on those two end points, there's a probability it was -- it was perpetual through the month. [...] So I don't want you -- I don't want to lead you to conclude it drops off and comes back on. That's not true.

Dep. of Margaret Leslie at 22:3–15; 125:4–11 (attached as Exhibit J).

Even if Equifax did not want to participate in the data culling process, it need simply produce after certification, the consumer communication file and other documents in the ACIS as well as the set of frozen scans for each person in the narrowed set (those who had been sued in Virginia General District Court, had a status other than judgment at the time the class list is created, and who had made a direct communication with Equifax after the date of this disposition). Plaintiff's counsel would then absorb the burden of completing the class list. "Sometimes in an effort to delay or defeat the litigation, the defendant will assert that the information is not readily available from its records or that retrieving the information is burdensome. This may or may no be the case. [...] [T]he fact that a business maintains records in a manner that makes it difficult to retrieve information does not relieve it from the obligation to do so." National Consumer Law Center, CONSUMER CLASS ACTIONS, Sixth Edition (2006), Section 7.1.2.5 *Discovery Directed to Identification of Class Members*, p. 97. *Accord Kozlowski v. Sears, Roebuck and Co.*, 73 F.R.D. 73, 76 (D. Mass. 1976) ("The defendant may not excuse itself from compliance with Rule 34 by utilizing a system of record-keeping that conceals rather

than discloses relevant records, or makes it unduly difficult to identify or locate them, thus rendering the production of documents an excessively burdensome and costly expedition."); *See also In re Brand Name Prescription Drugs Litig.*, 94 C 897 MDL 997, 1995 U.S. Dist. LEXIS 8281, at *6–7 (N.D. Ill. June 15, 1995); *Baine v. Gen. Motor Corp.*, 141 F.R.D. 328, 331 (M.D. Ala. 1991).

### 2. Ms. Soutter is a class member.

Equifax has asserted that Ms. Soutter is not a member of the putative class because it did not furnish Ms. Soutter's consumer report to a third party after it received notice that her judgment was dismissed, and this Court raised this issue for the parties to brief during the earlier teleconference. But it is factually untrue. What Defendant is really claiming is that it did not acknowledge Ms. Soutter's May 2008 dispute *as a dispute that would trigger its liability under 15 U.S.C. § 1681i. See* 15 U.S.C. § 1681i(a)(1)(A) ("if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer . . . the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate[.]"). *Equifax is not claiming that the dispute was not made or received.* Indeed, Equifax acknowledges that Ms. Soutter provided it with notice of the inaccurate judgment—the element expressly considered by the Fourth Circuit panel. *Soutter II*, at 265 ("Proof that Equifax's conduct was willful toward Soutter because she sent letters in advance informing Equifax that the case against her was dismissed will not advance the claims of other class members."). Equifax's records produced in this case acknowledge its receipt of Plaintiff's May 2008 dispute. Defendant acknowledges, "It is undisputed that Plaintiff submitted two disputes to Equifax concerning her Richmond GDC judgment: once in May 2008 and again in December 2008. *See* Doc. 77 at 10–11; *Soutter*, 498 Fed. App'x. at 262." (ECF No. 195 at

17

16).  Equifax agrees that it then furnished multiple consumer reports regarding the Plaintiff between the post-May 2008 date (when it added the inaccurate judgment) and December 30, 2008 (the date it ultimately removed it). Ex. E, Def.'s Resps. to Pl.'s Interrogs., No. 3. Simply stated, while the Plaintiff may not have a claim against Equifax under § 1681i(a) (and, in fact, she has not alleged a § 1681i violation in this case or against Equifax at all), her § 1681e(b) claim—and her inclusion in class membership—are unassailable.

The requirements of § 1681e(b) are independent of a consumer's right to dispute and obtain correction of inaccurate information.   The former places an initial burden on the CRA whether or not the consumer has made a dispute or otherwise provided notice to the agency.  The specific act that constitutes a violation of § 1681e(b) is the furnishing of a specific credit report to a third party.  In contrast, the specific CRA act that constitutes a §1681i(a) violation is the failure to conduct a reasonable reinvestigation in response to a specific consumer dispute.  The claims are distinct and have their own set of elements. A CRA failure to conduct a reinvestigation of a dispute does not constitute a violation of § 1681e(b); and the failure to follow reasonable procedures when a credit report is furnished does not constitute a violation of § 1681i(a). They are not at all interdependent. As a sister United States District Court explained, these claims are distinct FCRA requirements, each focusing on separate mandated conduct:

> First, the plain language of section 1681e(b) applies the maximum possible accuracy standard to every consumer report issued by a CRA. *See* § 1681e(b) ("*Whenever* a consumer reporting agency prepares a consumer report ...") (emphasis added). Because the definition of "consumer report" is defined in the statute and that definition is not limited to the initial report, section 1681e(b) also applies to consumer reports that contain inaccuracies that have or should have been reinvestigated. Second, the plain language of section 1681i applies the reinvestigation duty to "the completeness or accuracy of *any item of information contained in a consumer's file.*" § 1681i(a)(1)(A) (emphasis added). That is, section 1681i(a) does not directly concern the accuracy of *reports* but instead creates an obligation for the CRA to maintain an accurate *file.*

*Lazarre v. JPMorgan Chase Bank, N.A.*, 780 F. Supp. 2d 1330, 1336 n.4 (S.D. Fla. 2011).

**B.     There Are Questions Of Law and Fact Common To The Class.**

Rule 23(a)(2) requires that there be a common question of law or fact.    Commonality

requires that there be at least one question of law or fact common to the members of the class.

*Jeffreys v. Commc'ns Workers*, 212 F.R.D. 320, 322 (E.D. Va. 2003); *Cent. Wesleyan Coll. v.

W.R. Grace & Co.*, 143 F.R.D. 628, 636 (D.S.C. 1992), *aff'd* 6 F.3d 177 (4th Cir. 1993) (stating

that commonality "does not require that all, or even most, issues be common, nor that common

issues predominate, but only that common issues exist.")  More recently, the Fourth Circuit has

restated the standard for commonality, based upon the Supreme Court's clarification of the

concept:

> Commonality is generally established when a plaintiff's claims have "questions of
> law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As the Supreme Court
> recently clarified, in order to satisfy the commonality requirement, the plaintiff
> must "demonstrate that the class members 'have suffered the same injury,' " *Wal–
> Mart Stores, Inc., v. Dukes,* ——U.S. ——, ——, 131 S. Ct. 2541, 2551, 180
> L.Ed.2d 374 (2011) (quoting *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147,
> 156, 102 S. Ct. 2364, 72 L.Ed.2d 740 (1982)), and that the claim "depend[s] upon
> a common contention" that "is capable of classwide resolution—which means that
> determination of its truth or falsity will resolve an issue that is central to the
> validity of each one of the claims in one stroke," *id.*

*Gray v. Hearst Communications, Inc.*, 444 F. App'x 698, 700-01 (4th Cir. 2011).[9]  "A single

common question will suffice but it must be of such a nature that its determination "will resolve

---

[9]  Equifax has repeatedly overstated the meaning and relevance of *Wal-Mart Stores, Inc. v.
Dukes*, 131 S. Ct. 2541 (2011), claiming that commonality requires that the entire case will be
decided by a single issue. But of course if the Court reads the Supreme Court's decision, or the
various Fourth Circuit decisions interpreting it, it is obvious that this was not the meaning or
import of *Dukes*.   *Dukes* was an employment class action with sprawling 1.5 million person
class alleging a wide range of disconnected discriminatory policies in diverse states, localities
and stores. *Scott v. Family Dollar Stores, Inc.*, 12-1610, 2013 WL 5630636 (4th Cir. Oct. 16,
2013).

an issue that is central to the validity of each one of the claims in one stroke." *Adair*, 2014 WL 4070457 at *8 (internal citations omitted).

Commonality is a liberal standard, and the fact that there are some factual variations in individual grievances among class members does not defeat commonality. *Jeffreys*, 212 F.R.D. at 322. Not all factual or legal questions raised in the litigation need be common so long as at least one issue is common to all class members. *McGlothlin v. Connors*, 142 F.R.D. 626 (W.D. Va. 1992). The commonality requirement requires that the classes present dispositive questions which will propel the case through the system. *See Stott v. Haworth*, 916 F.2d 134, 145 (4th Cir.1990); *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001). "'Minor differences in the underlying facts of individual class members cases do not defeat a showing of commonality where there are common questions of law.'" *DiFelice v. U.S. Airways, Inc.*, 235 F.R.D. 70, 78 (E.D. Va. 2006).

As discussed below, the dispositive—and predominant—common issue is willfulness. However, there are also other core common issues, all revolving around the basic liability questions. Recently, this Court certified a comparable FCRA class action against Experian Information Solutions. *See Dreher v. Experian Info. Solutions, Inc.*, 3:11-CV-00624-JAG, 2014 WL 2800766 (E.D. Va. June 19, 2014). Experian's Rule 23(f) appeal was denied just one week after plaintiff filed his opposition. *Experian Info. Solutions, Inc.*, No. 14-325 (4th Cir. Sept. 2, 2014) (attached as Exhibit K). The District Court found:

> The common factual and legal issues include: (1) whether, as of August 1, 2010, Experian knew that Cardworks had been appointed, by the FDIC, as the new servicer on the (now-defunct) Advanta accounts; (2) whether Experian's failure to list "Cardworks" as a source of information violated § 1681(g)(a)(2); and finally, (3) whether Experian's violation of that statutory section was willful.

*Dreher*, 2014 WL 2800766 at *1. And just last week, in a case in which the applicability of the FCRA itself was in dispute, this Court found, "As to the Rule 23(b)(3) class, the class members have suffered the same injury, based on Defendants' treatment and sale of class members' information without treatment required by the FCRA; their claims depend on a common contention—namely, that Defendants' treatment and sale of information is subject to the FCRA." *Berry v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 3:11-CV-754, 2014 WL 4403524, at *10 (E.D. Va. Sept. 5, 2014). Similarly, the Southern District of West Virginia found commonality in a FCRA case explaining:

> There are several common questions in this case, which Ms. Kingery has identified: "(1) What constitutes sufficient use of a credit score to trigger the disclosure requirement of § 1681g(g)?; (2) Whether Quicken provides its score notices 'as soon as reasonably practicable' when it waits at least 21 days and until after its final application denial decision has been made; and (3) Whether Quicken's violation of FCRA disclosure requirements was 'willful.' " (Pl.'s Mem. in Supp. [Docket 221], at 13). Answering these questions will resolve issues central to the class claims.

*Kingery v. Quicken Loans, Inc.*, 2:12-CV-01353, 2014 WL 2117096, at *5 (S.D. W. Va. May 21, 2014) *vacated on other grounds*.

Accordingly, in the case *sub judice*, comparable common issues include: *Were Equifax's procedures for obtaining and reporting the status of paid or dismissed civil judgments unreasonable? Did these procedures violate § 1681e(b)? Were credit reports that omitted the current status of a terminated judgment inaccurate?* And of course*, were Equifax's FCRA violations willful?* In contrast, as discussed below, there are very few individual issues.

### C.   The Claims of the Named Plaintiff are Typical because Her Claim and the Class Claim Share Materially Similar Facts to Support a Prima Facie Case.

Donna Soutter's claim is typical of those of other class members. She, as every class member, alleges a violation of the same FCRA provision, 15 U.S.C. §1681e(b). This claim

challenges Equifax's credit reporting procedures and does not depend on any individualized facts. Equifax obtains all of its Virginia judgment records under the same contract from the same vendor. During the class period, those records were gathered from a single source—the Virginia Supreme Court's website. Equifax's notice and knowledge of the challenged reporting problem is the same for Plaintiff as for the Class. Plaintiff's proof of each of these elements in her own case will advance the class claims in proportionate degree.

Plaintiff has established that her claim is typical of that of the narrowed class she seeks to represent. Notwithstanding the outcome of its Rule 23(f) appeal, Equifax has never advanced this Rule 23(a) element as a primary, or even developed, argument in its opposition to class certification. Instead, Equifax's Rule 23(f) petition only mentioned typicality in passing and the argument made up only a minor part of its appellate briefs. That, of course, was due to that fact that, amongst the various elements to be necessarily analyzed by the Court's "rigorous analysis", typicality was (and remains) a threshold that is usually met. *See Brown v. Nucor Corp.*, 576 F.3d 149, 153 (4th Cir. 2009) ("The threshold requirements of commonality and typicality are not high . . .") (quoting *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir. 1993)); a*ccord Romero v. Mountaire Farms, Inc.*, 796 F. Supp. 2d 700, 714 (E.D.N.C. 2011); *McLaurin v. Prestage Foods, Inc.*, 271 F.R.D. 465, 475 (E.D.N.C. 2010).

In its decision, the Fourth Circuit did not change or impose any new requirement to establish typicality. Instead, the roadmap for this Court's typicality analysis is as follows:

> To determine if Soutter has shown typicality, we compare her claims and Equifax's defenses to her claims with those of purported class members by reviewing the elements of Soutter's prima facie case and the fact supporting those elements and examining 'the extent' to which those facts "would also prove the claims of the absent class members."

*Soutter II*, at 267 (citing *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006)).

Using the Fourth Circuit's roadmap, Ms. Souter's claim and facts are clearly typical of the narrowed putative class's claim and facts. As the Fourth Circuit held, "Souter's claim under § 1681e(b) requires her to prove that:

> (1) her credit report was inaccurate;
> (2) Equifax's unreasonable procedures caused the inaccuracy; and
> (3) Equifax's behavior was willful."

*Souter II*, at 267 (emphasis structure added). This case is that simple. Each of these elements is uniform and the same across the narrowed class.

### 1. Plaintiff's and Class Member Credit Reports Were Inaccurate in the Same Material Way.

Plaintiff's credit report was inaccurate in the identical way that the credit report of each putative class member was inaccurate. By nature of the narrowed class definition, every putative class member is in the exact same circumstance: Equifax furnished a credit report about each putative class member stating that a civil judgment against him or her was unpaid and owing, when this was objectively untrue. In fact, Equifax does not oppose typicality on this "inaccuracy" basis. (Dkt. No. 135, at 21–23). Rather, Equifax's only "inaccuracy" related objection is really an argument against predominance or manageability (or as Equifax believes, commonality)—in other words, that it would be difficult to electronically or manually determine class membership. (*Id*. at 15–17). These are not typicality arguments. Additionally, the Fourth Circuit panel did not find Souter's claim atypical based on the "inaccuracy" element. *Souter II*, at 467 ("Facts supporting Souter's claim include that her report was inaccurate because her judgment had been dismissed . . ."). Thus, the first element that the Plaintiff is required to show for her § 1681e(b) claim—that her credit report was inaccurate—is typical of the putative class members' claims, as their reports were inaccurate in the exact same way as the Plaintiff's.

**2.      Equifax's Unreasonable Procedures Caused the Inaccuracies**

Plaintiff's facts establish that "Equifax's unreasonable procedures caused the inaccuracy", *id.*, and would similarly do so for the narrowed class.  For this element, "Soutter's facts would also include the manner in which LexisNexis procured judgment data for general district courts in 2008." *Id.* While this was the primary basis for the Fourth Circuit's reversal of this Court's original class certification decision, there are substantial differences in the class definition as well as in the record now before the Court that warrant a different outcome than the one reached by the Fourth Circuit.

First and foremost, Plaintiff has limited the present class definition to accommodate the boundaries of factual similarity that the Fourth Circuit panel outlined in its decision. *Soutter II*, at 265.  The Plaintiff has narrowed the class definition to address these concerns in two important ways. First, obviously, the renewed class definition does not include circuit court judgments and instead only seeks certification of consumers with inaccurate general district court judgments. Second, Plaintiff is only seeking certification of a narrowed time period, which fully addresses the Fourth Circuit's concern that data was collected differently based on the date of the disposition. *Id.* at 262.  The Fourth Circuit held that there were three distinct time periods at issue and that Equifax's judgment collection methods were uniform only as to each period, as follows:

- Prior to May 2009, LexisNexis supposedly obtained judgment records by bulk-feed, with in-person verification by independent contractors ("time period one")
- From May 2009 through November 2009, LexisNexis used a "webscrape" program to obtain the judgment information ("time period two"); and
- From December 2009 on, LexisNexis supposedly had to switch exclusively to "in-person review" to collect General District Court judgment information ("time period three").

Accordingly, the Plaintiff's renewed motion proposes a class definition narrowed to the discrete time period in which Soutter's own disposition was entered (pre-May 2009, or "time period

one"). This significantly narrowed class definition respects and accommodates the Fourth Circuit's typically concerns.

The second reason that Equifax's appellate typicality argument is inapplicable and incorrect for the present motion is because it depends on an untruthful declaration and a factually inaccurate record. In overturning this Court's decision because of the disparity of collecting data over three different time periods, the Fourth Circuit accepted Equifax's factual statements, premised upon the now discredited testimony of LexisNexis employee Mark Johnson, as true. *See Soutter v. Equifax Info. Servs. LLC*, 3:10CV107, 2014 WL 1379551, at *7 (E.D. Va. Apr. 8, 2014) (hereafter referred to as "*Soutter III*") ("Apart from the fact that Johnson's affidavit lacks the time-tested predicate for reliability, the affidavit cannot be admitted simply because Johnson did not tell the truth.").

Now, however, Plaintiff has irrefutably proven that Equifax's vendor, LexisNexis, followed materially identical procedures for the *collection of judgment dispositions* (as opposed to initial judgment entry pickups) for all three of the time periods Equifax previously (and falsely) represented to the Fourth Circuit as distinct. As Plaintiff has previously established, while LexisNexis did use different vendors and different methods to collect **initial records of judgment entry**, not once during the now highly narrowed class period did it use courthouse vendors as its source of **judgment dispositions**. Dep. of Sandra Arrington at 24:14-20 (attached as Exhibit L); Dep. of Karen Christian at 12:6–11 (attached as Exhibit M); Dep. of Cynthia Long at 45:2–17 (attached as Exhibit N); Dep. of Pamela Vicari at 13:3–14:19; 22:2–8; 26:8–16 (attached as Exhibit O); *see also* Dkt. No. 186 at 8–12. In every material way, the LexisNexis procedure to collect judgment dispositions has remained the same from at least 2008 forward. (*Id.*; *see also* Dkt. No. 158, at 9–11). In fact, the only difference was the entry of the "captcha" (a

requirement that the website user read and re-enter a string of numbers manually) before use of an automated webscrape of the Virginia judicial website. Dep. of Mark Johnson at 109:8-18 (attached as Exhibit P). Accordingly, the second requirement of Plaintiff's § 1681e(b) claim— that Equifax's unreasonable procedures caused the inaccuracy—is typical of the putative class members' claims.

### 3.      Equifax's Conduct was Willful as to Plaintiff and the Proposed Class.

The third element of Soutter's claim considered by the Fourth Circuit was whether "Equifax's behavior was willful." *Soutter II,* at 267.  While this issue was barely briefed by the parties, the Fourth Circuit panel considered the individual circumstances of Ms. Soutter as material to this issue, proffering that "Proof that Equifax's conduct was willful toward Soutter because she sent letters in advance informing Equifax that the case against her was dismissed will not advance the claims of other class members." *Id.* The Plaintiff's renewed motion does not face this typicality concern.   The narrowed class is yet even further limited to those consumers who had—just as Ms. Soutter did—provided Equifax direct notice of the prospective inaccuracy before the unlawful credit report was furnished.

However, with due respect to the Fourth Circuit panel, the reversal opinion's one sentence mention of willfulness as a possible individualized issue was not a dispositive holding, and is contrary to nearly every other appellate and district court authority to have considered this question, including—post-*Soutter*—the Fourth Circuit's decision *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (favorably quoting *Stillmock v. Weis Markets, Inc.*, 385 Fed. App'x. 267 (4th Cir. 2010) with a unanimous decision, including Judge Wilkinson, who wrote the special concurrence in *Stillmock* mentioned in *Soutter*). Indeed, since the Supreme Court's decision in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007), a near consensus of

courts have found willfulness to be an objective or common issue.  *See, e.g.*, *Stillmock*, 385 F. App'x at 273 (finding that FCRA willfulness is an "overarching" common issue.); *Dreher*, 2014 WL 2800766 at *3 & n.5 (granting class certification and finding "The 'overarching issue' in this case concerns Experian's willfulness:  whether Experian acted in objectively reasonable fashion . . . There is no real debate that the answer to this question is common to all proposed plaintiffs."); *Dreher*, 2014 WL 2800766 at *4 ("Arguments about a defendant's subjective bad faith have no place in the willfulness analysis.") (citing *Safeco*, 551 U.S. at 70, n.20)); *Boyd v. CEVA Freight, LLC*, 3:13-CV-00150-JAG, 2013 WL 6207418, at *5 (E.D. Va. Nov. 27, 2013) (same); *Williams v. LexisNexis Risk Mgmt. Inc.*, CIV A 306CV241, 2007 WL 2439463, at *6 (E.D. Va. Aug. 23, 2007) ("Accepting *arguendo* LexisNexis' characterization that *Safeco* requires a tiered inquiry, the Court nonetheless fails to see why recklessness requires inquiry into individual circumstances.").

This near consensus also holds true outside this Circuit and District.  *See Gillespie v. Equifax Info. Servs., LLC*, 05 C 138, 2008 WL 4614327, at *7 (N.D. Ill. Oct. 15, 2008) ("Equifax also argues that individualized proof of willfulness will be required and will predominate over common questions. But willfulness will not turn, as Equifax asserts, on whether class members can show that Equifax deliberately tried to harm them in particular. Rather, it turns on whether Equifax knowingly or recklessly disregarded its statutory obligations under FCRA. *See Safeco*, 127 S. Ct. at 2208–09. That is plainly a common issue in this case, not an individual one, as it concerns a standardized practice that Equifax used. In short, willfulness is perfectly suitable for class-wide proof in this case."); *Summerfield v. Equifax Info. Servs., LLC*, 264 F.R.D. 133, 142–43 (D.N.J. 2009) ("Nothing about Plaintiffs' behavior or conduct impacts the case; it is Defendant's actions that are judged."); *Chakejian v. Equifax Info. Servs., LLC*, 256 F.R.D. 492,

500 (E.D. Pa. 2009) ("To prove willfulness here, a consumer-by-consumer inquiry is not necessary."); *Harris v. Experian Info. Solutions, Inc., et al.*, Civil No. 6:06-CV-01808-GRA, (D.S.C. May 29, 2008) (Doc. No. 118 at 17) ("Whether each Defendant acted willfully or negligently is one that is the same for each class member."); *Clark v. Experian Info. Solutions, Inc.*, CIV.A.8:00-1217-24, 2002 WL 2005709, at *4 (D.S.C. June 26, 2002) (same).[10]  *See also Levine v. World Fin. Network Nat. Bank*, 437 F.3d 1118, 1119 (11th Cir. 2006) (finding that FCRA willfulness is an objective question); *Fuges v. Sw. Fin. Servs., Ltd.*, 707 F.3d 241, 251 (3d Cir. 2012) ("*Safeco* does not require that the defendant actually have made such an interpretation at any particular point in time."); *Hammer v. Sam's E., Inc.*, 754 F.3d 492, 501–03 (8th Cir. 2014) (same).

The facts necessary for Soutter to prove that Equifax's FCRA violation was willful are the same as would prove this element for the putative class.   Accordingly, the third element of Plaintiff's § 1681e(b) claim—that Equifax's conduct was willful—is typical of the putative class members' claims.

### D.    Donna Soutter Adequately Represents the Class.

The final component of Rule 23(a) requires that the "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4). This prerequisite is met when: "(1) the named plaintiff[s] [have] interests common with, and not antagonistic to, the Class' interests; and (2) the plaintiff[s'] attorney is qualified, experienced and generally able to conduct the litigation." *In re Se. Hotel Props. Ltd. Pushup Investor Legit.*, 151 F.R.D. 597, 607 W.D.N.C. 1993); *Wiseman v. First Citizens Bank & Trust Co.*, 212 F.R.D. 482, 489 (W.D.N.C. 2003).

---

[10] *Williams*, *Dreher*, *Harris*, and *Clark* each survived Rule 23(f) appeal.

Equifax cannot possibly satisfy that burden since both components of the "adequacy" test are plainly met here.  Plaintiff does not have any interests antagonistic to those of the proposed class and is prepared to pursue this litigation vigorously to redress the wrongs alleged. Both the named Plaintiff and the proposed class share an identical interest in establishing Defendant's liability.  To establish liability, all members of the proposed class seek the same findings on the common questions of law and fact.  No apparent or even imagined antagonism exists between the named Plaintiff and the members of the putative class.

Plaintiff's counsel is experienced in class action work as well as consumer protection issues under the Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq.*, and has been approved as Class counsel in multiple cases before this Court.  *Souter I*, at 10.

## II.  PLAINTIFF'S CLAIM SATISFIES THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(b)(3).

Under Fed. R. Civ. P. 23(b)(3), an action that satisfies the threshold prerequisites for certification may be maintained as a class action if the court finds that: (1) "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Plaintiff's claim satisfies those requirements.

### A.  Common Questions Of Law Or Fact Predominate Over Individual Ones.

The focus of the Rule 23(b)(3)'s predominance inquiry is on whether the proposed classes are "sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  Thus, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) "This standard is met . . . where there exists

generalized evidence that proves or disproves an element of the class member's claim on a simultaneous, class-wide basis." White v. Imperial Adjustment Corp., Civil Action No. 99-3804-Section N, 2002 U.S. Dist. LEXIS 26610, at *58 (E.D. La. Aug. 6, 2002). This criterion is normally satisfied when there is an essential common factual link between all class members and the defendants for which the law provides a remedy. *Talbott*, 191 F.R.D. at 105 (citing *Halverson v. Convenient FoodMart, Inc.*, 69 F.R.D. 331 (N.D. Ill. 1974)).

Resolution of the common issues of fact and law in this case in a single proceeding will not only promote the efficient adjudication of these matters; it will dispose of them almost entirely. As suggested above, the most significant issues in the case all pertain to uniform conduct by Equifax—its uniform credit reporting procedures, its knowledge and notice of the defects in its systems; the willfulness of its conduct. In contrast, the individual inquiries are modest at best.

In FCRA cases this Court and the Fourth Circuit have uniformly held that questions of liability, and especially willfulness, predominate over individual issues posed in these cases. *Stillmock*, 385 Fed. App'x. at 273. ("[T]he qualitatively overarching issue by far is the liability issue of the defendant's willfulness[.]"); *Berry*, 2014 WL 4403524 at *13 ("Even the determination of appropriate statutory damages constitutes a common question under these circumstances, because the qualitatively overarching issue[s] are the Defendants' willfulness and the applicability of the FCRA[.]") (citation omitted); *Dreher*, 2014 WL 2800766 at *3 ("The 'overarching issue' in this case concerns Experian's willfulness: whether Experian acted in objectively reasonable fashion in failing to identify Cardworks as a source of information."); *Williams*, 2007 WL 2439463 at *5 ("As the claims rise and fall on the propriety of these standard

procedures, common issues would appear to predominate."); *accord Ealy*, 514 Fed. App'x. at 305.

Each of the common issues offered above would predominate over the minimal individualized questions in this case.

> **B.**    **The Class Action Device Is Superior To Other Available Methods For Adjudicating These Controversies.**

Finally, the Court must determine whether a class action be superior to other methods for the fair and efficient adjudication of the controversy under Fed. R. Civ. P. 23(b)(3). *Lienhart v. Dryvit Systems, Inc.*, 255 F.3d 138, 142 (4th Cir. 2001); *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 713 (4th Cir. 1989). The factors to be considered in determining the superiority for the class mechanism are: (1) the interest in controlling individual prosecutions; (2) the existence of other related litigation; (3) the desirability of concentrating the litigation in the forum; and (4) manageability. *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997); *Newsome v. Up_To_Date Laundry, Inc.*, 219 F.R.D. 356, 365 (D. Md. 2004).

In examining these factors, it is proper for a court to consider the "inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *CitiFinancial v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1164 (7th Cir. 1974). "Class actions are particularly appropriate where multiple lawsuits would not be justified because of the small amount of money sought by the individual plaintiffs." *See Advisory Committee Note* to 1996 Amendment to Rule 23.

Class litigation is not only the most efficient means of adjudicating these disputes; it is the only means. Separately litigating the common issues that bind the two classes, whether in hundreds or hundreds of thousands of individual lawsuits would be a practical impossibility— even assuming it were economically feasible for consumers to pursue these claims on their own.

Furthermore, even if just a small fraction of the classes were to bring individual suits, the adjudication of common issues in a single proceeding would be infinitely more efficient than would be the separate adjudication of thousands of individual claims.[11]

The reality, however, is that the alternative to class treatment in these cases is not hundreds of thousands, or even hundreds, of individual actions. "As courts have repeatedly recognized, the statutory damages available under the FCRA are 'too slight to support individual suits.' " *E-Loan*, 2006 U.S. Dist. LEXIS 62654, at *28; *see also In re Farmers Ins. Co., FCRA Litig.*, CIV-03-158-F, MDL No. 1564, 2006 U.S. Dist. LEXIS 27290, at *44 (W.D. Okla. Apr. 13, 2006); *White*, 2002 U.S. Dist. LEXIS 26610, at *52; *Braxton v. Farmer's Ins. Grp.*, 209 F.R.D. 654, 662 (N.D. Ala. 2002) *aff'd sub nom. Braxton v. Fire Ins. Exch.*, 91 F. App'x 656 (11th Cir. 2003). Moreover, even if that were not the case, the large majority of class members would never think to bring individual claims because they are unaware their rights have been violated—having little lay knowledge of the complex blanket of FCRA protections. *See, e.g.*, *Bonner*, 2006 U.S. Dist. LEXIS 54418, at *22 ("[M]any of the persons in these classes may be unaware that the form letter sent by Defendants may violate the FCRA, and a class action suit may help to safeguard their rights."); *White*, 2002 U.S. Dist. LEXIS 26610, at *58 (same).

"[T]here is a strong presumption in favor of a finding of superiority" where, as here, "the alternative to a class action is likely to be no action at all for the majority of class members."

---

[11] *See, e.g.*, *White v. E-Loan*, 2006 U.S. Dist. LEXIS 62654, at *28 (N.D. Cal. Aug. 18, 2006) ("given that thousands of consumers may have suffered identical injury, a class action is certainly the most efficient way to adjudicate disputes over those consumers' rights"); *Cavin*, 236 F.R.D. at 396; *Bonner*, 2006 U.S. Dist. LEXIS 54418, at *21; *White*, 2002 U.S. Dist. LEXIS 26610, at *53 ("the piecemeal approach is rife with shortcomings, not the least of which is the possibility of inconsistent adjudications with regard to an identical course of conduct").

*Cavin*, 236 F.R.D. at 396.[12]   This presumption is rooted in the policy that lies "at the very core of

the class action mechanism"—namely, "overcom[ing] the problem that small recoveries do not

provide the incentive for any individual to bring a solo action prosecuting his or her rights."

*Amchem*, 521 U.S. at 625.   Thus, as Judge Easterbrook noted in *Murray v. GMAC Mortgage*,

"Rule 23(b)(3) was designed for situations such as [those involving FCRA statutory damage

claims for impermissible use], in which the potential recovery is too slight to support individual

suits, but injury is substantial in the aggregate."   434 F.3d at 953; *see also Bonner*, 2006 U.S.

Dist. LEXIS 54418, at *21-22.

Given the commonality that characterizes all of the issues in these cases, such treatment

will not raise any significant manageability hurdles, particularly given the smaller size of the

proposed class.   Even if it did, however, "[a] class action has to be unwieldy indeed before it can

be pronounced an inferior alternative—no matter how massive the . . . wrongdoing that will go

unpunished if class treatment is denied—to no litigation at all."   *Carnegie v. Household Int'l,

Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).   There simply is no other practical means for this Class

to challenge a practice that stands in clear violation of federal law.   "The desirability of

providing recourse for the injured consumer who would otherwise be financially incapable of

bringing suit and the deterrent value of class litigation clearly render the class action a viable and

important mechanism in challenging fraud on the public."   6 H. NEWBERG AND A. CONTE,

---

[12] The minute fraction of consumers who theoretically might bring individual claims were this action not certified for class treatment can hardly assert any substantial interest in controlling the prosecution of their claims.   Such individual control "matters mainly when absent class members have personal injury claims."   *White*, 2002 U.S. Dist. LEXIS 26610, at *50.   "Where as here, the focus of the proceeding will be the alleged course of conduct of the defendants in conscious disregard of the consumers' rights, the purpose of which is to determine whether statutory and punitive damages are due, the interest in personally controlling the litigation is small."   *Id.*   To the extent any individual does wish to retain such control, he or she can always opt out of the Class.

NEWBERG ON CLASS ACTIONS § 21:30 (4th ed. 2003).  Alternatively, in the unlikely event that Class members become aware of their rights and are able to locate counsel, this would result in a multiplicity of scattered suits resulting in the inefficient administration of litigation.   The remarks of one district court faced with common issues of similar import are no less applicable here: "[t]here can be no serious dispute that . . . that considerations of judicial economy heavily favor litigating these common issues once, as part of a single class action, rather than rehashing the same questions of law and fact in each of what could likely amount to [hundreds of] thousands of individual lawsuits." *In re Napster*, 2005 U.S. Dist. LEXIS 11498, at *29.  This Court should reach the same conclusion.

## CONCLUSION

The class definition proposed herein by the Plaintiff has been considerably narrowed to mesh with the Fourth Circuit's ruling as to the alleged temporal differences asserted by Equifax to exist with respect to the manner in which judgment dispositions were collected.  While this class definition is perhaps narrower than necessary given that Mr. Johnson's testimony has been stricken, it is also now highly precise.  Plaintiff has satisfied each of the Rule 23 factors, and therefore moves that this Court certify the class as defined in Plaintiff's Second Amended Complaint.

Respectfully submitted,
**DONNA K. SOUTTER,**
*individually and on behalf of all*
*others similarly situated*


By: _____/s/_____
            Of Counsel

Matthew J. Erausquin, VSB No. 65434
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:    (703) 273-7770
Fax:    (888) 892-3512
matt@clalegal.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 12th day of September, 2014, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

John W. Montgomery, Jr.
John W. Montgomery, Jr., Attorney, PLC
2116 Dabney Road, Suite A-1
Richmond, Virginia 23230
Tel:     (804) 355-8744
Fax:     (804) 355-8748
Email: jmontgomery@jwm-law.com

Keasha Ann Broussard
Barry Goheen
John Anthony Love
*PRO HAC VICE*
King & Spalding (GA-NA)
1180 Peachtree St NE
Atlanta, GA 30309-3521
Tel:     (404) 215-5725
Fax:     (404) 572-5100
Email: abroussard@kslaw.com
Email: bgoheen@kslaw.com
Email: tlove@kslaw.com

*Counsel for the Defendant*

_____/s/_____
Matthew J. Erausquin, VSB No. 65434
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:     (703) 273-7700
Fax:     (888) 892-3512
matt@clalegal.com