

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DONNA K. SOUTTER,
For herself and on behalf
Of all similarly situated
Individuals,

     Plaintiff,

v.                              Civil Action No. 3:10cv107

EQUIFAX INFORMATION
SERVICES, LLC,

     Defendant.

### MEMORANDUM OPINION

This matter is before the Court on PLAINTIFF'S SECOND AMENDED MOTION FOR CLASS CERTIFICATION (Docket No. 205). For the reasons set forth below, the motion will be GRANTED.

### BACKGROUND

#### A.   Procedural Background

The present case commenced when Plaintiff Donna K. Soutter ("Soutter" or "Plaintiff") filed a Class Complaint against Defendant Equifax Information Services, LLC ("Equifax" or "Defendant") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et. seq. On October 29, 2010, Soutter filed a Motion for Class Certification, which this Court granted in Soutter v. Equifax Info. Servs., LLC (Soutter I), No. 3:10cv107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) and which

Equifax appealed to the United States Court of Appeals for the Fourth Circuit.   In <u>Soutter v. Equifax Info. Servs., LLC</u> (<u>Soutter II</u>), 498 F. App'x 260 (4th Cir. 2012), the Fourth Circuit held that Soutter had failed to satisfy the typicality requirement of Fed. R. Civ. P. 23(a)(3) and remanded the case with the instruction that any "renewed request for certification" be "subject to [a] 'rigorous analysis' under all four Rule 23(a) factors."  498 F. App'x at 266 n.*.

As the Fourth Circuit predicted, Soutter proposed a revised class definition.  This Court provided the parties a clean slate for their arguments and will conduct a fresh Rule 23 analysis. Although it is often the case that, "when a higher court reverses [on] one ground and remands a case without disturbing other determinations made by a lower court, the determinations not reversed continue to be the law of the case," <u>United States v. Kayser-Roth Corp.</u>, 103 F. Supp. 2d 74, 83 (D.R.I. 2000) <u>aff'd</u>, 272 F.3d 89 (1st Cir. 2001), that approach is not applicable here.  First and foremost, the Court of Appeals explicitly requested a new "rigorous analysis" under <u>all</u> Rule 23(a) factors.  To the extent that this analysis differs from that conducted in <u>Soutter I</u>, the Court must also revisit its Rule 23(b) analysis.  Second, Soutter proposes a materially different class definition on remand, rendering both this Court's and the Fourth Circuit's previous analyses of limited

2

value.   Lastly, Soutter has established on remand that certain material representations made by Equifax in its briefs and supporting documents in Soutter I and Soutter II were, in fact, untrue.   See Soutter v. Equifax Info. Servs. LLC (Soutter III), 299 F.R.D. 126 (E.D. Va. Apr. 8, 2014) (striking the April 19, 2013 affidavit of Mark Johnson containing many of the same substantive facts as the November 23, 2010 affidavit of Mark Johnson relied upon in Soutter I and Soutter II).[1]   Because the opinions in Soutter I and Soutter II rested upon a faulty foundation, the Court must apply the class certification factors and conduct its "rigorous analysis" anew based on the record as it now stands.

## B.   The Fair Credit Reporting Act

Soutter's claim arises under the FCRA.   15 U.S.C. § 1681, et. seq.   "Congress enacted [the] FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."   Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007); Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 142, 147 (4th Cir. 2008).   Even before the modern rise of "big data," Congress found that the credit industry's reliance upon "computerized data banks" posed

---

[1] In oral argument on the motion to strike resolved by Soutter III, Equifax represented that it no longer relied upon the 2010 affidavit in its opposition to class certification.   See Soutter III, 299 F.R.D. at 127 n.1.

3

a "great danger" that an individual's life and character would be "reduced to impersonal 'blips' and key-punch holes in a stolid and unthinking machine" and that, thereupon, his reputation would be ruined without cause. See Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 414 (4th Cir. 2001) (citing 116 Cong. Rec. 36570 (1970)). Although the role of keypunch cards may have receded, the "great danger" (and "great promise") of gleaning one's reputation from a complex nest of data points remains more relevant than ever.

To serve the twin needs of commerce and the consumer, the FCRA requires that consumer reporting agencies[2] ("CRAs") must accurately report credit information. See Saunders, 526 F.3d at 147. "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care[.]" Burke v. Experian Info. Solutions, Inc., 1:10-CV-1064, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

---

[2] "The term 'consumer reporting agency' means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

One such duty is articulated in § 1681e(b), which provides that, "[w]henever a consumer reporting agency prepares a consumer report,[3] it shall follow <u>reasonable procedures</u> to <u>assure maximum possible accuracy</u> of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b) (emphasis added). "Thus, a consumer reporting agency violates § 1681e(b) if (1) the consumer report contains inaccurate information and (2) the reporting agency did not follow reasonable procedures to assure maximum possible accuracy." <u>Dalton</u>, 257 F.3d at 415. If the CRA's failure to comply with this provision is "willful," then a consumer may maintain a private right of action and seek statutory damages under § 1681n. <u>See</u> 15 U.S.C. § 1681n. The plaintiff need not show "malice or evil motive" to prove willfulness, only that the defendant "knowingly and intentionally committed an act in conscious disregard for the rights of the consumer." <u>See</u> <u>Dalton</u>, 257 F.3d at 418.

---

[3] "The term 'consumer report' means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title." 15 U.S.C. § 1681a(d)(1).

### C.  Equifax's Information Collection Methods

Equifax is a CRA.  Although the FCRA does not require that Equifax record court judgments on consumer credit reports, Equifax chooses to include that information.  Equifax obtains this information by contracting with vendors that specialize in gathering information related to court filings.  One such vendor – LexisNexis – has provided Virginia court records to Equifax since 2007.  In Virginia, each county and independent city has a general district court with jurisdiction over small claims.  In addition, there are 120 circuit courts of general jurisdiction. All state court records are managed by the Office of Executive Secretary ("OES") of the Supreme Court of Virginia.  The clerk of each court uses a uniform system for recording judgments, which feeds into a shared case management system operated by the OES.

In <u>Soutter II</u>, the Court of Appeals detailed the various collection methods used by LexisNexis to capture "court records":

> [LexisNexis] used in-person review for all
> circuit courts through independent
> contractors.  These in-person reviews have
> some variety as well – some clerks provide a
> weekly summary printout to the reviewer,
> some let the reviewer peruse paper records,
> and some permit the reviewer use of the
> computer and case management system.  For
> the general district courts, the Supreme
> Court provided LexisNexis with bulk data
> feeds until May 2009.  LexisNexis then used

6

independent contractors to verify the bulk
feeds in person.  In May 2009, the Supreme
Court stopped providing these feeds.
LexisNexis then used a "webscrape" program
to grab the data from the Court's website.
This practice ended in December 2009 when
the Virginia Supreme Court enacted new
security measures, including a challenge-
response test, that limited the ability of
automated programs to access the public
records.  LexisNexis thus had to switch
exclusively to in-person review from
December 2009 to February 2010 for general
district court records.

498 F. App'x at 262.  Subsequently developed evidence has shown

that recitation to have been based on an inaccurate record

respecting legally determinative distinctions.

Indeed, the record now shows that, in <u>Soutter I</u> and <u>Soutter

II</u>, Equifax blurred the critical difference between the manner

in which it collects information about the <u>entry of judgments</u>

and the manner in which it collects information about the

<u>disposition of judgments</u>.  The record now shows clearly that

LexisNexis followed materially similar procedures for the

automated collection of judgment <u>disposition</u> information through

at least December 2009 and - unlike judgment <u>entry</u> information -

did not <u>require</u> "runners" to manually collect disposition

information from the courts in the first instance or for

verification purposes prior to this time.[4]  <u>See</u> Dep. of Mark

---

[4]  LexisNexis collected disposition information in automated
fashion from one source - the OES database - until at least
December 2009 when the Virginia Supreme Court introduced a

Johnson, 30:13-32:25 (Docket No. 158-1); Dep. of Mark Johnson, 109:12-18 (Docket No. 206-16); Dep. of Sandra Arrington, 26:8-17 (Docket No. 209-14); Dep. of Pamela Vicari, 19:5-9 (Docket No. 209-17); Dep. of Cynthia Long, 66:20-67:5; 68:5-25; 69:7-70:4 (Docket No. 186-3).

Under the terms of its contract with Equifax, LexisNexis was obligated to collect and provide all affirmative judgments (i.e., the entry of judgments in the first instance). In contrast, LexisNexis was only obligated to collect judgment dispositions if it determined that it was "commercially reasonable" to do so. Equifax/LexisNexis Agreement, Exhibit A to Agreement, ¶C.3.d (Docket No. 222). In addition, LexisNexis was required to "provide Equifax with its[] procedures for collecting dispositions" and provide changes to these procedures to Equifax "10 business days prior to implementation[.]" Id. For example, when LexisNexis lost its ability to purchase judgment disposition records in bulk, it advised Equifax via email. Pl.'s Reply at 3-4 (Docket No. 215). Further, at this stage of the proceedings, the record is sufficient to permit the inference that neither LexisNexis nor Equifax considered manual

---

"captcha" test. Whether this uniform collection of centralized data was conducted by bulk feed or webscrape prior to December 2009 is an immaterial distinction for certification purposes. Regardless, Soutter's revised definition now limits the class period to the bulk feed timeframe.

collection or verification of judgment disposition information "commercially reasonable."

### D.   Donna Soutter's Credit Report

In June 2007, Donna Soutter fell behind on her credit card payments to Virginia Credit Union ("Credit Union").   As a result, the Credit Union filed suit against her in the Richmond General District Court to recover $15,000 in unpaid credit card debt.   After Soutter and the Credit Union entered into a payment plan, the Credit Union agreed to dismiss the suit. Unfortunately, that intention was not relayed to the General District Court, which entered a default judgment against Soutter.   After the mistake came to light, the Credit Union moved to set aside the judgment, and on March 20, 2008, the General District Court set the judgment aside and dismissed the action without prejudice.

In order to forestall the mistake's predictable contagion to her credit records, Soutter sent Equifax a letter explaining that the judgment had been entered in error and enclosing a copy of the order setting it aside and dismissing the case.   On May 23, 2008, Equifax advised Soutter that the judgment was not yet in its file on her.   By July 2008, however, Soutter alleges that Equifax was reporting the judgment as unpaid and not vacated.[5]

---

[5] Technically, Soutter's judgment was set aside and dismissed, not vacated.

9

Soutter sent a second letter containing a copy of the order to Equifax in December 2008, explaining that she had been denied credit due to an erroneous Equifax report.  In response, Equifax removed the judgment from her file.  All told, Equifax furnished at least three consumer credit reports containing the inaccuracy.  Those reports were furnished on October 19, 2008, November 6, 2008, and December 16, 2008.

**E.  The Proposed Class and Class Claim**

Soutter claims that Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports that it furnished regarding her and other class members.  Soutter contends that Equifax's violation of 15 U.S.C. § 1681e(b) was willful, rendering Equifax liable pursuant to 15 U.S.C. § 1681n.

In her second amended motion for class certification, Soutter defines the proposed class as follows:

> All natural persons who meet every one of the following definitional requirements:
>
> 1.  the computer database of the Executive Secretary of the Supreme Court of Virginia shows that the person was the defendant in a Virginia General District Court civil action or judgment;
>
> 2.  the computer database of the Executive Secretary of the Supreme Court of Virginia shows that as of the date 20 days after the

Court's certification of this class, the civil action or judgment was dismissed, satisfied, appealed, or vacated on or before April 1, 2009 ("the disposition date");

3. Equifax's records note receipt of a communication or dispute from that person about the accuracy of Equifax's reporting of that civil action or judgment status; and

4. Equifax's records note that a credit report regarding the person was furnished to a third party who requested the credit report, other than for an employment purpose: (1.) no earlier than February 17, 2008, (2.) no later than February 21, 2013, (3.) after the date that Equifax's records note its receipt of the consumer dispute regarding the judgment status, and (4.) at least thirty (30) days after the disposition date but before the judgment notation was corrected by Equifax to report that it was satisfied, appealed or vacated.

Pl.'s Mem. at 6 (Docket No. 206). The proposed definition, drawing guidance from <u>Soutter II</u>, narrows the applicable time period, excludes circuit court judgments, and limits the class to consumers who had notified Equifax of the disposition of a judgment before Equifax published an inaccurate report.

## DISCUSSION

Class-action claims were designed to be "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." <u>Califano v. Yamasaki</u>, 442 U.S. 682, 700-701 (1979). "Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class

11

as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 155 (1982) (citing id. at 701.). In such cases, class actions save the resources "of both the courts and the parties" by litigating issues potentially affecting every class member "in an economical fashion." See id.

Before harnessing these economies, Rule 23(a) demands that four prerequisites be met: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the representative's claims or defenses are typical of those of the class; and (4) the representative will fairly and adequately represent the interests of the class." See Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 337 (4th Cir. 1998) (quoting Fed. R. Civ. P. 23(a)). In addition, putative classes must satisfy one of the Rule 23(b) tests. Where, as here, the plaintiff seeks certification under Rule 23(b)(3), the Court must ensure that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Because adjudication by class is an exception to the normal rules of litigation, the Court must perform a "rigorous

analysis" of each class certification factor.   See Ealy v. Pinkerton Gov't Servs., Inc., 514 F. App'x 299, 307-08 (4th Cir. 2013) (summarizing the rigorous analysis required under Rule 23(a) and Rule 23(b)(3)).

In conducting its analysis, the Court may face factual questions bearing on both class certification and the merits of the action.   "A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. ___, 131 S. Ct. 2541, 2551 (2011).   Because of this, "the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006).   Such findings are necessary "even if the issues tend to overlap into the merits of the underlying case," but "the likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper." Id.   The Court's factual determinations should go only as far as necessary and no farther. Compare Wal-Mart, 131 S. Ct. at 2551 ("Frequently [a court's] 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.   That cannot be

helped.") with Amgen Inc. v. Conn. Ret. Plans and Trust Funds, 568 U.S. ___, 133 S. Ct. 1184, 1194-95 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

## I. Rule 23(a)

The purpose of Rule 23(a) is to "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements — numerosity, commonality, typicality, and adequate representation — effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." Wal-Mart, 131 S. Ct. at 2550 (quoting Falcon, 457 U.S. at 156) (internal quotation marks omitted). Of the four explicit requirements, the first two factors (numerosity and commonality) represent necessary class characteristics and the second two factors (typicality and adequacy) represent necessary attributes for the class representative.

In addition to the requirements of Rule 23(a), Rule 23(c) states that "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B). This reflects the prior decisional

law holding that "the definition of the class is an essential prerequisite to maintaining a class action." Roman v. ESB, Inc., 550 F.2d 1343, 1348 (4th Cir. 1976). The Fourth Circuit, for example, has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014) (citing Hammond v. Powell, 462 F.2d 1053, 1055 (4th Cir. 1972)). This is more often referred to as the "ascertainability" requirement. See id.

### A.   Ascertainability

In order to certify a class under Rule 23, a court must be able to "readily identify the class members in reference to objective criteria." Id. Although the plaintiff "need not be able to identify every class member at the time of certification," the plaintiff must demonstrate that class members will be identifiable "without extensive and individualized fact-finding or 'mini-trials[.]'" Id.

Soutter proposes comparing data from two information sources in order to ascertain class members:  (1) Equifax's own records; and (2) the electronic copy of the OES database. The parties would use the OES database to identify each defendant in a Virginia General District Court civil action or judgment and obtain his or her name, address, and case number. That information would be used to locate the individual's Equifax

file, which would then be reviewed to determine: (1) whether the consumer provided notice contesting the judgment information; (2) when, if at all, Equifax updated the file's judgment status; and (3) whether an inaccurate credit report was furnished to a third party after the consumer provided notice to Equifax.

Equifax contests the ascertainability of the class in three ways. First, Equifax argues that the class is not objectively determinable. Specifically, Equifax states that the approach proposed by Soutter involves several costly and time-consuming steps, requires some degree of manual review by Equifax employees, and misstates Equifax's ability to ascertain the date of any "corrective updates" made to an individual consumer's file. Because Equifax accesses archives of files through "frozen scans" reflecting the state of the file on a single day of each month, it says that is not possible by reviewing the frozen scans to determine on which day within the month a particular change took place.

Second, Equifax argues that Soutter's definition imposes a requirement to report judgment dispositions within thirty days, and that the FCRA contains no such requirement. Soutter's current class definition identifies class members whose credit reports were furnished "at least thirty (30) days after the disposition date but before the judgment notation was

16

corrected." Equifax argues that this definition engrafts a "bright-line" liability rule onto the FCRA.

Third, Equifax contends that Soutter is not even a member of the proposed class. Equifax argues that the erroneous judgment was not yet listed on Soutter's credit file when she first contacted Equifax in May 2008, and, "therefore, there was no action for Equifax to take." Def.'s Resp. at 20 (Docket No. 206). Equifax then states that, because no consumer credit reports were furnished following Soutter's second notice to Equifax in December 2008, Soutter does not meet her own class definition.

None of these arguments serve to defeat class certification. First, none of Equifax's initial concerns reflect an inability to determine the members of the class by reference to objective criteria. The number of "steps" in the process and the time and effort required have no bearing on whether the individuals are or are not objectively ascertainable. See Dunnigan v. Metro. Life Ins. Co., 214 F.R.D. 125, 136 (S.D.N.Y. Jan. 2, 2003) ("[T]he class can be identified through an examination of the individual files of each of the participants. The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement."). Moreover, the majority of sifting in this case will be achieved through dataset searches and other forms of electronic data

17

analysis. After these steps are complete, any additional manual review to finalize class membership would reach approximately 1,000 consumers. These files and communications could be reviewed by a handful of attorneys in a matter of days.

Nor does this recourse to manual, member-by-member review render the inquiry "subjective." Here, most of the determinations are readily discernible and almost always binary: an individual was either listed as subject to a judgment or was not; this judgment was either recorded by Equifax or was not; Equifax either received a communication from the individual or did not; and so on. And, while the language of some consumer communications may require a degree of interpretation, the ultimate question arising from that communication is whether Equifax was "on notice" or not. The individualized fact-finding giving rise to mini-trials that defeat ascertainability are those requiring determinations on the merits — not an administrative review to determine whether an objective element of a class definition is met. See In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 116 (E.D.N.Y. Jan. 26, 2012).

What Equifax is really arguing when it laments the burden imposed is manageability, not ascertainability. The difficulty and burden of such an undertaking are undoubtedly relevant to a manageability analysis under the superiority factor explored below. Unlike ascertainability, however, the manageability of

adjudication by class is measured _in relation to_ the manageability of adjudication by other means. _See infra_ at 80. As such, manageability should only be used to deny certification "where the attention and resources which would have to be devoted strictly to administrative matters will overwhelm any relief ultimately accruing to the plaintiff class." _Brown v. Cameron-Brown Co._, 92 F.R.D. 32, 49 (E.D. Va. Oct. 16, 1981) (citation omitted). And, that simply is not the case here.

Equifax's protests ring especially hollow in light of its own substantial capabilities. As Soutter noted, Equifax describes itself as a business that:

> [C]reates and delivers unparalleled customized insights that enrich both the performance of businesses and the lives of consumers through the comprehensive and differentiated data it manages, the expertise in advanced analytics it provides, the state-of-the-industry solutions it develops, and the leading-edge proprietary technology through which the solutions are delivered. The company organizes, assimilates and analyzes data on more than 600 million consumers and more than 80 million businesses worldwide and its databases include more than 200 million employee files.

Pl.'s Reply at 12 (Docket No. 215) (citing http://www.equifax.com/about-equifax/company-profile (last visited Oct. 22, 2014)). In short, Equifax's very business model includes gathering and distilling information from a wide variety of sources in order to glean insights about individuals.

The irony here presumably is not lost on Equifax, and certainly is not lost on the Court.   In general, courts do not look favorably upon the argument that records a defendant treats as accurate for business purposes are not accurate enough to define a class.   See Herrera v. LCS Fin. Servs. Corp., 274 F.R.D. 666, 674 (N.D. Cal. June 1, 2011) ("What was ascertainable to Ocwen in the course of adhering to its own policy is ascertainable for the purposes of identifying members of the class.").   Moreover, Equifax has already proven its ability to determine whether and when a consumer has notified it of an inaccurate Virginia judgment pursuant to this Court's September 17, 2010 Order. Stipulated Discovery Order ¶ 1 (Docket No. 61) (requiring Equifax provide Soutter with a list of the names and addresses of each consumer who made a dispute concerning a Virginia judgment on their file at any time since February 17, 2008 under dispute codes 101, 102, 103, and/or 112).   In sum, the Court is confident that Equifax can perform the task ahead because the record shows as much.

Perhaps the closest Equifax comes to lodging a valid objective determinability argument is its contention that the "frozen scans" used for archival information do not reflect the exact date on which corrective updates were made to consumer files.   In other words, if a corrective update is made to a consumer's file and a credit report is furnished on that

20

consumer within the same month, Equifax claims it will be unable to determine whether the correction preceded the publishing of the report, or vice versa. That argument is insufficient to defeat class certification. First, Equifax has constructed little more than a paper obstacle, offering no evidence that such a hypothetical situation even exists for this class. Moreover, such a precise accounting is not necessary at this stage. See EQT, 764 F.3d at 358 ("The plaintiffs need not be able to identify every class member at the time of certification."); see also 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1760 (3d ed. 2005) [hereinafter "Wright, Miller & Kane"] (quoting Fischer v. Kletz, 41 F.R.D. 377, 384 (S.D.N.Y. Dec. 8, 1966)) ("[A] class does not have to be so ascertainable that every potential member can be identified at the commencement of the action."). Second, Equifax may not record the exact day it receives a judgment record or disposition from LexisNexis, but information in the record suggests that LexisNexis does maintain this information and has provided such data in a related case. See Letter from Donald Burton to Matthew Erausquin dated Mar. 26, 2014 (Docket No. 215-6) (confirming data production in Soutter v. Trans Union, LLC, No. 3:10-cv-514). Although Soutter also argues that the class definition already addresses this concern by reaching only those individuals whose credit reports were

furnished "at least thirty (30) days after the disposition date but before the judgment notation was corrected," the Court is not convinced that condition rectifies the hypothetical posed by Equifax.  Presumably, to avoid the "frozen scan" problem, the report would need to have been furnished at least thirty (30) days "before the judgment notation was corrected" (if it has been corrected) rather than "at least thirty (30) days after the disposition date," as required by the current class definition. This is because the frozen scan issue is only avoided if the date the report is furnished and the date the file is corrected (if it has been corrected) are separated by at least one month to avoid both falling within the same frozen scan.  The Court will make this change to the definition accordingly. Regardless, the class is more than sufficiently ascertainable by reference to objective criteria at this stage.

Second, Equifax's contention that the class definition imposes a thirty-day disposition reporting requirement is misplaced and – based on the revision above – inapplicable.  The class definition itself imposes no liability on Equifax.  The Court today rules on a motion for class certification, not a motion for summary judgment.  Equifax will be responsible for whatever liability, if any, is determined at trial.  If the class definition cuts counter to those findings on the merits, a final motion to amend the class definition will be entertained.

At this stage, however, Soutter is simply attempting to circumscribe a category of people for whom it is true that Equifax was on notice and furnished a report containing potentially inaccurate information despite this notice. The revised class definition accomplishes this aim and articulates an objectively determinable class.

Equifax's final ascertainability contention is that Soutter is not a member of the proposed class. That, however, is not an ascertainability argument. Typicality and adequacy demand that Soutter be a member of the class. See Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 147 (4th Cir. 2001) ("If [plaintiff] is not even a member of the class, her claims cannot be typical and she cannot be an adequate representative of the class."). Therefore, Equifax's class membership argument will be addressed in the discussion on typicality below. See infra at 55.

Where a plaintiff proposes objective criteria capable of identifying those individuals described in the class definition, the ascertainability requirement is satisfied. Soutter has done just that. The fact that applying the criteria could take significant time and effort may be a relevant consideration for weighing the manageability of the class device against other options under Rule 23(b)(3), but it does not factor into the Court's ascertainability determination. Holding otherwise would

mean that defendants could defeat class certification when their conduct affects a large number of individuals and the class-action device can be most useful.

## B.   Numerosity

Rule 23(a)(1) provides that one of the requirements for a class action is that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No specified number is needed to maintain a class action under Fed. R. Civ. P. 23; application of the rule is to be considered in light of the particular circumstances of the case[.]" Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir. 1967). "Courts consider a number of factors in considering whether joinder is practicable including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion." Adams v. Henderson, 197 F.R.D. 162, 170 (D. Md. Nov. 1, 2000) (internal quotation marks omitted).

The parties have stipulated that the revised class would include roughly 1,000 persons. Decl. of Leonard Bennett, ¶ 7, Ex 1, Ex. 2 (Docket No. 206-7). Equifax does not contest that the numerosity requirement is satisfied in this instance. The Court agrees. See William B. Rubenstein, Newberg on Class Actions § 3:11 (5th ed. 2013) [hereinafter "Newberg"]

24

("[J]oinder is generally deemed practicable in classes with fewer than 20 members and impracticable in classes with more than 40 members.").

## C. Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2); Lienhart, 255 F.3d at 146. The commonality requirement focuses on the claims of the class as a whole, and whether they "turn on questions of law applicable in the same manner to each member of the class." Califano, 442 U.S. at 701. To satisfy this requirement, there need be only a single issue common to the class. See Cent. Wesleyan Coll. v. W.R. Grace & Co., 143 F.R.D. 628, 636 (D.S.C. 1992), aff'd 6 F.3d 177 (4th Cir. 1993).

In discussing the typicality requirement in Soutter II, the Fourth Circuit invoked the lesson of Wal-Mart regarding commonality that "the members of a proposed class do not establish that 'their claims can productively be litigated at once,' merely by alleging a violation of the same legal provision by the same defendant." M.D. ex rel. Stukenberg v. Perry, 675 F.3d 832, 840 (5th Cir. 2012) (quoting Wal-Mart, 131 S. Ct. at 2551; see also Soutter II, 498 F. App'x at 266 ("Likewise, Soutter cannot satisfy typicality simply by asserting a violation of § 1681e(b) by Equifax."). "Commonality requires the plaintiff to demonstrate that the class members

25

have suffered the same injury.  This does not mean merely that they have all suffered a violation of the same provision of law."  Wal-Mart, 131 S. Ct. at 2551 (internal citations and quotation marks omitted).  As the Fourth Circuit panel implicitly recognized, if the level of generality at which commonality is established is insufficiently specific to first satisfy the commonality prong, then the class representative's proposed point of typicality cannot attempt to intersect at that juncture.  A point of commonality must be specific – and relevant – enough that it could help form the basis for the success of an individual claim.  These specific points of class commonality are the points at which the putative representative's claim must intersect in order to be typical of the class.  If the representative's claim attempts to intersect at a higher level of generality – either because that is where commonality has been forged or because it is the only level at which typicality can be achieved – then the class will fail.

In this observation, the Fourth Circuit did not tread new ground.  It has always been the case that typicality is meaningless where commonality is not first achieved.  See Newberg § 3:26 ("In essence, typicality requires that the class representative's claims share the common questions of law or fact that the class members' claims share with each other.").  In order to be "typical," Soutter's claims must be advanced at

26

the same level of generality - i.e., with the same type and degree of specificity - as the class' alleged commonality, which itself must be specific enough to buttress the class claim.

This lesson is reiterated in Wal-Mart's "one stroke" mandate. As Wal-Mart indicated, class claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551. In other words, the proposed points of commonality must possess the capacity "to generate common answers apt to drive the resolution of the litigation." Id. "Minor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law." DiFelice v. U.S. Airways, Inc., 235 F.R.D. 70, 78 (E.D. Va. Mar. 22, 2006) (citing Hewlett v. Premier Salons Int'l, Inc., 185 F.R.D. 211, 216 (D. Md. May 1, 1997)). But, commonality requires that the class present dispositive questions which will propel the case through the system. See Stott v. Haworth, 916 F.2d 134, 145 (4th Cir. 1990).

This does not mean, of course, that the entire case must be decided by a single issue. Wal-Mart does not, as Equifax seems to think, require that a common fact be one upon which the

entire case be decided "in one stroke." Such a requirement would render the predominance inquiry under Rule 23(b)(3) entirely meaningless. Rather, "[a] single common question will suffice [if] it [is] of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" EQT, 764 F.3d at 360 (internal citations omitted) (emphasis added); see also Wal-Mart, 131 S. Ct. at 2556 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do.") (internal quotation marks and brackets omitted). Put simply, if common evidence will generate a common answer to help resolve an element within the class' common claim, then Wal-Mart's "one stroke" demand is satisfied.

The Supreme Court has long observed that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Wal-Mart, 131 S. Ct. at 2551 n.5. As the Falcon Court noted:

> Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

457 U.S. at 158 n.13.  Although these concepts ideally "merge" when commonality and typicality intersect, the two requirements are not indistinguishable or interchangeable.  Whereas commonality "looks at the relationship among the class members generally," typicality looks "at the relationship between the proposed class representative and the rest of the class." Newberg § 3:26.  In order to meaningfully examine Soutter's typicality, the Court must first clearly identify the alleged commonalities of the class.

The Court finds four proposed "commonalities" that require rigorous analysis: the inaccuracy of the consumer reports, the reasonableness of the procedures alleged to cause these inaccuracies, whether Equifax's conduct was willful, and the determination of statutory damages.

### 1.  Inaccuracy

The inaccuracy of a consumer's report is a necessary element of a § 1681e(b) claim.  See Dalton, 257 F.3d at 415. Soutter argues that one of the "common questions" for the class is whether "credit reports that omitted the current status of a terminated judgment [are] inaccurate."  Pl.'s Mem. at 21 (Docket No. 206).  The answer to this question is, by definition, yes. But this truism does little to forge class commonality or drive the resolution of the litigation.  The relevant question is

whether the inaccuracy alleged is capable of resolution by common answer. It is.

As in _Soutter I_, the Plaintiff has shown that individualized proof will not be necessary, because the members of the class can all demonstrate the inaccuracy of their reports by reference to common evidence: the OES database. _See_ 2011 WL 1226025, at *9. By evaluating the OES data, the class members will be able to show the status of their judgments in contradistinction to the statuses published by Equifax in their consumer reports. "Thus, comparison of the Supreme Court of Virginia database with Equifax's records will prove the inaccuracy . . . of the putative class members' consumer reports[.]" _Id._ Nothing in _Soutter II_ challenged the typicality or commonality of this element, and the Court believes that this common question of inaccuracy remains capable of resolution by common answer.

Equifax contends that this cannot be the case because "[i]naccuracy is an uncommon, individualized issue" and proving inaccuracy will require "consumer-specific proof" such as "the judgment-related documents issued by . . . the court." Def.'s Resp. at 25, 26 (Docket No. 209). For support, Equifax cites to _Farmer v. Phillips Agency, Inc._, which held that "to determine whether the source of a particular consumer's records was faulty or inaccurate . . . will necessarily entail individualized

30

inquiry for many reports . . . ."  285 F.R.D. 688, 703 (N.D. Ga. Sept. 20, 2012).  Similarly, Equifax cites to Owner-Operator Indep. Drivers Ass'n v. USIS Comm'l Serv. Inc., where the Tenth Circuit agreed with the lower court that "the accuracy of each individual's [report], an essential element of a § 1681e(b) claim, require[s] a particularized inquiry."  537 F.3d 1184, 1194 (10th Cir. 2008).

The Court does not believe that Farmer or Owner-Operator established categorical commonality rules regarding this element of § 1681e(b).  In Farmer, for example, the court observed that the adverse information in each consumer's report came from a multitude of different sources, which obtained information from a number of jurisdictions.  See 285 F.R.D. at 702.  "[I]n order to determine whether the source of a particular consumer's records was faulty or inaccurate . . . the [Farmer] court would need to determine the source of each piece of adverse information in a consumer's report and then evaluate the quality of that source."  Id. at 703.  That problem is not present here. The inaccuracy at issue in this case involves one variable that is inaccurate in a common manner across the class and is easily verifiable by reference to a single court-run database without resorting to complex "mini-trials."

The record here shows that an expert witness, or perhaps even a summary witness, could present this kind of evidence

31

after a thorough study of the records kept by Equifax and the Supreme Court of Virginia. Equifax has advanced the unsupported argument of counsel as the predicate for its view that inaccuracy is an individual issue.[6] That is an insufficient basis upon which to find resolution of the community issue in its favor.

In short, Soutter has demonstrated that the inaccuracy element of the class claim is one that satisfies Wal-Mart's command that common issues "be of such a nature that [they are] capable of classwide resolution" by common answer. Wal-Mart, 131 S. Ct. at 2551. While only a single common issue is required to sustain Soutter's claim under Rule 23(a)(2), the Court will evaluate all alleged commonalities.

### 2. Reasonableness of Procedures

To meet the second element of a § 1681e(b) claim, Soutter must demonstrate that "the reporting agency did not follow reasonable procedures to assure maximum possible accuracy." Dalton, 257 F.3d at 415. In its defense, Equifax makes two claims: (1) that "reasonableness" is not a common issue, and 2) that the relevant question is whether Equifax's procedures "caused the inaccuracy" in any given credit report. Neither argument is persuasive.

---

[6] For example, counsel argue that accuracy necessitates a look at each underlying court record, but has not explained why this is so.

Equifax reiterates that the procedures for collecting judgments varies between the 134 General District Courts and argues that what is reasonable for one may not be reasonable for others. Equifax contends that "reasonableness" will vary according to the circumstances presented and is "quintessentially a fact-specific, individualized inquiry." This argument fails for three reasons.

First, a "reasonableness" determination regarding procedures is only "individualized" if the procedures in question actually varied by individual. See O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732, 742 (5th Cir. 2003) (class certification inappropriate where court would have to assess "reasonableness on a transaction-by-transaction basis"). Even Equifax does not allege that to be the case here.

Second, Equifax's argument fails because its repeated reference to the 134 General District Courts is simply irrelevant. That is because the evidence upon remand shows that, although the judgment collection methods varied by court and time period, the disposition collection method was uniform for the entirety of the class period, with the information drawn from a centralized source: the OES of the Virginia Supreme Court.[7]  See Pl.'s Mem. at 22, 24-26 (Docket No. 206). As such,

_____

[7] Although the uniformity of the procedures are evidence that the contention may be resolved "in one stroke," it may be possible

33

it is difficult to see how "the frequency with which a particular consumer's file should have been updated . . . is a question that is specific to the circumstances particular to each consumer" if there is a common baseline by which the jury can judge. Def.'s Resp. at 28 (Docket No. 209).

Equifax makes a similar argument in its discussion of Rule 23(b)(3), stating that what may be reasonable for consumers in rural Virginia is different than what is reasonable for consumers in urban areas. Thus, says, Equifax, reasonableness is an individual issue. Putting aside the fact that this argument bespeaks initial commonality, not final predominance, Equifax's contention is at war with logic. Perhaps that is why Equifax cited no authority to support it. Equifax's contention is based entirely on the now disproven notion that Equifax's default procedures for collecting information about judgment dispositions varied from jurisdiction to jurisdiction. That simply is not true. Based on the current record, Equifax's continued invocation of the varying judgment collection methods

---

that evidence of procedural variation itself could prove a basis for the "unreasonableness" of the procedures. In other words, Equifax cannot rely upon this opinion as support for the notion that it can insulate itself from liability under the FCRA by intentionally complicating its collection methods through a multitude of contracting co-parties or processes because a jury conceptually could find such an approach itself "unreasonable."

is a form of argumentation through obfuscation.  And, it is rejected.[8]

Third, the record here shows that the procedures for collection of judgment dispositions themselves are but one set of procedures employed by Equifax that bear upon the inaccuracy alleged.  Another, for example, is the method by which Equifax collects and synthesizes communications from customers placing Equifax on notice regarding the potential for erroneous information, which the Court will discuss below.

Equifax next contends that the uniformity of the procedures "obscures the actual question, which is whether those procedures 'cause the inaccuracy' in any particular consumer's Equifax credit file."  Def.'s Resp. at 32 (Docket No. 209).  Equifax challenges the commonality of this causal link by arguing that it is possible that any given inaccuracy conceivably could be attributable to another source, such as a court clerical error.  This argument is too clever by half.  Mere conjecture about wayward scriveners does not disturb the question common to the class:  whether Equifax's procedures were unreasonable.  Equifax's "causation" argument has no bearing on whether Equifax's procedures were or were not unreasonable.  That

---

[8] It is indeed troubling that Equifax continues to make arguments regarding its collection of "court records" generally, when the collection of disposition information is the legally relevant question.

question is common across the class and capable of resolution on a classwide basis.

Equifax retorts that the EQT court rejected this line of argument by vacating class certification where "the district court placed an inordinate emphasis on the sheer number of uniform practices without considering whether those practices are relevant to assessing the defendants' ultimate liability." 764 F.3d at 366. In essence, Equifax argues that the commonality of the unreasonableness determination is only "relevant" if causality is also common. Not so. EQT requires only that the common procedures actually be relevant to the class claim and, in the words of Wal-Mart, drive the litigation forward by resolving an issue central to the claim in one stroke. Equifax cannot legitimately claim that the reasonableness of the uniform procedures at issue is "irrelevant" to the class claim.

In examining the evidence necessary to make a class certification decision, the Court finds at least three "procedures" supporting Souter's § 1681e(b) claim. Each procedure is common across the class and capable of classwide resolution based on jury findings.

First, the Court finds that the agreement between Equifax and LexisNexis structuring the terms of each party's obligations distinguishes, on its face, between the collection standard for

36

judgment information and the collection standard for disposition information.   This contract establishes the overarching rules that govern LexisNexis' collection practices and could reasonably be found to constitute part of Equifax's procedures. Although LexisNexis was obligated to collect and provide all affirmative judgments (i.e., entry of judgment in the first instance) to Equifax, it was only obligated to collect judgment dispositions if it determined that to do so was "commercially reasonable."   Equifax/LexisNexis Agreement, Exhibit A to Agreement, ¶C.3.d (Docket No. 222).   Also, the record shows that LexisNexis was contractually obligated to inform Equifax of the procedures being employed, permitting the inference that a less thorough standard was applied to the collection of judgment disposition information than to collection of judgment entry information.   In other words, the record permits the inference that Equifax approved the widespread use of a procedure that was likely not to reveal that an entered judgment had been disposed of favorably to the consumer.   A jury could reasonably find that structuring the contract in this manner was unreasonable given Equifax's duty to adopt procedures to assure maximum possible accuracy.

Second, the Court finds that the procedures employed by LexisNexis for collecting disposition information were uniform across the class period.   Because part of the factual predicate

animating the appellate decision on this point was incorrect, the concerns raised by the Fourth Circuit on this point are inapplicable on remand.   Contrary to Equifax's representations on appeal, judgment and judgment dispositions were not collected in the same manner, and the method for collecting dispositions was uniform for the duration of the class period.   Soutter has produced evidence from which a jury could determine that the procedures employed by Equifax were unreasonable; namely, that Equifax was aware that disposition information was not being collected, purchased, or incorporated into consumer files in a consistent, adequate, or timely manner.   Weighing the credibility of the evidence and the reasonableness of the procedures is a responsibility reserved for jury.   At this stage, it is sufficient to find, as a fact, that, throughout the class period, Equifax employed uniform procedures affecting the entire class, and that a jury's decision regarding the reasonableness of these procedures will resolve an issue central to the class' claim "in one stroke."

Third, Soutter has narrowed the class to include only those individuals who submitted some form of notice to Equifax about inaccuracies respecting an entered judgment before Equifax furnished information about the judgment in the form of a consumer report.   Thus, the common question is whether Equifax's procedures or policies for handling such inquiries and notice

were reasonable.  As the Seventh Circuit recognized in Henson v. CSC Credit Servs., prior consumer notice is an important consideration when weighing the reasonableness of a CRA's approach to ensuring "maximum possible accuracy."  See 29 F.3d 280, 285 (7th Cir. 1994) ("[A]s a matter of law, a credit reporting agency is not liable under the FCRA for reporting inaccurate information obtained from a court's Judgment Docket, absent prior notice from the consumer that the information may be inaccurate.")  (emphasis added); see also Shaunfield v. Experian Information Solutions, Inc., 991 F. Supp. 2d 786, 799 (N.D. Tex. Jan. 9, 2014) (allegations that credit agency disseminated incorrect information after being notified of error raise a reasonable inference that agency failed to adopt and utilize reasonable procedures to assure maximum possible accuracy of information under 15 U.S.C.A. § 1681e(b)).  Ensuring that consumer notice is appropriately incorporated into a CRA's procedures is critical, because "[t]he consumer is in a better position than the credit reporting agency to detect errors appearing in court documents dealing with the consumer's own prior litigation history." Henson, 29 F.3d at 286.

The Court finds that Equifax has a system in place whereby it uses codes to track customer inquiries and communications. See supra at 20.  A jury can determine whether Equifax's procedures for addressing or incorporating this information

before producing a consumer report were reasonable.[9]   That is a

common issue that is capable of classwide resolution through a

common answer.

---

[9] The Court recognizes that this decision is at odds, to some extent, with the holdings in Swoager v. Credit Bureau of Greater St. Petersburg, 608 F. Supp. 972 (M.D. Fla. Apr. 15, 1985) and Grenier v. Equifax Credit Info. Servs., 892 F. Supp. 57 (D. Conn. June 20, 1995).   Those courts held that allowing a plaintiff to challenge "reinvestigation and grievance procedures" under § 1681e(b) would "engraft" a "redundant" duty onto § 1681e(b) where one already exists under § 1681i.   Those decisions miss the mark for several reasons.   First, this case does not involve "reinvestigation and grievance" procedures. The focus here is on the procedure for assuring maximum accuracy of the consumer report in the first instance.

Second, the purpose of § 1681e(b) is to prevent the disclosure of an inaccurate consumer report.   A "consumer report" is "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living[.]"   15 USCA § 1681a(d)(1).   The purpose of § 1681i, on the other hand, is to set forth dispute resolution procedures and reinvestigation duties after a consumer challenges the accuracy of his or her file.   A "file" means "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored."   15 USCA § 1681a(g).   Although the Swoager court uses these terms interchangeably, the "file" actually represents the latent information stored by the CRA, whereas the "report" represents the prepared document furnished to a third party.   As the Swoager court observed, "the standard of conduct imposed under § 1681i is lower than the standard of conduct imposed under § 1681e(b)."   608 F. Supp. at 975.   This higher threshold reflects the higher consequences of publishing an inaccuracy to a third party.

Third, the Swoager court believed that § 1681e(b) applied to the accuracy of the "initial compiled consumer credit report" before any dispute and found the higher standard of conduct appropriate because "where the only information available to the creditor is that initially compiled by the credit bureau, it is essential

In sum, the Court finds that Soutter has advanced three procedures applicable across class members that raise a common contention of reasonableness that can be resolved with common answers on a classwide basis.   Therefore, the commonality requirement of Rule 23(a)(2) is satisfied.

Before proceeding to the question of willfulness, the Court will address another "common question" posed by Soutter:   "Did these procedures violate § 1681e(b)?"   Pl.'s Mem. at 21 (Docket No. 206).   <u>Wal-Mart</u> makes clear that the question whether a

---

that the compilation procedures utilized ensure maximum possible accuracy."   <u>Id.</u>   As the court in <u>Lazarre v. JPMorgan Chase Bank, N.A.</u> noted, "the plain language of section 1681e(b) applies the maximum possible accuracy standard to <u>every</u> consumer report issued by a CRA," not just the first report.   780 F. Supp. 2d 1330, 1336 n.4 (S.D. Fla. June 23, 2011).

This Court, like the <u>Lazarre</u> court, also observes that the <u>Swoager</u> court hedged its position:

> Assuming arguendo a contrary result on the § 1681e(b) issue as to reinvestigation procedures, the Court would reach this same result. As set forth above, the Court views the standard of conduct under § 1681i to be slightly lower than under § 1681e(b). It necessarily follows that the failure to correct inaccuracies upon reinvestigation also constitutes a failure to follow reasonable procedures to assure maximum possible accuracy.

<u>Swoager</u>, 608 F. Supp. at 976 n.4.   Lastly, there may be situations where, as here, a consumer provides notice to a CRA before the derogatory information reaches her file.   It is not unreasonable to expect this notice to have the effect of preventing an inaccurate report, and a jury could find the CRA's treatment of such information unreasonable as well.

defendant violated the law does not satisfy Rule 23(a)(2). The Fourth Circuit agreed in Soutter II, holding that "members of a proposed class do not establish that 'their claims can productively be litigated at once,' merely by alleging a violation of the same legal provision by the same defendant." 498 F. App'x at 265 (quoting Wal-Mart, 131 S. Ct. at 2551 (quotations and citation omitted)). Here, however, Soutter does not ask "Did Equifax violate § 1681e(b)?" Rather, she asks "Did these procedures violate § 1681e(b)?" In Wal-Mart, the claims all challenged the same statute, but the specific policies and procedures that were challenged all varied. Thus, the claims were tied together at an impermissibly general, and superficial, level. Unlike in Wal-Mart, the putative class members in this case allege violation of the same statute in the same way. And the question, as phrased by Soutter, incorporates the specific, common procedures at issue above.

To the extent that this question reaches a scope different than that discussed above, however, Equifax's "causality" concerns must now be addressed because the common procedures outlined above cannot constitute violations of § 1681e(b) if they did not cause the inaccuracies in the class members' reports. See Soutter II, 498 F. App'x at 265 ("Soutter's claim under § 1681e(b) requires her to prove that (1) her credit report was inaccurate; [and] (2) Equifax's unreasonable

procedures <u>caused</u> the inaccuracy") (emphasis added). Notwithstanding the addition of the causality element, the Court finds the question to be a common one. The common evidence probative of the unreasonableness of the procedures paired with the common evidence proving the inaccuracies themselves will constitute sufficient circumstantial evidence from which a jury could find a violation of § 1681e(b). Because no further, individualized proof is necessary to find a violation, the question is still one capable of classwide resolution.

### 3. Willfulness

In addition to the questions of inaccuracy and reasonableness, Soutter contends that the question of willfulness under 15 U.S.C. § 1681n is common to the class as well. The Supreme Court has interpreted the phrase "willfully fails to comply," in 15 U.S.C. § 1681n(a), to reach both knowing <u>and</u> reckless violations of the FCRA. See <u>Safeco</u>, 551 U.S. at 57. A "reckless" violation is one that entails "an unjustifiably high risk of harm that is either known or so obvious that it should be known." <u>Id.</u> at 68.

Both Soutter and Equifax cite cases to demonstrate that "willfulness" – writ large – either is or isn't a common issue. Both overstate the importance of their citations. Willfulness is not a common issue as a matter of law or an individualized issue as a matter of law; rather, it is the factual context of

43

the case that will determine whether the defendant's behavior

was willful in a manner with individualized, discretionary

impact or common, generally applicable impact.[10]   Where the

challenged behavior involves individual determinations or

---

[10] Equifax circuitously cites to Souter II for the proposition
that "each class member must show willfulness, which 'typically
require[s] an individualized inquiry.'"   Gomez v. Kroll Factual
Data, Inc., No. 13-CV-445, 2014 WL 1456530, at *4 (D. Colo. Apr.
14, 2014) (citing Souter II, 498 F. App'x at 265).   Such a
statement would certainly help Equifax's case, if that's what
Souter II actually said.   However, the original passage reads:

> In addition, to recover statutory damages,
> Souter must show willfulness. Proof that
> Equifax's conduct was willful toward Souter
> because she sent letters in advance
> informing Equifax that the case against her
> was dismissed will not advance the claims of
> other class members.   These problems are
> exacerbated because Souter is claiming only
> statutory damages, which typically require
> an individualized inquiry.

Souter II, 498 F. App'x at 265 (emphasis added).   That passage,
properly read, states that statutory damages "typically require
an individualized inquiry," not willfulness.   This Court holds
no differently below.   See infra at 48.   The quoted passage in
Souter II could not possibly stand for the proposition that
willfulness is individualized because the Court of Appeals
relies upon a concurring opinion in Stillmock for support – a
case that explicitly held that "where . . . the qualitatively
overarching issue by far is the liability issue of the
defendant's willfulness, . . . the individual statutory damages
issues are insufficient to defeat class certification under Rule
23(b)(3)."   Stillmock v. Weis Markets, Inc., 385 F. App'x 267,
273 (4th Cir. 2010) (emphasis added).

The Fourth Circuit also observed that Souter's letters would
not advance the claims of other class members with respect to
willfulness in Souter II because such notice was not part of
the prior class definition.   Nothing in Souter II conveys the
idea that willfulness, as a general concept, is typically
"individualized."

discretion, willfulness is likely to be a noncommon issue. Where the challenged behavior takes the form of a policy, practice, or procedure with generally applicable impact, willfulness is likely to be a common issue. See Ealy, 514 F. App'x at 305 (citing Stillmock, 385 F. App'x at 273) ("the qualitatively overarching issue by far is the [common] liability issue of the defendant's willfulness"); Dreher v. Experian Info. Solutions, Inc., No. 3:11-CV-624, 2014 WL 2800766, at *3 & n.5 (E.D. Va. June 19, 2014); Williams v. LexisNexis Risk Mgmt. Inc., No. 3:06-CV-241, 2007 WL 2439463, at *6 (E.D. Va. Aug. 23, 2007) ("The Plaintiffs' class allegations charge that these standard procedures violated the FCRA, and that, in adopting these procedures, LexisNexis willfully violated the FCRA. It is not readily apparent how an inquiry directed at LexisNexis' state of mind in adopting standard procedures is affected by any particular case in which those standard procedures were applied."). Soutter's contention takes the form of the latter and poses common questions capable of classwide resolution.

Based upon the common procedures above, the question is whether Equifax adopted (or declined to adopt) those procedures conscious that doing so "ran a risk of violating the law substantially greater than the risk associated with a reading [of the law] that was merely careless." Safeco, 551 U.S. at 69. The Court finds that a reasonable jury could come to such a

45

conclusion.  With respect to the LexisNexis-Equifax contract, a jury could find that Equifax's conscious decision to categorically subject information about disposition of judgments to a different collection standard than information about imposition of the judgment inherently favors adverse information over accurate information and invites inaccuracies of the type that are alleged here to be in violation of § 1681e(b). Similarly, a jury could find that Equifax understood the risks associated with its mode of collecting judgment disposition information, its purchasing decisions, and its integration procedures and that, thusly aware, Equifax's conduct nonetheless "ran a risk of violating the law substantially greater than the risk associated with a reading of the law that was merely careless."  Finally, a jury could find that Equifax's policy or procedure in handling consumer notices ran just such a risk as well.[11]  Of course, the fact that Equifax was on notice about potential problems before furnishing a consumer report speaks to Equifax's willfulness on its own.  See Soutter II, 498 F. App'x at 265 (noting that the fact [Soutter] "sent letters to Equifax

---

[11]  The questions facing the jury with respect to the reasonableness of the procedures and the presence of willfulness are closely related.  If the jury finds that any of the procedures were "unreasonable," the question then shifts to whether Equifax's adoption or use of those procedures was "objectively unreasonable" in light of its statutory obligations.  See Safeco, 551 U.S. at 69.

informing them of the possible inaccuracy before it occurred" bore upon "whether Equifax's behavior was willful").

Equifax responds that it is entitled to an individual review of each alleged dispute letter received from a putative class member to determine whether it is sufficient to place Equifax on such notice that its conduct could be determined to be willful. Equifax is surely entitled to review the letters at issue to determine if it was on notice or not. This does not, however, upend the commonality of the willfulness inquiry. The common questions are whether the overarching policy employed by Equifax in the face of "notice" (any notice) posed an unjustifiably high risk of harm or whether Equifax was "on notice" (any notice) that the reports it was furnishing were not accurate. Whether or not Equifax's policy or procedure regarding notice poses a risk rising to the level of willfulness is not affected by whether or not Equifax was on "more or less" notice on any particular occasion. Neither does the tone, tenor, or frequency of the individual letters change the fact that Equifax either "knew" or "did not know" that the accuracy of what it was reporting on or was about to report was in doubt. Once the threshold of "notice" is crossed at all, it is Equifax's knowledge of, and procedures for, handling such notice

that are implicated.[12]   In this case, common evidence applicable across all class members regarding willfulness will resolve a common contention and drive the litigation forward by common answers.[13]

### 4.   Statutory Damages

Lastly, the Court examines whether statutory damages constitute a common issue.   Soutter did not explicitly raise

---

[12]  The class definition ties this threshold to Equifax's own dispute code records.   In other words, Equifax is said to be "on notice" if its "records note receipt of a communication or dispute" about the civil action or judgment.   If Equifax would like to contest the accuracy of its own dispute code records and internal determinations, it is entitled to do so. But this will only result in class members being excluded entirely because failure to provide notice would remove them from the class definition altogether.   The question in this case is not whether an individual Equifax employee entrusted with some level of discretion willfully disregarded "dispute" information from any specific customer, but rather what Equifax does and knows once it receives such a communication.

[13]  It is worth noting that this holding would remain undisturbed even if individualized evidence were necessary to prove inaccuracy and, as a result, provide the circumstantial causal evidence necessary to show a violation under 1681e(b).   This is because the question "Was Equifax's behavior willful?" can be answered on a classwide basis, even if the question "Is Equifax liable under § 1681n?" cannot.   The latter depends upon a violation of § 1681e(b).   The former simply requires showing that "Equifax's procedures – or again, lack thereof – entailed 'an unjustifiably high risk of harm that is either known or so obvious that it should be known[.]'"   Soutter II, 498 F. App'x at 267 (Gregory, J., dissenting) (citing Safeco, 551 U.S. at 68).   Neither the reasonableness of Equifax's procedures nor Equifax's perception of the risk posed by those procedures will in any way vary based on whether those procedures caused an inaccuracy in any particular application.

this as a common contention, but both parties debated the commonality of statutory damages in their briefing.

As the Fourth Circuit observed in _Soutter II_, "statutory damages . . . typically require an individualized inquiry." 498 F. App'x at 265. To support that point, the Court of Appeals quoted Judge Wilkinson's concurring opinion in _Stillmock_ for the proposition that, "because statutory damages are intended to address harms that are small or difficult to quantify, evidence about particular class members is highly relevant to a jury charged with this task." _Id._ (quoting _Stillmock_, 385 F. App'x at 277 (Wilkinson, J., concurring)).

Even if statutory damages were based solely upon the number of inaccurate reports furnished, this question would still likely require resolution on a member-by-member basis. _See, e.g._, _Stillmock_, 385 F. App'x at 273 (approaching statutory damages as an individualized issue where violations occurred with each receipt printed and plaintiffs were "exposed to the same risk of harm every time the defendant violated the statute in [an] identical manner"). Because the issue of statutory damages is unlikely to be resolved on a classwide basis "in one stroke," it cannot constitute a point of commonality under Rule 23(a)(2). Whether individualized determinations, such as the calculation of statutory damages, are sufficient to defeat class certification is reserved for Rule 23(b)(3).

\*   \*   \*

Although Soutter has failed to demonstrate commonality based upon statutory damages, she has successfully displayed three common contentions capable of classwide resolution by common answer: (1) whether class members' consumer reports were inaccurate as required by § 1681e(b); (2) whether Equifax's procedures were unreasonable as required by § 1681e(b); and (2) whether Equifax's actions were willful as required by § 1681n. Any of these contentions are sufficient to demonstrate class commonality under Rule 23(a)(2).

**D.   Typicality**

While the numerosity and commonality prerequisites focus on the characteristics of the class members in comparison to each other, the typicality prerequisite focuses on the general similarity of the named representative's legal and remedial theories to those of the proposed class. See Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 472 (5th Cir. 1986). "In the language of the Rule, therefore, the representative party may proceed to represent the class only if the plaintiff establishes that his claims or defenses are 'typical of the claims or defenses of the class.'" Deiter v. Microsoft Corp., 436 F.3d 461, 467 (4th Cir. 2006) (quoting Fed. R. Civ. P. 23(a)(3)) (emphasis omitted). The class representative "must be part of the class and possess the same interest and suffer the same

50

injury as the class members." _Falcon_, 457 U.S. at 156 (internal quotation marks omitted).   The Fourth Circuit captured the necessary analysis best in _Deiter_, stating:

> The typicality requirement goes to the heart
> of a representative parties' ability to
> represent a class, particularly as it tends
> to merge with the commonality and adequacy-
> of-representation requirements.   The
> representative party's interest in
> prosecuting his own case must simultaneously
> tend to advance the interests of the absent
> class members.   For that essential reason,
> plaintiff's claim cannot be so different
> from the claims of absent class members that
> their claims will not be advanced by
> plaintiff's proof of his own individual
> claim.   That is not to say that typicality
> requires that the plaintiff's claim and the
> claims of class members be perfectly
> identical or perfectly aligned.   But when
> the variation in claims strikes at the heart
> of the respective causes of actions, we have
> readily denied class certification.

436 F.3d at 466-67.   In short, "[t]he essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'"   _Deiter_, 436 F.3d at 466 (quoting _Broussard_, 155 F.3d at 340).

This is the very reason that the Fourth Circuit emphasized that a plaintiff's arguments cannot be made at an "unacceptably general level."   _Soutter II_, 498 F. App'x at 265 (citing _Dieter_, 436 F.3d at 467).   If there are "meaningful differences" between the representative's claims and the class claims that "would require 'new and different proof,'" then "proving the

51

representative's case would hardly prove a case on behalf of the class." Id. at 467, 468.    On the other hand, the concepts of commonality and typicality begin to "merge" when the class representative's claims are "typical" in the same way the class claims are "common."

It is not enough that these concepts overlap.    If the claims follow the same legal theories with markedly different degrees of specificity, than a "substantial gap" in necessary evidence might persist and the concepts will fail to merge. Only when commonality and typicality merge both in legal theory and level of generality will the evidence proffered to advance the representative's claim serve to adequately advance the class claim.    Without this nexus, the purposes of representation by class cannot be served.

Thus, the Court's typicality analysis "must involve a comparison of the plaintiffs' claims or defenses with those of the absent class members . . . begin[ning] with a review of the elements of plaintiffs' prima facie case and the facts on which the plaintiff would necessarily rely to prove it." Deiter, 436 F.3d at 467.  The Court "then determine[s] the extent to which those facts would also prove the claims of the absent class members." Id.  The Court will examine each of the elements of the claim discussed above and evaluate the extent to which

Soutter's facts will tend to advance the claims of the putative class members accordingly.

### 1.  Inaccuracy

One of the elements in Soutter's prima facie case is the inaccuracy of her consumer report. See Dalton, 257 F.3d at 415. In order to prove this element, Soutter will put forth the OES data and testimony about it and Equifax's records to demonstrate the error in the consumer reports furnished by Equifax.  By probing and relying upon common datasets to prove her claim, Soutter will similarly advance the claims of her peers.  In other words, "the facts on which [Soutter] would necessarily rely to prove [inaccuracy]" – the OES and Equifax databases – will also help "prove the claims of the absent class members." Although Equifax's counsel argue that resort to the consumer's individual court records will be necessary to prove inaccuracy, it has offered no proof on why or how that is so.  Thus, it is not really possible to analyze the Equifax inaccuracy defense. For these reasons, the Court finds Soutter's claim typical of the class claim with respect to inaccuracy.

### 2.  Reasonableness of Procedures

Proving Soutter's case will also require her to demonstrate that Equifax "did not follow reasonable procedures to assure maximum possible accuracy." Dalton, 257 F.3d at 415.  Here, the questions that Soutter aims to resolve are common to the class,

and the proof upon which Soutter relies will advance her own claim as well as those of the class members.

With respect to the Equifax/LexisNexis Agreement, Soutter has already produced the contract governing the collection of her judgment and disposition information. This same contract governed the procedure for collection of judgment and disposition information for every other class member.

With respect to LexisNexis' procedures for collecting the judgment disposition information and Equifax's decisions and procedures regarding the purchasing and incorporation of this information into consumer files, Soutter has shown that such information was collected by a uniform method. On remand, Soutter has debunked the notion that the collection procedures for disposition of judgments varied in any meaningful way and has tailored her class to a narrower time period and set of courts to further ensure that her claim is typical of the class claim. Simply stated, the record shows that disposition data was collected using a method that was uniform in all material respects for the duration of the class period. Equifax's decisions and procedures regarding the collection, purchase, and incorporation of this data were therefore applicable to all class members. On the other side, Equifax has made no showing that its pertinent policies and procedures respecting collection of judgment disposition information have varied over the class

period.[14]  Thus, the analysis turns, at least on this record, on Soutter's proffered evidence.  The proof offered by Soutter will resolve questions regarding the reasonableness of Equifax's procedures for her claim just as it resolves these questions for the class.

Finally, Soutter's evidence about Equifax's treatment of her own notice will focus on the reasonableness of Equifax's policies and procedures for handling notices of inaccuracy in general.  By eliciting and presenting proof about the reasonableness of Equifax's procedures for synthesizing and harmonizing conflicting consumer and data inputs, Soutter's evidence will advance the claims of each class member.

Here, it seems, is where Equifax's misplaced "ascertainability" argument belongs.  Equifax argues that Soutter is not even a member of the class, because at the time of her May 2008 inquiry, the anticipated error had not yet reached her file, but that, after her December 2008 inquiry, the error was removed within two days and no reports were furnished in the intervening time.  According to Equifax, there was simply "no action for Equifax to take" in May 2008 because Equifax

---

[14]  Equifax has proffered occasional instances of LexisNexis "runners" receiving disposition information alongside judgment information, but this does not alter the inquiry into the reasonableness of Equifax's procedures or the fact that Soutter's evidence will advance this inquiry for the class.

could not remove a judgment that wasn't reporting in the first place. Def.'s Resp. at 20 (Docket No. 209).

Equifax's argument has superficial appeal, but, in the final analysis, it lacks merit. It is, of course, true that typicality and adequacy demand that Soutter be a member of the class as defined.[15] But the legally relevant question is not whether Equifax was put on notice before or after the conflicting information reached its files, but whether Equifax was on notice before it prepared, and dispatched to third parties, a consumer report containing the erroneous judgment information and how it responded to that notice. There is substantial evidence that, before Equifax furnished any of the three consumer reports about Soutter, it was on notice that the judgment against her had been set aside and dismissed. If a jury were to so find, it also could find that Equifax's

---

[15] See <u>Lienhart</u>, 255 F.3d at 147 ("If [plaintiff] is not even a member of the class, her claims cannot be typical and she cannot be an adequate representative of the class."); <u>Hayes v. Wal-Mart Stores, Inc.</u>, 725 F.3d 349, 360 (3d Cir. 2013) (citing <u>Bailey v. Patterson</u>, 369 U.S. 31, 32-33 (1962)) ("It is axiomatic that the lead plaintiff must fit the class definition."). There is nothing typical about a plaintiff who does not meet the class definition. And, if a plaintiff is not typical, she cannot be adequate. See <u>Newberg</u> § 3:32 (citing <u>In re Am. Med. Sys., Inc.</u>, 75 F.3d 1069, 1083 (6th Cir. 1996)) ("The typicality prerequisite overlaps with the Rule 23(a)(4) requirement that class representation be adequate, for 'in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members.'").

procedures were unreasonable, whether the notice was characterized as preventative or corrective.

Equifax's argument that Soutter is not a part of the class as defined, raises an interesting, but ultimately unsuccessful, point. Although it is apparent from Soutter's briefing that the class is meant to reach both individuals who provided anticipatory notice and disputes, it is not at all clear that Soutter's actual class definition so provides. For example, Soutter's third "definitional requirement" for the class is that "Equifax's records note receipt of a communication or dispute from that person about the accuracy of Equifax's reporting of that civil action or judgment status." Pl.'s Mem. at 6 (Docket No. 206). Similarly, Soutter's fourth definitional requirement refers to "the consumer dispute" laid out above. Id.

At the time that Soutter first gave notice to Equifax, however, Equifax did not have the judgment information on file and was not reporting the judgment. Because Soutter did not contact Equifax regarding "the accuracy of Equifax's reporting," she simply would not be part of the class as it is now defined.

But the inartful word choice in proposing a class definition does not forfeit what is otherwise a legitimate class claim. Based on the rather obvious intent as expressed in the briefing and argument, the Court will replace Soutter's third definitional requirement to read: "Equifax's records note

receipt of a communication or dispute from that person about the status of a civil action or judgment that was dismissed, satisfied, appealed or vacated." In addition, the Court will substitute the phrase "communication or dispute" for the word "dispute" in Soutter's fourth definitional requirement. Quite clearly, Soutter fits within that definition of the class.

Relatedly, Equifax argues that, "if the class definition can be expanded to include not just 'disputes' as that term is formally used in the FCRA but to include this type of 'notice' as Plaintiff uses that term, then Plaintiff has traded one problem for another, i.e., she has added yet another individualized issue." Def.'s Resp. at 22 n.7 (Docket No. 209). That is not so because the test, and the issue to be decided here, is "typicality," not "identicality." Typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." Deiter, 436 F.3d at 467. Again, it is important to keep in mind that violation of § 1681e(b) turns on the furnishing of an inaccurate consumer report. Variation in the exact timing of a consumer's notice to Equifax does not "strike at the heart" of the cause of action, so long as that notice occurred before Equifax furnished the inaccurate consumer report of the class member to a third party. Soutter and her compatriots, of course, have this in common. Equifax has not shown how proof of notice as given by

58

Soutter would fail to advance claims for those absent class members who provided notice at a later time. At present, there do not appear to be any meaningful differences (or "substantial gaps") in the types of proof required or the underlying legal theories. Equifax was "on notice" before furnishing a credit report or it was not.

### 3. Willfulness

Because Soutter alleges that Equifax's violation of the FCRA was willful, she will also be required to put forth evidence of willfulness. See 15 U.S.C. § 1681n. To prove willfulness, Soutter must show that Equifax acted either knowingly or "recklessly" (i.e., that Equifax "knowingly and intentionally committed an act in conscious disregard for the rights of the consumer"). See Dalton, 257 F.3d at 418; see also Safeco, 551 U.S. at 68 (taking actions entailing "an unjustifiably high risk of harm that is either known or so obvious that it should be known").

The question then is whether, as to the common procedures outlined above, Soutter's evidence will help demonstrate that Equifax was conscious that its procedures (or lack thereof) "ran a risk of violating the law substantially greater than the risk associated with a reading [of the law] that was merely careless." Safeco, 551 U.S. at 69. The Court finds that a

reasonable jury could come to such a conclusion based upon the proof that Soutter uses to advance her own claim.

With respect to the LexisNexis-Equifax contract, a jury could find that Equifax's decision to categorically subject the collection of information about the disposition of judgments to a different collection standard than that which applied to collection of judgment information prioritized adverse information over accurate information and invited inaccuracies of the type alleged to be in violation of § 1681e(b). Soutter has put forth the contract that governed the collection of her information as well as that of her peers. Deposition testimony is to the same effect. It is clear that her evidence is the class' evidence as well.

Similarly, a jury could find that Equifax fully understood the risks associated with the procedure that it elected to use for the collection of information about the disposition of judgments, its purchasing of services, and its integration procedures and decisions and that Equifax knowingly "ran a risk of violating the law substantially greater than the risk associated with a reading of the law that was merely careless." This information was collected in an essentially uniform fashion and the evidence put forth by Soutter will reflect Equifax's overarching procedures and decisions affecting the class as a

whole.  As such, Soutter's evidence will advance her own cause while serving to prove the case for the class at large.

Finally, a jury could find that Equifax's policies or procedures regarding consumer notices – as evidenced by Equifax's handling of Soutter's letter and subsequent consumer reports – ran just such a risk as well.  As noted above, evidence of how Soutter's inquiries were handled will elucidate the procedure/policy (or lack thereof) that was applied to all class members.  If the decision to use this procedure posed an unjustifiably high risk of harm that was either known or so obvious that it should have been known, then Soutter will be able to demonstrate that the procedure was willfully unreasonable and that that willfulness applied across class members.

As discussed above, the fact of notice itself also stands as evidence of willfulness insofar as Equifax furnished consumer reports notwithstanding having prior notification of a potential inaccuracy.  In this regard, Soutter is typical of all the class members who, by definition, provided Equifax with notice regarding the status of their judgment before a report was issued.

### 4.  Statutory Damages

As the Court discussed above, there can be no typicality where commonality is lacking.  Newberg § 3:31 ("[A] finding of

typicality logically presupposes a finding of commonality."). Where a contention is not itself amenable to classwide resolution by common answer, the plaintiff's evidence can serve only her claim alone.

Even if statutory damages were to vary only by the number of reports furnished, the easy, formulaic nature of the proof speaks to qualitative predominance rather than commonality and typicality. See, e.g., Stillmock, 385 F. App'x at 273 (holding that common questions regarding liability outweighed "simple and straightforward" statutory damage calculations). Because the Court has already found that there is no "common answer" available to drive the resolution of this element under the commonality criterion, see supra at 48, there can be no finding of typicality.

### E.   Adequacy

The adequacy prerequisite requires the Court to be satisfied that "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), and that "class counsel [will] fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(4). Rule 23(a)(4) seeks to ensure that the named plaintiff will protect the class in matters germane to the claims in the litigation, and it also looks to the personal characteristics of the named plaintiff to see whether he or she is a fit

representative.   See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625-26 (1997).   "The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members." Broussard, 155 F.3d at 338.   Whereas "typicality focuses on the similarities between the class representative's claims and those of the class, . . . adequacy focuses on evaluating the incentives that might influence the class representative in litigating the action, such as conflicts of interest."   Newberg § 3:32.

Rule 23(g), on the other hand, examines the adequacy of class counsel.   "Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure, those questions have, since 2003, been governed by Rule 23(g)."   See Sheinberg v. Sorensen, 606 F.3d 130, 132 (3d Cir. 2010); see also Fed. R. Civ. P. 23(g) Adv. Comm. Note (2003 Amendment, subdivision (g)) ("Until now, courts have scrutinized proposed class counsel . . . under Rule 23(a)(4). . . .   Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision.").   But see

DiFelice, 235 F.R.D. at 79, 83 (finding class counsel adequate under 23(a) and appointing class counsel under 23(g)); In re BearingPoint, Inc. Sec. Litig., 232 F.R.D. 534, 541, 545 (E.D. Va. Jan. 17, 2006) (same).

With respect to the adequacy of class counsel, this Court found in Soutter I that "Soutter's counsel is qualified, experienced, and able to conduct this litigation. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases." Soutter I, 2011 WL 1226025 at *10. This remains true today and, as before, Equifax does not contest Soutter's counsel's adequacy. Based on the record and the Court's familiarity with counsel's work in this case and others, the Court finds that class counsel will fairly and adequately represent the interests of the class under Rule 23(g)(4) and is eligible for appointment under the requirements of Rule 23(g)(1)(A)(i) through (iv).[16]

As to the adequacy of the class representative, Equifax renews its contention that Soutter is in conflict with the class because she has waived any claims to actual damages. Because

---

[16] Counsel has identified and investigated the possible claims; counsel is experienced in handling cases of this sort in this Court and across the country; counsel is highly knowledgeable in the applicable law and about CRAs generally and how they work; and counsel has devoted the necessary resources to this and other like cases.

Soutter has testified to sustaining actual damages but excludes such damages from her claim, Equifax calls it "inconceivable" that she could be deemed adequate.  Def.'s Resp. at 35 (Docket No. 209).  But, to put it plainly, "that dog won't hunt."

"For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.'"  Ward v. Dixie Nat. Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010) (quoting Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003)).  "A conflict is not fundamental when . . . all class members share common objectives and the same factual and legal positions and have the same interest in establishing the liability of [the defendant].  Moreover, a conflict will not defeat the adequacy requirement if it is merely speculative or hypothetical . . . ."  Id. (citations and internal quotation marks omitted).

This Court has subjected each Rule 23 factor to a new rigorous analysis, but here the outcome remains the same.  "The Court can discern no fundamental conflict between Soutter and putative class members who may wish to assert actual damages based on this record."  Soutter I, 2011 WL 1226025, at *11. Soutter shares the same factual and legal positions as the class, has the same interest in establishing Equifax's liability, and is bound by her prior representations that she is not asserting an actual damages claim.  Moreover, as the Court

held previously, "[t]he conflict alleged by Equifax rests on the hypothetical and speculative prediction that there are numerous putative class members who would seek to litigate substantial actual damage claims." Id. Equifax has done nothing to shore up this contention on remand, and it remains true that any putative class members who wish to litigate actual damages retain the right to opt-out pursuant to Rule 23(c)(2). See Gunnells, 348 F.3d at 431-32 (holding that putative class members "who wish to pursue claims . . . requiring more individualized inquiry" are not "'jammed,' 'sacrificed' or 'caught' in any class action against their will" so long as they are permitted a right to opt out) (brackets omitted).

Equifax argues that "Plaintiff cites no case that has approved such a result." Def.'s Resp. at 35 (Docket No. 209). Of course, Equifax cites no case that disapproves such a result, save a passing, unexplained, and irrelevant reference to Wal-Mart. But Wal-Mart does not help Equifax's position. Wal-Mart stands for the proposition that the class must contain a single common contention capable of class-wide resolution; it does not stand for the proposition that the class claim must be common in every single respect or that the plaintiff's claim be typical in every single respect. Even the predominance inquiry under Rule 23(b)(3) does not go so far. Moreover, while commonality and typicality reflect and serve the values underlying adequacy, the

adequacy inquiry itself focuses on conflicts of interest. To the extent that adequacy incorporates the dictates of commonality and typicality, it is clear that Soutter has satisfied those requirements above.

For the reasons set out above, Soutter has satisfied each of the Rule 23(a) prerequisites for class certification.

## II.  Rule 23(b)

In order to justify certification of a class, Soutter must also satisfy one of the Rule 23(b) tests. "If a lawsuit meets these requirements, certification as a class action serves important public purposes. In addition to promoting judicial economy and efficiency, class actions also 'afford aggrieved persons a remedy if it is not economically feasible to obtain relief through the traditional framework of multiple individual damage actions.'" Gunnells, 348 F.3d at 424 (citing 5 James Wm. Moore et al., Moore's Federal Practice § 23.02 (3d ed. 1999)).

Soutter moves for certification under Rule 23(b)(3). Rule 23(b)(3) is intended to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchem, 521 U.S. at 615. Certification under Rule 23(b)(3) is appropriate where the Court finds that questions of law or fact common to the members of the

class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. <u>See</u> Fed. R. Civ. P. 23(b)(3).

### A.   Predominance

Under Rule 23(b)(3), the common questions found under Rule 23(a)(2) "must predominate over any questions affecting only individual members." <u>Amchem</u>, 521 U.S. at 615.   Whether common questions predominate over individual questions "is a separate inquiry, distinct from the requirements found in Rule 23(a)." <u>Ealy</u>, 514 F. App'x at 305 (citing <u>Wal-Mart</u>, 131 S. Ct. at 2556). This requirement is "even more demanding than Rule 23(a)," <u>Comcast Corp. v. Behrend</u>, 569 U.S. ___, 133 S. Ct. 1426, 1432 (2013), and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," <u>Amchem</u>, 521 U.S. at 623.   This is not simply a matter of counting common versus noncommon questions and checking the final tally.   "Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." <u>Stillmock</u>, 385 F. App'x at 272 (citing <u>Gunnells</u>, 348 F.3d at 429).   In other words, Rule 23(b)(3) "compares the quality of the common questions to those of the noncommon questions." <u>Newberg</u> § 3:27.

If the "qualitatively overarching issue" in the litigation is common, a class may be certified notwithstanding the need to

resolve individualized issues. See Ealy, 514 F. App'x at 305 ("Indeed, common issues of liability may still predominate even when some individualized inquiry is required."). For example, if "common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." Stillmock, 385 F. App'x at 273 (citing Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d 32, 40 (1st Cir. 2003)). This is because class certification in such cases will still "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Gunnells, 348 F.3d at 424 (citing Amchem, 521 U.S. at 615); see also id. at 426 ("Proving these issues in individual trials would require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues. Consolidation of these recurring common issues will also conserve important judicial resources.").

Equifax advances no discernible arguments distinguishing between the commonality and predominance inquiries. Rather than arguing that individualized issues would predominate even if the Court found some common issues, Equifax merely asserts that

69

because Rule 23(b)(3) poses a higher bar than Rule 23(a)(2), then, a fortiori, Soutter must fail. In other words, Equifax is addressing predominance by doubling down on its commonality arguments. That strategy does not work.

Soutter observes that questions of law or fact common to the members of the class predominate over individual issues because "the most significant issues in the case all pertain to uniform conduct by Equifax — its uniform credit reporting procedures[;] its knowledge and notice of the defects in its systems; the willfulness of its conduct." Pl.'s Mem. at 30 (Docket No. 206). The Court examines each of the common and individualized questions below to weigh the quality and complexity of each issue.

### 1. Inaccuracy

Determining inaccuracy constitutes a common question. See supra at 29. Inaccuracy is a principal element of the class claim and its commonality weighs in favor of class certification under the predominance inquiry.

Even if this element failed to form part of the common basis for the claim, however, common questions would still predominate since any conceivable individualization of the inaccuracy inquiry would be qualitatively insignificant. Although the existence of individualized inquiries are considered a negative factor in the analysis, the weight upon

70

the scale is greatly influenced by the difficulty of the inquiry. "Common issues will predominate if 'individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria - thus rendering unnecessary an evidentiary hearing on each claim.'" Newberg § 4:50. Where, as here, the evaluation regards a single variable that is inaccurate, in a common manner across the class and is easily verifiable and objectively determinable, any alleged "individualization" would rest only lightly upon the scales. Regardless of whether the comparison between OES data and consumer reports could be deemed individualized or whether additional individualized proof - such as original court documents - could be deemed necessary, this Court would hold that common issues prevail over individualized ones in this action.

Nor do Equifax's examples of "contrary" holdings convince the Court otherwise. First, the Court has found that the inaccuracy inquiry here is a common question to begin with for the reasons stated above. See supra at 29. That alone renders those cases inapplicable. Second, the Court must avoid drawing superficial similarities between cases or adopting categorical shortcuts in its rigorous analysis. Even if the inaccuracy inquiry in this case constituted an individualized question as it did in Owner-Operator, Farmer, and Gomez, it would not

overwhelm the questions common to the class. Far from it. The Court has reviewed those cases and finds meaningful distinctions in each.

In *Owner-Operator*, the plaintiffs alleged that the defendant company violated the FCRA when it disseminated their employment histories with inaccurate information. *See* 537 F.3d at 1187. This employment history, understandably, varied considerably by individual. Each individual had a different background with different prior employers. The form filled out by each previous employer contained seventeen different sections. *Id.* Each section contained several descriptors and some sections included an option for prior employers to provide short explanations. *Id.* The Court of Appeals, quite understandably, found that the question was individualized and that the nature of the inquiries necessary to determine "inaccuracy" made the case inappropriate for class certification. *Id.* at 1194.

Similarly, in *Farmer*, the court observed that the adverse information in each consumer's report came from a multitude of different sources, which obtained information from a number of jurisdictions. *See* 285 F.R.D. at 702. "[I]n order to determine whether the source of a particular consumer's records was faulty or inaccurate . . . the court would need to determine the source of each piece of adverse information in a consumer's report and

then evaluate the quality of that source." *Id.* at 703. As discussed above, that is not the case here.

Finally, in *Gomez*, the court declined to weigh the quality or complexity of the individualized inaccuracy determinations altogether, citing the outcomes in *Owner-Operator* and *Farmer* as precedent without any further analysis. *See* 2014 WL 1456530, at *3. In addition, the *Gomez* court - unlike this Court - found willfulness to be an individualized question as well, thereby tipping the scales further in favor of denial under the predominance criterion. *See id.* at *4. For the reasons stated above, willfulness does not pose an individualized question, *see supra* at 44, n.10, and the Court does not find that the decisions in *Owner-Operator* or *Farmer* appropriately inform the predominance analysis in this case on this record.

As the *Gomez* court itself observed, a plaintiff does not fail the predominance inquiry simply based on the existence of some individualized issues or factual inquiries. *See* 2014 WL 1456530, at *3 (citing *Cook v. Rockwell Intern. Corp.*, 151 F.R.D. 378, 388 (D. Colo. Oct. 8, 1993) ("[W]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though other important matters have to be tried separately."). The Court does not believe that the inaccuracy inquiry here is an individualized one. But even if

73

it were, the determinations required in this case would simple, straightforward, and objective.   That is the epitome of a qualitatively insignificant question under the predominance test.

### 2.   Reasonableness of Procedures

The most qualitatively significant question of Soutter's § 1681e(b) claim is whether Equifax's procedures were reasonable. For the reasons previously explained, the reasonableness of the procedures Equifax has chosen to employ to satisfy its duty to assure maximum possible accuracy is a common issue across the class.

For its predominance argument, Equifax does nothing more than rehash its commonality argument about the alleged procedural differences between jurisdictions and reiterate that individualized issues predominate.   The Court rejects Equifax's contention that reasonableness is an individual issue and, a fortiori, Equifax's related predominance position.

A similar result obtains for the question of "whether these procedures violate § 1681e(b)?"   It is true that causality may be easier to prove for some procedures (such as Equifax's procedures for handling notice or purchasing and incorporating disposition data) over others (such as Equifax's decision to adopt tiered collection thresholds in its contract with LexisNexis).   It is also true that Equifax may wish to challenge

causality in more elaborate and individualized ways at trial. None of this changes the fact that there will be sufficient common evidence at the moment inaccuracy is proven for the plaintiff to circumstantially demonstrate causality without resorting to additional complex or individualized proof. Perhaps this will not be enough for Soutter to prevail at trial. But, the question at class certification is not whether Soutter is likely to win; the question is whether the quality of the questions common to the class predominate over the quality of any individualized issues. They undoubtedly do.

Because certification of the class would easily "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results," Gunnells, 348 F.3d at 424 (citing Amchem, 521 U.S. at 615), the Court finds that the common contentions raised by Soutter predominate.

### 3. Willfulness

Willfulness - another common issue - is a similarly weighty qualitative question. As the Fourth Circuit observed in Stillmock, "where, as here, the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the

75

identical manner, the individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3)." 385 F. App'x at 273. It is clear here that the critical question of willfulness - resolved by common proof - predominates over the comparatively simple question of statutory damages.

The Court does not believe that the contrary decision in Gomez serves as proper guidance. The Gomez court found willfulness to be an individualized issue. See 2014 WL 1456530, at *4. That court based its decision on Soutter II and Stillmock, claiming that both cases stood for the notion that willfulness "typically require[s] an individualized inquiry." Id. Neither case so holds. As discussed above, see supra 44, n.10, Soutter II held that statutory damages, not willfulness, "typically require an individualized inquiry." 498 F. App'x at 265 (emphasis added). Similarly, the Gomez court cited to Judge Wilkinson's concurrence in Stillmock, with the following quotation: "Because statutory damages are intended to address harms that are small or difficult to quantify, evidence about particular class members is highly relevant to a jury charged with this task." Gomez, 2014 WL 1456530, at *4 (citing Stillmock, 385 F. App'x at 277 (Wilkinson, J., concurring)) (emphasis added). Nothing in either case suggests that willfulness is an inherently individualized issue. Rather, the

primary lesson of Stillmock was that simple or formulaic statutory damages determinations do not outweigh more qualitatively weighty common questions, such as willfulness. See Stillmock, 385 F. App'x at 273; see also Ealy, 514 F. App'x at 305 (citing Gunnells for the proposition that "common issues of liability may still predominate even when some individualized inquiry is required" and citing Stillmock as an example); Dreher, 2014 WL 2800766, at *2 ("[E]ven though Stillmock raised questions involving the award of statutory damages, the predominant issue remained the question of liability."). As such, this Court relies upon the lessons of Stillmock and Souter II in finding that willfulness is a common – and qualitatively predominate – question.

### 4.  Statutory Damages

As a predictable consequence of the analysis above, the Court finds that the question of statutory damages may be individualized but is minimally influential in the predominance analysis. As in Stillmock, where each receipt issued constituted a violation, here each report furnished constitutes a violation. Stillmock, 385 F. App'x at 273 ("Pragmatically, the only substantive difference between putative class members for purposes of affixing the statutory damages figure within the statutory damages range of $100 to $1,000 or in awarding punitive damages is the number of receipts received by a single

class member during the approximately eighteen months at issue."). And, this Court, like the Stillmock court, finds the individualized statutory damages questions both "simple and straightforward." Id. Unlike individualized, subjective determinations of damages, which could spawn a series of mini-trials, this is simply a matter of counting heads and data points. See Williams, 2007 WL 2439463, at *7 ("Plaintiffs are seeking only punitive and statutory damages, neither of which require a showing of individual harm.").

"Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification. In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations." Gunnells, 348 F.3d at 427-28 (citing Fed. R. Civ. P. 23 Adv. Comm. Note (1966 Amendment, subdivision (c)(4)) for the proposition that Rule 23(c)(4) permits courts to certify a class with respect to particular issues and contemplates possible class adjudication of liability issues with "the members of the class . . . thereafter . . . required to come in individually and prove the amounts of their respective claims"). Any reading of Soutter II to the contrary would inexplicably deviate from the Fourth Circuit's consistent - albeit largely unpublished - position on this issue. See Dreher, 2014 WL 2800766, at *3

("<u>Soutter</u>'s admonition that a district court consider the issue of individual damages restates, rather than revises, its previous (<u>Gunnell</u>, <u>Stillmock</u>) and subsequent (<u>Ealy</u>) discussions of Rule 23(b)(3)'s predominance requirements."). "Because the common issue of liability predominates over the question of how to best apportion statutory damages, [the] proposed class satisfies Rule 23(b)(3)'s predominance requirement." <u>Id.</u>

*   *   *

Resolution of the common issues of fact and law in this case in a single proceeding will not only promote the efficient adjudication of these matters, it will dispose of the case's most complex questions entirely. As suggested above, the most significant issues in the case pertain to uniform conduct by Equifax — its uniform credit reporting procedures; its knowledge and notice of the defects in its systems; and the willfulness of its conduct. In contrast, the individual inquiry into statutory damages pales in comparison to the more significant, common contentions. Even if inaccuracy could be deemed individualized — which this Court does not so hold — the questions would become quantitatively close, but the answer would remain qualitatively clear.

### B.   Superiority

The superiority requirement necessitates a finding that use of a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority "depends greatly on the circumstances surrounding each case," but "requires the court to find that the objectives of the class-action procedure really will be achieved." Stillmock, 385 F. App'x at 274 (quoting Wright, Miller & Kane § 1779).

The analysis under this facet of Rule 23(b)(3) is a comparative one. The court must first "consider what other procedures, if any, exist for disposing of the dispute before it." Id. Next, the court must "compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." Id. In determining whether the class mechanism is truly superior, the court should consider "(1) the interest in controlling individual prosecutions; (2) the existence of other related litigation; (3) the desirability of concentrating the litigation in the forum; and (4) manageability." Hewlett, 185 F.R.D. at 220 (summarizing the factors set out in Fed. R. Civ. P. 23(b)(3)).

80

Soutter argues that the statutory damage and fee-shifting provisions in the FCRA are insufficient to support any meaningful number of individual suits. Pl.'s Mem. at 31-33 (Docket No. 206). Moreover, Soutter claims that the vast majority of individuals affected by Equifax's practices are unlikely to know that their rights have been violated at all. Id. Even if a number of claims were to arise, Soutter says, they would inefficiently relitigate the common questions before the Court and risk generating inconsistent outcomes on the same essential facts. Id. at 34. Equifax responds that the existence of a fee-shifting mechanism in the FCRA "precludes" a finding of superiority. Def.'s Resp. at 38-39 (Docket No. 209). In addition, Equifax suggests that courts should not certify "novel" claims absent a "track record" of trials. Id. at 39.

Soutter's view is correct. The Stillmock court squarely and unambiguously addressed the issue of statutory damages and attorney's fees under the FCRA:

> [The Defendant's] argument is without merit. First, the low amount of statutory damages available means no big punitive damages award on the horizon, thus making an individual action unattractive from a plaintiff's perspective. Second, there is no reasoned basis to conclude that the fact that an individual plaintiff can recover attorney's fees in addition to statutory damages of up to $1,000 will result in enforcement of FCRA by individual actions of a scale comparable to the potential enforcement by way of class action.

385 F. App'x at 274.  Notwithstanding Equifax's sundry citations
to contrary holdings outside the Fourth Circuit, this Court is
persuaded to follow in _Stillmock_'s footsteps.

Soutter is additionally correct to point out that "there is
a strong presumption in favor of a finding of superiority"
where, as here, "the alternative to a class action is likely to
be no action at all for the majority of class members." _Cavin
v. Home Loan Ctr., Inc._, 236 F.R.D. 387, 396 (N.D. Ill. May 10,
2006).  Because "the effect of class certification on collateral
estoppel redounds to the benefit of" Equifax, one suspects that
Equifax "resists certification in an attempt to keep Plaintiffs
with relatively small claims out of court altogether — precisely
the problem the class action mechanism was designed to address."
_Gunnells_, 348 F.3d at 427.  Moreover, the interest in personal
control of the litigation is minimal in this context.  _See White
v. Imperial Adjustment Corp._, No. 99-CV-3804 2002 WL 1809084, at
*14 (E.D. La. Aug. 6, 2002) _aff'd in part_, _appeal dismissed in
part and remanded_, 75 F. App'x 972 (5th Cir. 2003) ("Where, as
here, the focus of the proceeding will be the alleged course of
conduct of the defendants in conscious disregard of the
consumers' rights, the purpose of which is to determine whether
statutory and punitive damages are due, the interest in
personally controlling the litigation is small.").  To the

82

extent any individual does wish to retain control, or seek actual damages, the opt-out mechanism will be available.

The interest in consistent and efficient adjudication favors class certification as well because class certification will "promote[] consistency of results, giving [Equifax] the benefit of finality and repose." Stillmock, 385 F. App'x at 275. Furthermore, even if just a fraction of the class members were to bring individual suits, the adjudication of the common issues in a single proceeding would be more efficient than the separate adjudication of individual claims. See, e.g., White v. E-Loan, Inc., No. 05-CV-02080, 2006 WL 2411420, at *9 (N.D. Cal. Aug. 18, 2006).

In closing its superiority argument, Equifax fires one last parting shot, arguing that "the novelty" of Soutter's legal theory "forecloses any finding of superiority." Def.'s Resp. at 39 (Docket No. 209). This court has engaged in just the kind of "searching inquiry into the viability of [the] theory" required in such situations, In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 26 (1st Cir. 2008), however, and finds Soutter's claim supported by sufficient evidence to proceed. Furthermore, the legal theory at issue is not novel. It relies, instead, on basic legal principles applied to a case-specific set of facts. That does not equate to a "novel legal theory."

83

Compared to any available alternatives, the facts of Soutter's case demonstrate that the class-action mechanism constitutes a superior means of adjudicating the claims before the Court.   Therefore, having satisfied each of the four Rule 23(a) prerequisites and both prongs of the Rule 23(b)(3) test, Soutter has affirmatively demonstrated that the proposed class complies with the requirements necessary for this Court to certify her class.

## CONCLUSION

For the foregoing reasons, PLAINTIFF'S SECOND AMENDED MOTION FOR CLASS CERTIFICATION (Docket No. 205) will be GRANTED. The Court appoints Leonard Anthony Bennett as class counsel and certifies a class meeting the following definition:

> All natural persons who meet every one of the following definitional requirements:
>
> 1. the computer database of the Executive Secretary of the Supreme Court of Virginia shows that the person was the defendant in a Virginia General District Court civil action or judgment;
>
> 2. the computer database of the Executive Secretary of the Supreme Court of Virginia shows that as of the date 20 days after the Court's certification of this class, the civil action or judgment was dismissed, satisfied, appealed, or vacated on or before April 1, 2009 ("the disposition date");
>
> 3. Equifax's records note receipt of a communication or dispute from that person about the status of a civil action or judgment that was dismissed, satisfied, appealed or vacated; and

4. Equifax's records note that a credit report regarding the person was furnished to a third party who requested the credit report, other than for an employment purpose: (1) no earlier than February 17, 2008, (2) no later than February 21, 2013, (3) after the date that Equifax's records note its receipt of the consumer communication or dispute regarding the judgment status, and (4) after the disposition date and at least thirty (30) days before the judgment notation was corrected (if it has been corrected) by Equifax to report that it was dismissed, satisfied, appealed or vacated.

It is so ORDERED.

_____ /s/    _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April _15,_ 2015