**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

DONNA K. SOUTTER, *et al., for themselves and on
behalf of other similarly situated individuals*,

                Plaintiffs,                          Civil Action No. 3:10-cv-107

        v.

EQUIFAX INFORMATION SERVICES, LLC,

                Defendant.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT AND FOR ATTORNEY'S FEES, EXPENSES, AND
<u>CLASS REPRESENTATIVE SERVICE AWARDS</u>**

        The Plaintiffs, Donna Soutter, Brenda Arnold, and Joyce Ridgley, by counsel and with

the consent of the Defendant, Equifax Information Services, LLC, respectfully submit this

memorandum of law in support of their Motion for Final Approval of Class Action Settlement

and Attorney's Fees, Expenses, and Class Representative Service Awards.

<div align="center"><u>OVERVIEW</u></div>

        On February 17, 2010—more than six years ago—Plaintiff Donna K. Soutter filed a

Complaint in the above-captioned class action. Later, Plaintiffs Brenda Arnold and Joyce

Ridgley filed a complaint asserting similar claims and the two cases were eventually

consolidated (the "Lawsuit"). The Lawsuit's core claims related to the manner in which Equifax

reported the status of Virginia General District Court judgments in consumer credit reports.

        As with most types of public records, these court judgment "indexes" contained little to

no identifying information (such as social security number or date of birth) to accurately pinpoint

whether a specific judgment even belonged to a particular consumer in the first place, and were

often left reflected as "unpaid" on the credit file belonging to the consumer of Equifax's choice

for months or years after the judgment was paid, vacated, or appealed by the actual debtor. Prior to the filing of this matter, only the transmission of a written dispute (or sometimes several) from a consumer to Equifax was sufficient to ultimately result in the update of the public record notation to reflect the disposition.

As the Court is aware and the docket shows, this case has been vigorously litigated. The Parties engaged in significant written and third-party discovery, conducted depositions, and engaged in extensive motions practice before Plaintiff Souter filed her first class certification motion. After the Court granted that motion, Equifax filed an interlocutory appeal that was fully briefed and argued at the appellate level. After the Fourth Circuit overturned the certification decision and remanded the case, discovery was reopened. Plaintiff Souter took numerous additional depositions and conducted other third-party discovery. Both parties filed and fully briefed additional motions. An amended complaint and two additional class certification motions were filed and briefed. Eventually, after another year of highly contentious litigation, this Court again certified a class—a decision which Equifax again promptly appealed. However, the Fourth Circuit denied Equifax's challenge to certification and the case was set for trial.

At all times during that six-year period, Equifax vigorously denied all claims asserted against it in the Lawsuit. It contended that its past and current procedures with respect to collecting and reporting public records were reasonable and compliant with the FCRA and did not constitute a willful violation of the statute. Throughout the case, Equifax indicated that it was prepared to take this case to trial on the merits, and was not open to mediation or settlement of the case until its most recent class certification appeal was unsuccessful.

Plaintiffs, Class Counsel, Equifax, and Equifax's Counsel thereafter engaged in extensive, good faith arm's-length negotiations under the supervision of Rodney Max, a skilled

mediator with significant prior FCRA and class-action experience. The original in-person mediation session was followed by a substantial number of additional telephonic and written negotiations both through Mr. Max as well as directly between lead counsel. This extended effort finally resulted in an agreement on the principal terms of the settlement—an extraordinary settlement by any measure, which provides in excess of $22 million in settlement benefits to the class members in addition to unprecedented and industry-changing relief—the removal of as many as 1.1 million judgments from the credit files of consumers with Equifax credit files. Plaintiffs and their counsel have concluded that the settlement is fair, reasonable, adequate, and in the best interests of the Class based upon their investigation and discovery, and taking into account the sharply contested issues involved, the uncertainty and cost of further prosecution, and the substantial and unprecedented benefits to be received by the class members pursuant to the Settlement Agreement.

The Settlement is made on behalf of consumers who were the subject of an Equifax consumer report in which Equifax reported Virginia General District Court judgments as unpaid when those judgments had actually been satisfied, vacated, or appealed. It was preliminarily approved by the Court. (Dkt. No. 239). Class Counsel now moves the Court to order final approval to the Settlement. In addition, Class Counsel moves for an attorney's fee award of $3,725,000.00, a service award to Ms. Soutter of $20,000.00, and service awards to Ms. Arnold and Ms. Ridgley of $2,500 each. Equifax has agreed to pay these amounts separate and apart from the other class member benefits. (Settlement Agreement ¶¶ 4.1-4.3).

As explained below, this Settlement is an excellent result for the Class. Indeed, this nearly understates the result. This outcome, which includes both economic and equitable relief, is one of the strongest ever negotiated by Class Counsel. The Settlement's release is also

precisely and narrowly focused on the claims brought in this case. Class members only release claims related directly to judgments, and then only claims brought because the judgment disposition was not reported.  Not all types of public records claims are released (specifically, tax liens are not within the scope of the release).  Additionally, an individual that was the subject of a "mixed file" issue—the most valuable FCRA claim available—can still bring a claim based on the appearance of someone else's judgment within his credit file.  This was not a small concession.  Given the frequency that this occurs due to the difficulty in tying a specific consumer to a specific judgment when there is no social security number available—Equifax is leaving many of these claims worth hundreds of thousands of dollars available to class members and consumers generally, although it has presumably dealt with the genesis of the underlying problem by removing the judgments altogether from its databases and agreeing not to report them in the future.  Given these significant benefits, the high degree of flexibility afforded to class members in structuring them, and the carefully narrowed scope of the release, it is not surprising that not a single class member, attorney, public interest group, or government agency (i.e., Attorneys General, Federal Trade Commission) has voiced an objection to the settlement.

Out of the class members that received notice, the Settlement has produced 71 timely requests for exclusion (opt out), and nine untimely requests. Declaration of Frank Barkan on behalf of RSM US, LLP (attached as Exhibit "1"). Class Counsel believes, and Equifax agrees, that the untimely opt out requests should still be excluded from the Settlement Class as they desire, for a total of 80 excluded Class Members. This results in a .09994% opt-out rate.[1]

---

[1] In calculating the opt-out rate, Class Counsel assumed that 90.4% of all class members had been successfully found and reached by mail, thus yielding a .09994% opt-out rate. Ex. 1, RSM Decl., ¶¶ 3-6. The opt-out as it relates to the entire class size is just .09032%.

Further, there was not a single objection (timely or untimely) to the settlement. Ex. 1, RSM Decl., ¶ 13.

<div align="center">

**THE SETTLEMENT, NOTICE, AND CLAIMS PROCESS**

</div>

**A.    Settlement Terms**

As described below and in their Motion for Preliminary Approval of this settlement, the deal reached between Class Counsel and the Defendant provides several important benefits to class members, including a four-year credit-monitoring subscription with an insurance product offering, the ability to claim into a $3 million cash fund, and the removal of all Virginia General District Court judgments from all Equifax credit reports (not just class members' reports). Class Members were also provided with the opportunity to reserve their actual damages, which they can pursue in a separate case against Equifax. The Parties have agreed that Equifax will not contest Class Counsel's request for attorney's fees and expenses of $3,725,000.00, a service award to Donna Soutter of $20,000.00, and service awards to Brenda Arnold and Joyce Ridgley in the amount of $2,500.00 each. Attorney's fees, expenses, and the service awards to the Named Plaintiffs will be paid separate and apart from the cash settlement fund. (Settlement Agreement ¶ 4).

**1.    The Class**

The court preliminarily approved the following settlement class definition:

> All consumers in the United States whose Equifax File contained a Virginia General District Court civil judgment, between January 1, 2003 and the date of preliminary approval of the Settlement, that was reporting as an open judgment, if at least 31 days prior to delivery of the consumer report, and on the date of delivery of the consumer report, such judgment had been satisfied, vacated dismissed, or appealed as shown by the VSC Master File.

There are 88,573 Settlement Class Members.

## 2.     Settlement Consideration

As described *infra,* while the pecuniary benefits of the Settlement are substantial, Class Counsel believes that the most important settlement consideration is the complete removal of all Virginia General District Court judgments from *all* Equifax credit reports for a period of no less than five years. (Settlement Agreement ¶ 3.1). This is an unprecedented change to the industry standard that applies not only to class members, *but also to every other consumer in the country that has ever suffered a General District Court judgment in Virginia.* By the most recent analysis of the database maintained by Class Counsel and constructed from the records of the Virginia Supreme Court, there have been more than 1.1 million judgments entered since 2003 against a natural person in a Virginia General District Court.  This settlement ensures that these judgment records will no longer appear within the credit files of consumers, including consumers who no longer owe the judgment as well those consumers to whom the judgments are inaccurately attributed (in large part, due to the lack of social security numbers or other personal identifiers within these public records).  This benefit will offer a significant improvement to consumers' credit scores—particularly when the consumer has a positive credit report otherwise and the judgment is the lone remaining derogatory item. The change will have significant monetary value to every class member, perhaps worth thousands of dollars to many, but at least hundreds of dollars to all.

The reason that the removal of the judgment information from consumer credit reports is so critical—and why Class Counsel fought so hard for this relief—is because public records are perhaps the most inaccurate component of any credit report.  Within the general category of "public records," judgments and liens lack sufficient identifiers and are the most problematic to report—given that the third type of public records (bankruptcies) usually contain a social

security number and other identifiers to sufficiently ascertain the identity of the consumer that has filed the bankruptcy petition.

As with criminal records, the credit-reporting agencies purchase "indexes" and do not acquire or otherwise examine a complete public record before they add a judgment to a consumer's credit report. Because credit-reporting agencies do not collect the complete set of data contained in the public records for civil judgments, any subsequent reporting of that public record in a credit file often contains inaccuracies regarding status, disposition, or even who the judgment actually belongs to. And by removing these inaccurate records from credit reports entirely (whether a disposition occurred or not), the accuracy of consumer reports across the scope of all consumers who suffered a Virginia General District Court judgment will be greatly improved.

The Settlement Agreement also requires Equifax to automatically provide four years of its premium credit-monitoring service that it sells for $14.95 a month (or a total value of $717.60). (Settlement Agreement ¶ 3.3). This credit-monitoring subscription includes an insurance policy in cases of identity theft, which is an important benefit. All Class Members receive the benefit of a credit-monitoring subscription without having to supply a credit card or other method of payment to activate the subscription. (Settlement Agreement ¶ 3.4). Class members also have the option of receiving a $180 cash payment instead of the credit-monitoring subscription. (Settlement Agreement ¶ 3.7). Importantly, after final approval, a second "delivery" notice will be sent out post-approval, providing a credit monitoring/insurance product activation code *to every class member regardless of whether they filed a claim*. This is important, as the Defendant agreed to bear significant additional cost to place these activation codes in the hands of each and every class member—not just those who chose to file a claim.  These class members

will also have two full years to use the activation codes before they expire.  While this benefit has a market value of $717.60, it is worth an actual monetized value of at least $180 to each class member, as they have the absolute right in this settlement to forego the subscription and receive a substantial cash payment.

The Settlement Agreement also establishes a $3 million cash fund to compensate class members who are most likely to have suffered credit injury. (Settlement Agreement ¶ 3.9). Class members are eligible to make claims from the cash fund by verifying that (i) Equifax issued a credit report about him or her that inaccurately included a Virginia General District Court judgment as owing when it was at that time vacated, dismissed, or appealed; or (ii) he or she made a written demand or filed suit against Equifax based upon the allegation that it furnished a credit report containing an inaccurately reported Virginia General District Court judgment. (Settlement Agreement ¶ 3.10). The class members that make a valid claim will receive pro rata payments from the fund without any cap on their payment. (Settlement Agreement ¶ 3.9). If twenty percent of class members submit a valid claim for payment from the cash fund, each claimant will receive $169.35. If ten percent of class members submit a claim, the payment amount would be $338.71. At the time of this filing, 5,895 class members have submitted a claim for payment from the cash fund and would presently receive $508.90 per person. *See* Email from Frank Barkan to Casey Nash (March 24, 2015) (attached as Exhibit "2").

Equifax has also agreed to pay all costs of class notice and administration (approximately $200,000), service awards to the Plaintiffs in an amount not to exceed $25,000, and attorney's fees not to exceed $3.725 million. Importantly, each of these amounts are paid separately from the settlement consideration paid to class members and will not decrease any class member recovery. Thus, with a monetized value of $180 per class member for the credit monitoring (and

included insurance policy) , the total value of this component of the settlement is at least $15,943,140.00, and the total value of the settlement once the cash fund, notice, administration and attorney's fees are considered is over 22 million dollars.  Over time, as class members activate their credit-monitoring codes, raising the effective value of their product from the $180 monetized value to the $717.60 retail value they would have otherwise had to pay, the total settlement value will only increase, and it will increase substantially.   In the analogous world of "gift card" settlements, Courts have routinely assessed the value of a settlement based on the face value of the gift cards provided to class members, even in cases where the class member was not offered the opportunity to monetize the benefit, as class members are permitted to do here.  See, e.g., *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949-50 (9th Cir. 2015) (upholding the district court's fee award in a class action case using a percentage-of-the fund method where the settlement fund was comprised of gift card payments to class members); *Torres v. Pet Extreme*, No. 1:13-CV-01778-LJO, 2015 WL 224752, at *9 (E.D. Cal. Jan. 15, 2015) *amended,* No. 1:13-CV-01778-LJO, 2015 WL 648241 (E.D. Cal. Feb. 5, 2015) (awarding an attorney's fee award in a class action case using the percentage-of-the-fund method where the settlement fund was comprised of gift card payments); *Fernandez v. Victoria Secret Stores, LLC,* No. CV 06–04149, 2008 WL 8150856, at *2, *4–16 (C.D. Cal. Jul. 21, 2008) (same).

A chart summarizing the potential increased monetary value to the class based on the number of individuals that activate their credit-monitoring subscriptions in the future is below:

| % of Class Activating Credit Monitoring | Monetized Value ($180.00) | Activated Subscription Value ($717.60) | Cash Fund | Notice & Admin | Attorney's Fees and Expenses | New Settlement Value to Class |
|---|---|---|---|---|---|---|
| 5% | $15,145,983.00 | $3,177,999.24 | $3,000,000 | $200,000 | $3,725,000 | $25,248,982.24 |
| 10% | $14,348,826.00 | $6,355,998.48 | $3,000,000 | $200,000 | $3,725,000 | $27,629,824.48 |
| 15% | $13,551,669.00 | $9,533,997.72 | $3,000,000 | $200,000 | $3,725,000 | $30,010,666.72 |
| 20% | $12,754,512.00 | $12,711,996.96 | $3,000,000 | $200,000 | $3,725,000 | $32,391,508.96 |
| 100% | $0.00 | $63,559,984.80 | $3,000,000 | $200,000 | $3,725,000 | $70,484,984.80 |

In addition, to accommodate the possibility that some consumers may have suffered larger than typical actual damages, class members may reserve their claim for actual damages by submitting the appropriate form to the Class Administrator, which has the effect of carving this claim out from the release. (Settlement Agreement ¶ 7.7). Any class member who elects to reserve his or her actual damages claim may seek to recover these actual damages from Equifax in a subsequent lawsuit. (Settlement Agreement ¶ 7.8).

### 3.    The Release

Class Counsel negotiated the narrowest release possible under the circumstances based on the practices described in the litigation and the information obtained through formal and informal discovery.

### 4.    Notice to the Class

The notice program described in the Settlement Agreement and approved in the Preliminary Approval Order was designed to reach as many class members as possible, using First Class U.S. mail as well as a Settlement Website. The names and addresses for the Notice came from the information maintained by Equifax and were checked against the U.S. Postal Services' National Change of Address database to ensure that class members' information was

10

current. The Class Administrator reports a 90.4% effective delivery rate, which is an acceptable rate. *See In re Serzone*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*, 3:05cv00143 (E.D. Va. Aug. 29, 2006) (Final Order approving class notice with approximately 85% delivery rate); *In re Zurn Pex Plumbing Prod. Liab. Litig.*, No. 08–MDL– 1958 ADM/AJB, 2013 WL 716088 (D. Minn. Feb. 27, 2013) (approving settlement where 80.6% of the class received notice).

Additionally, Class Counsel negotiated that a second notice would be sent to all class members reminding them not only of their ability to submit a claim form for payment from the $3 million cash fund, but also of their ability to receive a $180 cash payment in lieu of the credit-monitoring subscription. For the class members who have not already elected to receive a $180 cash payment, the second notice will also provide an activation code for four free years of credit monitoring. Class members do not have to file a claim form or take any affirmative action to receive these codes, which will remain valid for two full years. This second "delivery" or "post-approval" notice to remind people of their ability to claim settlement benefits was a point of contention during the settlement negotiations since it increased the cost of class notice and administration—paid by Equifax—but Class Counsel felt that it was important to remind class members of the value of this settlement and ensure that class members were able to claim their portion of the settlement consideration in the event that they missed the first notice in the mail. Class Counsel anticipates that a significant number of class members may submit claim forms after they receive the second class notice.

**B.    The Notice Process is Complete**

In accordance with the Preliminary Approval Order, Class Counsel retained a national class administration company, RSM US, LLP (formerly McGladrey, LLP), to accomplish the notice and claims process for the settlement. All actions taken by the Class Administrator to date have been under the direct supervision of Class Counsel with many communications, decisions, and consultations required between the Administrator and Class Counsel through the notice process. In addition, Class Counsel and Defendant's counsel have consulted and worked together throughout the notice and claims process to reach consensus on its day-to-day implementation.

Defendant delivered a class list to RSM containing a total of 88,589 names. RSM identified 16 duplicate entries on this list, which were removed, for a total of 88,573 class members. Ex. 1, RSM Decl., ¶ 3. RSM mailed notices to these class members on January 27, 2016. Ex. 1, RSM Decl., ¶ 4. As of the close of business on March 15, 2016, 9,066 notices were returned by the U.S. Postal Service as undeliverable. Ex. 1, RSM Decl., ¶ 5. Out of the 9,066 returned notices, 132 were returned with a forwarding address. Pursuant to Section 6.5 of the Agreement, 122 of these notices were re-mailed within 30 days of the original postmark date. Ex. 1, RSM Decl., ¶ 7. Ten of these notices were received more than 30 days after the original postmark date and therefore were not re-mailed. *Id.* The remaining 8,934 notices were returned without a forwarding address. Ex. 1, RSM Decl., ¶ 6.  Although the Settlement Agreement did not require these notices to be re-mailed, Class Counsel requested that the Settlement Administrator attempt to locate updated addresses so that the notices could be re-mailed. *Id.* The Settlement Administrator was able to locate 417 updated addresses using Accruint, a third-party database. *Id.* These notices were re-mailed on February 26, 2016. *Id.* Therefore, a total of 80,046 notices were delivered, or a 90.4% delivery rate. Ex. 1, RSM Decl., ¶ 8.

This process was certainly the best available given the facts of this case. While it is almost always difficult to obtain current addresses and identification information on class members, the Parties and Administrator were able to minimize this problem in this case by obtaining up-to-date and as complete information as possible from the U.S. Postal Service's National Change of Address database.

In addition to the mailed Notices, the class members and the general public could also access a website, http://www.souttersettlement.com, to access the claim form or to obtain all the information contained in the Notice, as well as the Settlement Agreement, Preliminary Approval Order, and contact information of Class Counsel and the Settlement Administrator. Ex. 1, RSM Decl., ¶ 9. The website also provided a conspicuous mechanism for any Settlement Class Member to provide an e-mail address for further communications, including for use to send the Approval Notice. Ex. 1, RSM Decl., ¶ 10. The website established by the Class Administrator had 966 visits as of March 15, 2016. Ex. 1, RSM Decl., ¶ 11. The Class Administrator also established a toll-free telephone number dedicated to the Settlement in this case, which provided automated answers to frequently asked questions, the ability to request the copy of the Notice packet by mail, and contact information for Class Counsel. Ex. 1, RSM Decl., ¶ 13. As of March 15, 2016, 1,744 people called the toll-free number. Ex. 1, RSM Decl., ¶ 14.

The website operated by the Settlement Administrator provided further notice and access to information in order to: (1) enable Settlement Class Members to access and download the Class Notice, Settlement Agreement, and Preliminary Approval Order; (2) enable Settlement Class Members to download an exclusion form, claim form, and reservation of rights form; (3) provided a list of critical dates and deadlines in the settlement process; and (4) provided contact information for Class Counsel.

C.    **Class Member Reaction**

Unquestionably, the settlement is an excellent result for the Class. Indeed, the fact that there were no objections and only eighty exclusions speaks volumes. Whether the Court considers the thousands of class members who neither objected nor opted out or the 1,744 who affirmatively telephoned the administrator, Ex. 1, RSM Decl., ¶ 14, the collective voice of the Class is overwhelmingly positive. By any account, this settlement is a resounding success for the class members. In fact, the percentage of the class that excluded or objected is so small, it is insignificant. The settlement benefits in the form of cash and extensive, top-tier credit-monitoring products are substantial, but every Class Member received the most substantial benefit (uniquely available in settlement and arguably not even on Plaintiffs' best day at trial), the removal of all Virginia General District Court judgments from their Equifax consumer reports. This significant change to the class members' credit files would not have occurred had Plaintiffs not prosecuted this action through to a successful conclusion.

## ARGUMENT

A.    **The Proposed Settlement is Fair, Reasonable, and Adequate and Should Be Approved.**

1.    **The Standard for Judicial Approval of Class Action Settlements**

There is a strong judicial policy within this Circuit favoring resolution of litigation prior to trial. *See, e.g.*, *S.C. Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("[t]he voluntary resolution of litigation through settlement is strongly favored by the courts") (citing *Williams v. First Nat'l Bank*, 216 U.S. 582 (1910)). Settlement spares the litigants the uncertainty, delay and expense of a trial and appeals while simultaneously reducing the burden on judicial resources. As the court in *S.C. Nat'l Bank* observed:

In the class action context in particular, there is an overriding public interest in

14

> favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation impose upon already scarce judicial resources.

749 F. Supp. at 1423 (quoting *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 313 (7th Cir. 1980)).

Rule 23 requires Court review of the resolution of a class action such as this one. Specifically, the Rule provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Rule 23(e) imposes two basic requirements on the parties and on the Court before the approval of a class settlement and dismissal. First, the Court must determine that notice was directed "in a reasonable manner to all class members." Fed R. Civ. P. 23(e)(1)(B). The next phase of the Court's determination of compliance with Rule 23(e)(1)(c) typically requires a two-part analysis, often referred to as the *Jiffy Lube* factors. The Court must determine whether the settlement is "fair and reasonable" and then whether the settlement is "adequate." The parties address each of these requirements below.

## 2.    The Notice to the Class Members was Reasonable.

In a settlement class maintained under Rule 23(b)(3), the class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e). Rule 23(e) specifies that "[n]o class action may be 'dismissed or compromised without [court] approval,' preceded by notice to class members." Fed. R. Civ. P. 23(e). Rule 23(c)(2) requires that notice to the class must be "the best practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c). The Rule also requires that the notice inform potential class members that (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out; (3) and any member who does not opt out may appear through counsel. *Id.* The Court must consider the mode of dissemination and

15

the content of the notice to assess whether such notice was sufficient. *See* Federal Judicial

Center, *Manual for Complex Litigation* § 21.312 (4th 2004).

As this Court explained, "[w]hat amounts to reasonable efforts under the circumstances is

for the Court to determine after examining the available information and possible identification

methods . . . 'In every case, reasonableness is a function of [the] anticipated results, costs, and

amount involved.'" *Fisher v. Va. Elec. & Power Co.,* 217 F.R.D. 201, 227 (E.D. Va. 2003)

(citations omitted). The Supreme Court has concluded that direct notice satisfies due process,

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812-13 (1985), and other courts—including this

Court and others within the Fourth Circuit—have approved mailed-notice programs that reached

a similar percentage of class members than the class notice reached in this case.

In order to effectuate the notice process in this case, the Defendant compiled the class list

and provided it to the Class Administrator. The Class Administrator then ran the class list

through the U.S. Postal Service's National Change of Address database to obtain current mailing

addresses for each class member. After class members' addresses were updated, the Class

Administrator sent the notices to the class members by First Class U.S. mail. After a re-mailing

process, the Class Administrator determined that 90.4% of the notices were delivered.

In addition to the direct mail notice, the Class Administrator also established a Settlement

Website. The class members were also able to contact both the Class Administrator and Class

Counsel to ask questions about the Settlement, which they did. The website was visited a total of

996 times. Additionally, more than 1,700 calls have been received by the Administrator as of the

date of this filing, and Class Counsel estimate that they have received a couple hundred inquiries

to date by telephone and/or email correspondence. Equifax also served notice of this settlement

on the relevant state and federal authorities as required by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1715. None of these agencies or states have objected to the Settlement.

The efforts used to identify class member addresses is as thorough as could have been accomplished. With 88,573 members, it was a fairly large class, but the information in the class list was also largely up-to-date because of the class member records maintained by Class Counsel, Equifax and LexisNexis. As it appears that 90.4% of the notices reached the class members, it is clear that the notice process in this case was not only acceptable, but was a success.

The Parties' efforts to provide class members with notice of the settlement makes it clear that such notice was the best available notice under the circumstances given: (a) the available information; (b) the possible identification methods; (c) the number of class members; and (d) the amount of the settlement. The Parties have complied fully with the Court's Preliminary Approval Order, and have taken reasonable steps to ensure that the class members were notified—in the best and most direct manner possible—of the Settlement's terms and excellent benefits.

> **3.    An Analysis of the Jiffy Lube Factors Demonstrates that the Settlement is Fair and Reasonable.**

The first step in the *Jiffy Lube* analysis is a determination as to the fairness of the settlement. The fairness factors are critical to the protection of the class members from unscrupulous class counsel and relate to whether there has been arm's-length bargaining. *See In re Mid-Atlantic Toyota Antitrust Litig.,* 564 F. Supp. 1379, 1383 (D. Md. 1983); *S. Carolina Nat'l Bank v. Stone,* 139 F.R.D. 335, 339 (D.S.C. 1991). The court must consider four factors: (i) the posture of the case at the time of settlement; (ii) the extent of discovery that has been conducted; (iii) the circumstances surrounding the negotiations; and (iv) the experience of

counsel. *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158-159 (4th Cir. 1991); *see also In re Microstrategy, Inc. Sec. Litig.,* 148 F. Supp. 2d at 663-64; *Strang v. JHM Mortg. Sec. Ltd. P'ship,* 890 F. Supp. 499, 501 (E.D. Va. 1995). A proposed class action settlement is considered presumptively fair where there is no evidence of collusion and the parties, through capable counsel, have engaged in arm's-length negotiations. *See S. Carolina Nat'l Bank*, 139 F.R.D. at 339. As described below, the settlement reached in this case is clearly fair and each of the *Jiffy Lube* fairness factors are satisfied.

### i.    The posture of the case at the time of settlement

The Parties agreed to settle only after completing discovery, conducting significant motions practice, and two class certification decisions, both of which were appealed to the Fourth Circuit. After the Fourth Circuit denied Equifax's second petition to appeal, the case was set for trial in February 2016. The Parties were looking to start pretrial preparation when they started settlement discussions and participated in a private mediation, supervised by Rodney Max. Given each party's litigation positions, it was not possible to settle the case at an earlier posture until the class certification dispute had been resolved conclusively by the Fourth Circuit. Because this case was set to proceed to trial and discovery had been completed, the posture of the case at the time of settlement is a factor that supports approval.

### ii.    The extent of discovery that has been conducted

The Parties also engaged in discovery sufficient to aid counsel and the Court in evaluating Plaintiffs' claims and Defendant's defenses. Discovery was fully completed at the time of settlement—both sides had responded to written discovery and completed numerous depositions. Discovery was reopened after the Fourth Circuit reversed and remanded this Court's first class certification decision to ensure that all of the details regarding Equifax's collection of

18

judgment dispositions had been fully discovered. These facts further point to the conclusion that the proposed Settlement was the product of arm's-length negotiation by experienced counsel and thus warrants preliminary approval. *See In re Jiffy Lube*, 927 F.2d at 159.

### iii.    *The circumstances surrounding the negotiations*

The Parties only agreed to settle after the case had been pending for five and a half years, discovery had been completed, multiple rounds of class certification had been briefed, and the Fourth Circuit denied Equifax's last class certification appeal. The case was set to go to trial when the parties fairly reached the Settlement as a result of an arm's-length negotiation process with the assistance of a private mediator, Rodney Max, who has significant experience mediating FCRA class action cases. The mediation session lasted a full day, with significant discussions continuing after the mediation session to finalize the settlement terms. Importantly, the issue of attorney's fees was not discussed until all of the other settlement terms had been finalized. These facts surrounding the negotiations more than satisfy the requirement that the settlement not be one brokered through "collusion or coercion." *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 117 (2d Cir. 2005); *Weiss v. Regal Collections,* Civ. No. 01CV881-DMC, 2006 WL 2038493, at *2 (D.N.J. July 19, 2006); *Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501-02 (E.D. Va. 1995) (concluding fairness requirement met where "plaintiffs' counsel, with their wealth of experience and knowledge in the securities-class action area, engaged in sufficiently extended and detailed settlement negotiations to secure a favorable settlement for the Class").

### iv.    *Experience of counsel*

Class Counsel is experienced in both class action litigation and consumer protection litigation. Leonard Bennett, Matthew Erausquin, Susan Rotkis, and Casey Nash of Consumer

Litigation Associates, P.C., have extensive collective experience in both consumer protection and class action litigation, having been involved in now numerous, large consumer class actions where they have been found to be adequate Class Counsel. *See, e.g.*, *Soutter v. Equifax Info. Servs., LLC*, 3:10CV107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) ("[T]he Court finds that Soutter's counsel is qualified, experienced, and able to conduct this litigation. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases."); *James v. Experian Info. Solutions*, No. 3:12CV902 (E.D. Va. Oct. 29, 2014) (approving in open court class counsel's hourly rates as reasonable and finding "that class counsel are experience and qualified."); *see also* Declaration of Matthew J. Erausquin, ¶ 15 (attached as Exhibit 3).

There are advantages to the parties and to the docket when opposing counsel are already experts on the legal and factual issues in a case and in a field of practice. *See S. Carolina Nat'l Bank*, 139 F.R.D. at 339 (concluding fairness met where settlement discussions "were, at times, supervised by a magistrate judge and were hard fought and always adversarial," and those negotiations "were conducted by able counsel" with substantial experience in the area of securities law). Experienced counsel negotiated the Settlement, making it their first priority to bring the best benefit possible to their clients, and in Plaintiffs' cases, to the Class.

###    4.    An Analysis of the Jiffy Lube Factors Demonstrates that the Settlement is Adequate

The Court must also determine whether the proposed class settlement is substantively "adequate," the second prong of the *Jiffy Lube* analysis. The Fourth Circuit's decision in *Jiffy Lube* held that the adequacy inquiry is guided by evaluating: (i) the relative strength of the plaintiffs' case on the merits, (ii) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (iii) the anticipated duration and expense

of additional litigation, (iv) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (v) the degree of opposition to the settlement. *In re Jiffy Lube*, 927 F.2d at 159. As described below, the settlement reached in this case is clearly adequate and each of the *Jiffy Lube* adequacy factors are satisfied.

<div align="center">

i.     *The relative strength of the Plaintiffs' case on the merits*

</div>

The Plaintiffs have, at all times, believed that this case was very strong in several regards, including being able to establish basic FCRA liability and that Equifax's FCRA violations were willful. However, the Defendant was prepared at all times to contest both assertions. Under the FCRA, liability can be established either upon a showing of negligent or willful noncompliance. 15 U.S.C. §§ 1681n & 1681o. If negligent noncompliance is proven, a consumer may recover actual damages. In the case of willful noncompliance, a consumer may recover statutory and punitive damages. As a practical matter, the Plaintiffs would have to proceed as a class either under a theory of negligence and thus prove uniform actual damages, or proceed under a willfulness theory requiring the higher standard of proof in order to recover statutory and punitive damages. Either way, the Plaintiffs would be required to produce adequate evidence for a jury to find that Equifax violated the FCRA. Without the certainty afforded both sides in the approval of the class settlement, all parties would have proceeded with a long, expensive litigation process likely to culminate in a trial on the merits likely followed by an appeal.

<div align="center">

ii.     *The existence of any difficulties of proof or strong defenses*

</div>

Despite the fact that Plaintiffs' counsel and Defendant's counsel were at all times professional, it was nonetheless contentious as each side zealously represented the interests of their clients. Equifax retained King & Spalding, LLP, a prestigious international law firm that represents a broad array of clients, including half of the Fortune Global 100, with 900 lawyers in

<div align="center">

21

</div>

18 offices in the United States, Europe, the Middle East, and Asia. King & Spalding assigned several of its most experienced attorneys in class action and consumer financial services litigation to this case. The attorneys of King & Spalding regularly represent Equifax opposite Class Counsel, and are extremely experienced litigators and, in particular, with regard to the FCRA. This alone could have affected the outcome of the case at any stage. The determination of when it is appropriate to settle a case is one that is entrusted to experienced class counsel. It is often difficult to transition off of a litigation track that is focused on an upcoming trial and meeting the various burdens of proof to a mindset that considers that every case—no matter how conceivably strong it may seem—will always have an element of risk at its core. Settlement is the only outcome that allows both sides to be assured of a certain ending to the litigation, alleviating both the risk and cost inherent in further litigation to both sides, as well as the additional burden on the Court. This case was no exception, and in fair consideration of the strengths and weaknesses (as well as with significant involvement by the mediator), Plaintiffs' counsel felt that settlement was appropriate at this juncture because of the excellent result for the class based on the allegations in the Second Amended Complaint. *See Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.,* No. 85CV4038, 1987 WL 7030, at *2 (S.D.N.Y. Feb. 13, 1987) (concluding that because continued prosecution of the action would have been expensive and time-consuming, and would have involved substantial risks, "it [was] not unreasonable for the plaintiff class to take a 'bird in the hand'"); *Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 547 (D. Colo. 1989) (noting that "[i]t has been held prudent to take 'a bird in the hand instead of a prospective flock in the bush'" in weighing the value of an immediate recovery against "the mere possibility of future relief after protracted and expensive litigation") (quoting *West Virginia*

*v. Chas. Pfizer & Co.,* 314 F. Supp. 710, 740 (D.W.V. 1970)); *In re Microstrategy, Inc. Sec. Litig.,* 148 F. Supp. 2d at 667.

### iii.     Anticipated duration and expense of additional litigation

Had this case not settled at this posture, it would have proceeded to trial. In fact, settlement was reached just short of the Parties starting trial preparation. Discovery was completed, the Class was certified, and Equifax's last appeal had been denied. That being said, the cost of trial preparation for each Party would have been very high—easily in the tens of thousands of dollars. The Settlement avoids the increased cost of trial to both sides, as well as the burden of a class action trial on this Court's docket, while still providing considerable benefits to the Class. This factor weighs in favor of the adequacy of the Settlement.

### iv.     Solvency of the Defendant

Equifax is solvent and is able to pay both the cost of the Settlement or any litigated verdict. Therefore, this factor does not weigh in favor or against approval of the Settlement.

### v.     Degree of opposition to the Settlement

Despite mailing 88,573 total notices, no class members have objected and only eighty opted out. "Such a lack of opposition to the partial settlement strongly supports a finding of adequacy, for '[t]he attitude of the members of the Class, as expressed directly or by failure to object, after notice to the settlement is a proper consideration for the trial court.' *Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir. 1975)." *In re Microstrategy, Inc. Sec. Litig.,* 148 F. Supp. 2d at 668. As the Court has previously explained, "[b]ecause 'the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.' The lack here of any objections to the partial settlement and the small number of class members choosing to opt-out of the case strongly compel a finding of adequacy" *Id. (citing Sala v. Nat'l*

23

*R.R. Passenger Corp.,* 721 F. Supp. 80, 83 (E.D. Pa. 1989). Courts recognize that where the class as a whole supports a settlement, it should be approved.[2] The overwhelming support from the class members for this Settlement indicates that it is adequate and should be approved.

**B.    The Court Should Approve Attorney's Fees, Costs, and Service Awards to the Plaintiffs.**

**1.    Defendant agreed not to contest Plaintiffs' motion for attorney's fees and expenses in the amount of $3,725,000.00.**

The Supreme Court has consistently calculated attorneys' fees in common fund cases on a percentage-of-the-fund basis. *See Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 165-67 (1939); *Boeing Co. v. van Gemert,* 444 U.S. 472, 478-79 (1980); *Blum v. Stenson,* 465 U.S. 886, 900 n. 16 (1984); *see also Report of the Third Circuit Task Force, Court Awarded Attorney Fees,* 108 F.R.D. 237, 242 (Oct. 8, 1985) (noting that fee awards in common funds cases have historically been computed based on a percentage of the fund). The Supreme Court has never adopted the lodestar method over the percentage of recovery method in a common fund case, even when lower federal courts began using the lodestar approach in the 1970's. *See Shaw v. Toshiba Am. Info. Sys., Inc.* 91 F. Supp. 2d 942, 943 (E.D. Tex. 2000); *see also Manual for Complex Litigation* § 24.121 at 210.

In the Fourth Circuit, attorneys' fees in common fund cases such as this one are almost universally awarded on a percentage-of-the-recovery basis. *Smith v. Krispy Kreme Doughnut*

---

[2] *See, e.g., In re Beef Industry Antitrust Litig.,* 607 F.2d 167, 180 (5th Cir. 1979), *cert. denied sub nom. Iowa Beef Processors, Inc. v. Meat Price Investigators Ass'n,* 452 U.S. 905 (1981); *Laskey v. Int'l Union,* 638 F.2d 954 (6th Cir. 1981) (small number of objectors demonstrates fairness of a settlement); *Shlensky v. Dorsey,* 574 F.2d 131 (3rd Cir. 1978) (same); *Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.),* 494 F.2d 799, 803 (3d Cir.) (20 percent opted out or objected; settlement approved), *cert. denied sub nom. Abate v. Pittsburgh Plate Glass Co.,* 419 U.S. 900, (1974); *Grant v. Bethlehem Steel Corp.,* 823 F.2d 20 (2d Cir. 1987) (thirty-six percent; settlement approved); *Boyd v. Bechtel Corp.,* 485 F. Supp. 610, 624 (N.D. Cal. 1979) (sixteen percent; settlement approved).

*Corp.*, No. 1:05cv00187, 2007 WL 119157, at *1 (M.D.N.C. Jan 10, 2007); *see DeLoach v. Philip Morris Cos.*, No. 00-1235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003) (citing, with approval for this same proposition, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D. Me. 2003)); *see also Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 502 (E.D. Va. 1995) (explaining "[a]lthough the Fourth Circuit has not yet ruled on this issue, the current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases.").

The Fourth Circuit has not established a benchmark for fee awards in common funds cases, but district courts within the Fourth Circuit have noted that most fee awards range from 25 percent to 40 percent of the settlement fund. Percentage-fee awards are exactly what the name suggests—class counsel fees are determined as a percentage of the total settlement fund. This Court has recognized the importance of incentivizing experienced class counsel to take on risky cases. *See, e.g., In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d at 788. In fact, a comprehensive study of attorney's fees in class action cases notes "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. of Empirical Legal Studies 27, 31, 33 (2004).

In this case, Plaintiffs seek $3,725,000.00 in attorney's fees and expenses, which the Defendant does not oppose. The total settlement value of at least $22,868,140 is comprised of the following components:

a) The credit monitoring / insurance policy product value (ranging from the monetized value of $15,943,140.00 up to the actual retail value of $63,559,984.80, depending on how many consumers activate their product);
b) The value of the cash fund for actual damages ($3,000,000);
c) Cost of notice and administration (approximately $200,000); and

d) The intrinsic value of the complete removal of derogatory Virginia judgment records from the credit reports of class members, (not easily ascertained and varies from consumer to consumer, depending on their credit rating apart from the judgment record).

Therefore, this settlement has a value ranging between $22,868,140 and $70,484,984.80, depending on whether the Court evaluates this based on the monetized or retail value of the credit-monitoring product provided to the class members.[3] Thus, the fee request of $3,725,000 represents a percentage of the settlement benefits ranging between 5.28% and 16.28%, before even considering the value of the complete removal of Virginia judgments from their credit reports (likely in the form of lowered interest rates, increased credit opportunities, streamlined employment application and security clearance renewals, and a myriad of other ways in which having an improved credit record makes life easier in general).  Under any of these measurements, Class Counsel's fee request is reasonable and well within the parameters of common fund percentages regularly approved by this Court and others.

As with any class case that they agree to take on, Plaintiffs' counsel live by the result that they obtain for the class members. In this case, where Class Counsel bore the risk of the litigation entirely for six years, staffed it accordingly, brought in outside expertise when appellate counsel was needed (twice), and advanced tens of thousands of dollars in furtherance of the litigation, Class Counsel submits that its requested fee, in light of the outcome for the Class and the law of the Fourth Circuit, is reasonable.

The Court is, of course, aware of the history of this litigation, but may not be aware of the complete "behind the scenes" process that transpired to ensure that the Plaintiffs' case and the objectives of this litigation were obtained, even if Equifax's challenge to class certification was

---

[3] The credit-monitoring subscription, Equifax Gold Watch, has an actual market cash value. Equifax normally sells its Gold Watch product for $14.95 a month, or $717.60 for a four-year subscription.

ultimately successful. Class Counsel assumed the entire risk of the litigation, appropriately staffing it with experienced counsel, recreated a massive electronic database containing the details of all Virginia Court judgments entered since 2003, updated that database against publicly available address records, completed mailings to thousands of individuals who were the subject of judgment dispositions, and in some cases, interviewed these class members.  Hundreds of credit reports were reviewed, and in some cases, updated reports were ordered to attempt to calculate the length of time for which the judgment disposition had not been updated.  Counsel developed timelines to attempt to understand the nature of the underlying problem and comparing the reports of consumers who resided close to each other to determine the counties in which the delay in obtaining dispositions appeared to be the longest, in the event that the Plaintiffs ended up moving to certify a series of classes on a county by county basis.  In parallel, on the litigation front—Class Counsel were faced with strategically addressing issues raised during two class certification briefings, conducting the back and forth of discovery, and vigorously litigating the case, including two appeals, over the past six years. This effort required significant litigation time—a conservative total of 4,075.75 attorney hours and 570 staff hours across five firms.  All of this took place at the same time that Class Counsel attempted to identify the terms where the Parties might find compromise while still ensuring that this problem was solved permanently.

The risks taken should be compensated, as the law recognizes, not only because of the specifics of the outcome, but because of the substantial investment and risk incurred.  In hindsight, the effort was worth the unprecedented result of the complete abandonment of Virginia judgment reporting, but Plaintiffs could not be certain of that as the case progressed. There is no doubt that the excellent outcome in this case for the Class was the result of risk-

taking and hard work by a group of skilled lawyers.  The achievement of the removal of Virginia judgments—a remedy that arguably could not even have been obtained at trial given the perceived limitations of the FCRA—underscores the significant amount of work, tactical planning, and tough negotiation that went into the prosecution of this matter.

In this case, and in all cases in which Plaintiffs' counsel will come before this Court, they submit that the proper measure of compensation should be driven by the benefit actually obtained for the class members. Class Counsel's requested fee is $3,725,000.00, and when considered in light of the cash for the Class as well as the significant other benefits achieved, it is readily apparent that the fee requested is reasonable.

### 2. A cross-check of time incurred by attorneys and paralegals provides support for the requested fee.

A cross-check is not required to determine the fairness of a fee when the percentage of recovery method is used. However, this Court has on occasion requested information regarding an estimate of Class Counsel's lodestar as a cross-check in determining the percentage of the common fund that should be awarded. *Manual for Complex Litigation (Fourth)* § 21.724. Class Counsel have supplied an estimate of their lodestar and expenses, which are $2,074,591.25 in fees, and $28,612.73 in total expenses. Ex. 3, Erausquin Decl. ¶¶ 47-48; Declaration of Dale W. Pittman, ¶ 33 (attached as Exhibit "4"); Declaration of Stuart Rossman, ¶ 35 (attached as Exhibit "5"). In this case, each class member will receive substantial benefits. Plaintiffs have demonstrated that a fee percentage that is between 5.28% and 16.28% of the total benefits provided to the Class is not only appropriate, but is towards the low end of the spectrum. Indeed, "empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in the class actions average around one-third of the recovery." 4 Newberg on Class Actions § 14:6 (4th ed.); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735

28

(E.D. Pa. 2001)(review of 289 class action settlements demonstrates "average attorney's fees percentage [of] 31.31%" with a median value that "turns out to be one-third.").

When the court also looks at the attorneys and the hours they and their law firms expend on a given case, it may give additional support to an award of a fee. In this case, counsel have provided the estimates of their billable time and expenses with their declarations.

| Law Firm | Lodestar |
|---|---|
| Consumer Litigation Associates, P.C. | $1,810,075.00 |
| The Law Office of Dale W. Pittman, P.C. | $55,975.00 |
| National Consumer Law Center | $92,591.25 |
| Sykes, Bourdon, Ahern & Levy, PC | $33,750.00 |
| Gutpa Wessler, PLLC | $82,200.00 |
| Total: | $2,074,591.25 |

The time actually expended in this case for important tasks such as answering class members' questions and significant time spent conferring between counsel has never been recorded, as it has a tendency to be duplicative. Counsel has also not included all telephone calls, emails, or some simpler work.  The requested fee is $3,725,000.00, and the total lodestar in the case is presently $2,074,591.25.   Thus, even if the Court chose not to use the percentage-of-recovery method and awarded fees strictly by the hours spent (as in a contested posture), the current multiplier is 1.77.  The Court should note that the Fourth Circuit recently weighed in on the use of multipliers in *uncontested* fee petitions (as contrasted with the situation that the Supreme Court considered in Perdue) and stated as follows:

> Other features of this case further diminish any concern about the fee award and, accordingly, any need for heightened scrutiny by the district court. ***Because class counsel's fee is to be paid entirely by Lexis***, it does not reduce the (b)(2) Class's recovery. *Cf. Cook v. Niedert,* 142 F.3d 1004, 1011 (7th Cir. 1998) (when attorneys' fee reduces amount of common fund, court must carefully scrutinize fee application). Nor, of course, will it require the expenditure of taxpayer funds, which might warrant additional scrutiny. *Cf. Perdue v. Kenny A.,* 559 U.S. 542, 559, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010) (limiting the use of multipliers <u>in lodestar-based fee awards</u> <u>against the government</u> <u>under fee-shifting statutes</u>).

> Finally, the parties did not even begin to negotiate class counsel's fee until after the substantive terms of the Agreement were finalized, making it far less likely that counsel could have traded off the interests of class members to advance their own ends.

*Berry v. Schulman*, 807 F.3d 600, 618 ftnt. 10 (4th Cir. 2015) (emphasis added).

The class settlement that the Fourth Circuit considered in *Berry* is exactly as the Court has before it here. The requested multiplier is (1) paid entirely by the Defendant; (2) does not reduce the class members' recovery; and (3) does not require the expenditure of taxpayer funds because it is not a case brought against the government. Therefore, in the event that the Court did not choose to adopt the percentage-of-recovery method here, it could similarly approve the requested fee award by using a multiplier of 1.77. Such a multiplier is justified given the contingent nature of the case, the significant risk incurred (both in the advancement of $28,612.73 in upfront expenses and 4,075.75 hours of attorney time with no guarantee of recovery), and the result achieved. It is also consistent with comparable multipliers approved as cross checks in other cases.[4]

Quantitatively - a multiplier of 1.77 is well within the range of fairness, and is of course lower than the 1.99 multiplier that the Fourth Circuit approved in *Berry*. *Berry*, 807 F.3d at 617-18. Furthermore, Courts nationwide have—many times over—approved multipliers similar to or larger than the one Class Counsel requests here, and in much more straightforward cases.[5] For

---

[4] Professor Miller reviewed cases where federal courts used a multiplier to determine whether a multiplier was reasonable, citing cases approving a range of multipliers from 2.5 to 19.6. *See Henderson v. Axciom Risk Mgt.*, Civ. No. 3:12CV589 (E.D. Va. 2014)(Doc. 104-1) (Miller Decl. ¶¶ 32-33).

[5] *See, e.g., In re Charger Commc'n, Inc., Sec. Litig.*, No. MDL 1506, 4:02CV1186CAS, 2005 WL 4045741, at *1, *18 (E.D. Mo. June 20, 2005) (approving lodestar multiplier of 5.61); *In re Excel Energy, Inc., Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 989 (D. Minn. 2005) (approving a multiplier of 4.7 in a case that only involved document review, and was resolved without any depositions after two days of mediation); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (awarding lodestar multiplier of 6.96 despite the fact that the

example, in *Henderson v. Axciom Risk Management*, another class action settlement recently approved by this Court, Class Counsel engaged an expert, Geoffrey P. Miller, to review the fairness of the fee requested in that case. *See Henderson v. Axciom Risk Mgt.*, Civ. No. 3:12CV589 (E.D. Va. 2014)(Doc. 104-1). In his Declaration, Professor Miller reviewed court-approved multipliers of lodestar used as a cross-check on the reasonableness of the fee request, and in the *Henderson v. Axciom* case, he opined that a multiplier of 3.05 was "in line" with or below multipliers approved in many other federal courts. (Miller Decl. ¶¶ 32-33). Though Professor Miller was not engaged for an expert opinion of the fee requested in this case, his general observations and opinions regarding the cross-check multiplier are applicable here. A multiplier that is 1.77 times counsel's lodestar is "in line" with or below the multipliers cited both in this brief and in Professor Miller's declaration in *Henderson v. Axciom*.

### 3.    The Court should grant Plaintiffs' motion for service awards.

Courts generally recognize that "[i]ncentive or service awards reward representative plaintiffs' work in support of the class, as well as their promotion of the public interest." *Deem*, 2013 WL 2285972, at *6 (citing *Jones*, 601 F. Supp. 2d at 767). Plaintiffs request, and the

---

parties engaged mostly in informal discovery and took no depositions); *Maley v. Del Global Techs. Corp.*, 186 F.Supp.2d 358, 362 (S.D.N.Y 2002)(describing multiplier of 4.65 as "modest" in a case in which plaintiffs conducted no depositions, only interviews, and confirmatory discovery consisted of tens of thousands of pages of documents;); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998)(awarding 3.97 multiplier, reasoning that multipliers between 3 and 4.5 were common); *DiGiacomo v. Plains All Am. Pipeline*, Nos. Civ. H-994137, Civ. H-99-4212, 2001 WL 34633373, at *3, *11 (S.D. Tex. Dec. 19, 2001)(endorsing multiplier of 5.3 despite the fact no depositions were taken and most of the discovery was informal or document review); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002)(affirming multiplier of 3.65 to compensate class counsel for risk of taking the case); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197-98 (S.D.N.Y. 1997)(approving multiplier of 5.5 in what the court described as risky and hard fought litigation); *In re Interpublic Sec. Litig.*, 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004)(awarding multiplier of 3.96): *In re WorldCom, Inc., Sec. Litig.*, 388 F. Supp. 2d 319, 353 (S.D.N.Y. 2005)(awarding multiplier of 4).

Defendant does not oppose, a service award for Ms. Soutter in the amount of $20,000 and service awards to Ms. Arnold and Ms. Ridgley in the amount of $2,500 each, for their service as Class Representatives. In this case, the Plaintiffs chose to serve as the Class Representatives in this lawsuit after Class Counsel explained to them the responsibilities required. Cognizant of those responsibilities, Plaintiffs began this lawsuit with the intent to vigorously pursue it, for themselves and the benefit of the class members they represent. The Class Representatives understand the theories of this lawsuit, have kept abreast of the case's status, reviewed documents provided to them by Counsel, and discussed with Counsel aspects of the case, discovery issues, and settlement negotiations. Ms. Soutter seeks a higher service award because of the multiple years that she has spent vigorously pursuing this lawsuit, including two appeals to the Fourth Circuit. She has remained actively involved since the filing of this case in 2010. In addition to providing documents and cooperating with discovery in the case, she has been deposed and is in very frequent contact with her counsel regarding the status of the case. Where class representative involvement has been as rigorous as Ms. Soutter's, courts have approved service awards similar, and even higher, than the one sought by Ms. Soutter.[6] Additionally, service awards have been regularly approved by judges in the Eastern District of Virginia in

---

[6] *See*, *e.g.*, *Loudermilk Servs., Inc. v. Marathon Petroleum Co. LLC*, 623 F. Supp. 2d 713, 727 (S.D. W. Va. 2009) (awarding each of the five class representatives a $25,000 service award); *Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, No. 3:08-CV-00271-JFA, 2012 WL 4061537, at *6 (D.S.C. Sept. 14, 2012) (approving $20,000 service awards to each of the two class representatives); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002) (approving a service award of $25,000 to each of the three class representatives in the case); *Van Vranken v. Atl. Richfield Co. .*, 901 F. Supp. 294, 299–300 (N.D.Cal.1995) (awarding $50,000 to the named plaintiff); *In re Dunn & Bradstreet Credit Serv. Customer Litig.*, 130 F.R.D. 366, 374 (S.D. Ohio 1990) (awarding $55,000 each to two named plaintiffs); *In re Janney Montgomery Scott LLC Fin. Consultant Litig.*, No. 06-3202, 2009 WL 2137224, at *12 (E.D. Pa. July 16, 2009) (approving a service award of $20,000 to each of the three class representatives in the case); *Garett v. Morgan Stanley DW Inc.*, Civ. A. No. 04–1858 (S.D. Cal. Sept. 12, 2006) (order granting final approval) (awarding named plaintiffs service awards of $20,000 each).

cases such as this one where the class representative took a role in prosecuting the claims on behalf of the class.[7] Here, the Named Plaintiffs amply fulfilled their duties as Class Representatives, and the requested service awards are appropriate.

## **CONCLUSION**

In summary, the Parties have reached a settlement in this case that provides genuine relief to the class members. The Settlement is an excellent result considering the contentiousness and posture of the litigation, the result obtained for the class members, and the significant monetary relief that the class members will receive, in addition to the credit reporting changes and credit monitoring and insurance products. Each class member will receive a benefit from the Settlement, regardless of whether they were aware that the Defendant's conduct violated the FCRA and even whether they suffered actual harm. In addition, the terms of the Settlement, as well as the circumstances surrounding negotiations and its elimination of further costs caused by litigating this case through trial and appeal, satisfy the Fourth Circuit's requirements for final approval. The Plaintiffs respectfully ask that this Court grant the Plaintiffs' Motion for Final Approval of the Settlement Agreement and for Attorney's Fees, Expenses, and Class Representative Service Awards and enter the Final Approval Order in the form attached to their Motion as Exhibit "1".

<div style="margin-left: 40%;">

Respectfully submitted,
**PLAINTIFFS,**
*individually and on behalf of all
others similarly situated*

</div>

---

[7] *Cappetta v. GC Servs. LP,* No. 3:08cv288-JRS (E.D. Va. April 27, 2011) (Judge Spencer approved a $5,000 service award to each named plaintiff); *Henderson v. Verifications Inc.,* No. 3:11cv514 (E.D. Va. Mar. 13, 2013) (Judge Payne approved a $5,000 service award to named plaintiff); *Pitt v. Kmart Corp., et al.,* No. 3:11cv697 (E.D. Va. May 24, 2013) (Judge Gibney approved a $5,000 service award to the class representative); *Conley, et al. v. First Tennessee Bank, N.A.,* No. 1:10cv1247 (E.D. Va. Aug. 18, 2011) (Judge Ellis awarded a $5,000 service award to each named plaintiff).

By: _____/s/_____
                        Of Counsel


Matthew J. Erausquin, VSB No. 65434
*Counsel for the Plaintiffs*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel: (703) 273-7770
Fax: (888) 892-3512
Email:  matt@clalegal.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of March, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

John W. Montgomery, Jr.
JOHN W. MONTGOMERY, JR. ATTORNEY, PLC
2116 Dabney Road, Suite A-1
Richmond, Virginia 23230
Tel:    (804) 355-8744
Fax:    (804) 355-8748
Email: jmontgomery@jwm-law.com

Barry Goheen
John Anthony Love
Keasha Ann Broussard
PRO HAC VICE
King & Spalding (GA-NA)
1180 Peachtree St NE
Atlanta, GA 30309-3521
Tel:    (404) 572-4618
Fax:    (404) 572-5142
Email: bgoheen@kslaw.com
Email: tlove@kslaw.com
Email: abroussard@kslaw.com

*Counsel for the Defendant*

_____/s/_____
Matthew J. Erausquin, VSB No. 65434
*Counsel for the Plaintiffs*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel: (703) 273-7770
Fax: (888) 892-3512
Email:  matt@clalegal.com